# 24-2312

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆—◆

PATRICIA HARAN,

*Plaintiff-Counter-Defendant-Appellant,*

—against—

ORANGE BUSINESS SERVICES INC.,

*Defendant-Counter-Claimant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**JOINT APPENDIX
VOLUME II OF III
(Pages JA296 to JA590)**

AMY J. TRAUB
JUSTIN A. GUILFOYLE
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200

*Attorneys for Defendant-Counter-
Claimant-Appellee*

MICHAEL TAUBENFELD
LIANE FISHER
FISHER TAUBENFELD LLP
225 Broadway, Suite 1700
New York, New York 10007
(212) 571-0700

*Attorneys for Plaintiff-Counter-
Defendant-Appellant*

## TABLE OF CONTENTS

PAGE

District Court Docket Sheet ............................................. JA1

Defendant's Notice of Motion for Summary Judgment,
    dated February 13, 2024 .......................................... JA12

Defendant's Memorandum of Law in Support of Motion for Summary
    Judgment, dated February 13, 2024 ................................ JA15

Declaration of Amy J. Traub, for Defendant, in Support of Motion
    for Summary Judgment, dated February 13, 2024 ................... JA44

    Exhibit A to Traub Declaration—
    Orange Business Services' Policy Against Unlawful
    Discrimination and Harassment.................................... JA47

    Exhibit B to Traub Declaration—
    Excerpts from Deposition Transcript of Non-Party
    Adam Kimmick, dated October 5, 2023 ........................... JA51

    Exhibit C to Traub Declaration—
    Excerpts from Deposition Transcript of Non-Party
    Eddy Youkhanna, dated October 4, 2023 ........................ JA121

    Exhibit D to Traub Declaration—
    Excerpts from the Deposition Transcript of Patricia Haran,
    dated April 26, 2023 ............................................. JA141

    Exhibit E to Traub Declaration—
    Acknowledgement of Employee Handbook........................ JA203

    Exhibit F to Traub Declaration—
    Family and Medical Leave Act (FMLA) Policy.................... JA205

    Exhibit G to Traub Declaration—
    Acknowledgement of Notice of Employee Rights
    and Responsibilities under the Family and Medical Leave Act..... JA211

ii

PAGE

Exhibit H to Traub Declaration—
Patricia Haran's First Half 2020 Performance Evaluation ......... JA215

Exhibit I to Traub Declaration—
Patricia Haran's Second Half 2020 Performance Evaluation ....... JA226

Exhibit J to Traub Declaration—
February 24, 2021 Termination Letter ........................... JA237

Exhibit K to Traub Declaration—
Microsoft Teams chats with former coworker Peter Singh
on February 10, 2021 ........................................... JA241

Exhibit L to Traub Declaration—
Microsoft Teams chats with former coworker Peter Singh
on February 1, 2021 ............................................ JA244

Exhibit M to Traub Declaration—
Microsoft Teams chats with former coworker Xavier Pichon
on February 24, 2021 ........................................... JA249

Exhibit N to Traub Declaration—
Objections and Responses to Defendant's First Set
of Interrogatories ............................................. JA252

Exhibit O to Traub Declaration—
Microsoft Teams chats with former supervisor Adam Kimmick
Singh on October 8, 2020 ....................................... JA258

Defendant's Statement of Undisputed Facts, dated February 13, 2024 .. JA261

Plaintiff's Memorandum of Law in Opposition to Motion
for Summary Judgment, dated March 26, 2024 ................... JA272

Plaintiff's Response to Statement of Material Facts,
dated March 26, 2024 .......................................... JA304

Declaration of Patricia Haran, dated March 26, 2024 ................. JA783

iii

PAGE

Declaration of Liane Fisher, for Plaintiff, in Opposition to Motion
    for Summary Judgment, dated March 26, 2024 ................... JA788

Defendant's Reply Memorandum of Law in Further Support
    of Motion for Summary Judgment, dated April 19, 2024 .......... JA790

Defendant's Response to Counterstatement of Facts,
    dated April 19, 2024 ........................................... JA804

Declaration of Justin A. Guilfoyle, for Defendant, in Further Support
    of Motion for Summary Judgment, dated April 19, 2024 .......... JA821

    Exhibit A to Guilfoyle Declaration—
    Microsoft Teams chats with supervisor Adam Kimmick,
    on August 21, 2020 ........................................... JA822

    Exhibit B to Guilfoyle Declaration—
    Email Chain .................................................. JA824

Opinion and Order of the Honorable Dale E. Ho, dated July 29, 2024 .. JA833

Plaintiff's Notice of Appeal, dated August 26, 2024 .................. JA845

terminated on February 24, 2021, just two weeks after taking leave (on February 12, 2021) to escort her mother to an FMLA-qualifying doctor's appointment. See Exhibit S, Plaintiff's Responses to Defendants' Interrogatories, No. 15. Contrary to Defendant's assertion, Plaintiff had also taken leave as late as December 30, 2020 to escort her daughter to an FMLA-covered medical appointment. Id. Plaintiff took intermittent leave throughout October, November and December 2020 to care for her daughter. Id.

Even though temporal proximity alone establishes that Plaintiff was terminated in retaliation for exercising her FMLA rights, Mr. Kimmick's negative comment about Plaintiff's performance due to her FMLA leave resolves any doubt about the connection between these events. Plaintiff Dep. 38:6-39:7. Mr. Kimmick criticized Plaintiff for having a "lack of focus", which he directly attributed to her daughter's illness and her intermittent leave of absence in late 2020.  Plaintiff Dep. 38:6-39:7. Prior to Plaintiff taking FMLA leave, Mr. Kimmick had never criticized Plaintiff for "lack of focus." Plaintiff's Decl. ¶ 7.

Mr. Kimmick's criticism was delivered in conjunction with a negative performance review and on the heels of scrutinizing and pressuring Plaintiff to perform and threatening to remove one of her key accounts due to her FMLA leave. Where there are "other indicia of discrimination," such as "evidence that, if believed, tends to show that the remarks were part of a sequence of events culminating in" the adverse employment action, "the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." Danzer v. Norden Sys., 151 F.3d 50, 55-56 (2d Cir. 1998).  Accordingly, Plaintiff has established a nexus between exercising her FMLA rights and her termination.

Given that Plaintiff exercised FMLA rights when caring for her daughter and mother, was qualified for her position, and has established a nexus between exercising her FMLA rights and her termination, summary judgment should be denied as to her FMLA retaliation claim.

**B.  Defendant's Proffered Reason for Terminating Plaintiff is Pretextual.**

Defendant alleges that it terminated Plaintiff due to "her inability to create and maintain a sales pipeline with enough velocity to achieve her going-forward sales goals." Defendant's professed reason is merely a pretext for discrimination because of (i) the questionable circumstances surrounding Defendant's expectations for Plaintiff's 2021 sales, (ii) Defendant's shifting reasons for Plaintiff's termination, and (iii) the close temporal proximity between Plaintiff's FMLA leave and termination.

**1.  The Circumstances Surrounding Defendant's Expectations for Plaintiff's 2021 Sales Establish Pretext.**

As stated in Section I(a) supra, Plaintiff's alleged deficient pipeline was not the result of her own performance or lack of qualifications, but rather predated her taking over various accounts, resulted from Defendant's unwillingness to enter into contractual terms with clients, and were caused by the COVID-19 pandemic, which disrupted Defendant's business and client-relations in general. See Exhibit F, page 9.

Furthermore, Defendant never provided Plaintiff with her 2021 quota, and, to date, has failed to identify the 2021 quota that Plaintiff would have failed to meet. Plaintiff's Decl. ¶ 26. Despite Plaintiff presenting (mere weeks before her termination) a solid plan to increase her sales funnel, which Mr. Kimmick did not question or contest, Plaintiff was not given the opportunity to develop her pipeline when she was prematurely terminated seven weeks into the fiscal year. Plaintiff's Decl. ¶ 27. Plaintiff's history of satisfactory performance in achieving her 2019 and 2020 revenue quotas would have engendered promise, not doubt, for any reasonable employer that

20

Plaintiff would again achieve her sales goals in 2021. Plaintiff's Decl. ¶ 25. Accordingly, Defendant's reason for terminating Plaintiff is pretextual.

### 2. Defendant's Shifting Reasons for Termination Are Evidence of Pretext.

Even though Defendant maintains that Plaintiff was terminated based on her alleged insufficient sales funnel and the expectation that she would fall short of some unspecified 2021 revenue goal, it also suddenly asserts vague and unproven interpersonal issues with clients and coworkers as a factor in her termination. Kimmick Dep. 76:2-20. Mr. Kimmick testified that these interpersonal issues were "hearsay", suggesting that he believed they were only one side of the story and were unsubstantiated. Kimmick Dep. 76:2-20. Additionally, he did not receive anything in writing about these issues from clients or coworkers and could not recall which customers or coworkers complained about Plaintiff. Id. When Plaintiff asked for details about the alleged complaints so that she could address them, Mr. Kimmick strangely construed her response as defiance, even though he acknowledges that Plaintiff expressed a willingness to redress the purported issues. Kimmick Dep. 79:3-25.

This is not the first time Defendant has propounded different reasons for Plaintiff's termination. During the termination meeting with Plaintiff, Human Resources Representative Jennifer Lawson first told Plaintiff that she was being terminated for failing to achieve her 2020 revenue goals. Plaintiff Dep. 53:13-16. When Plaintiff corrected Ms. Lawson by explaining that she had, in fact, met her 2020 sales goals, Mr. Kimmick jumped in and changed course, stating instead that Plaintiff was being terminated because she "didn't have an adequate forecast for 2021." Plaintiff Dep. 55:9-12. Mr. Kimmick never mentioned Plaintiff's interpersonal issues with clients or coworkers during the termination meeting. Plaintiff's Decl. ¶ 35.

Shifting reasons for termination are evidence of pretext. A plaintiff "may establish pretext and thereby successfully oppose summary judgment, by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nondiscriminatory reason for its action." Orlando v. BNP Paribas N. Am., Inc., No. 14 CIV. 4102 AJP, 2015 WL 6387531, at *13 (S.D.N.Y. Oct. 22, 2015) (internal quotations omitted). "Courts have denied summary judgment where a defendant offered shifting and somewhat inconsistent explanations for an adverse action." Digilov v. JPMorgan Chase Bank, N.A., No. 13 CIV. 975 KPF, 2015 WL 685178, at *14 (S.D.N.Y. Feb. 18, 2015). Here, Defendant's varying reasons for Plaintiff's termination (i.e., that she failed to meet her 2020 revenue goal, was expected to fall short of some unidentified 2021 revenue goal, and unspecified interpersonal issues with clients and coworkers) are evidence of pretext precluding summary judgment.

### 3. The Close Temporal Proximity Between Plaintiff's FMLA Leave and Termination Establishes Pretext.

The two week gap between Plaintiff's FMLA leave and her termination indicates that her termination was retaliatory and that the proffered reason for her termination was pretextual. Graziadio at 431 (2d Cir. 2016) (two months between a request for leave and termination is considered "very close temporal proximity") Here, there is a gap of only two weeks between Plaintiff's termination on February 24, 2021 and her leave on February 12, 2021 to take her mother to the doctor. See Exhibit C, Plaintiff's Responses to Defendants' Interrogatories, No. 15; Plaintiff's Decl. ¶32-33. Plaintiff had also taken leave as late as December 30, 2020 to accompany her daughter to a medical appointment. Id.

### III. THE COURT SHOULD DENY SUMMARY JUDGMENT AS TO PLAINTIFF'S CAREGIVER DISCRIMINATION CLAIM WHERE PLAINTIFF WAS TREATED LESS WELL THAN OTHER EMPLOYEES, AND, IN ANY EVENT, PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATION AND EVIDENCE OF PRETEXT.

The Court should deny summary judgment as to Plaintiff's NYCHRL claim because Plaintiff has established that Defendant treated her less well than other employees based on her caregiver status where it criticized her performance, subjected her to heightened scrutiny and pressure to perform, threatened to take away one of her key accounts, and ultimately fired her. To the extent the McDonell Douglas burden-shifting framework applies to New York City Human Rights Law claims, Plaintiff has established a prima facie case of caregiver discrimination and evidence that Defendant's reason for terminating her is pretextual.

**A. Plaintiff Has Established Her Caregiver Discrimination Claim Where She Was Treated "Less Well" Than Other Employees.**

To prove a case of caregiver discrimination under NYCHRL, Plaintiff need only show by a preponderance of the evidence that Defendant treated her "less well" than other employees at least in part because she was a caregiver. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 (2d Cir. 2013). NYCHRL claims must be "analyzed 'separately and independently' from state and federal discrimination claims, as the NYCHRL's provisions are 'uniquely broad.'" Id. at 109. They should be interpreted "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Delo v. Paul Taylor Dance Found., Inc., No. 22-CV-9416 (RA), 2023 WL 4883337, at *6 (S.D.N.Y. Aug. 1, 2023). An employer is entitled to summary judgment *only if* discrimination played no role in its actions. Mihalik 715 F.3d at 110.

Criticizing an employee is sufficient to establish that an employee was treated "less well" under NYCHRL. Forgione v. City of New York, No. 11-CV-5248, 2012 WL 4049832 (E.D.N.Y. Sept. 13, 2012) (finding that plaintiff established that he was treated less well where he was taunted and criticized). Similarly, subjecting an employee to increased scrutiny establishes that an employee was treated "less well". Clarke v. New York City Dep't of Educ., No.

18CV1850NGGJO, 2020 WL 6047426 (E.D.N.Y. Oct. 13, 2020) (denying summary judgment where plaintiff was treated "less well" because she was subjected to intense scrutiny).

Here, Plaintiff provided "direct and ongoing care for a minor child," which renders her a member of a protected class under NYCHRL, N.Y.C. Admin. Code ¶ 8-107(1). Plaintiff was treated less well than her non-caregiver counterparts where Mr. Kimmick: (i) criticized Plaintiff for her "lack of focus" because she took leave for care for her sick daughter; (ii) issued Plaintiff a negative performance evaluation rating her a 2 ("Improvement Needed") based on an insufficient pipeline that was due to reasons he acknowledged were outside her control, conspicuously ignoring Plaintiff's significant accomplishments during the review period (including a $2.5 million deal renewal); (iii) subjected Plaintiff to increased scrutiny and pressure to increase her sales pipeline; (iv) threatened to remove one of her key accounts; and (iv) deprived Plaintiff of an opportunity to develop her pipeline by prematurely terminating her a mere seven weeks into the fiscal year, even though Plaintiff presented to him a viable plan for building her sales funnel, which he did not question or contest, a few weeks prior to her termination. Plaintiff Dep. 38:6-39:7; Plaintiff's Decl. ¶ 10-23.  Plaintiff was the only employee terminated at the time. Plaintiff's Decl.  ¶ 34. Even if Defendant terminated Plaintiff in part because of her alleged insufficient sales pipeline, Mr. Kimmick's treatment of Plaintiff that her status as a caregiver played a role in her termination.

Mr. Kimmick's lone comment about Plaintiff's "lack of focus" is also sufficient to demonstrate discriminatory animus. Under NYCHRL, "even a single comment may be actionable in appropriate circumstances." Gorokhovsky v. New York City Hous. Auth., 552 F. App'x 100, 102 (2d Cir. 2014). Here, Defendant began scrutinizing Plaintiff's work after she took leave to care for her daughter and shortly thereafter terminated her employment. Further, Mr. Kimmick's statement regarding Plaintiff's "lack of focus" due to taking FMLA leave was related to Plaintiff's

termination.  <u>Tomassi v. Insignia Fin. Grp., Inc.</u>, 478 F.3d 111, 115 (2d Cir. 2007) ("the closer the [discriminatory] remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."); <u>Kirsch v. Fleet Street, Ltd.</u>, 148 F.3d 149, 162-63 (2d Cir. 1998) (rejecting comment as "stray" where decision-makers made remarks near time of plaintiff's termination).

> **B.** **<u>Assuming *Arguendo* that the McDonnell Douglas Burden-Shifting Framework Applies to Plaintiff's Caregiver Status Discrimination Claim, Plaintiff Has Established a Prima Facie Case of Discrimination and That Defendant's Reason for Terminating Her Is Pretextual.</u>**

Even if the McDonnell-Douglas burden shifting framework applies to NYCHRL claims, Plaintiff has established a *prima facie* case of caregiver discrimination and Defendant's reason for terminating her is pretextual. <u>McDonell Douglas</u>, 411 U.S. at 793. Here, Plaintiff provided "direct and ongoing care for a minor child," and was a member of a protected class under the NYCHRL. N.Y.C. Admin. Code ¶ 8-107(1). Plaintiff was qualified for her position (see Section II(a)2) and suffered an adverse employment action by being terminated.  Defendant terminated her due to the care she provided to her minor daughter because (i) Mr. Kimmick expressed discontent with Plaintiff's caregiving obligations, (ii) Defendant provided shifting reasons for Plaintiff's termination, and (iii) Plaintiff's termination was in close temporal proximity to her leave requests. Section 2(b)3. Furthermore, Defendant's reason for terminating Plaintiff is pretextual given (i) the questionable circumstances surrounding Plaintiff's 2021 sales pipeline, (ii) Defendant's shifting reasons for termination, and (iii) the close temporal proximity between Plaintiff's FMLA leave and termination. Sections II(B). Summary judgment is therefore unwarranted.

## <u>CONCLUSION</u>

Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment in its entirety and grant Plaintiff any relief the Court deems just and proper.

Dated: March 26, 2024

New York, NY 10007

By:    _____/s/_____
Liane Fisher
FISHER TAUBENFELD LLP
225 Broadway, Suite 1700
New York, New York 10007
Phone: (212) 571-0700
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICIA HARAN,

*Plaintiff,*

- against -

ORANGE BUSINESS SERVICES INC.,

*Defendant.*

Case No. 21-cv-10585-VSB

**RESPONSE TO STATEMENT OF MATERIAL FACTS**

**(Local Rule 56.1(a))**

Plaintiff PATRICIA HARAN respectfully submits the following response to Defendants' Statement of Material Facts, pursuant to this Court's Local Civil Rule 56.1(a):

1) Defendant is a telecommunications company and global integrator of communications products and services for multinational corporations. (Complaint [Dkt. No. 1] at ¶ 10)

   **Admit.**

2) Defendant maintains a Policy Against Unlawful Discrimination and Harassment, which strictly prohibits discrimination, harassment, and retaliation. (Exhibit A to the Declaration of Amy J. Traub, Esq., dated February 13, 2024 ("Traub Decl.") – Defendant's Policy Against Unlawful Discrimination and Harassment).

   **Admit.**

3) Defendant not only encourages, but requires, employees to report violations of its Policy Against Unlawful Discrimination and Harassment. (Id.).

   **Plaintiff does not have sufficient personal knowledge to admit or deny this statement.**

1

4) Adam Kimmick ("Kimmick") and Eddy Youkhanna ("Youkhanna") received anti-discrimination training while employed at Defendant. (Exhibit B to Traub Decl. – Excerpts from Transcript of October 5, 2023 Deposition of Adam Kimmick ("Kimmick Dep.") at 58:10-59:16; Exhibit C to Traub Decl. – Excerpts from Transcript of October 4, 2023 Deposition of Eddy Youkhanna ("Youkhanna Dep.") at 9:6-24).

**Plaintiff does not have sufficient personal knowledge to admit or deny this statement.**

5) Neither Defendant nor Kimmick tolerate discrimination in the workplace. (Kimmick Dep. at 59:17-23; Exhibit A to Traub Decl.).

**Plaintiff does not have sufficient personal knowledge to admit or deny this statement. Plaintiff denies that Defendant and Kimmick do not tolerate discrimination in the workplace to the extent that her claims in this action assert that they did so.**

6) Plaintiff commenced her employment at Defendant in May 2017. (Exhibit D to Traub Decl. – Excerpts from Transcript of April 26, 2023 Deposition of Plaintiff Patricia Haran ("Pl. Dep.") at 24:5-15).

**Admit.**

7) As part of the onboarding process, Defendant provided Plaintiff with its Employee Handbook, and Plaintiff signed an Employee Handbook Acknowledgement for Defendant's United States Employee Handbook on May 11, 2017. (Pl. Dep. at 28:3-23; Exhibit E to Traub Decl. – Plaintiff's Acknowledgement of Defendant's Employee Handbook).

**Admit.**

8) Defendant's Family and Medical Leave Act ("FMLA") policy contained within its Employee Handbook required Plaintiff to submit a request in writing to both her direct supervisor and to Human Resources on Defendant's FMLA form. (Exhibit F to Traub Decl. – Defendant's FMLA Policy).

**Admit.**

9) As part of the onboarding process, Defendant also provided Plaintiff with a copy of Employee Rights and Responsibilities under the FMLA, which Plaintiff acknowledged on May 18, 2017. (Exhibit G to Traub Decl. – Plaintiff's Acknowledgment of Employee Notice of FMLA Rights; Pl. Dep. at 28:24-29:16).

**Admit.**

10) Kimmick was Plaintiff's direct supervisor from the beginning of her employment until the termination thereof. (Pl. Dep. at 29:17-19; Kimmick Dep. at 26:8-11).

**Admit.**

11) Plaintiff reported exclusively to Kimmick and to no one else at Defendant during her employment. (Pl. Dep. at 30:7-8, 55:16-19; Kimmick Dep. at 26:12-19; Youkhanna Dep. at 12:5-6).

**Admit.**

12) Youkhanna was Kimmick's supervisor during the time Plaintiff was employed at Defendant. (Youkhanna Dep. at 7:21-25, 8:6-18).

**Admit.**

13) Kimmick hired Plaintiff. (Kimmick Dep. at 26:4-5).

   **Admit.**

14) Kimmick hired Plaintiff as a Senior Account Manager to manage "B-end" accounts, which are accounts that are headquartered outside of the United States. (Kimmick Dep. at 69:15-19, 70:14-71:11)

   **Admit.**

15) For the first and second halves of 2019, Plaintiff was fully successful in her role, which involved only "B-end" accounts that were being managed by a person outside of the United States and for which Plaintiff was Defendant's United States representative. (Kimmick Dep. at 74:4-22).

   **Admit.**

16) Plaintiff met only with Kimmick to discuss her performance evaluations during her employment with Defendant. (Pl. Dep. at 30:9-19).

   **Admit.**

17) Plaintiff began working with "A-end" accounts in or about January 2020. (Pl. Dep. at 26:24-27:23).

   **Admit.**

18) Plaintiff working with A-end accounts was not a promotion nor was it a more senior role. (Kimmick Dep. at 69:20-70:13).

**Admit.**

19) Plaintiff's first half 2020 performance evaluation was prepared by Kimmick and Plaintiff. (Pl. Dep. at 30:20-32:12; Kimmick Dep. at 88:8-17).

**Admit.**

20) Kimmick noted in Plaintiff's first half 2020 performance evaluation, inter alia, that "1H 2020 was a challenge for Patty in her new territory." (Exhibit H to Traub Decl. at p. 8 – Plaintiff's First Half 2020 Performance Evaluation; Pl. Dep. 30:20-31:16).

**Admit.**

21) Kimmick noted in Plaintiff's first half 2020 performance evaluation, inter alia, that her "qualified pipeline is not currently sufficient to meet her 2020 financial objectives, and the new opportunities created in 2019 with her B-end accounts exploring partnership and sell with opportunities to expand our portfolio, have not yet matured as ample opportunities." (Exhibit H to Traub Decl. at p. 8; Pl. Dep. at 33:7-16).

**Admit to the extent that Kimmick included this feedback in Plaintiff's review.**

22) Plaintiff understood Kimmick's statement regarding her qualified pipeline to mean that it was "not sufficient" and that Kimmick does not feel that she had "enough opportunities in [her] sales forecast to meet [the] target quota for 2020." (Pl. Dep. at 33:17-34:12)..

**Admit to the extent that Plaintiff speculated as to what Kimmick meant by this statement.**

23) Kimmick stated in Plaintiff's first half 2020 performance evaluation, inter alia, that Plaintiff "has not yet built an agreed consensus on strategy with her team in response to these difficult situations, and this has lead to some miscommunication." (Exhibit H to Traub Decl. at p. 8).

**Admit to the extent that Kimmick wrote this statement in Plaintiff's performance evaluation.**

24) Kimmick stated in Plaintiff's first half 2020 performance evaluation, inter alia, that, "There was also a miscommunication with a client. These episodes resulted [in] some concern that Patty may not be fully understanding [of] feedback, or has not had the time to 'read between the lines' regarding indirect or non-verbal cues which are critical for a sales leader." (Id.).

**Admit to the extent that Kimmick wrote this statement in Plaintiff's performance evaluation.**

25) The above issues are examples of Plaintiff's interpersonal shortcomings with Defendant's clients and employees that Kimmick noted in his performance evaluation for Plaintiff and were also addressed verbally with Plaintiff at other times. (Kimmick Dep. at 99:2-100:18, 77:2-24).

**Deny that Plaintiff had interpersonal shortcomings with clients and employees, or that any alleged issues were addressed with Plaintiff verbally.**

26) Plaintiff's second half 2020 Performance Evaluation was prepared by Kimmick and Plaintiff. (Pl. Dep. at 35:16-36:12; Kimmick Dep. at 90:4-21).

**Admit.**

27) Plaintiff received an "overall rating" of "2-Improvement Needed" for her second half 2020 job performance. (Exhibit I to Traub Decl. at p. 9 – Plaintiff's Second Half 2020 Performance Evaluation; Pl. Dep. at 36:13-18; Kimmick Dep. at 90:12-15).

**Admit.**

28) Kimmick stated in Plaintiff's second half 2020 Performance Evaluation, inter alia, that although Plaintiff had made progress in building an agreed consensus on her strategy with her team, "this strategy has not resulted in an increase[] in proposed services." (Exhibit I to Traub Decl. at p. 9; Kimmick Dep. at 75:5-12).

**Admit to the extent that Kimmick wrote this in Plaintiff's performance evaluation.**

29) Kimmick stated in Plaintiff's second half 2020 Performance Evaluation, inter alia, that "her pipeline velocity is not currently sufficient to meet her 2021 financial growth objectives." (Exhibit I to Traub Decl. at p. 9).

**Admit to the extent that Kimmick wrote this in Plaintiff's performance evaluation. Deny that Plaintiff's pipeline velocity was insufficient to meet her 2021 financial growth objectives, which had not yet even been set. (Pl. Dep. at 38-17:19, 55-12:15).**

30) Kimmick stated in Plaintiff's second half 2020 Performance Evaluation, inter alia, that "opportunities to expand our portfolio ... have not matured, and no new deals in this space have been moved through the funnel to negotiation." (Id.).

**Admit to the extent that Kimmick wrote this in Plaintiff's performance evaluation.**

31) Kimmick stated in Plaintiff's second half 2020 Performance Evaluation, inter alia, that "fragile prospects for stability and growth in Patty's business remain. Urgent focus needs

to be on identifying new opportunities and move these aggressively through the funnel." (Id.).

**Admit to the extent that Kimmick wrote this in Plaintiff's performance evaluation.**

32) Plaintiff herself admitted that she had a lack of focus on her job during this time. (Pl. Dep. at 43:12-23).

**Admit.**

33) Despite responding to Kimmick's comments and conclusions in her second half 2020 Performance Evaluation, Plaintiff did not claim that her "Improvement Needed" rating was in any way due to her having taken time off in connection with her daughter's illness. (Pl. Dep. at 36:19-37:17; Exhibit I to Traub Decl. at p. 9).

**Deny. Plaintiff testified that she and Kimmick spoke about her "lack of focus" being related to her daughter and mother's illnesses during her performance review. Plaintiff did claim that this "lack of focus," which contributed to her low rating, was partially attributable to "manag[ing her] daughter's illness." Pl. Dep. at 43-12:23.**

34) There is no mention of Plaintiff having taken days off in connection with her daughter's or mother's illnesses, or for any other reason, in Plaintiff's second half 2020 Performance Evaluation. (Exhibit I to Traub Decl.).

**Admit.**

35) Kimmick did not bring up Plaintiff having taken days off in connection with her daughter's or mother's illnesses during their meeting to discuss Plaintiff's second half 2020 Performance Evaluation. (Pl. Dep. at 42:16-23).

**Admit to the extent that Kimmick did not bring it up. However, Plaintiff's time off was discussed. Plaintiff's Dep. 42-2:22.**

36) One of Defendant's clients complained to Kimmick in 2020 about Plaintiff's communication, responsiveness, and ability to deliver timely responses to complaints. (Kimmick Dep. at 75:18-21, 77:19-78:7).

**Plaintiff does not have knowledge sufficient to admit or deny this statement.**

37) Plaintiff's co-workers complained to Kimmick in 2020 about their dissatisfaction with how Plaintiff was requesting their help and the way in which Plaintiff pressured them. (Kimmick Dep. at 81:2-9, 82:5-12, 84:22-85:4).

**Plaintiff does not have knowledge sufficient to admit or deny this statement.**

38) Plaintiff's employment was terminated effective February 24, 2021. (Exhibit J to Traub Decl.; Pl. Dep. at 53:13-54:2, 56:15-57:11).

**Admit.**

39) Kimmick was the individual who made the decision to terminate Plaintiff's employment, and he conferred with Youkhanna and Defendant's Human Resources about his decision. (Kimmick Dep. at 144:21-145:14).

**Admit.**

40) Because Kimmick was Plaintiff's direct supervisor, Kimmick is the best source of information regarding the reasons why Plaintiff's employment was terminated. (Youkhanna Dep. at 32:19-25).

**Plaintiff does not have knowledge sufficient to admit or deny this statement.**

41) Kimmick made the decision to terminate Plaintiff's employment due to her lack of performance, specifically, her inability to produce enough sales pipeline for the business

to be healthy in the future, the insufficient velocity for opportunities already in the pipeline, and the interpersonal issues she had with Defendant's clients and employees. (Kimmick Dep. at 98:14-25, 150:18-151:7, 151:24-152:14).

**Deny. Plaintiff was terminated at least in part because of her need for leave to care for her mother and daughter, expressed by Kimmick as a "lack of focus." Plaintiff's Dep. 39-5:7. Kimmick and Defendants' claims about their reasons for terminating Plaintiff are pretextual.**

42) Plaintiff's pipeline and pipeline velocity were insufficient to support Defendant's business because Plaintiff's identified opportunities were not maturing, they were not being proposed, they were not being negotiated, and they were not moving towards closure. (Kimmick Dep. at 105:23-106:14).

**Deny. Plaintiff presented Kimmick with a forecast and plan to build a sufficient pipeline for 2021. Plaintiff Dep. 38-17:25.**

43) On February 10, 2021, prior to her termination, Plaintiff communicated to her co-worker, Peter Singh, that she was "starting to look around at what's next for [her]." (Exhibit K to Traub Decl. at p. 1 – Microsoft Teams Chats (1); Pl. Dep. at 65:2-21).

**Admit.**

44) Prior to her termination, Plaintiff thought that her employment at Defendant was in jeopardy because of her performance. (Pl. Dep. at 57:23-58:3).

Admit in part. Plaintiff believed that her job was in jeopardy not just because of performance reasons but also due to the time off she was taking. **Plaintiff Dep. 58-14:24.**

45) Prior to her termination, on February 1, 2021, Plaintiff communicated to her co-worker, Peter Singh, that "things are intense as far as pressure for more business quickly," that she was not sure how safe her job was, and that she was "hoping to hang in here for a bit longer." (Exhibit L to Traub Decl. at p. 2 – Microsoft Teams Chats (2); Pl. Dep. at 60:7-24).

**Admit.**

46) On February 24, 2021, following notification of the termination of her employment, Plaintiff communicated to her former co-worker, Xavier Pichon, that she should have taken family medical leave, but she did not want to let the company down. (Exhibit M to Traub Decl. at p. 2 – Microsoft Teams Chats (3); Pl. Dep. at 69:2-22).

**Admit.**

47) In addition to Plaintiff, Kimmick terminated several other employees from the time Plaintiff was hired in May 2017 until October 2023. (Kimmick Dep. at 54:6-19).

**Admit.**

48) Plaintiff's daughter was diagnosed with her illness in or around late September or early October of 2020. (Pl. Dep. at 74:14-75:2).

**Admit.**

49) Plaintiff only took 8.5 workdays off to care for her daughter from the onset of her illness in October 2020 through the end of Plaintiff's employment with Defendant. (Exhibit N to Traub Decl. at p. 3 – Excerpt from Plaintiff's Interrogatory Responses; Pl. Dep. at 109:8-110:2).

**Admit.**

50) Kimmick told Plaintiff to take off whatever time she needed to take care of her daughter, that he would be thinking of her, and to let him know if she needed anything. (Kimmick Dep. at 142:5-25, 143:6-25; Exhibit O to Traub Decl. – Microsoft Teams Chats (4); Pl. Dep. at 107:9-108:3).

**Admit. Plaintiff also testified that Kimmick was "cold and…unsympathetic." Pl. Dep. at 80:21-24.**

51) Plaintiff perceived increased pressure from Kimmick for her to get sales closed and move sales along quickly and believed this increased pressure was related to her daughter's condition because Kimmick was "cold" and "unsympathetic" and just wanted her "to close these sales." (Pl. Dep. at 80:6-81:8).

**Admit. Plaintiff also testified that Kimmick's pressure was related to her not being "as focused" as she had been in the past due to her daughter's and mother's illnesses. Pl. Dep. at 80:15-19.**

52) Despite feeling an increased pressure from Kimmick, Plaintiff's 2020 performance expectations did not change at any time. (Pl. Dep. at 82:19-25).

**Admit.**

53) No one at Defendant made disparaging comments about Plaintiff's daughter's illness. (Pl. Dep. at 114:3-6).

**Admit.**

54) No one at Defendant made negative or disparaging comments about Plaintiff's mother's illness. (Pl. Dep. at 114:22-25).

**Admit.**

55) No one at Defendant made disparaging or negative comments about Plaintiff having taken days off in connection with her daughter's illness. (Pl. Dep. at 114:15-21).

   **Admit.**

56) No one at Defendant made disparaging or negative comments about Plaintiff having taken days off in connection with her mother's illness. (Pl. Dep. at 115:2-6).

   **Admit.**

57) Defendant never prohibited Plaintiff from taking any time off due to her daughter's illness. (Pl. Dep. at 105:21-105:24; Kimmick Dep. at 63:10-17).

   **Admit.**

58) Defendant never prohibited Plaintiff from taking any time off due to her mother's illness. (Pl. Dep. at 106:21-24).

   **Admit.**

59) Plaintiff was paid for the days she took off to care for her daughter. (Pl. Dep. at 105:21-106:20).

   **Admit.**

60) Plaintiff was paid for the days she took off to care for her mother. (Pl. Dep. at 106:25-107:8).

   **Admit.**

61) The only basis for Plaintiff's FMLA interference claim is her belief that despite being given the time off to care for her daughter and mother, Defendant should have categorized the time off as FMLA leave. (Pl. Dep. at 105:5-20).

   **Admit in part. Plaintiff does believe that she should have been offered FMLA leave and her leave should have been categorized as FMLA leave. (Pl. Dep. at 117:8-14,**

**105:5-20). Plaintiff's right to FMLA leave was also impeded when she expressed to an HR representative that her daughter may need another surgery, necessitating that Plaintiff may need to take additional leave, and Defendants terminated her before she could do so. Pl. Dep. at 117:8-14.**

62) The only basis for Plaintiff's FMLA retaliation claim is the fact that Defendant terminated her employment. (Pl. Dep. at 108:4-13).

   **Admit.**

63) Plaintiff did not request FMLA leave while employed by Defendant. (Pl. Dep. at 108:17-19; Kimmick Dep. at 62:15-18).

   **Admit to the extent that Plaintiff did not request leave categorized as FMLA leave.**

64) Plaintiff did not take FMLA leave while employed by Defendant. (Pl. Dep. at 108:14-16).

   **Admit to the extent that Plaintiff did not take leave categorized as FMLA leave.**

65) The basis for Plaintiff's NYCHRL caregiver discrimination claim is the alleged fact that she was a caregiver to her daughter and mother, that she needed an accommodation to care for them, and that she was terminated for having taken time off. (Pl. Dep. at 110:20-112:10).

   **Admit.**

66) Plaintiff never requested an accommodation while employed by Defendant. (Pl. Dep. at 111:17-20).

   **Deny. Plaintiff did request leave.**

67) The only individuals Plaintiff claims subjected her to discrimination or retaliation are Kimmick and Youkhanna. (Pl. Dep. at 110:3-19, 112:11-113:3; Exhibit N to Traub Decl. at p. 2).

**Admit.**

68) Plaintiff never reported discrimination or retaliation to anyone at Defendant. (Pl. Dep. at 115:7-11).

**Admit.**

69) No employees working under Kimmick at Defendant complained about discrimination. (Kimmick Dep. at 153:19-22).

**Admit.**

70) No employees working under Kimmick at Defendant complained about violations of the FMLA. (Kimmick Dep. at 153:23-154:2).

**Admit.**

## **PLAINTIFF'S RULE 56.1 COUNTERSTATEMENT**

1. Plaintiff was employed by Defendant from May 2017 until February 2021, and reported directly to Adam Kimmick throughout that time. Exhibit A, Kimmick Dep. 26:4-14.

2. Plaintiff's title when she began working for Defendants was "senior account manager farmer." Kimmick Dep. 30:2-6.

3. In late September or early October 2020, Ms. Haran's 15-year-old daughter, Julia Haran, was diagnosed with a possible tumor in her femur bone. Exhibit B, Plaintiff's Dep. at 74:14-75:2; Plaintiff's Decl. ¶¶ 2,3,4.

4. In October 2020, Plaintiff informed her supervisor, Sales Director Adam Kimmick, about Julia's diagnosis and her anticipated need for time off work to care for her daughter. Kimmick Dep. 63:10-14. Plaintiff's Decl. ¶ 3,4.

5. Kimmick was sufficiently aware of the FMLA to know that "people should have the time and the ability to take time off from work if …required in order to support a family member." Kimmick Dep. 62:3-7.

6. In the coming months, Ms. Haran took intermittent days off work to take Julia to doctor's appointments and for treatment, including a half day on October 14, between October 15th and 19th for major surgery, November 11, December 18, December 28, December 30, and February 12, 2021 (for Plaintiff's mother's appointment). Plaintiff Dep. 109:8-25, Exhibit C, Plaintiff's Responses to Defendant's Interrogatories No. 15.

7. At all times, Ms. Haran apprised Mr. Kimmick of her need for leave and the status of Julia's condition. Plaintiff's Decl. ¶ 3,6.

8. Plaintiff provided notice of her need for family leave to care for her daughter to Adam Kimmick in clear terms, as he recalled in his deposition: "Q. Did she ever take any time off work to care for a family member? A. I believe so, yes. She asked for paid leave, paid time off. Q. Which family member did she take time off of work to care for? A. I believe it was her daughter." Kimmick deposition, 62:19-25 "Q. Did Patty come to you and ask you if she could take time off work to care for her daughter? A. As I said, yes. I believe she did, yes." Kimmick deposition, 63:10-17

9. Kimmick was aware that Plaintiff's daughter's condition was "severe," "significant," "beyond just a normal injury," and he was aware that she needed medical procedures to be done. Kimmick Dep. 138:18-142:4. However, Kimmick at that time failed to provide Plaintiff with any information regarding her FMLA rights, and did not refer her to the employees of the Company who were equipped to discuss family leave. Kimmick Dep., 64:12-13; Plaintiff's Decl. ¶ 6.

10. On October 23rd, Plaintiff met with Human Resources employee Michelle Rocco to receive an award for her participation in a fundraising event. Exhibit D, Rocco Dep. 16:15-21.

11. At that time, Plaintiff communicated her daughter's condition to Ms. Rocco along with the potential need for her to take further leave going forward. Plaintiff Dep. 48:17-52:4; Plaintiff's Decl. ¶4.

12. Ms. Haran explained that Julia might need another surgery, which remained to be determined by her surgeon. Plaintiff Dep. 48:17-52:4; Plaintiff's Decl. ¶4.

13. Plaintiff also explained that Julia was being homeschooled while she recovered from surgery for 6 weeks, and that Julia had ongoing doctor's appointments and treatment. Plaintiff Dep. 48:17-52:4; Plaintiff's Decl. ¶4.

14. At no time did Ms. Rocco inform Ms. Haran about her FMLA rights or provide her with FMLA paperwork. Plaintiff Dep. 48:17-52:4; Rocco Dep. 18:10-13; Plaintiff Decl. ¶6.

15. Plaintiff informed both Michelle Rocco and Mr. Kimmick that her daughter might need additional surgery in the future. Plaintiff Decl. ¶5.

16. Plaintiff's daughter, Julia, was home recovering from surgery from October 15, 2020 to November 18, 2020. Plaintiff Decl. ¶8.

17. Plaintiff returned to work on October 20, 2020, before her daughter was fully recovered. Plaintiff Decl. ¶8. Julia was on crutches with limited mobility during the period of her recovery. Plaintiff Decl. ¶9. She had a wound that required cleaning and dressing on a daily basis, and needed help with showering, going to the bathroom and other day-to-day activities. Plaintiff Decl. ¶9.

18. After Plaintiff informed Mr. Kimmick about Julia's condition and began taking intermittent leave to care for Julia, Mr. Kimmick suddenly began subjecting Plaintiff to heightened scrutiny and pressure.  Plaintiff Decl. ¶10.

19. Plaintiff was intimidated by negative performance feedback she received from Mr. Kimmick, and avoided taking more time off work while her daughter continued to recuperate, receive treatment, and attend homeschooling. Plaintiff Decl. ¶11.

20. Mr. Kimmick constantly asked Plaintiff whether she was going to be able to maintain the schedule and pace of conversations with one of her accounts, Pfizer, given her caregiving obligations. Plaintiff Decl. ¶12.

21. After coming home from sleeping at the hospital with her daughter for five nights, Plaintiff received a call from a peer, Mr. Paul Reticker, late one evening; Mr. Reticker told Plaintiff that if she was unable to participate in the upcoming conversations with Pfizer, the account would be transferred to him, per Mr. Kimmick.  Plaintiff Decl. ¶14.

22. During this time, Mr. Kimmick was constantly checking up on Plaintiff to ascertain the status of her deals, even when he was fully aware of the status. Plaintiff Decl. ¶15.

23. For example, with respect to a renewal of Plaintiff's account with Moody's, Mr. Kimmick repeatedly asked Plaintiff on a day-to-day basis when she was going to get the contract executed by the customer. Plaintiff Decl. ¶16.

24. He was aware that it took time for the deal to finalize, yet he persistently asked Plaintiff for updates.  Plaintiff Decl. ¶16.

25. Mr. Kimmick was responsible for facilitating negotiations with clients by encouraging the Company internally to agree to contractual terms with clients.  Plaintiff Decl. ¶17.

26. With respect to Plaintiff, Mr. Kimmick was unwilling to advocate internally to help Plaintiff finalize the terms of a Master Agreement with Pfizer; instead, he put pressure on Plaintiff to get Pfizer to change its position. Plaintiff Decl. ¶18.

27. Conversely, Mr. Kimmick helped Plaintiff's peers, Messrs. Reticker and Renassia, to secure deals by advocating internally on their behalf to get certain unusual contractual terms approved by Orange. Plaintiff Decl. ¶19.

28. If Mr. Kimmick had not subjected Plaintiff to increased pressure and scrutiny, Plaintiff would have taken off the time necessary to care for her daughter for the full duration of her recovery. Plaintiff Decl. ¶20.

29. Despite the personal difficulties Plaintiff was experiencing, she met her revenue quota for the year in 2020, and at the end of June 2020 she received a performance review rating her as "fully successful." Kimmick Dep. 111:19-22, 88:11-23.

30. In January 2021, Ms. Haran met with Mr. Kimmick to discuss her performance review for the second half of 2020. Kimmick Dep. 90:4-92:10.

31. In 2020, Plaintiff had achieved 100.58% of her revenue goal and managed both her old territory and new territory while a new employee was being onboarded. Kimmick Dep. 111:15-22, 115:4-7.

32. Mr. Kimmick recognized that Plaintiff "stepped up to take...a series of responsibilities that helped [him] and the business" over the course of [2020]. Kimmick Dep. 126:16-19.

33. During the review, Mr. Kimmick delivered positive feedback to her but also attributed two lost business opportunities to her, which he used as the basis for giving her an overall rating of "2" (Needs Improvement). See Exhibit E, Plaintiff's December 2020 Performance Review; Kimmick Dep. 90:12-15.

34. Mr. Kimmick had known and had discussed several times with Plaintiff that it would be highly unlikely that Defendant would successfully retain these two accounts. See Exhibit E, page 9, where Mr. Kimmick stated that "the largest A-end accounts…have made decisions to move away from Orange products and services. These decisions were being fomented before Patty took on responsibility for managing the accounts. And in the case of Pfizer, Orange was unable to accept some onerous contract terms." See Exhibit E.

35. In the same performance review meeting, Mr. Kimmick also told Ms. Haran that she had a "lack of focus" in general, which Plaintiff interpreted as referring to her absences and obligations due to her daughter's illness.  Plaintiff's Dep. 39:17-41:20.

36. Plaintiff had never received this feedback from Mr. Kimmick before. Plaintiff Decl. ¶7. Plaintiff brought up the time she had taken off to support her daughter and the two spoke explicitly about the connection between Plaintiff taking time off and her lack of "focus" on work. Plaintiff's Dep. 38:6-43:23.

37. The "2" rating on Plaintiff's performance review did not reflect all the positive feedback she received, or the large renewal deal he had just congratulated her for making. See Exhibit F, Moody's Renewal Email; Plaintiff's Decl. ¶24.

38. This review left Plaintiff so uncertain of her future at the Company that she mentioned to a coworker that "things are intense" and that she was "not sure how safe I am." Exhibit G, Instant Messages with Peter Singh. In or around January or February of 2021, Plaintiff presented Mr. Kimmick with a proposed plan for improving her deal pipeline for the following year. Kimmick Dep. 92:23-93:6; Plaintiff's Decl. ¶27.

39. Plaintiff had a viable plan to increase her sales pipeline for 2021, which she presented to Mr. Kimmick on or about February 8, approximately two weeks prior to her termination. Plaintiff's Decl. ¶27.

40. During that presentation, Mr. Kimmick did not raise any concerns about Plaintiff being able to generate satisfactory revenue for the 2021 fiscal year. Plaintiff's Decl. ¶27.

41. On February 8, 2021, Ms. Haran informed Mr. Kimmick that she would need to take a half day off work to take her mother to the eye doctor. Plaintiff's Dep. 16:21-107:5.

42. On or about December 10, 2020, Plaintiff's mother was diagnosed with Macular degeneration, which limits her vision and requires ongoing care by an eye doctor, requiring regular treatment and visits. Plaintiff's Decl. ¶28-32.

43. Due to her Macular degeneration, Plaintiff's mother is unable to drive at night or navigate unfamiliar settings, such as hospitals and doctor's offices. Plaintiff's Decl. ¶28-32. Since her diagnosis, Plaintiff's mother has been following a regimen of treatment involving several follow-up appointments, including eye injections every 3 months to slow the progression of the disease. Plaintiff's Decl. ¶28-32.

44. Ms. Haran proceeded to take time off as scheduled on February 12. See Exhibit C, No. 15.

45. Less than two weeks later, on February 24, 2021, Mr. Kimmick and an HR representative, Jennifer Lawson, met with Ms. Haran virtually and summarily terminated her employment. Plaintiff Dep. 53:13-16.

46. Ms. Lawson told Ms. Haran that the reason for her termination was that she did not meet her "number" for 2020. Plaintiff Dep. 54:20-55:90.

47. However, Plaintiff had met her goal number for 2020. Kimmick Dep. 111:19-22, 88:11-23.

48. Mr. Kimmick jumped in and said, instead, that she was being terminated because she was not expected to meet her 2021 number. Plaintiff Dep. 55:9-15.

49. Ms. Haran protested that she had not yet been given her 2021 number. Plaintiff Dep. 55:13-15; Plaintiff's Decl. ¶26.

50. During Plaintiff's termination meeting, Mr. Kimmick never mentioned anything about alleged interpersonal issues with clients or coworkers. Plaintiff's Decl. ¶35.

51. After this termination meeting, Plaintiff instant messaged a coworker saying: "[I] feel that due to my daughter's illness in Q4 that I should have taken family medical leave off but I didn't want to let the company down." Exhibit H, Instant Messages with Xavier Pichon.

52. To Plaintiff's knowledge, she was the only employee terminated at that time. Plaintiff's Decl. ¶34.

Dated: March 26, 2024
New York, NY

FISHER TAUBENFELD LLP

_____/s/_____
LIANE FISHER, ESQ.
225 Broadway, Suite 1700
New York, NY 10007
T: (212) 571-0700
F: (212) 505-2001

Attorneys for Plaintiff

## APPENDIX TO PLAINTIFF'S 56.1 STATEMENT

## TABLE OF CONTENTS

Exhibit A, Adam Kimmick Deposition Transcript

Exhibit B, Patricia Haran Deposition Transcript

Exhibit C, Plaintiff's Interrogatory Responses

Exhibit D, Michelle Rocco Deposition Transcript

Exhibit E, Plaintiff's 2020 Performance Review

Exhibit F, Emails Regarding Plaintiff's Accounts

Exhibit G, Instant Messages with Peter Singh

Exhibit H, Instant Messages with Xavier Pichon

Exhibit I, Instant Messages with Adam Kimmick

# Exhibit A

Adam Overton Kimmick
October 05, 2023

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

PATRICIA HARAN,

                        Plaintiff,

        -against-

ORANGE BUSINESS SERVICES INC.,

                        Defendant.

-----------------------------------------X

                        October 5th, 2023
                        10:03 a.m.

        REMOTE DEPOSITION of ORANGE

BUSINESS SERVICES, INC., by ADAM OVERTON

KIMMICK, the Defendant in the

above-entitled action, taken on behalf of

the Plaintiff, held remotely via video

teleconference, taken before Stefanie

Calabria, a Reporter and Notary Public

within and for the State of New York.

Adam Overton Kimmick
October 05, 2023

```
1   A P P E A R A N C E S:

2


3   FISHER TAUBENFELD, LLP
         Attorney for Plaintiff
4        225 Broadway - Suite 1700
         New York, New York 10007
5         (646) 741-3490
    BY: LIANE FISHER, ESQ.
6   E-MAIL: liane@fishertaubenfeld.com

7

    BAKER HOSTETLER
8        Attorney for Defendant
         45 Rockefeller Plaza
9        New York, New York 10111
          (212) 589-4200
10  BY: JUSTIN GUIFOYLE, ESQ.
    E-MAIL: jguilfoyle@bakerlaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Adam Overton Kimmick
October 05, 2023

```
 1          IT IS HEREBY STIPULATED AND

 2    AGREED by and between the counsel for the

 3    respective parties hereto, that the

 4    filing, sealing, and certification of the

 5    within deposition shall be and the same

 6    are hereby waived;

 7       IT IS FURTHER STIPULATED AND AGREED

 8    that all objections, except as to the form

 9    of the question, shall be reserved to the

10    time of trial.

11       IT IS FURTHER STIPULATED AND AGREED

12    that the within deposition may be signed

13    before any notary public with the same

14    force and effect as if signed and sworn to

15    before this court.

16

17

18

19

20

21

22

23

24

25
```

Adam Overton Kimmick
October 05, 2023

```
 1              THE REPORTER:  The attorneys

 2      participating in this deposition

 3      acknowledge that I am not physically

 4      present in the deposition room and

 5      that I will be reporting this

 6      deposition remotely.

 7                  They further acknowledge

 8      that, in lieu of an oath administered

 9      in person, the witness will verbally

10      declare his/her testimony in this

11      matter under penalty of perjury.

12              The parties and their counsel

13      consent to this arrangement and waive

14      any objections to this manner of

15      reporting.  Please indicate your

16      agreement by stating your name and

17      agreement on the record.

18              MS. FISHER:  Liane Fisher,

19      agreed.

20              MR. GUIFOYLE:  Justin Guifoyle,

21      agreed.

22              THE REPORTER:  Would you please

23      present your identification by holding

24      it up to the camera for verification?

25                  THE WITNESS:  (Witness
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2         complying.)

3    A D A M   O V E R T O N   K I M M I C K ,

4    the witness herein, having first been duly

5    sworn by a Notary Public of the State of

6    New York, was examined and testified as

7    follows:

8    BY THE REPORTER:

9         Q.    Please state your name for the

10   record.

11        A.    Adam Overton Kimmick.

12        Q.    Please state your address.

13        A.    20 Route 25A, Oyster Bay, New

14   York 11771.

15   EXAMINATION BY

16   MS. FISHER:

17        Q.    Good morning, Mr. Kimmick.  I

18   represent Patricia Haran.  I'm going to be

19   asking you a series of questions here

20   today to which you will respond under oath

21   subject to the penalty of perjury.

22             If there is any question that

23   you don't understand, let me know, and I

24   will rephrase it for you.  If there is any

25   question you didn't hear, either the court
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2    reporter or I will repeat it for you.  If

3    you answer a question, it's going to be

4    presumed that you understood the question

5    and gave your best most truthful response.

6    If at any time you want to take a break,

7    let me know, I will be happy to

8    accommodate you, as long as there is no

9    question pending.

10          The court reporter cannot

11   transcribe two people talking at once so

12   please wait for me to finish asking my

13   question before you give your answer; and

14   the court reporter cannot transcribe a nod

15   or shake of the head so please give verbal

16   responses to my questions.

17          Do you understand these

18   procedures?

19      A.    Yes.

20      Q.    Okay.  Are you suffering from

21   any illness that would affect your ability

22   to testify today?

23      A.    No.

24      Q.    Have you taken any medications

25   that would affect your ability to testify
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2   here today?

3       A.    No.

4       Q.    Did you prepare for your

5   deposition here today?

6       A.    Yes.

7       Q.    How did you prepare for it?

8       A.    I met with my attorneys.

9       Q.    Who is that?

10      A.    Justin Guifoyle and Justin will

11  have to help me with the name of other

12  one.

13      Q.    Well, he can't testify for you.

14      A.    There was another attorney at

15  Baker Hostetler that met with me as well

16  and at the same time.  I believe the date

17  was May 4th.

18      Q.    Okay.  May 4th, you said?

19      A.    Yes.

20      Q.    That's when you met with your

21  attorneys to prepare for your deposition?

22      A.    Correct.  And I met yesterday

23  with Justin.

24      Q.    Was there anyone else present

25  for your meeting with Justin?
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2        A.    Yes.  There was one other

3   person.  I don't remember her name.

4        Q.    Okay.  But it was an attorney?

5        A.    It was an attorney, yes.

6        Q.    And how long did you meet with

7   Justin and the other attorney?

8        A.    A little over an hour and

9   yesterday it was about 10 minutes.

10       Q.    Did you review any documents in

11  preparation for your deposition?

12       A.    Yes.

13       Q.    Which documents did you review?

14       A.    I can't recall them all.  I

15  can't recall them all.

16       Q.    Can you recall any of them?

17       A.    Yes.

18       Q.    Which ones can you recall?

19       A.    Performance reviews.

20       Q.    Performance reviews for who?

21       A.    Patty Haran.

22       Q.    What years were the performance

23  reviews?

24       A.    I don't recall all of them.

25       Q.    Did you review any performance
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2   reviews for the 2020 year?

 3        A.    Yes.

 4        Q.    Did you review any other

 5   documents that you recall?

 6        A.    Yes.

 7        Q.    Which ones?

 8        A.    They were instant messages from

 9   Teams.

10        Q.    Who were the instant messages

11   with?

12        A.    Eddi Youkhanna,

13   E-d-d-i-Y-o-u-k-h-a-n-n-a.

14        Q.    What did those instant messages

15   include?

16        A.    Comments about this case.

17        Q.    Have you produced those to your

18   attorney?

19        A.    The -- our HR department or our

20   IT department did.  I was unable to.

21        Q.    Do you know when your HR

22   department produced them to the attorneys?

23        A.    No.

24        Q.    And what did you talk about in

25   those instant messages with Eddi, what
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK
 2   specifically?
 3       A.    You would have to show them to
 4   me.  I would -- believe they are in
 5   evidence or a part of the packet.  You
 6   would have to show them to me.  I don't
 7   recall them all.
 8       Q.    Well, you just said you just
 9   reviewed them yesterday, right?  If you
10   would give me --
11       A.    No, no, no.  I reviewed them on
12   May 4th or -- yeah, I believe it was May
13   4th.
14       Q.    So you don't recall anything
15   specific about the instant messages with
16   Eddi other than the fact that they were
17   comments about this case?
18       A.    No.  I mean, if you refresh my
19   memory, maybe I could pull it up.
20       Q.    Yeah, I'm not sure.  I --  I'm
21   not sure I have those, but I'm going to
22   look for them, and we can come back to
23   that.
24            Did you do anything else to
25   prepare for today?
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK
 2       A.    My attorneys gave me some
 3   instructions about --
 4       Q.    I don't -- wait.  Let me just
 5   stop you.  I don't want to know anything
 6   that you and your attorneys spoke about.
 7             Other than meeting and speaking
 8   with your attorneys and reviewing some
 9   documents in preparation for today, did
10   you do anything else?
11       A.    No.
12       Q.    Other than counsel -- well,
13   other than counsel, who have you spoken to
14   about this case?
15       A.    My HR department and management
16   senior management within our firm about,
17   you know, the case.
18       Q.    Who in HR did you speak with
19   about this case?
20       A.    Jennifer Lawson.
21       Q.    When did you speak with Jennifer
22   Lawson about this case?
23       A.    I can't recall all of the dates.
24       Q.    You spoke with Jennifer Lawson
25   about this case on more than one occasion?
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2       A.    Yes.

 3       Q.    When was the most recent time

 4   you spoke with her about this case?

 5       A.    Months ago.  I don't recall the

 6   date.

 7       Q.    Was it within the last six

 8   months?

 9       A.    Yes, probably.

10       Q.    What did you discuss with her?

11       A.    That we were engaging our

12   attorneys and that Patty was bringing a

13   case.

14       Q.    Did you discuss anything else

15   with her?

16       A.    I don't recall the full

17   conversation.  I don't recall the full

18   conversation.

19       Q.    Is there anything else that you

20   do recall?

21       A.    I mean, it seems like a pretty

22   wide question.  Can you clarify?

23       Q.    Well, you testified that you

24   spoke with her about engaging attorneys,

25   that Patty was bringing a case, I'm asking
```

```
 1                    A. KIMMICK
 2   you if there's anything else that you
 3   recall from that conversation.  It's
 4   actually a pretty narrow question.
 5       A.    We discussed making an offer to
 6   Patty.
 7       Q.    An offer of what?
 8       A.    Settlement.
 9       Q.    Did you discuss how much you
10   were going to offer?
11       A.    Yes.
12            MR. GUIFOYLE:  To the extent
13       that this witness has this knowledge
14       relaid from counsel, whether inhouse
15       at Orange or outside counsel at Baker,
16       I'd advise the witness not to answer;
17       to the extent he has this knowledge
18       without learning it from counsel, he
19       can answer.
20            MS. FISHER:  This is a
21       conversation he had with HR that is
22       not privileged so I'm asking what he
23       discussed with Jennifer Lawson about
24       numbers.  There is no privilege that
25       applies to that.
```

Adam Overton Kimmick
October 05, 2023

```
 1                  A. KIMMICK
 2          MR. GUIFOYLE:  To the extent
 3      that it's relaying information from
 4      counsel, it remains privileged.
 5          MS. FISHER:  If you relay
 6      information that's privileged to
 7      someone that is no longer privileged
 8      with, you no longer have the
 9      privilege.  We can get the judge on
10      the phone if we have to.
11          MR. GUIFOYLE:  That's fine.
12          MS. FISHER:  All right.  Let's
13      do that.
14          MR. GUIFOYLE:  The witness
15      hasn't answered how he gathered the
16      information to begin with so I'm not
17      sure what the argument is.
18          MS. FISHER:  The source of the
19      information is irrelevant if he has a
20      conversation with someone that the
21      privilege does not extend to and I'm
22      asking about his conversation with
23      someone who's in HR, there is no
24      privilege that applies to that.
25          MR. GUIFOYLE:  All right, Adam,
```

Adam Overton Kimmick
October 05, 2023

```
 1                     A. KIMMICK

 2        we'll see.  You can answer it.

 3              MS. FISHER:  He can answer?

 4              MR. GUIFOYLE:  Sure.

 5        Q.    Okay.  Please, Mr. Kimmick, go

 6   ahead.

 7              How much did you discuss with

 8   Jennifer Lawson offering to Patricia

 9   Haran?

10        A.    I don't recall the number.

11        Q.    Is that number memorialized in

12   any document?

13        A.    Not to my knowledge.

14        Q.    And whose decision was it about

15   how much to offer Ms. Haran?

16        A.    It was a committee decision, and

17   I don't believe she accepted it.  I don't

18   know the number that was offered, I was

19   not privy to that.  I know that it came

20   from our attorneys and I'm almost positive

21   because I'm here that she did not accept

22   it.

23        Q.    When you say it was  "a

24   committee decision,"  can you explain what

25   you mean?
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK
2         A.    HR and our attorneys and the
3    head of region and Eddi Youkhanna at the
4    time were reviewing a potential lawsuit
5    and impact on the company and deciding
6    whether an offer was more relevant than a
7    proceeding.
8         Q.    Who is the head of region?
9         A.    At the time it was Rob Willcock.
10        Q.    Sorry, you said Rob --
11        A.    Rob Willcock.
12        Q.    And when was the decision made,
13   the committee decision?
14        A.    I don't recall.  I wasn't part
15   -- I wasn't part of that.  It was attorney
16   only.
17        Q.    And is it your understanding
18   that the number, the settlement offer, was
19   relaid to Ms. Haran?
20        A.    I have no way of validating
21   that, but I -- I assume it was.  I don't
22   know whether my assumption would be
23   correct or -- no, I have no way of
24   knowing.
25        Q.    Do you remember anything else
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK
 2   about your discussions with Jennifer
 3   Lawson concerning this case?
 4       A.    No, I mean, not specifics.  I'm
 5   sure we must have talked about her
 6   performance reviews, Patty's performance
 7   reviews.
 8       Q.    What about them?
 9       A.    Contents.
10       Q.    What contents?
11       A.    You would have to pull them up.
12   I could go through, I mean, we could read
13   them, and I could tell you what potential
14   pieces of it.
15       Q.    Which performance reviews, from
16   what years, did you discuss with Jennifer
17   Lawson?
18       A.    I don't recall all of them.
19       Q.    Did you review 2020?
20       A.    I believe so, yes.
21       Q.    Did you review 2019?
22       A.    I don't recall.
23       Q.    And is there anything else that
24   you recall from your conversations with
25   Jennifer Lawson about this case other than
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2   what you testified to?

 3        A.    I can't recall specifics.  It's

 4   too long ago.

 5        Q.    You testified that you spoke

 6   with senior management within Orange about

 7   this case, who within senior management?

 8        A.    Eddi Youkhanna.

 9        Q.    When did you speak with Eddi

10   about this case?

11        A.    More than 18 months ago.  Yeah,

12   more than 18 months ago.

13        Q.    What did you speak with him

14   about?

15        A.    He left Orange so I have only

16   spoken to him once since he left Orange

17   and it wasn't about Patty.

18        Q.    What did you speak with Eddi

19   about more than 18 months ago?

20        A.    The fact that Patty was going to

21   sue.

22        Q.    What did you say to Eddi?

23        A.    I told him I thought it was

24   justified.

25        Q.    You told him you thought what
```

Adam Overton Kimmick
October 05, 2023

```
 1                     A. KIMMICK

 2   was justified?

 3        A.    Patty's dismissal.

 4        Q.    Why did you say that?

 5        A.    There was adequate evidence,

 6   performance didn't meet expectations, and

 7   she had some relationship issues with her

 8   piers and customers, but that was not part

 9   of the conversation with Eddi, that was a

10   very simple message to Eddi.  He asked me

11   whether I thought that this was an issue

12   and I said, no, it was justified, that was

13   that.  It was a very matter-of-the-fact

14   call, if I recall correctly.

15        Q.    Was there anything else you

16   recall from that conversation?

17        A.    No.

18        Q.    Was this a telephone

19   conversation?

20        A.    Yes.

21        Q.    How long was the conversation?

22        A.    I don't recall the exact length

23   of the conversation.  There may have been

24   other topics that we had to talk about

25   other than this one so --
```

```
1                    A. KIMMICK

2         Q.    Was any -- sorry.  Go ahead.

3         A.    (Indicating).

4         Q.    Did anyone else participate in

5    that conversation?

6         A.    No.

7         Q.    Did you speak with anyone else

8    within senior management --

9         A.    No.

10        Q.    -- about this case?

11        A.    No.

12        Q.    Did you speak with anyone else

13   other than who you testified to about this

14   case?

15        A.    Not that I recall.

16        Q.    Have you ever been a defendant

17   in a lawsuit?

18        A.    No.

19        Q.    Have you ever given sworn

20   testimony before?

21        A.    No.  Well, not in a deposition.

22   I'm a village official, and I have given

23   my testimony, and all of the things that I

24   say in my public hearings are recorded by

25   a court reporter, but not -- not in a
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK
 2    lawsuit like this.
 3        Q.    Okay.  What's the highest level
 4    of education that you have received?
 5        A.    Bachelors in arts.
 6        Q.    Where did you -- where did you
 7    get your bachelors in arts?
 8        A.    Trinity College in Hartford.
 9        Q.    When?
10        A.    In 1986.
11        Q.    Where are you currently working?
12        A.    Orange Business.
13        Q.    When did you start working at
14    Orange?
15        A.    February of 1999.
16        Q.    What was your position at the
17    time?
18        A.    I don't recall my exact title.
19        Q.    How long did you hold that
20    title?
21        A.    I can't recall.  I need to go
22    back to records.  A year, a year or two.
23        Q.    And what was the next position
24    that you held at Orange?
25        A.    I been in sales or sales
```

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK

2   management my entire career at Orange.

3       Q.    Okay.  What was the position you

4   held after the initial position you had at

5   Orange?

6       A.    I -- I don't recall the title, I

7   mean, they had so many different titles.

8   I was a manager of people.

9       Q.    Have you been a manager of

10  people throughout your tenure at Orange?

11      A.    Yes.

12      Q.    What is your current title?

13      A.    Senior -- I'm a senior manager

14  and my title is sales director, and I am

15  the head of sales for the East, South and

16  Central United States.

17      Q.    And how long have you held that

18  title?

19      A.    About 18 months.

20      Q.    What does your position entail?

21      A.    I'm responsible for client

22  relationships, profitable revenue growth,

23  and maintaining the future of the health

24  of the business in the area that I manage.

25      Q.    How many people do you have
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2   reporting to you?

 3        A.    I currently have nine.

 4        Q.    What title did you hold before

 5   this?

 6        A.    I was the head of global

 7   accounts for the Americas.

 8        Q.    During what time period?

 9        A.    From 2004 to 2009.  This is an

10   estimate, I'm guessing.

11        Q.    Well, so I'm asking specifically

12   about your position you held right before

13   your current position.

14        A.    I was the head of sales for the

15   Eastern United States.

16        Q.    What was the time period --

17   sorry.  Go ahead.

18        A.    And that was maybe three months

19   before that I was interim head of sales

20   for the Americas, I had responsibility for

21   the entire sales force for the Americas

22   for about a year.

23        Q.    When?

24        A.    From when Eddi Youkhanna left

25   Orange, which was, I'm guessing, May of
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2    2021, I don't remember the year, into the

3    end of -- the beginning of that year, the

4    beginning of the next -- the following

5    year.

6         Q.    And what position did you --

7         A.    It could be 2021 or 2022.  I

8    can't remember the date.  It was about a

9    year that I held that title before my

10   current title.

11        Q.    Okay.  And what did you -- what

12   position did you have prior to that?

13        A.    I was the head of sales for the

14   Eastern U.S.

15        Q.    During what time period?

16        A.    Again, I would need

17   documentation from HR to give you the

18   exact dates, I've had quite a few jobs,

19   they have all been in sales and sales

20   management, and I have senior roles within

21   Orange.

22        Q.    What did you do as head of sales

23   for the Eastern U.S.?

24        A.    I believe I have already

25   answered that question.
```

Adam Overton Kimmick
October 05, 2023

```
1                   A. KIMMICK

2        Q.    Just remind me what you said

3   then.

4        A.    I'm responsible for managing

5   client relationships, delivering revenue

6   and I'm responsible for making sure that

7   the future of the business is healthy.

8        Q.    Do you have anyone reporting to

9   you as head of sales for the Eastern U.S.?

10        A.    Yes.

11        Q.    How many people?

12        A.    It varied from nine to fourteen

13   at the time.

14        Q.    Was Patty Haran one of those

15   people?

16        A.    I don't recall the dates.  Patty

17   did report to me at one time.

18        Q.    Do you know what your position

19   was at the time she reported to you?

20        A.    I believe I was head of sales

21   for New York and the East.  I don't recall

22   the exact title, I mean, as I said, the

23   titles changed, the titles changed and the

24   territory changed slightly, but my

25   responsibilities were always the same in
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2    managing clients and the future of the

3    business and revenue.

4        Q.    Did you hire Patty?

5        A.    Yes.

6        Q.    Did you set her rate of pay?

7        A.    Yes.

8        Q.    Did you assign her job duties?

9        A.    Yes.

10       Q.    Did you supervise her work?

11       A.    Yes.

12       Q.    Did she report to anyone else

13   other than you?

14       A.    Not that I recall.  And the

15   reason I say that is because I changed

16   jobs frequently and there were periods of

17   time where I had managers and managers and

18   so I don't believe so, but I wouldn't

19   testify under oath that that's the case.

20            MS. FISHER:  Just bear would me,

21       I'm going to put a document in the

22       chat.  Give me one second.  It's not

23       loading.  Give me one second.

24       Q.    Do you see a document posted to

25   the chat window?
```

Adam Overton Kimmick
October 05, 2023

```
 1                   A. KIMMICK
 2       A.    Yes.
 3       Q.    Will you take a minute to just
 4  review this document and let me know when
 5  you are done?
 6       A.    Sorry, it's just opening.
 7       Q.    No, that's okay.
 8       A.    Okay.
 9       Q.    Do you recognize this document?
10       A.    Vaguely, yes.
11       Q.    What do you recognize it to be?
12       A.    These are responses from
13  Orange's hired attorney to what looks like
14  Patty's case and what she is representing.
15       Q.    Okay.  Did you provide the
16  information to your attorneys that ended
17  up being the responses to this document --
18  or excuse me, let me rephrase that.
19            Did you provide responses to
20  your attorney to answer the questions that
21  Patricia Haran posed to Orange and you in
22  the form of interrogatories?
23            MR. GUIFOYLE:  Objection to
24      form.
25            You can answer.
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2        A.    I'm sorry, I didn't understand

3   that.

4        Q.    Let me turn your attention to

5   the last page of this document on Page 12.

6        A.    Okay.

7        Q.    Let me know when you are there.

8        A.    Yes.

9        Q.    Did you digitally sign this

10  document?

11       A.    Yes.

12       Q.    Did you review this document

13  before signing it?

14       A.    Yes, I did.

15       Q.    Are you the individual that

16  provided the responses that are

17  memorialized in this document?

18       A.    No, I'm the one who validated

19  that they are true.

20       Q.    Okay.  So the responses that are

21  memorialized in this document are all true

22  and accurate?

23       A.    To my knowledge, yes.

24       Q.    Let's go to Interrogatory 4 that

25  starts on Page 4.  Let me know when you're
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2   there.

 3        A.    Okay.

 4        Q.    Interrogatory 4 asked:

 5   "Identify all Global Account Managers who

 6   have reported to Adam Kimmick from May

 7   2017 to present," do you see that?

 8        A.    Yes.

 9        Q.    And the response that continues

10   on to Page 5 has a list of five people,

11   correct?

12        A.    Yes.

13        Q.    Is this the full list of global

14   account managers who reported to you

15   during this time period?

16        A.    When you define account

17   managers, the -- the -- the question, and

18   I think that the question you asked was

19   identify all global account managers who

20   reported to Adam Kimmick so the global

21   account manager is not a title, we -- we

22   -- we looked at this question and said,

23   well, this doesn't really apply because

24   global account managers, that wasn't the

25   title at the time, so we looked at account
```

Adam Overton Kimmick
October 05, 2023

```
 1                      A. KIMMICK
 2   manager farmer, Patty, I believe at the
 3   time, was a senior account manager farmer,
 4   which is the title that she held and these
 5   are the individuals that held the same
 6   title as Patty.
 7        Q.    Okay.
 8        A.    So in the answer it says that it
 9   seeks information outside the scope,
10   that's because the title of account
11   manager was incorrect or global account
12   manager didn't exist and, therefore, we
13   provided the information that was relevant
14   in this circumstance, which we said it
15   was, and these are the people that held
16   Patty's title at the time.
17        Q.    During that time period?
18        A.    Correct.
19        Q.    Okay.  And you had other
20   individuals reporting to you besides the
21   five people that you listed here?
22        A.    Yes.
23        Q.    How many other people did you
24   have reporting to you during that time
25   period?
```

Adam Overton Kimmick
October 05, 2023

```
1                      A. KIMMICK

2        A.    I don't recall.  Somewhere

3   between nine and fourteen at any given

4   time.

5        Q.    Okay.  And what other titles did

6   those people hold?

7        A.    Account manager farmer, account

8   manager, senior account manager, account

9   director, and I need to look -- I need to

10  review the HR documentation in order to

11  get all of them.  There are at least

12  three, maybe more, titles.

13       Q.    Okay.  Did you have any

14  integration service specialists reporting

15  to you?

16       A.    Yes.

17       Q.    Did you have any other titles

18  reporting to you that you haven't

19  testified to?

20       A.    Again, I -- I -- maybe.  I can't

21  -- I wouldn't know.  I wouldn't know

22  exactly.  I wouldn't testify to it unless

23  I saw it from HR, because the people are

24  reporting to me and titles change.

25       Q.    So you testified that you had
```

Adam Overton Kimmick
October 05, 2023

```
 1                      A. KIMMICK
 2   senior account manager farmers reporting
 3   to you; is that correct?
 4        A.    That is correct.  And some of
 5   those senior account manager farmers were
 6   integration specialists.
 7        Q.    During this time period, who
 8   were the senior account manager farmers
 9   reporting to you?
10        A.    They are listed here on 1 to 5.
11        Q.    There is no one else that was a
12   senior account manager farmer other than
13   these people listed here during that time
14   period?
15        A.    To my knowledge, no.
16        Q.    And another title that you said
17   reported to you were just account manager
18   farmers; is that right?
19        A.    Yes.  They weren't senior, they
20   were just account managers.
21        Q.    Who were the account managers
22   farmers who were reporting to you?
23        A.    I don't recall all of them, and
24   I need to have the -- HR validate before I
25   could verify.
```

Adam Overton Kimmick
October 05, 2023

```
1                   A. KIMMICK

2       Q.    Why is that?

3       A.    Because they -- I don't -- you

4  have asked for a certain period, and I

5  can't testify that during that exact time

6  period that all of the people who reported

7  to me, people change territories, they

8  come and go from Orange, I couldn't

9  testify to all of them.

10      Q.    Okay.  Approximately how many

11 account manager farmers reported to you

12 during this time period?

13      A.    More than five.  No, let me

14 clarify that question.  There are more

15 than five account managers, senior account

16 managers, and there were account managers

17 that were not senior, and I don't know how

18 many of them there were, I'm guessing it

19 was three or four; but, again, this is an

20 estimate, I'm not testifying to the exact

21 number.

22      Q.    That's fine.  I'm looking for an

23 estimate, that's why I said approximately.

24            Okay.  So you had senior account

25 manager farmers, account manager farmers
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2      and what were -- can you give me one of

 3      the other titles, please?

 4           A.    Account directors.

 5           Q.    Account directors?

 6           A.    Yes.

 7           Q.    Were there also senior account

 8      directors?

 9           A.    No, not to my knowledge.

10           Q.    Okay.  Who were the account

11      directors that were reporting to you

12      during this time period?

13           A.    I don't know if I -- I mean,

14      again, I mean, I -- I think that there

15      were at least five of them; but, again,

16      this is an estimate, and I don't -- I

17      couldn't recall all of their names here,

18      I'm afraid I would miss them or that one

19      of them might have transferred to a new

20      territory during that period, I -- I don't

21      know, but there was four or five as an

22      estimate.

23           Q.    Okay.  Who were the integration

24      service specialists reporting to you

25      during that time period?
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2      A.    Based on Interrogatory 4, there

 3   would be Jennifer Rossdale, senior account

 4   manager integration specialist. There was

 5   an account manager integration specialist,

 6   but I don't recall the name.  I think I

 7   had two or three people who were

 8   integration service specialists.

 9      Q.    During this time period?

10      A.    Yes.

11      Q.    And you don't recall the name of

12   anybody else who was integration service

13   specialist?

14      A.    I -- no, I mean, I know Jennifer

15   was one of them, because I could see the

16   name here.  I don't want to guess.

17      Q.    Okay.

18           MS. FISHER:  For the record,

19      this document entitled defendant's

20      supplemental objections and responses

21      to plaintiff's first set of

22      interrogatories is Kimmick 1.

23           I'm going to put another

24      document in the chat.

25           MR. GUIFOYLE:  Exhibit 1 is not
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK
2         the supplemental, Exhibit 1 looks like
3         the original.
4              MS. FISHER:  I'm sorry, you're
5         right.  Let me reread that.
6              So, Stefanie, for the record,
7         Kimmick 1 is defendant's objections
8         and responses to plaintiff's first set
9         of interrogatories.
10             (Whereupon, the aforementioned
11        defendant's objections and responses
12        to plaintiff's first set of
13        interrogatories was marked as Kimmick
14        Exhibit 1 for identification as of
15        this date by the Reporter.)
16        Q.    I just put another document in
17   the chat, Mr. Kimmick.  Just let me know
18   when you are able to open that and review
19   it.
20        A.    Okay.
21        Q.    Do you recognize this document?
22        A.    Vaguely, yes.
23        Q.    What do you recognize this to
24   be?
25        A.    This is a supplemental document
```

Adam Overton Kimmick
October 05, 2023

```
1                       A. KIMMICK

2     that looks like there are additional names

3     of people who reported to me and some

4     clarifications on other interrogatories.

5         Q.    Did you digitally sign this

6     document on the last page?

7         A.    I did.

8         Q.    Did you review this document for

9     accuracy before signing it?

10        A.    I did, yes.

11        Q.    According to you, everything in

12    this document is accurate and truthful?

13        A.    To my knowledge, yes.

14        Q.    Let's go to Interrogatory 3 on

15    Page 4.  Let me know when you are there.

16    I'm sorry, Interrogatory 4 on Page 4.

17        A.    Okay.

18        Q.    As you see, it continues on to

19    Page 5 and it looks like it mirrors the

20    responses in the initial interrogatories.

21            Is this the full list of

22    individuals who held the same title as

23    Patricia Haran?

24        A.    Interrogatory 4 are the people

25    who had the same title, it looks like.
```

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK
2    Interrogatory 5 were --
3         Q.   Well, let's take it one at a
4    time.
5              So Interrogatory 4 has the list
6    of all people who had the same title as
7    Patricia Haran, correct?
8         A.   Some of them were integration
9    specialists, but all had the same base
10   title, senior account manager.
11        Q.   Okay.  And then Interrogatory 5
12   has the list of the global account
13   directors that reported to you during the
14   time period of 2017 until when these
15   interrogatories were responded to,
16   correct?
17        A.   Yes.
18        Q.   And there is no one else that
19   was a global account director that
20   reported to you during this time period
21   other than the five people listed here?
22        A.   No, not to my knowledge.
23        Q.   Okay.  Interrogatory 6 asks for
24   integration service specialists and the
25   response has four people, are these the
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK
 2    only four people that were integration
 3    service specialists reporting to you
 4    during the time period of May 2017 to
 5    present?
 6        A.    Some of them were before that
 7    time period, but yes.
 8        Q.    What's the difference between an
 9    account manager and a senior account
10    manager?
11        A.    Experience in the job, salary,
12    obviously, and there is a difference in
13    expectation between somebody whose an
14    account manager and a senior account
15    manager.
16        Q.    Are the job duties the same?
17        A.    The job duties are similar, but
18    the expectations for senior person are
19    greater.
20        Q.    How are the job duties
21    different?
22        A.    In some ways because of the
23    volume and the expectations, the job
24    duties may be slightly different.
25        Q.    Can you explain what you mean by
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2   that?

 3       A.    Because you are dealing with --

 4   senior account managers are dealing with

 5   larger customers, typically, the

 6   expectations on the amount of revenue and

 7   the kind of services that we're proposing

 8   to them, the depth of the relationship, it

 9   is a higher expectation.

10       Q.    Are both senior account managers

11   and account managers responsible for

12   sales?

13       A.    Yes.

14       Q.    Do both titles have quotas that

15   they have to maintain?

16       A.    Yes.

17       Q.    What about account directors,

18   what are they responsible for?

19       A.    Typically an account director

20   has only one account, that account has

21   cycles of business that may -- that may

22   transpire over a many year period and so

23   they are responsible for the relationship

24   and the revenue and the health of that

25   account and targets and revenue delivery,
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2    but the account director is the most

 3    senior person in our sales organization,

 4    and, as I said, they are responsible

 5    typically for one account, a very large

 6    account, and the typical difference

 7    between the senior account manager and

 8    account manager is the fact that the

 9    expectations are slightly different

10    because of the size and scope and the

11    cadence of the contracts and services that

12    we provide to those very large customers.

13         Q.    Do they maintain -- do account

14    directors also have quotas that they are

15    responsible for?

16         A.    Yes.

17         Q.    Are you familiar with someone by

18    the name of Paul Renassia?

19         A.    Yes.

20         Q.    Who is Paul Renassia?

21         A.    He is currently a senior account

22    manager.

23         Q.    Okay.  When did he become a

24    senior account manager?

25         A.    I can't recall the exact date.
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2         Q.    Did he report to you during the

3    time period of 2017 to 2020 -- excuse me,

4    to 2021?

5         A.    I believe so, yes.

6         Q.    What was his title during that

7    time period?

8         A.    I believe it was account manager

9    or senior account manager or both.

10        Q.    Did he have a quota that he was

11   responsible for?

12        A.    Yes.

13        Q.    What about Roxanne Tabool (ph),

14   are you familiar with her?

15        A.    Yes.

16        Q.    Who is Roxanne?

17        A.    She is an account manager who is

18   part of the Orange graduate program and an

19   expat from France.

20        Q.    Did she report to you from 2017

21   to 2021?

22        A.    Not that entire period, no.

23        Q.    For some part of that time

24   period did she report to you?

25        A.    Yes.
```

Adam Overton Kimmick
October 05, 2023

```
 1               A. KIMMICK

 2      Q.    Okay.  What was her title at the

 3   time?

 4      A.    I don't recall exactly her

 5   title, but I believe it was account

 6   manager.

 7      Q.    Did she have a quota she was

 8   responsible for?

 9      A.    Yes, but more loosely because

10   she is part of the Orange graduate

11   program.

12      Q.    Can you explain what that

13   program is?

14      A.    It is a program sponsored by our

15   corporate parent, which places promising

16   people in different jobs for fixed periods

17   of time so that they can experience

18   different parts of the organization.  She

19   --

20      Q.    And when you say she was

21   "loosely"  held to a quota, what do you

22   mean by that?

23      A.    She had different expectations

24   because of her role in the Orange graduate

25   program.  She was responsible for a quota,
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2    and I managed her as every other person in

3    the -- in my team; however, I -- I really

4    didn't have the ability to hire and fire

5    her, because she was part of a larger

6    program managed by corporate.

7         Q.    Did she meet her quota for 20 --

8    let's say for the -- was she there during

9    the 2020 calendar year?

10        A.    I don't recall whether she was

11   there for the whole 2020 calendar year,

12   because that was part of Covid and because

13   she was in France and couldn't move there

14   were -- there were extenuating

15   circumstances.  I don't recall whether she

16   made a quota or not.

17        Q.    What about Paul Renassia, was he

18   there during the 2020 calendar year?

19        A.    I believe so, yes.

20        Q.    Did he meet his quota for that

21   year?

22        A.    I don't recall.

23        Q.    Are you familiar with Lorna

24   Paine?

25        A.    Yes.
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2      Q.    Who is Lorna Paine?

 3      A.    Lorna Paine, I -- I -- as I

 4  recall, she was one of the integration

 5  services account managers.  Her title

 6  might have been account manager or senior

 7  account manager.  I can't recall the exact

 8  title she was in, but she was in

 9  integration services specialist, I

10  believe.

11      Q.    And she had a quota that she had

12  to maintain?

13      A.    Yes.

14      Q.    Did she meet her quota?

15      A.    I don't recall.

16      Q.    In the -- let me just finish my

17  question.

18            Did she meet her quota in the

19  2020 calendar?

20      A.    I don't recall.

21      Q.    Is she still with Orange?

22      A.    No.

23      Q.    What were the circumstances of

24  her employment ending?

25      A.    We decided to discontinue the --
```

Adam Overton Kimmick
October 05, 2023

```
 1                A. KIMMICK

 2     the -- the account -- the title of

 3     integration services account manager and

 4     integration services senior account

 5     manager because that role was

 6     underperforming in general so we -- we

 7     eliminated the title and unfortunately we

 8     had to dismiss the people that were in

 9     that title.

10         Q.    So Orange about dismissed Lorna

11     Paine?

12         A.    Correct.

13         Q.    When you say she was

14     underperforming or people in that role

15     were underperforming, what do you mean?

16         A.    So it wasn't about performance

17     of individual people in this case.  In

18     this case it was a -- we were defining the

19     direction of the firm and how we were

20     going to structure the business moving

21     forward, and we decided that the

22     profitability of that individual product

23     line did not warrant a specialist, and

24     unfortunately we, for business reasons,

25     needed to eliminate that role.
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2        Q.    How many other people had that

3    role?

4        A.    I don't recall.

5        Q.    How many other people were

6    terminated at the time that Lorna Paine

7    was terminated?

8        A.    I don't recall.

9        Q.    Was it more than two?

10        A.    Yes.

11        Q.    Was it more than five?

12        A.    Yes.

13        Q.    Was it more than ten?

14        A.    I don't recall.

15        Q.    When Lorna Paine was dismissed,

16    were some of the accounts that she handled

17    given to Patty Haran?

18        A.    The integration specialist role

19    is an overlay role, they were responsible

20    for selling only one or two product lines,

21    therefore, they weren't responsible for

22    the relationship on those accounts, they

23    were responsible for selling the products

24    associated with integration services; so

25    no, she was not responsible for managing
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2   an account.

 3       Q.    Did any of Lorna Paine's

 4   responsibilities get transferred over to

 5   Patty Haran after Lorna was dismissed?

 6       A.    I'm hesitating because it is not

 7   a black-and-white answer.  She -- pat --

 8   because the account managers were

 9   responsible for the overall health of the

10   account and Lorna and the other

11   integration specialists were responsible

12   for selling in certain product lines,

13   there is an overlap between the account

14   manager and the integration services

15   account manager where the account manager

16   is responsible for the overall health of

17   the account and the revenue on the

18   account, there are some job

19   responsibilities that the integration

20   services people had that were transferred

21   to the account manager, meaning

22   administrative tasks were not part of the

23   responsibilities necessarily, it was about

24   maintaining and growing revenue, and since

25   the business had taken a different
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2    direction and eliminated the -- that

3    integration services specialist there is

4    an expectation over time that business

5    would erode and so that -- it's not a

6    black-and-white answer to a question; so

7    the answer is in some cases yes, but

8    overall the role was eliminated and the

9    responsibilities still remained with the

10   account manager.

11        Q.    And who was the account manager

12   for Pfizer at the time that Lorna Paine

13   worked there?

14        A.    I don't recall, but I believe

15   that it was Patty.

16        Q.    Was Patty the account manager

17   for Pfizer while Lorna worked there?

18        A.    I -- again, I don't recall.  It

19   was too long ago, but I believe so.

20        Q.    When Patty took over the Pfizer

21   account, at the time she took over the

22   Pfizer account, was the master service

23   agreement expired on the account?

24        A.    I don't recall.

25        Q.    If a master service agreement
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK
2    was expired, how would that limit Patty's
3    ability to work on the account?
4         A.    She would be responsible for
5    either renewing that master services
6    agreement or finding other business to
7    replace it.
8         Q.    Did you ever speak with Eddi
9    Youkhanna about a dual role for Patty
10   where she would work on both new and
11   existing accounts?
12        A.    Yes.
13        Q.    When did you speak with Eddi
14   about that?
15        A.    I don't recall the date.
16        Q.    What was the outcome of your
17   conversation with Eddi?
18        A.    At Patty's request she assigned
19   her some new accounts.
20        Q.    Which accounts?
21        A.    I don't recall the -- the -- the
22   brands.  I believe IBM was one of them.
23        Q.    At the time Lorna Paine worked
24   at Orange, who was the account manager
25   from Moodys?
```

Adam Overton Kimmick
October 05, 2023

```
1                   A. KIMMICK

2        A.    Again, I don't know the overlap,

3   and I -- but I believe it was Patty.  I

4   wouldn't be able to testify to the dates,

5   but I believe it was Patty.

6        Q.    You believe Patty was the

7   account manager at the time that Lorna

8   worked there?

9        A.    Again, the -- the -- the exact

10  dates, I couldn't testify to that fact,

11  but I believe that that is the case.  They

12  worked together on the account at some

13  period.

14       Q.    Are you familiar with Jennifer

15  Rossdale?

16       A.    Yes.

17       Q.    Who was Jennifer Rossdale?

18       A.    She was one of the individuals

19  on my team.

20       Q.    What was her title?

21       A.    I don't recall.

22       Q.    Was she one of the individuals

23  on your team between 2017 and 2021?

24       A.    I don't believe she was there

25  for the entire period, perhaps a piece of
```

**JA379**

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2    that period.

 3         Q.    Did she have a quota?

 4         A.    Yes.

 5         Q.    Did she meet her quota during

 6    the 2017 to 2021 time period?

 7         A.    I don't recall.

 8         Q.    Are you familiar with Patrick

 9    Barnes?

10         A.    Yes.

11         Q.    Who is Patrick Barnes?

12         A.    He was an individual who worked

13    on my team.

14         Q.    What was his title between 2017

15    and 2021?

16         A.    I don't recall.

17         Q.    Was he responsible for a quota?

18         A.    Yes.

19         Q.    Did he meet his quota during

20    that time period?

21         A.    I don't recall.

22         Q.    Are you familiar with Celeste

23    Daniel?

24         A.    Yes.

25         Q.    Who is Celeste Daniel?
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2        A.    She was an individual who worked

 3   on my team.

 4        Q.    What was her title between 2017

 5   and 2021?

 6        A.    I believe account manager, but,

 7   again, I don't recall the exact title.

 8        Q.    Did she have a quota?

 9        A.    Yes.

10        Q.    Did she maintain that -- did she

11   meet her quota during that time period?

12        A.    I don't recall.

13        Q.    Are you familiar with Boyne Kim?

14        A.    Yes.

15        Q.    Who is Boyne Kim?

16        A.    He was an individual who worked

17   on my team.

18        Q.    Did he work on your team between

19   2017 and 2021?

20        A.    I believe so, yes.  Although I

21   couldn't testify to the date.

22        Q.    What was his title during that

23   time period?

24        A.    I don't recall.

25        Q.    Did he have a quota?
```

Adam Overton Kimmick
October 05, 2023

```
 1                A. KIMMICK

 2        A.    Yes.

 3        Q.    Did he meet his quota during

 4   that time period?

 5        A.    I don't recall.

 6        Q.    Other than Ms. Haran, have you

 7   terminated anyone else from your team from

 8   2017 to present?

 9        A.    Yes.

10        Q.    Who?

11        A.    I don't recall all of them.

12   Certainly the people that were integration

13   service specialists.  Jennifer Rossdale

14   was terminated for cause, I believe.

15   Boyne Kim was terminated for cause, I

16   believe.  There were others.

17        Q.    Do you recall the names of

18   anyone else?

19        A.    Not at this time.

20        Q.    Why was Jennifer Rossdale

21   terminated?

22        A.    Under performance, and she had

23   issues with her client relationships and

24   some relationships with her piers, her

25   work was inconsistent.
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2        Q.    What do you mean by  "under

 3   performance"?

 4        A.    Didn't meet the expectations of

 5   the business.

 6        Q.    Did she meet -- was her quota

 7   one of those expectations?

 8        A.    I don't recall.  Possibly.

 9   That's one of the considerations.

10        Q.    When was she terminated?

11        A.    I don't recall.

12        Q.    Was it within the last year?

13        A.    No.

14        Q.    Was it within the last two

15   years?

16        A.    I don't recall.

17        Q.    Who made the decision to

18   terminate her?

19        A.    I did.

20        Q.    Had she taken any leave for any

21   personal reasons or medical reasons during

22   her employment at Orange?

23        A.    Not that I recall.  Possibly.

24        Q.    Are you aware of any medical

25   issues that she suffered from?
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2         A.    I'm hesitating here because this

 3    is none of my business.

 4         Q.    You can still answer.

 5         A.    Not that I'm aware of.

 6         Q.    Are you aware of anyone -- any

 7    close family members of hers who suffered

 8    from any medical conditions?

 9         A.    Again, that's none of my

10    business.  She wouldn't need to tell me

11    that.

12         Q.    That's not the question.  The

13    question is not whether it was your

14    business.  The question is whether or not

15    you are aware of any.

16         A.    I'm not aware.

17         Q.    When was Boyne Kim terminated?

18         A.    I don't recall.

19         Q.    Was it in the last year?

20         A.    No.

21         Q.    Was it in the last two years?

22         A.    Not that I recall.

23         Q.    So it was earlier than that?

24         A.    I -- again, I -- I wouldn't be

25    able to tell you the exact date.  We would
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2   have to validate that with HR.

 3        Q.    Who made the decision to

 4   terminate him?

 5        A.    I did.

 6        Q.    What was the decision based on?

 7        A.    His relationship with customers,

 8   his ability to generate new business and

 9   possibly quota payment, he wasn't meeting

10   the requirements of the job and the

11   expectations of the business.

12        Q.    When you say  "his ability to

13   generate business,"  what do you mean?

14        A.    All salespeople, whether account

15   director, account manager, senior account

16   manager, have the responsibility to ensure

17   the future health of our business, and,

18   therefore, generate new pipeline and new

19   activity to maintain future revenues for

20   Orange.

21        Q.    And Boyne Kim didn't demonstrate

22   that ability?

23        A.    I don't recall exactly the --

24   the circumstances, but he was terminated.

25        Q.    When making the decision to
```

Adam Overton Kimmick
October 05, 2023

```
 1                 A. KIMMICK

 2    terminate Jennifer Rossdale, did you

 3    memorialize the basis for your decision in

 4    any document?

 5        A.    I don't recall.

 6        Q.    When terminating Boyne Kim, did

 7    you memorialize the basis for your

 8    decision in any document?

 9        A.    I don't recall.

10        Q.    Have you participated in any

11    training on discrimination in the

12    workplace at Orange?

13        A.    Yes.

14        Q.    How many times have you

15    participated in such training?

16        A.    Once a year.  I don't recall

17    when it started.

18        Q.    When was the most recent

19    training you had?

20        A.    October 7th of --

21        Q.    Of 2022?

22        A.    No, I did it yesterday or the

23    day before.

24        Q.    So October 3rd or 4th?

25        A.    What's the date today?  It's the
```

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK
2    5th today?  So it would be -- it would be
3    Tuesday or -- Tuesday or Wednesday this
4    week.
5         Q.    What did that training include?
6         A.    A program on discriminatory
7    behavior and sexual harassment in New York
8    and New York City.
9         Q.    How long is the training?
10        A.    About two hours.
11        Q.    Is it virtual or in person?
12        A.    Virtual.
13        Q.    Did you participate in a similar
14   training in 2020?
15        A.    I don't recall exactly, but most
16   likely, yes.
17        Q.    What is your understanding of
18   discrimination in the workplace?
19             MR. GUIFOYLE:  Objection.
20        A.    It is not tolerated by Orange.
21        Q.    I'm sorry?
22        A.    It is not tolerated by Orange or
23   me.
24        Q.    What is discrimination,
25   according to your understanding?
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2      A.    I would have to look at the

 3   definition.

 4      Q.    Well, I'm asking for your own

 5   understanding.  I'm not asking for a

 6   definition.  I'm asking for your

 7   understanding.

 8      A.    Respect for individuals,

 9   treating everyone equal, not to

10   discriminate against protected classes,

11   that we have sets of procedures around

12   maintaining and managing complaints, that

13   every individual and the company has a

14   right to put -- to open a complaint, that

15   my responsibility as a manager is to lead

16   by example, I could -- I think that's

17   enough.

18      Q.    Are you familiar with the Family

19   Medical Leave Act?

20      A.    Vaguely.

21      Q.    What is your understanding of

22   the Family Medical Leave Act?

23      A.    Again, I -- I don't know the

24   legal definition of it.  My responsibility

25   as a manager for this is to refer somebody
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2    who comes to me to HR if they have a

 3    situation that arises with their family,

 4    and I would refer them immediately.  If I

 5    was requested or if somebody came to me on

 6    my team, I would refer them immediately to

 7    HR if they requested family medical leave.

 8         Q.   What is your understanding of

 9    the Family Medical Leave Act?

10         A.   Again, I mean, from my

11    perspective, if somebody felt that they

12    had a -- a claim to take off work to

13    support a family member, I wouldn't ask

14    them what it was about, I would refer them

15    directly to HR, I would immediately assume

16    that it was valid, support them as best I

17    could, and refer them to HR and their

18    policy.

19         Q.   So I'm not asking -- I

20    appreciate that, but I'm not asking what

21    you would do.  I'm asking what your

22    understanding is of the Family Medical

23    Leave Act.  If you don't have an

24    understanding of it, you could say that,

25    but I'm asking what your understanding is
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2    of the Family Medical Leave Act.

3         A.    My understanding is people

4    should have the time and the ability to

5    take time off from work if they' required

6    in order to support a family member,

7    that's my general understanding.

8         Q.    Anything else?

9         A.    Only how I would act.

10        Q.    What do you mean by that?

11        A.    Like I said, if anybody came to

12   me and asked for it, I would immediately

13   assume it was valid without question and

14   refer them to HR.

15        Q.    Did Patty ask you to take time

16   off work under the FMLA, under the Family

17   Medical Leave Act?

18        A.    No, not to my knowledge.

19        Q.    Did she ever take any time off

20   work to care for a family member?

21        A.    I believe so, yes.  She asked

22   for paid leave, paid time off.

23        Q.    Which family member did she take

24   time off of work to care for?

25        A.    I believe it was her daughter.
```

Adam Overton Kimmick
October 05, 2023

```
 1                  A. KIMMICK
 2        Q.    Do you know the circumstances of
 3   her daughter -- of her daughter's
 4   sickness?
 5        A.    It was quite some time ago, but
 6   I believe it was an infection of some
 7   kind.  I don't know all of details, I
 8   don't recall, but -- but I believe it was
 9   an infection of some kind.
10        Q.    Did Patty come to you and ask
11   you if she could take time off work to
12   care for her daughter?
13        A.    As I said, yes.  I believe she
14   did, yes.
15        Q.    What did you do?
16        A.    I gave her time off.  I told her
17   to take whatever time she needed.
18        Q.    Did you refer her to HR?
19        A.    I didn't know that the -- the --
20   the scale or what -- or how much time she
21   needed, I just assumed that she would
22   manage that if she needed to take more
23   time off, she would come to me, and I
24   would grant paid time off up to the limit,
25   and if she -- if she decided that she
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2   needed family leave, that that's up to

 3   her.  I -- if she had asked me about that,

 4   I would have immediately said that it was

 5   -- it would have been fine for me, and I

 6   would have referred her to HR to manage

 7   the policy, but --

 8        Q.    Did you --

 9        A.    I -- I remember the

10   conversation.  I told her to take as much

11   time as she needed.

12        Q.    Did you refer her to HR?

13        A.    No, not to my recollection.

14        Q.    How much time did she take off

15   work to care for her daughter?

16        A.    I don't recall.

17        Q.    Do you believe that the time

18   that she took off work to care for her

19   daughter impacted her performance in any

20   way?

21        A.    No.

22              MR. GUIFOYLE:  Can we take 10

23        minutes or do you want to finish --

24              MS. FISHER:  Yeah, I -- let me

25        just finish this and then we can
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2      definitely take a break.

3               MR. GUIFOYLE:  Okay.  Thank you.

4               MS. FISHER:  Yeah.  Just give me

5      one second.

6      Q.    Did you ever inform Ms. Haran

7  about her rights under the Family Medical

8  Leave Act?

9      A.    Not to my knowledge, no.

10      Q.    Did you ever tell Ms. Haran that

11  she had a lack of focus?

12      A.    I don't recall that.

13               MS. FISHER:  Okay.  So let's

14      take a break, it's almost 11:30, you

15      want to just come back at 11:40?

16               MR. GUIFOYLE:  That works for

17      me.

18               MS. FISHER:  Okay.  Great.

19               MR. GUIFOYLE:  Thank you.

20               (Whereupon, a short recess was

21      taken.)

22      A.    Just to clarify, as I was in the

23  break, I had -- I may have misremembered

24  the -- the circumstances behind Boyne

25  Kim's release from Orange.  I don't know
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2   whether it was termination for cause or

 3   redundancy, either way his role and he

 4   wasn't supporting the business in a proper

 5   way, but -- and he was terminated from,

 6   you know, his release from Orange, but I'm

 7   not sure if it was a termination for cause

 8   or redundancy, I don't recall the details.

 9       Q.    Okay.

10       A.    Just to clarify.

11             MS. FISHER:  Stefanie, I just

12       want to make sure, for the record, you

13       have the supplemental -- OBS'

14       supplemental interrogatory responses

15       as Kimmick 2.

16             (Whereupon, the aforementioned

17       OBS' supplemental interrogatory

18       responses was marked as Kimmick

19       Exhibit 2 for identification as of

20       this date by the Reporter.)

21             MS. FISHER:  I'm going to put

22       another document in the chat.

23       Q.    Mr. Kimmick, do you see a

24   document in the chat labelled job

25   description?
```

Adam Overton Kimmick
October 05, 2023

|     |                                                  |
|-----|--------------------------------------------------|
| 1   | A. KIMMICK                                       |
| 2   | A.    Yes.                                        |
| 3   | Q.    Could you open that, review it             |
| 4   | and let me know when you're done?                |
| 5   | A.    Okay.                                        |
| 6   | Q.    Do you recognize this document?            |
| 7   | A.    I don't know whether it's an               |
| 8   | Orange document or not, but it appears to        |
| 9   | be a job description.                            |
| 10  | Q.    Is this a job description for              |
| 11  | Patty Haran?                                      |
| 12  | A.    I don't know whether this is the           |
| 13  | exact description for Patty Haran, no, I         |
| 14  | mean, I -- it could be.                          |
| 15  | Q.    Does this reflect Patty Haran's            |
| 16  | responsibilities?                                |
| 17  | A.    It appears to have most of her             |
| 18  | responsibilities, but, again, I mean, it         |
| 19  | -- this appears to be a job description          |
| 20  | and it appears to have most of the               |
| 21  | requirements for general sales.                  |
| 22  | Q.    Okay.  Is there anything that              |
| 23  | Ms. Haran was responsible for that was --        |
| 24  | that is not reflected in this document?          |
| 25  | A.    It seems to be generally                    |

Adam Overton Kimmick
October 05, 2023

1                     A. KIMMICK

2    covering the responsibilities.  I might

3    have been more specific around order

4    targets.

5        Q.    Around what?

6        A.    Order targets.  It does say,

7    "Financial - This position has revenue,

8    margin, and order targets,"  I may have

9    been more specific around order targets, I

10   believe --

11       Q.    How would you --

12             (Indiscernible crosstalk.)

13       Q.    Go ahead.

14       A.    I believe I was, in some of my

15   reviews with Patty, about what was

16   required in terms of her orders and future

17   business.

18       Q.    Can you explain that some more,

19   please?

20       A.    This appears to be an account

21   manager job description, it appears to

22   have an OBS date on it, but I can't

23   guarantee that this is the job description

24   that she read when she took the job.  I

25   gave her expectations based on her

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2    territory, and we sat on an annual basis

 3    goals and objectives that she needed to

 4    achieve, some of those were discussed in a

 5    semiannual review and more detail might

 6    have been provided at the time.

 7             MS. FISHER:  This document is

 8        being marked as Kimmick 3 and it's

 9        bates stamped OBS_00406 to 00407.

10             (Whereupon, a job description

11        bates stamped OBS_00406 to 00407 was

12        marked as Kimmick Exhibit 3 for

13        identification as of this date by the

14        Reporter.)

15        Q.    What was Ms. Haran's title at

16    the time she was hired?

17        A.    I don't recall.  I believe it

18    was senior account manager farmer, but I

19    would need to validate that with HR.

20        Q.    Did you ever promote her?

21        A.    Not to my knowledge.

22        Q.    Did you ever recommend that she

23    be given additional job responsibilities?

24        A.    No.

25        Q.    Did you ever recommend that she
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2    have responsibilities taken away?

3         A.    She asked for more

4    responsibilities in a different role or a

5    different type of a role and at her

6    request I tried to make that happen.  It

7    wasn't a more senior role, it -- just a

8    different set of accounts with a different

9    set of responsibilities, I did this at her

10   request, but it was not a more senior

11   role, it did not have any less or more

12   responsibility, and it was not a

13   promotion.

14        Q.    How did the accounts differ?

15        A.    She was hired to manage what we

16   call B-end accounts, these are accounts

17   that are headquartered outside of the

18   United States and her initial territory it

19   was typically French-based multinationals

20   who made some of their decisions in the

21   United States, those accounts were managed

22   by an account director for the most part

23   or an account manager that was outside the

24   United States who had overall

25   responsibility for the global account, her
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2   responsibilities were to deliver and drive

 3   new business and maintain revenue streams

 4   and the relationship within the United

 5   States for those accounts, she requested

 6   to be on accounts that allowed her to be

 7   more in control of the overall

 8   relationship of those accounts, she wanted

 9   to be an A-end account manager on accounts

10   that she managed globally herself and so I

11   attempted to make that change for her.

12       Q.    What A-end accounts were

13   assigned to her?

14       A.    I don't recall all of them.

15       Q.    And when did you make the

16   change?

17       A.    I don't recall the exact date.

18       Q.    Do you remember the year?

19       A.    I believe that it was -- it was

20   -- it was the year that she departed.  I

21   am not -- again, I mean, I'm not -- I'm

22   not entirely sure of the dates and the

23   reason I'm not sure of the dates is

24   because Covid played a major part in that

25   transition.  She was managing a territory,
```

Adam Overton Kimmick
October 05, 2023

```
 1                   A. KIMMICK
 2   but the person that I had to step in to
 3   manage the other territory was -- was not
 4   able to be in the U.S. or cover the
 5   territory appropriately and therefore
 6   there was an interim period where she was
 7   managing some other accounts while she was
 8   trying to figure out how to manage those
 9   B-end accounts; and, yeah, this wasn't an
10   easy period for anyone because Covid threw
11   our business into bit of a, as everyone,
12   it was a difficult time to manage through,
13   and I believe that during that period I
14   recognized what was going on with Patty,
15   and I made adjustments to her territory
16   and her quota and to make sure she was
17   paid out for that double work.
18        Q.    When you say during that period
19   you recognized what was going on with her,
20   what do you mean?
21        A.    She was managing the accounts
22   that she had in her old territory, and she
23   was also managing some of the A-end
24   accounts that she had requested.
25             MS. FISHER:  I'm going to put a
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2        document, another document, in the

 3        chat.

 4        Q.    Just open that document and let

 5   me know when you have reviewed it.

 6        A.    I don't know if it's just me,

 7   but the document is coming up with only --

 8   a lot of it is redacted.

 9        Q.    Yeah.  If you scroll through it,

10   though, there is some verbiage on Page 2.

11        A.    Okay.  It's a very small blurb,

12   but yes.

13        Q.    Do you recognize this?

14        A.    Yes.  It appears to be one

15   section of Patty's performance review from

16   the first half of 2019.

17             MS. FISHER:  Okay.  For the

18        record, this is document bates stamped

19        OBS_00708 to 00710.

20             (Whereupon, a performance review

21        bates stamped OBS_00708 to 00710 was

22        marked as Kimmick Exhibit 4 for

23        identification as of this date by the

24        Reporter.)

25        Q.    Do you know who wrote this on --
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK
 2    the blurb on Page 2?
 3         A.    I believe I did.
 4         Q.    So as of the first half of 2019,
 5    Patty Haran was fully successful in her
 6    job duties?
 7         A.    In her current territory at that
 8    time she was showing appropriate results
 9    for those accounts.  These accounts were
10    -- were traditionally B-end accounts that
11    were being managed by a person outside of
12    the United States and Patty was the U.S.
13    representative.
14         Q.    Do you see where it says  "fully
15    successful"?
16         A.    Yes.
17         Q.    Did you write that?
18         A.    Yes.
19         Q.    Okay.  So she was fully
20    successful in managing her accounts at
21    that time, correct?
22         A.    Correct.
23              MS. FISHER:  I'm going to put
24         another document in the chat.
25         Q.    Just let me know when you have
```

Adam Overton Kimmick
October 05, 2023

```
 1                   A. KIMMICK
 2   had a chance to review this other
 3   document.
 4        A.    Okay.
 5        Q.    Okay.  Do you recognize this
 6   document?
 7        A.    Yes.
 8        Q.    What do you recognize it to be?
 9        A.    This appears to be Patty's
10   second half 2020 performance review.
11        Q.    Did you write this?
12        A.    Yes.
13        Q.    Okay.  And did this memorialize
14   all of the issues in her performance at
15   the time?
16        A.    That's a very broad statement.
17   Can you clarify?
18        Q.    Were there any other performance
19   issues that Patty exhibited that are not
20   memorialized in this blurb?
21        A.    Yes.
22        Q.    What were the other performance
23   issues?
24        A.    There were some other behaviors
25   that I talked to her about about client
```

```
 1                    A. KIMMICK

 2    relationships and relationships with her

 3    piers that weren't appropriate to write in

 4    a review.

 5        Q.    Why is that not appropriate to

 6    write that in the review?

 7        A.    It was hearsay.

 8        Q.    Can you specify what client

 9    issues there were?

10        A.    Her clients had complaints about

11    their relationship with them.

12        Q.    Which clients?

13        A.    I don't recall.

14        Q.    How did you learn about those

15    issues?

16        A.    From the customer.

17        Q.    Did the customers write anything

18    to you, was anything memorialized in

19    writing?

20        A.    No.

21        Q.    Was it more than one customer?

22        A.    I don't recall.

23        Q.    Was there more than one issue

24    with any given customer?

25        A.    I don't recall.
```

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK

2        Q.   Did you address the issues with

3   Patty?

4        A.   I did.

5        Q.   When?

6        A.   I had -- during the review

7   process and part of our weekly and monthly

8   cadences; in fact, I typically have

9   30-minute sessions with my account

10  managers, I had ended up scheduling an

11  hour or even an hour-and-a-half with Patty

12  to make sure that she understood the

13  requirements and what was going on with

14  her piers and the customers.

15       Q.   What did you tell her

16  specifically about these issues?

17       A.   I tried to give guidance about

18  what I thought needed to happen.

19       Q.   Well, what was the issue that

20  the customer complained about?

21       A.   Clarity of communication,

22  responsiveness, the ability to deliver

23  timely responses to their complaints,

24  again, all of this was hearsay.

25       Q.   What do you mean by  "hearsay"?
```

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK

2       A.    This was a dialogue that was

3   between the customer and myself and that

4   needed to be shared with Patty, and I was

5   under the impression that she could

6   hopefully correct some of those issues,

7   and she didn't.

8       Q.    How didn't she -- why do you say

9   she did not correct the issue?

10      A.    The customer did not sign on for

11  more business, and they were -- and they

12  were, as I said in this review, hasn't

13  resulted in increased proposed services,

14  the pipeline isn't currently sufficient to

15  meet her budgets, customers were unwilling

16  to talk about new opportunities with her

17  because she was unable to address the

18  things that were their issues.

19      Q.    Which customer are you talking

20  about?

21      A.    I don't recall.

22      Q.    We can leave a blank in the

23  record so that you can fill that in later.

24  (INSERT):_____.

25      Q.    Did you speak with Patty again
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2   when she failed to correct the issue?

3        A.    As I said, we had weekly calls.

4        Q.    Did you speak with Patty again

5   about this particular issue when she

6   failed to rectify it?

7        A.    We had weekly calls.

8        Q.    You are not answering my

9   question.

10             Did you speak with her when she

11  failed to rectify this issue?

12       A.    Yes.

13       Q.    And what was her response?

14       A.    Defiance.

15       Q.    What do you mean by that?

16       A.    She didn't take feedback

17  positively.

18       Q.    What do you mean by that?

19       A.    She was defensive.

20       Q.    What did she say?

21       A.    She wanted to know all of the

22  details in excruciating detail and it was

23  not a comfortable conversation for her or

24  for me.

25       Q.    Her asking for details about
```

Adam Overton Kimmick
October 05, 2023

| | |
|---|---|
| 1 | A. KIMMICK |
| 2 | this issue represented her being defensive |
| 3 | to you? |
| 4 | A.    Yes. |
| 5 | Q.    Did she do anything else that |
| 6 | showed she was being defensive? |
| 7 | A.    No. |
| 8 | Q.    Did she do anything else that |
| 9 | showed that she wasn't taking the feedback |
| 10 | positively? |
| 11 | A.    I measured that in the result. |
| 12 | Q.    So what do you mean by that? |
| 13 | A.    The opportunities that she was |
| 14 | uncovering were not sufficient to maintain |
| 15 | the health of the business long term. |
| 16 | Q.    Did she say to you that she |
| 17 | would not make an effort to fix the |
| 18 | issues? |
| 19 | A.    No. |
| 20 | Q.    Did she tell you that she would |
| 21 | make an effort to try to fix the issues? |
| 22 | A.    As I recall, yes. |
| 23 | Q.    Are there any other customer |
| 24 | issues that you recall regarding Patty? |
| 25 | A.    Not that I recall. |

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2       Q.    What were the issues with her

 3  piers that you discussed with her?

 4       A.    Again, this was hearsay.  I

 5  don't have anything in writing.  These

 6  were individuals who came to me to express

 7  dissatisfactions about how Patty was

 8  asking for their help and the way in which

 9  she pressured them to be part of the team.

10       Q.    Who were the individuals who

11  expressed this to you?

12       A.    I don't recall.

13       Q.    Okay.  We can leave a blank in

14  the record for the names of those

15  individuals as well.

16  (INSERT):_____.

17       Q.    So how was it -- what was it

18  that they told you about how Patty was

19  asking for her help that was problematic?

20       A.    I don't recall all of the

21  detail.

22       Q.    Do you remember any of the

23  details?

24       A.    These were conversations that I

25  had with them either in person or on the
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2    phone and it was about the way that she

3    was communicating with them that made it

4    an uncomfortable work environment.

5         Q.    What about the way she was

6    communicating with them made it

7    uncomfortable?

8         A.    I can't speak for them.

9         Q.    Well, what did they tell you?

10        A.    They were uncomfortable and that

11   I needed to speak to Patty about her

12   behavior.

13        Q.    Well, what did they tell you

14   made them uncomfortable?

15        A.    I can't recall the detail.

16        Q.    You don't have anything in

17   writing about this issue?

18        A.    No.

19        Q.    And you don't have anything in

20   writing about the issues that the customer

21   had brought to you about Patty's

22   performance, correct?

23        A.    No.

24        Q.    Is it typically your practice to

25   memorialize in writing performance issues?
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2      A.    Yes, but they have to be factual

 3   and from my perspective the result would

 4   -- would in some cases overrule behaviors,

 5   but in this case there were neither, the

 6   behaviors supported -- didn't support a

 7   better result and, therefore, from my

 8   perspective this was all about performance

 9   and the future health of the business.

10      Q.    So the issues with the piers,

11   was that something that you deemed

12   factual?

13      A.    If it had risen to a level of a

14   hostile work environment, I would have

15   reported it to HR, it was just discomfort

16   and, therefore, it was something that I

17   thought would be better managed by me, and

18   I made the attempt and Patty's results

19   were not sufficient to support a healthy

20   business going forward.

21      Q.    So I'm speaking specifically

22   about her issues with her piers.  What

23   about her results demonstrated -- well,

24   let me rephrase this.

25              So the issue you had with her
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2     piers, did you deem those to be factual,

3     yes or no?

4          A.    It didn't matter.

5          Q.    What do you mean?

6          A.    When somebody comes to me with

7     an issue that says that somebody on the

8     team is uncomfortable and it's reported to

9     me, as her manager, leading by example, I

10    want to make sure that everybody on the

11    team has a mission that understands the

12    direction and the goals associated with

13    what needs to happen on the team and if

14    that is being distracted in any way by the

15    way that somebody is asking for work to be

16    done or how these things are being

17    approached then I want to make sure that

18    everyone on the team has a common

19    direction and is a productive employee,

20    and I would love to have everybody on the

21    team be happy and productive.

22         Q.    Okay.  Were issues from her

23    piers reported to you on more than one

24    occasion?

25         A.    Yes.
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2       Q.    Were they reported to you by

 3  more than one person?

 4       A.    Yes.

 5       Q.    And yet you didn't see it fit to

 6  document any of that?

 7       A.    It was not a hostile work

 8  environment, these were behaviors.

 9       Q.    All right.  So something would

10  have to be a hostile work environment for

11  you to document it, yes or no?

12       A.    Yes.

13       Q.    Okay.

14       A.    Well, I did document this in her

15  review.

16       Q.    That she was having problems

17  with her piers?

18       A.    I believe in one of her reviews

19  I made a comment with customers and piers,

20  yes, I did.  I would imagine that it came

21  up, it had to have.  If it didn't come up

22  in writing it would certainly come up as a

23  verbal discussion.

24       Q.    But you didn't document it in

25  this -- in this document that's here --
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2        A.    It doesn't appear that I have

 3   recorded it in the second half performance

 4   for -- what is this?  This is the second

 5   half performance --

 6        Q.    -- for 2020, correct?

 7        A.    -- for 2020.  I believe here I

 8   was focussing on results, and I --

 9        Q.    Okay.

10            MS. FISHER:  All right.  I'm

11       going to put another document in the

12       chat.

13            And, Stefanie, you have this

14       last document as, I think, Kimmick 5.

15            (Whereupon, a performance review

16       bates stamped OBS_00714 to 00718 was

17       marked as Kimmick Exhibit 5 for

18       identification as of this date by the

19       Reporter.)

20        A.    I don't have anything in there

21   yet.

22        Q.    No, no, no.  I didn't put

23   anything there yet.  Sorry, just give me

24   one second.

25            Before we move on, I just want
```

Adam Overton Kimmick
October 05, 2023

```
1                      A. KIMMICK

2    to go back to the document we were just

3    reviewing and that's Kimmick 5, do you see

4    in the second sentence of this review it

5    states,  "She has met her objectives

6    related to her B-end accounts, but the

7    largest A-end accounts (Moodys and Pfizer)

8    have made decisions to move away,"  do you

9    see that?

10       A.    Yes.

11       Q.    And you see where it says

12   "These decisions were being fermented

13   before Patty took on responsibility for

14   managing the accounts"?

15       A.    M-hm.

16       Q.    Is that, in fact, true?

17       A.    Yes.

18            MS. FISHER:  Just give me one

19       second.

20            Okay.  I just put another

21       document in the chat which will be

22       marked as Kimmick 6; and, for the

23       record, that's a performance review

24       for Patty Haran for what looks like

25       the time period of January 1st, 2020
```

Adam Overton Kimmick
October 05, 2023

```
1                  A. KIMMICK

2       to June 30th, 2020.

3               (Whereupon, a performance review

4       bates stamped OBS_00334 and 00343 was

5       marked as Kimmick Exhibit 6 for

6       identification as of this date by the

7       Reporter.)

8       Q.    Could you review this and let me

9   know when you are done, please?

10      A.    Okay.

11      Q.    What was -- is this Patty's

12  performance review for the time period of

13  January 1st, 2020 to June 30th, 2020?

14      A.    Yes.

15      Q.    Did you write this performance

16  review for her?

17      A.    Yes.

18      Q.    Did you discuss this performance

19  review with her?

20      A.    Yes, I did.

21      Q.    Okay.  And what was her overall

22  rating for this performance review?

23      A.    Fully successful.

24              MS. FISHER:  And this document

25      is bates stamped OBS_335 through 343.
```

Adam Overton Kimmick
October 05, 2023

```
1                  A. KIMMICK

2            I'm going to put another

3       document in the chat.

4       Q.    Just let me know when you have

5   had a chance to open and review it.

6            MS. FISHER:  This document will

7       be Kimmick 7 and it is bates stamped

8       OBS_00344 to 00353.

9            (Whereupon, a performance review

10      bates stamped OBS_00344 to 00353 was

11      marked as Kimmick Exhibit 7 for

12      identification as of this date by the

13      Reporter.)

14      A.    This appears to be the same

15   document without the information taken

16   out, redacted.

17      Q.    Let me make sure I put the right

18   thing in there.

19            Well, it looks like this is for

20   a different time period so am I correct

21   that this is the Patty Haran for the time

22   period of July 1st, 2020 to December 31st,

23   2020, Mr. Kimmick?

24      A.    I'm looking at it, because I'm

25   just trying to determine what's different
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2    between what I said in the redacted

 3    document and this one.

 4         Q.    Let me just ask you:  Is this

 5    the performance review for the time period

 6    of July 1st, 2020 to December 31st, 2020?

 7         A.    It appears so, yes; however, the

 8    manager's comments look to be the same as

 9    the ones on the redacted document.

10         Q.    Are you done reviewing this?

11         A.    Yes.

12         Q.    Okay.  What is the overall

13    rating that Patty received on this

14    performance review?

15         A.    Improvement needed.

16         Q.    All right.  And did you

17    determine that improvement was needed?

18         A.    Yes.

19         Q.    Is this a performance review

20    that you filled out for Patty?

21         A.    Yes.

22         Q.    Did you discuss it with her?

23         A.    Yes.

24         Q.    When did you discuss it with

25    her?
```

Adam Overton Kimmick
October 05, 2023

```
 1                  A. KIMMICK

 2       A.    During her annual review.

 3       Q.    Which was when?

 4       A.    I don't recall the date.

 5       Q.    When are annual reviews

 6  typically held?

 7       A.    So a document like this is a

 8  formal document, she, as you can see, puts

 9  her input in, into each one of the

10  categories, and she -- these comments are

11  labelled as employee, I then fill in

12  manager's comments and there's a period of

13  time in between when Patty has put in her

14  feedback, and I populate mine that it

15  needs to be formally acknowledged and

16  during that open time period I spoke to

17  Patty.

18       Q.    When about did you speak to

19  Patty, approximately?

20       A.    I can't -- I don't know the

21  date.

22       Q.    Do you know a month?

23       A.    I don't know the month.

24       Q.    Okay.  If you look at the top of

25  the document, it says date of review
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2    meeting, January 28th, 2021, do you see

 3    that?

 4         A.    Yes.

 5         Q.    Would that have been the date

 6    that you met with Patty to discuss the

 7    review?

 8         A.    There may have been more than

 9    one time; and, yes, I probably met with

10    her at that time.

11         Q.    What was Patty's response to

12    this performance review?

13         A.    She has made her comments on the

14    document.

15         Q.    Other than what she wrote on the

16    document, what was her response?

17         A.    She was disappointed.

18         Q.    How do you know she was

19    disappointed?

20         A.    We talked for a considerable

21    about of time and more than once about

22    this review.

23         Q.    Did Patty present to you a plan

24    to improve her pipeline in or about

25    January or February of 2021?
```

Adam Overton Kimmick
October 05, 2023

```
1                  A. KIMMICK

2        A.    Yes.

3        Q.    Was that a plan that she put in

4   writing?

5        A.    I don't recall specifically, but

6   I would imagine yes.

7              MS. FISHER:  Okay.  We're going

8         to call for the production of that

9         document.

10             MR. GUIFOYLE:  Put it in

11        writing.  We will take it under

12        advisement.

13       Q.    What do you recall about that

14   plan that she presented to you?

15       A.    It was ineffective.

16       Q.    Why?

17       A.    She didn't make a -- she didn't

18   achieve the business objectives that were

19   part of her targets and objectives.

20       Q.    When did she present that plan

21   to you -- withdrawn.  You already

22   testified it was January or February of

23   2021.

24       A.    I don't think I said that.  I

25   believe that I said I don't recall.
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK
 2        Q.    Well, we can get a reading from
 3    the court reporter.
 4              MS. FISHER:  Stefanie, can you
 5          just read it back?  I think my
 6          question was did she present a plan to
 7          you in January or February of 2021
 8          regarding her plan -- regarding
 9          improving her pipeline.
10              (Whereupon, the referred
11          question and answer was read back by
12          the Reporter.)
13        A.    Okay.  I -- to clarify, it is
14    likely she submitted a plan, but I don't
15    know the dates.
16        Q.    Would it have been after this
17    review?
18        A.    It could have been before.  We
19    have weekly meetings.  We had weekly
20    scheduled sessions one on one so we can
21    talk about the accounts and coverage.
22        Q.    Was anyone else present when she
23    presented that plan to you?
24        A.    Not to my knowledge.
25        Q.    And why do you say the plan was
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK
 2   ineffective?
 3        A.    She didn't achieve the results
 4   that were intended.
 5        Q.    Meaning that she wasn't able to
 6   follow through on the plan?
 7        A.    I specified this in the
 8   manager's comments, and you can read them
 9   and if you clarify that along with that
10   comments that I made in the -- in the
11   prior review that specifies her issues
12   with the team and her clients, it's all in
13   my document -- it's all documented here in
14   her review.
15        Q.    Okay.  But upon asking about the
16   plan that she presented to you, you
17   believe that the plan she presented to you
18   was ineffective, I'm representing to you
19   that the plan was presented in January or
20   February of 2021, which would have been
21   after the review so my question is:    Why
22   was the plan ineffective?  Did she even
23   have a chance --
24        A.    I'm not accepting that the plan
25   was delivered in January or February, I
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2    don't know; and, secondly, the plan was

 3    her plan, the fact that I reviewed it

 4    doesn't take off the fact that this is her

 5    plan and that plan needed to deliver

 6    results.  It may or may not have feedback,

 7    but the results were that the new

 8    opportunities that she created had not

 9    matured, no new deals in the space have

10    moved through the funnel to negotiation,

11    and she had challenges building and

12    growing a healthy business.

13        Q.    Did you --

14        A.    This was fact.

15        Q.    Did you tell her that you

16    thought her plan was ineffective?

17        A.    I don't recall.

18            MS. FISHER:  I'm putting another

19        document in the chat.

20        Q.    Let just me know when you have

21    had a chance to review it.

22        A.    This appears to be a termination

23    letter from HR to Patty.

24        Q.    Right.

25            MS. FISHER:  So this is
```

Adam Overton Kimmick
October 05, 2023

```
 1                 A. KIMMICK
 2     Youkhanna 8 bates stamped P00016 to
 3     P00019.
 4           MR. GUIFOYLE:  Just for the
 5     record it's Youkhanna 1, I believe.
 6           MS. FISHER:  Sorry?
 7           MR. GUIFOYLE:  Youkhanna 1.
 8           MS. FISHER:  I'm sorry.  Sorry,
 9     not Youkhanna.  It's labeled
10     Youkhanna, because I plucked it from
11     the folder for Youkhanna, but this is
12     --
13           MR. GUIFOYLE:  -- Kimmick 8.
14           MS. FISHER:  -- Kimmick 8, yes.
15     This is Kimmick 8.
16           MR. GUIFOYLE:  Thank you.
17           (Whereupon, a termination letter
18     bates stamped P00016 through 00019 was
19     marked as Kimmick Exhibit 8 for
20     identification as of this date by the
21     Reporter.)
22     Q.    So, Mr. KimmicK, is it correct
23     that Haran's termination date was February
24     24th, 2021?
25     A.    That's what is represented in
```

Adam Overton Kimmick
October 05, 2023

```
1                A. KIMMICK

2    this document.  I couldn't personally

3    testify to that, no, but this is what it

4    says in the document.  I'm assuming that

5    that is the date.

6        Q.    Did you memorialize the reasons

7    form Ms. Haran's termination in any

8    document?

9        A.    Not that I recall.

10        Q.    What were the reasons for her

11    termination?

12        A.    That's a very broad question.

13    Can you be more specific?

14        Q.    Why did you decide to terminate

15    Ms. Haran?

16        A.    Nonperformance.

17        Q.    What specifically?

18        A.    As documented in her review, she

19    was unable to produce enough business for

20    the -- enough new pipeline for the

21    business to be healthy in the future, the

22    opportunities were not moving through the

23    -- the pipeline in a sufficient velocity,

24    and she had issues with her piers and

25    customers.
```

Adam Overton Kimmick
October 05, 2023

| | |
|---|---|
| 1 | A. KIMMICK |
| 2 | Q.    The issues with her piers and |
| 3 | customers are the issues that you don't |
| 4 | recall that you testified to earlier? |
| 5 | A.    That is correct, and I believe |
| 6 | in one of the documents that you had sent, |
| 7 | I believe this is the performance review |
| 8 | from -- sorry, I have to go back to look |
| 9 | at the actual performance review again. |
| 10 | One of the reviews I said she had issues |
| 11 | with her piers and that that was feedback |
| 12 | from her customers.  I am looking for it |
| 13 | in the documents. |
| 14 | Q.    Well, I can make it easy, so the |
| 15 | -- |
| 16 | A.    So I said,  "She has not yet |
| 17 | built an agreed consensus on strategy with |
| 18 | her team in response to these difficult |
| 19 | situations, and this has lead to some |
| 20 | miscommunication.  There was also a |
| 21 | miscommunication with a client"  -- |
| 22 | Q.    Are those the issues -- |
| 23 | A.    --  "These episodes results some |
| 24 | concern that Patty may not be fully |
| 25 | understanding feedback, or has not had the |

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2   time to  'read between the lines'

3   regarding indirect or nonverbal cues which

4   are critical for a sales leader."

5        Q.    So are these the issues that are

6   referring to when you made the decision to

7   terminate her?

8        A.    This is one of the many.

9        Q.    Okay.  Are there any other pier

10  and customer issues that you considered

11  when making the decision to terminate her

12  that are not reflected on that performance

13  review?

14       A.    This performance review is a

15  generalization of performance overall and

16  there was -- those situations were

17  addressed as they came up; and, no, there

18  is no documentation.

19       Q.    Did you give Patty a quota for

20  2021?

21       A.    Yes.

22       Q.    When did you give her a quota

23  for 2021?

24       A.    So I believe for 2021 she had --

25  she had at least two territories so she
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK
 2   would have been assigned a target at the
 3   beginning of 2021 which was revised at
 4   least once during the year.
 5      Q.    Did you give her a quota in
 6   writing?
 7      A.    Yes.
 8           MS. FISHER:  We are going to
 9      call for the production of that
10      document.
11      Q.    Isn't it true that --
12      A.    Actually, this is for 2021,
13   right?
14      Q.    Yes.
15      A.    So I may have been mistaken
16   about the year.  Certainly for 2020 she
17   would have had a target and during 2020
18   she would have had multiple targets.  I
19   don't know whether for 2021 that target
20   was communicated or not.  Since she was
21   terminated in February of 2021, it is
22   possible she did not yet have a full
23   target for 2021.
24      Q.    Did you give full targets to any
25   other employees that reported to you for
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2   2021?

 3      A.    I don't recall.  Sorry, I was

 4   mistaken about the dates.

 5      Q.    That's okay.

 6            So you don't recall whether or

 7   not she was given a target for 2021, just

 8   to clarify for the record?

 9      A.    No, I don't.  Since she was

10   terminated in February of 2021, it's

11   unlikely that she was communicated her

12   full target by then; however, I don't

13   know, I can't -- I can't validate it.  I

14   don't know.

15      Q.    Did you -- and you don't recall

16   whether or not you gave anyone else their

17   targets at that time?  By February of

18   2021, had you given anyone else their

19   targets?

20      A.    I don't recall.

21      Q.    When do you typically give

22   targets to employees reporting to you?

23      A.    We begin talking about budgets

24   in August, we talk about requirements and

25   the need for additional pipeline, what's
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2    going to be required in order to achieve

3    business goals, those are discussed, and

4    budgets are then agreed in the

5    October/November timeline; however, the

6    compensation plan is not usually

7    formalized until March or even sometimes

8    April when the compensation guidelines

9    against the actual targets can be measured

10   against compensation and so the actual

11   written targets are formally placed

12   against the budget, and we -- and we

13   provide that as a formal document in a --

14   in a goal sheet, but that goal sheet

15   usually isn't produced until after the

16   compensation plan is agreed and since the

17   compensation plan is not likely agreed

18   until March, but people don't have their

19   full targets formally presented until

20   March or even sometimes April.

21            However, budgets are discussed

22   and pipeline is discussed and future

23   business is discussed as part of an

24   ongoing health of the business.

25       Q.    If she didn't have a quota as of
```

Adam Overton Kimmick
October 05, 2023

```
1                  A. KIMMICK

2      February 2021, how was it that you

3      determined that her pipeline was

4      insufficient to meet her quota?

5         A.    We wouldn't have made the budget

6      with the current pipeline that she had.

7      She had a history of not closing the deals

8      that she had in her pipeline.

9         Q.    Which deals?

10        A.    I don't recall them all.

11        Q.    And why -- when you say she had

12     a history of not closing deals, you are

13     saying this happened multiple times?

14        A.    I would say that the pipeline

15     and the pipeline velocity and how the

16     opportunities were being managed was not

17     effective for producing the results

18     required for the business.

19        Q.    Did the -- did she fail to close

20     deals multiple times?

21        A.    I would have to go back and look

22     at the detail, but yes.

23        Q.    Are you talking about B-end

24     accounts or A-end accounts?

25        A.    Certainly her performance as an
```

Adam Overton Kimmick
October 05, 2023

1                    A. KIMMICK

2    B-end account manager because she had less

3    responsibility, and she was -- it was a

4    slightly different kind of a territory

5    from a communication requirements

6    perspective that her performance clearly

7    was more ineffective as an A-end account

8    manager.

9        Q.    So let's take her B-end

10   performance, how was her performance on

11   her B-end accounts as of February of 2021?

12       A.    I believe in February of 2021

13   she had responsibilities for both.

14       Q.    How was her performance on her

15   B-end accounts as of February of 2021?

16       A.    I can't recall.

17       Q.    Were there any deals she failed

18   to close on her B-end accounts?

19       A.    I can't recall.

20       Q.    Were there any deals on her

21   A-end accounts that she failed to close?

22       A.    I can't recall that detail.

23       Q.    When you testified earlier that

24   based on her pipeline she would not have

25   made the budget, what do you mean by that?

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK

2       A.    She identified pipeline, and she

3   had identified opportunities with some

4   customers, but those opportunities were

5   not maturing, they weren't moving through

6   the pipeline, they weren't being proposed

7   or negotiating, they weren't moving

8   towards closure and, therefore, there was

9   a low expectation that she would make her

10  target and, therefore, make the needs of

11  the business and, yeah, I mean, these --

12  the projects she was working on were long

13  shots, and she wasn't doing what was

14  necessary to move them forward.

15      Q.    Did she have a chance to do that

16  before she was terminated?

17      A.    That's the job.

18      Q.    Well, when she --

19      A.    That's what an account manager

20  is hired to do.

21      Q.    When she presented her plan to

22  you to increase her pipeline from that

23  time until the time she was terminated,

24  did she have an opportunity to pursue the

25  opportunities she outlined?
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2     A.    Yes.

 3     Q.    How much time?

 4     A.    I don't recall.

 5           MS. FISHER:  I'm just going to

 6     put another document in the chat.  One

 7     second.

 8     Q.    Let me know when you are able to

 9  review that.

10     A.    Okay.  This appears to be a

11  first half 2020 review with large pieces

12  redacted.

13           MS. FISHER:  Okay.  So this is

14     Kimmick 9, I believe, and it is bates

15     stamped OBS_00711 through 00713.

16           (Whereupon, a performance report

17     bates stamped OBS_00711 through 00713

18     was marked as Kimmick Exhibit 9 for

19     identification as of this date by the

20     Reporter.)

21     Q.    The section that is not redacted

22  regarding Patty Haran, did you write this?

23     A.    Yes.

24           MS. FISHER:  Okay.  I'm putting

25     yet another document in chat.
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2        Q.    Let me know when you have had

 3   the opportunity to review the latest

 4   document.

 5              Actually, this is not -- this is

 6   a repeat of a document that I introduced

 7   earlier.

 8        A.    Yes.  I already have this one

 9   opened.

10        Q.    Yeah.  We're not going to mark

11   this document.

12        A.    We already did.

13              MS. FISHER:  Okay.  I'm going to

14        put another document in the chat.

15        Q.    Let me know when you have had an

16   opportunity to review the latest.

17        A.    Okay.

18        Q.    Do you recognize this document?

19        A.    It appears to be a sales

20   compensation summary from December 31st of

21   2020.

22        Q.    What time period did this cover?

23        A.    It appears to be January 1st,

24   2020 to January the 31st of 2020.

25        Q.    This is a sales compensation
```

Adam Overton Kimmick
October 05, 2023

| | |
|---|---|
| 1 | A. KIMMICK |
| 2 | summary for Patty Haran? |
| 3 | A.    It is. |
| 4 | MR. GUIFOYLE:  I will just note |
| 5 | my objection as to this document being |
| 6 | introduced as an exhibit.  It does not |
| 7 | bear any bates label so there's no way |
| 8 | of knowing where it came from. |
| 9 | MS. FISHER:  Okay. |
| 10 | Q.    Do you recognize this document |
| 11 | as an accurate sales compensation summary |
| 12 | for Patty Haran? |
| 13 | MR. GUIFOYLE:  Objection to |
| 14 | form. |
| 15 | You can answer, if you know. |
| 16 | A.    It appears to have the right |
| 17 | format.  I can't testify to the numbers. |
| 18 | MS. FISHER:  Okay.  Give me one |
| 19 | second. |
| 20 | (Whereupon, a short recess was |
| 21 | taken.) |
| 22 | Q.    If you can open that and let me |
| 23 | know when you are done reviewing it. |
| 24 | A.    Okay. |
| 25 | MS. FISHER:  This is Kimmick 10 |

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK
2        marked OBS_00233 to 234.
3               (Whereupon, a 2020 sales
4        compensation payment summary for Patty
5        Haran bates stamped OBS_00233 to 00234
6        was marked as Kimmick Exhibit 10 for
7        identification as of this date by the
8        Reporter.)
9        Q.    Do you recognize this document?
10       A.    It appears to be a sales
11  compensation, what we call workbook.  Yes,
12  I recognize the format and -- yeah.
13       Q.    Okay.  And is this the 2020
14  sales compensation payment summary for
15  Patty Haran?
16       A.    That's what the document says,
17  yes.
18       Q.    Do you see the third box down
19  from the left where it says YTD
20  achievement and annual achievement?
21       A.    Yes.
22       Q.    What does YTD achievement
23  represent?
24       A.    Year to date.
25       Q.    Okay.  Achievement meaning how
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK
2    Patty Haran paired against her quota?
3        A.    Correct.
4        Q.    And annual achievement, what
5    does that represent?
6        A.    That means the achievement
7    against her target or quota for the year.
8        Q.    Well, how does year to date
9    versus annual achievement, how do they
10   differ?
11       A.    Well, they don't in this case
12   because the statement is from December the
13   31st, 2020.
14       Q.    Okay.  What does revenue mean?
15       A.    Revenue is the total revenue
16   target and what the accounts in her
17   territory delivered during that time
18   period.
19       Q.    And according to this it says
20   that Patty achieved 100.58 percent of her
21   revenue goal?
22       A.    That is correct.  What I would
23   say, though, is that during 2020 Patty had
24   multiple territories, this is a summary
25   for the year, so this doesn't reflect
```

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK
2    simply what was going on with one set of
3    accounts or in one territory.
4              As I recall, Patty was managing
5    B-end accounts at the beginning of the
6    year, midyear there was a new person that
7    came in to manage the B-end accounts, but
8    Patty had been managing them for the
9    beginning of the year, and I felt it
10   appropriate at the time to make sure that
11   Patty was compensated appropriately for
12   the work that she was doing not only on
13   her new territory, but also on her old
14   territory, and because of that I made an
15   adjustment mid year to Patty's quota that
16   lowered her quota so that she would be
17   paid close to 100 percent.
18             Therefore, I would say that for
19   the -- for this particular year, because
20   it was a year that was fraught with Covid,
21   that the result on revenue was a
22   manipulated number so I could compensate
23   Patty for the work that she was doing;
24   also, I would say that it doesn't
25   represent the future and what the future
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2   held in her new territory, which is much

 3   more compelling from a review perspective

 4   than what she was made or whether she made

 5   her target in the past.

 6       Q.    So this sales compensation

 7   payment summary is only reflective of one

 8   set of accounts that Patty managed; is

 9   that accurate?

10       A.    No.

11       Q.    So this does this reflect all of

12   the accounts that she managed?

13       A.    Yes, in multiple territories.

14       Q.    Okay.  Did you change the quota

15   for anyone else during 2020?

16       A.    I don't recall.

17       Q.    What does orders N&G core mean?

18       A.    So orders new & get, these are

19   core products and services, meaning, these

20   are what -- what produce the vast majority

21   of our revenues for the future; and,

22   again, this number was manipulated based

23   on mid-year results and her covering

24   multiple territories; new & get strategic

25   are new sets of business around strategic
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2    products; and keep business is business

 3    that we expect would renew so she had a

 4    number of accounts in her territory that

 5    she was assigned that did not renew that

 6    would affect future revenue and that --

 7    and that revenue we can't expect to keep

 8    for the next year because those customers

 9    were not reviewed.

10        Q.    Okay.

11        A.    So this would indicate that --

12    that she made a revenue number, she was

13    close on her new & get core and strategic

14    numbers, but she was unable to keep the

15    current business, and she needed to make

16    up for that by overachieving in seven

17    other areas; and, again, what I would say

18    here is that this is not necessarily a

19    representation of the future performance

20    that's expected, but it's a representation

21    of a manipulation, because she was

22    managing a B-end and an A-end territory

23    for half of the year, and we were trying

24    to make sure -- I was trying to make sure

25    that Patty was compensated appropriately
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK
2    for what I considered to be a favor that I
3    had asked her to do.
4         Q.    What was the favor?
5         A.    She was managing her old
6    territory and her new territory while the
7    new person was coming in during Covid.
8         Q.    And that was -- you asked her to
9    do that?
10        A.    I asked for her to do that, yes,
11   I did.
12        Q.    When did you ask her to do that?
13        A.    Early in the year, and I told
14   her that I would make up for it, which I
15   did.
16        Q.    Did anyone else reporting to you
17   have a similar percentage or not achieve
18   their goal for orders keep in 2020?
19        A.    I don't recall.  I would say
20   that the expectation for renewals is 100
21   percent.  We target 100 percent of
22   renewals, meaning that if we a have
23   customer whose a current customer the
24   expectation is that customer would
25   continue with Orange and that is an
```

```
 1              A. KIMMICK
 2  expectation is of the business, right, and
 3  so a target accomplishment of 11 percent
 4  would be low; but on the other hand, I
 5  can't say that -- that I recall any other
 6  person in that -- in that -- that would
 7  have had a category like that, but I would
 8  say that the expectation was that -- that
 9  we would renew 100 percent of the time.
10  Of course, that doesn't always happen,
11  which is all the time which is why we are
12  in sales.  It's a tough job.
13      Q.   So is the failure to meet the
14  renewal quota a reason alone to terminate
15  someone?
16      A.   No.
17      Q.   Did you discuss this sales
18  compensation summary with her?
19      A.   I don't recall.  I know I did
20  talk to her about the target reset that I
21  did mid year to make sure that she
22  understood what I -- the promise that I
23  had made early in the year I was keeping
24  good on.
25      Q.   Was the target reset presented
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2   to her as a new goal sheet?

 3       A.    Yes.

 4       Q.    And you saying that it

 5   represented or reflected a lower quota

 6   than the goal you presented to her in the

 7   beginning of the year in 2020?

 8       A.    I would not say that it was

 9   lower.  I would say it was adjusted to

10   reflect a higher payout.

11       Q.    Did she still have the same

12   target?

13       A.    She had the same

14   responsibilities to the business.

15       Q.    Okay.  So did she have the same

16   quota?  Did the quota change at all during

17   2020?

18       A.    Yes.

19       Q.    So was she expected to meet the

20   same target numbers?

21       A.    I don't understand the question.

22       Q.    When you say that her quota was

23   changed midyear, what specifically about

24   the quota was changed?

25       A.    It was manipulated to make sure
```

Adam Overton Kimmick
October 05, 2023

```
 1                A. KIMMICK

 2   that she was compensated in -- compensated

 3   more.

 4        Q.    Okay.  But --

 5        A.    Because I had asked her to do me

 6   a favor and manage some of these accounts

 7   during a difficult period of Covid, and I

 8   didn't have -- I couldn't hire another

 9   person quickly enough to get them into the

10   role that she was vacating so she managed

11   some of those accounts, she did me a favor

12   in managing those accounts, and I paid her

13   for it.

14        Q.    But was her target, the number

15   she was supposed to achieve for revenue

16   and all the four categories on her

17   compensation summary, were the target

18   numbers lower?

19        A.    I can't say that for a fact,

20   because I -- I can only say that we tried

21   to adjust the numbers to achieve a result

22   and higher pay.

23             MS. FISHER:  I'm going to put

24        another document in the chat.

25        Q.    Specifically to the fourth tab
```

Adam Overton Kimmick
October 05, 2023

| | |
|---|---|
| 1 | A. KIMMICK |
| 2 | on the bottom of this spreadsheet. |
| 3 | A.    Okay. |
| 4 | MS. FISHER:  For the record, |
| 5 | this is Kimmick 11 and it's an Excel |
| 6 | spreadsheet marked OBS_001006. |
| 7 | (Whereupon, an Excel spreadsheet |
| 8 | bates stamped OBS_001006 was marked as |
| 9 | Kimmick Exhibit 11 for identification |
| 10 | as of this date by the Reporter.) |
| 11 | Q.    Okay.  Do you see Column D where |
| 12 | it says salesperson? |
| 13 | A.    Yes. |
| 14 | Q.    Do you see Patricia Haran's name |
| 15 | twice in Rows 10 and 15? |
| 16 | A.    Yes. |
| 17 | Q.    Why do you have her -- why is |
| 18 | she listed twice here? |
| 19 | A.    I don't know.  I would be |
| 20 | speculating. |
| 21 | Q.    Okay.  If you could scroll over |
| 22 | to Column Z, let me know when are you |
| 23 | there.  Are you in -- looking at Column Z |
| 24 | now? |
| 25 | A.    Yes.  It appears to be a revenue |

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK
 2    annual attainment.
 3        Q.    Right.  Okay.
 4              So for Ms. Haran it looks like
 5    one cell which is for Row Z so Cell Z10
 6    says 101 percent and then Z 15 has her at
 7    0 percent, do you know why?
 8        A.    I don't.  I would be
 9    speculating.  A possible possibly, she had
10    two goal sheets, meaning that she had two
11    sets of targets and the reason I would
12    have separated these is to have one set of
13    territory results separated for another so
14    that I could end up at the compensation
15    goal that I had intended.
16              Again, this has to do with her
17    carrying responsibilities as a favor for
18    me and, again, I was trying to achieve a
19    compensation result for Patty for the year
20    which -- which was achieved.  I made a
21    promise, and I kept it.
22        Q.    Okay.  If you could scroll over
23    to Column A  "L" as in Larry, let me know
24    when you are there.
25        A.    New & get annual achievement.
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2        Q.    Yes, exactly.  So there are --

3   the beginning, one, two, three, four,

4   five, six, seven, eight, nine, the

5   beginning nine cells in that column for

6   various salespeople is not populated, do

7   you know why?

8        A.    Again, I would be speculating,

9   but the three individuals that are listed

10  on the bottom are integration services

11  specialist, and they had -- they had

12  targets that were slightly different

13  because they were, as I described earlier,

14  overlay roles so their roles were reliant

15  on only one product line and probably what

16  happened in this case is that the

17  compensation tool pulled out the results

18  only for that product associated with new

19  & get annual achievement for that product.

20       Q.    Is this spreadsheet a document

21  that you have ever seen before today?

22       A.    No.

23       Q.    Do you know where the --

24       A.    Again, I'm speculating on why I

25  would have -- yeah, I never seen this.
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2        Q.    Do you know where the

 3   information came from that populated the

 4   spreadsheet?

 5        A.    No, I don't.

 6        Q.    Is there a document that lists

 7   all of the accounts in Ms. Haran's book?

 8        A.    Yes, it's called a goal sheet.

 9        Q.    And it has all the different

10   accounts or theoretically it should have

11   the different accounts that she was

12   responsible for?

13        A.    Yes.

14             MS. FISHER:  Okay.  I'm putting

15        another document in the chat.

16             (Whereupon, a 2020 goal sheet

17        was marked as Kimmick Exhibit 12 for

18        identification as of this date by the

19        Reporter.)

20        Q.    Let me know when you have had a

21   chance to review that.

22        A.    This appears to be her original

23   goal sheet from January of 2020 largely

24   with accounts in her new territory.  There

25   are two accounts that she requested to
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2    keep, because they had ongoing opportunity

3    and revenue that she felt she would be

4    compensated on during the era, and I

5    allowed her to keep those, LVMH and Cap

6    Gemini, but this appears to be her goal

7    sheet as of January 1st, 2020.

8         Q.    Does this reflect as of that

9    date all of the accounts -- all the

10   customers she had in her book?

11        A.    As of that date, it -- it does.

12        Q.    And you said there was another

13   goal sheet subsequent to this in 2020?

14        A.    I'm speculating.  I don't know

15   whether or a new goal sheet was produced

16   or not for a fact, because I don't have it

17   in front of me, but I do know that the

18   process in which the change in

19   compensation would happen requires both of

20   -- a goal sheet to be produced and that

21   goal sheet to be approved by me so I would

22   imagine there is another goal sheet in

23   2020 that Patty is associated with, and I

24   would also imagine that those accounts

25   would be listed in that goal sheet.
```

Adam Overton Kimmick
October 05, 2023

| | A. KIMMICK |
|---|---|
| 1 | A. KIMMICK |
| 2 | Now, it's possible that I used |
| 3 | the -- the existing accounts in order to |
| 4 | come up with the result and didn't change |
| 5 | the accounts and just changed the goal |
| 6 | sheet itself in order to come up with a |
| 7 | compensation that I had -- I had indicated |
| 8 | to Patty in the beginning of the year that |
| 9 | I would try to do as part of my promise to |
| 10 | her. |
| 11 | Q.    So is it accurate to say that |
| 12 | Ms. Haran met her quota in 2020 for three |
| 13 | of the four categories meaning revenue, |
| 14 | orders new and get core and orders new and |
| 15 | get strategic, is it accurate to say that? |
| 16 | A.    No. |
| 17 | Q.    Why is it not accurate? |
| 18 | A.    Because the results were |
| 19 | manipulated in order to produce her result |
| 20 | in higher compensation.  What I would say |
| 21 | was accurate was that if that -- that |
| 22 | manipulation did not happen, she would not |
| 23 | have made her target. |
| 24 | Q.    And what would her percentages |
| 25 | have been? |

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK
 2        A.    It is impossible to tell.
 3        Q.    How do you know she would not
 4   have made her target?
 5        A.    Because she wasn't assigned the
 6   accounts that she was working on.
 7        Q.    What do you mean by that?
 8        A.    I mean, I asked her as a favor
 9   to cover some other accounts that she was
10   working on, largely administrative tasks
11   and some other account management relation
12   management kind of things and those
13   accounts needed attention, therefore, it's
14   unlikely that she would have made her
15   target on any of those accounts given the
16   status of them, that changed in July, I
17   paid her in -- I paid her based on full
18   achievement of her compensation in return
19   for that favor that she covered those
20   accounts and for the second half of the
21   year largely Covid was over, she had her
22   new territory and in that new territory
23   she was also not performing.
24        Q.    So are there any documents that
25   reflect how she was actually performing
```

Adam Overton Kimmick
October 05, 2023

```
 1                A. KIMMICK

 2   versus the manipulation?

 3        A.    Her reviews that I provided.

 4        Q.    The reviews don't have numbers,

 5   right, and they don't provide percentages

 6   of her quota; am I right?

 7        A.    Not complete, and they would

 8   reflect only what was in workbook.

 9        Q.    Okay.  So are there any

10   documents that show how she was actually

11   performing, what her percentages were?

12        A.    Again, I think, you know, from a

13   -- from a territory perspective Covid was

14   a difficult time.  As a manager, I was

15   trying to make sure that I was taking care

16   of my employees.  Patty had stepped up to

17   take only a series of responsibilities

18   that helped me and the business, and I

19   paid her for that.

20        Q.    My question is whether or not

21   there is any documents that reflect how

22   she was actually performing?

23        A.    The only documents that you

24   could look at were the documents that you

25   have.
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2      Q.    Which document are you referring

 3   to?  Are you talking about the 2020 sales

 4   compensation summary?

 5      A.    Yes.

 6      Q.    That document you said is --

 7   shows manipulated numbers, I'm asking if

 8   there is any document that shows how she

 9   was actually performing that was not

10   manipulated?

11      A.    Those are real numbers, and she

12   was paid against those numbers and I'm

13   telling you they were manipulated.

14      Q.    They were -- okay.

15            So these numbers you're saying

16   are real, but you're also saying they were

17   manipulated so I'm trying to understand

18   the difference, I'm trying to understand.

19      A.    There is no difference.

20      Q.    Well, had she --

21      A.    That was her performance at the

22   end of year, that was what she was paid

23   for.

24            (Indiscernible crosstalk.)

25      Q.    Hold on.  Hold on.  Hold on.
```

Adam Overton Kimmick
October 05, 2023

```
 1                A. KIMMICK
 2    Hold on.  Hold on.  Hold on.  The court
 3    reporter can't type us talking at the same
 4    time.  Let me clarify what I'm asking,
 5    okay?
 6                If you had not manipulated the
 7    numbers that you manipulated, is there a
 8    document that reflects how these
 9    percentages would have been different?
10        A.    Not to my knowledge.
11        Q.    So we don't know from any
12    documentation what her percentages would
13    have been had you not manipulated the
14    numbers?
15        A.    Not to my knowledge.
16        Q.    Was Ms. Haran's orders keep
17    percentage, the 11.33 percent, a factor
18    that you considered when terminating her?
19        A.    Yes.
20        Q.    And did anyone else have an
21    orders keep percentage that you deemed
22    unacceptable for the 2020 year?
23        A.    I can't recall.
24                MS. FISHER:  Okay.  I'm going to
25        put another document in the chat.
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2       Q.    Let me know when you are able to

3   review that.

4       A.    Okay.

5       Q.    Do you recognize this document?

6       A.    It appears to be the sales

7   compensation workbook for Angela Arias for

8   --

9       Q.    And that's for the --

10      A.    Sorry.

11      Q.    Sorry.  Go ahead.

12      A.    For the year 2020.

13      Q.    Okay.

14            MS. FISHER:  This is Kimmick 13

15      and it's bates stamped OBS_01271 to

16      01272.

17            (Whereupon, the aforementioned

18      sales compensation workbook for Angela

19      Arias bates stamped OBS_01271 to 01272

20      was marked as Kimmick Exhibit 13 for

21      identification as of this date by the

22      Reporter.)

23      Q.    Do you know why there is only

24   two categories, revenue and order new &

25   get, for Angela Arias?
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2         A.    Angela was an overlay, she had

3     the title of integration services

4     specialist and only had targets based on

5     integration services, products and

6     services and as such they were no renewals

7     because those products are all sold new.

8         Q.    Got it.

9               What is the percentage that you

10    look for for orders keep?  Typically I

11    know that ideally you would have it at 100

12    percent, but is there a percentage that

13    you deem to be unacceptable?

14        A.    So it is a -- typically we try

15    to guess at when the renewal will happen,

16    we like to do it exactly when the contract

17    expires so that we don't give price

18    advantage too early, and we don't want to

19    do it after the contract expires, because

20    then it's not enforced and so when the end

21    of the contract term comes, we assign a

22    quota for the end of that contract period

23    for the customer; so, for example, if the

24    contract is up on July the 31st, we will

25    have that target within the year of -- of
```

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK
2   that July -- that particular July fell.
3        Q.    Okay.
4        A.    So if the contract gets renewed
5   early then the -- the target might not hit
6   that -- that calendar year.  If it does
7   not get renewed then the -- typically the
8   account manager would pay the penalty for
9   not renewing it on time by not getting
10  compensated for that, but they would carry
11  the full target the next year.
12       Q.    Okay.  Is there a percentage
13  that you look for for orders keep that is
14  satisfactory or?
15       A.    Typically we look for expansion
16  and so when a contract renews the
17  expectation is it would be renewed at 100
18  percent and typically with a successful
19  account person the keep number would be
20  larger than in prior renewals and so the
21  expectation is that it would be at least
22  100 percent of the existing.
23            Now, that -- again, that -- that
24  is somewhat subjective, because certain
25  products mature at different times, there
```

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK

2   can be a ragged edge products and services

3   that are associated with that and all that

4   needs to be taken into account during the

5   budget process, which is why I explained

6   that it's difficult to set a target before

7   the compensation plan is set which is why

8   most people don't have their target fully

9   baked out until March or April because the

10  budget is set based on the expectation of

11  the existing contract and all its

12  complexities, the larger the deal, the

13  more complex it gets and the more

14  expectation that the account leader on

15  that account would know the account and be

16  able to budget effectively and then plan

17  ahead to make sure that they are doing

18  enough work in order to expand the revenue

19  on the accounts.

20      Q.    But so 11 percent of renewals is

21  -- that's a number that you deem to be

22  low, correct?

23      A.    Absolutely.

24      Q.    Okay.  What percentage do you

25  deem to be low for renewals?
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2      A.    The compensation plan does not

 3   pay below 50 percent so I personally would

 4   think that below 100 percent would not be

 5   acceptable because I have high

 6   expectations, but I know that that's

 7   unreasonable.  The compensation plan does

 8   not pay below the 50 percent so that --

 9   the company has decided that is

10   unacceptable, and we wouldn't even pay for

11   amounts below that number.

12      Q.    Is that 50 percent the same for

13   the other categories as well, for the

14   revenue and the orders new & get?

15      A.    No.

16      Q.    What is the percentage according

17   to the compensation plan, what's the

18   minimum percentage that needs to be

19   acquired on revenue?

20      A.    I would have to check for that

21   compensation year.  It changes every year.

22      Q.    Do you know what the minimum

23   percentage is for orders new & get for the

24   2020 year?

25      A.    I don't.
```

Adam Overton Kimmick
October 05, 2023

1            A. KIMMICK

2       Q.    And what about --

3       A.    But it, you know, the

4   expectation is that a salesperson will

5   achieve 100 percent.  If they don't

6   achieve 100 percent then you have to look

7   at what the mitigating factors were and

8   are there other things involved in what's

9   going on like customer relationships and

10  piers and all kind of other factors,

11  right, so yeah.

12      Q.    Do you know what the minimum

13  percentage was for orders new & get

14  strategic in 2020?

15      A.    I don't.

16          MS. FISHER:  Okay.  I'm going to

17      put a document in the chat, which will

18      be Kimmick 14.

19          (Whereupon, a sales compensation

20      workbook for Danielle Willins bates

21      stamped OBS_01088 to 01089 was marked

22      as Kimmick Exhibit 14 for

23      identification as of this date by the

24      Reporter.)

25      Q.    Let me know when you have had a

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2    chance to review it.

 3         A.    Okay.

 4              MS. FISHER:  This document is

 5         stamped OBS_01088 to 01089.

 6         Q.    Do you recognize this?

 7         A.    This appears to be the

 8    compensation workbook for Danielle Willins

 9    to the year January to December of 2020.

10         Q.    And, again, there is only two

11    categories for Danielle Willins, was she

12    also an integration service specialist?

13         A.    Yes.

14         Q.    You see her revenue is 61.87

15    percent?

16         A.    Yes.

17         Q.    Is that something you deem to be

18    low?

19         A.    All of the integration

20    specialists were removed from the business

21    because they were nonperforming, it was a

22    class issue.  All of them were made

23    redundant.

24         Q.    Okay.

25         A.    So, yes, this was unacceptable.
```

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK

2         MS. FISHER:  Okay.  I'm putting

3     another document in the chat.  This is

4     Kimmick 15.  It's bates stamped

5     OBS_00659.

6              (Whereupon, an e-mail bates

7     stamped OBS_00659 was marked as

8     Kimmick Exhibit 15 for identification

9     as of this date by the Reporter.)

10    Q.    Could you take a look at this

11 and let know me know when you are done,

12 please?

13    A.    Okay.

14    Q.    Do you recognize this?

15    A.    Yes.

16    Q.    What do you recognize it to be?

17    A.    It appears to be an e-mail that

18 I send sent to Moodys announcing the

19 change from Lorna to Patty.

20    Q.    You wrote that Lorna had decided

21 to leave the Orange family; is that true?

22    A.    Correct.

23    Q.    Did you -- did she not get

24 terminated?

25    A.    No.  She left on her own.
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2       Q.    And you represent in this e-mail

3   that Patty would be taking on Lorna's

4   responsibilities, correct?

5       A.    That's correct.

6       Q.    And that was all the

7   responsibilities for the Moodys account?

8       A.    Yes.

9       Q.    Okay.  And Moodys was an A-end

10  account?

11      A.    Correct.  This is part of her

12  new territory.

13      Q.    And was this e-mail sent at the

14  time that the change happened in January

15  of 2020?

16      A.    It appears so, yes.

17      Q.    When did you first learn that

18  Ms. Haran's daughter had a health

19  condition?

20      A.    I can't recall the date.

21      Q.    Do you recall an approximate

22  timeframe?

23      A.    No.  I remember the call.  She

24  had -- she described the -- an event that

25  was not pleasant and that she had needed
```

Adam Overton Kimmick
October 05, 2023

```
 1                 A. KIMMICK

 2   to take some time to take care of her and

 3   go to the hospital and do whatever she

 4   needed to do and, yeah, I felt sorry for

 5   her.

 6         Q.    Do you have children?

 7         A.    I do.

 8         Q.    Have you ever had to take time

 9   off work to care for a child due to

10   illness?

11         A.    Thank God I have not.

12         Q.    Has anyone else that reported to

13   you had to take off work to care for a

14   child with a health condition?

15         A.    Not that I recall, but I been a

16   manager for nearly 40 years.  I don't

17   remember everything.

18         Q.    What was it that Patty told you

19   that was the unpleasant event?

20         A.    She said that her daughter was

21   having some pain in her leg and that she

22   was -- was on a trampoline and that

23   something had happened to her, that she

24   had injured herself, and she went to check

25   it out and the doctor had diagnosed
```

Adam Overton Kimmick
October 05, 2023

```
 1                  A. KIMMICK
 2    something more severe, which was
 3    concerning and obviously horrible.
 4        Q.    Are you aware that her daughter
 5    had to have a surgery?
 6        A.    I was aware that there were
 7    procedures done, I was not aware of the
 8    detail behind, yeah, so, I mean, I wasn't
 9    aware of the depth or nature of the
10    surgery.  I knew that there were
11    procedures being done, and I didn't know
12    how severe it was, I just assumed that it
13    was because it was her daughter, I mean, I
14    would have been horrified so I assumed
15    that she needed to take whatever time she
16    needed.
17        Q.    Did you inform Eddi Youkhanna
18    about Ms. Haran's daughter's illness?
19        A.    Not that I can recall.
20        Q.    Did you inform Eddi Youkhanna
21    that Patty had to take time off of work
22    because of her daughter's medical
23    condition?
24        A.    Not that I can recall.  It may
25    have been possibly a topic of, I mean, I
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2    may have announced it as part of -- if

 3    Patty have allowed me to I would have

 4    asked Patty because I want to share with

 5    my team the concerns going on with other

 6    team members because we are a team, I

 7    would have shared with the team what was

 8    happening, but I would have asked Patty's

 9    okay to release that information, I don't

10    recall the detail behind it.  I don't

11    recall whether I had conversations

12    specifically with the team or other team

13    members, but that is something I might

14    have done because obviously I wanted

15    everyone to support Patty at a time of

16    need.

17        Q.    Did Patty ever inform you that

18    her daughter needed surgery?

19        A.    As I said, I was -- I was aware

20    of a procedure, I was aware that there was

21    an issue going on that was beyond just a

22    normal injury, but I was not aware of the

23    details of the surgery, no.

24        Q.    I'm not asking you whether you

25    were aware of the details of the surgery,
```

Adam Overton Kimmick
October 05, 2023

```
 1                A. KIMMICK
 2    did Patty ever inform you that her
 3    daughter needed surgery?
 4        A.    I was aware that there were
 5    procedures happening and that it was
 6    beyond a simple injury that happened on a
 7    trampoline, there was a diagnosis that was
 8    made that was beyond typical injury, I
 9    don't know what actions needed to happen
10    beyond that and --
11        Q.    So just to answer --
12        A.    I know that Patty didn't tell me
13    that there was anything going on, I mean,
14    it was enough so that I was very
15    concerned, but I didn't know all of the
16    details of -- of everything that was going
17    on, no.
18        Q.    Okay.  So my question is very
19    specific, it's not about procedures, it's
20    about -- specifically about surgery.  Did
21    she ever inform you that her daughter
22    needed surgery?
23        A.    I can't recall that conversation
24    in particular, no; but, again, I mean, I
25    knew it was significant, I knew that it
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2   was beyond a normal injury, right, but

 3   there was no way for me to know what those

 4   procedures might be or how severe it was.

 5        Q.    Were you -- did Patty tell you

 6   she needed to take time off work on an

 7   ongoing basis for her daughter?

 8        A.    She said she needed to take some

 9   time off, and I told her take whatever

10   time she needed.

11        Q.    Okay.  In 2021, during the

12   months of January and February while she

13   was still employed, did she inform you

14   that she needed to take any more time off

15   work for her daughter?

16        A.    I can't recall the dates.  I

17   don't believe that she sent me anything in

18   writing.

19        Q.    Did you ask her to send you

20   anything in writing?

21        A.    No.  I told her to take whatever

22   time she needed.  She was -- she was

23   having difficulty with her daughter, and I

24   wanted her to be doing what she needed to

25   do for her family.
```

Adam Overton Kimmick
October 05, 2023

```
 1                   A. KIMMICK

 2           MS. FISHER:   Okay.  I just put

 3      another document in the chat.  This

 4      will be Kimmick 16 and bates stamped

 5      OBS_0575 to 576.

 6              (Whereupon, a chat bates stamped

 7      OBS_00575 to 00576 was marked as

 8      Kimmick Exhibit 16 for identification

 9      as of this date by the Reporter.)

10      Q.    Just let me know when you have

11   had a chance to review this.

12      A.    Okay.  So this looks like I -- I

13   more than likely called Eddi to tell her

14   what's happening based on the training

15   class.

16      Q.    Okay.  Hold on.  Let me just ask

17   some specific questions.  You recognize

18   this?

19      A.    No, but it -- it appears to be a

20   text conversation between me and Patty.

21      Q.    Okay.  And the date of the

22   conversation is October 8th, 2020 as

23   reflected on this document; is that

24   correct?

25      A.    Yes.
```

Adam Overton Kimmick
October 05, 2023

```
1              A. KIMMICK

2       Q.    And in this conversation you

3  state at 3:06 p.m.,  "I'll let Eddy know"

4  in response to Patty telling you that she

5  needs to take time off work for her

6  daughter's surgery, correct?

7       A.    She says her daughter's

8  situation, she doesn't say surgery, and

9  she asked me whether she -- she should let

10 Eddi know about whether somebody else

11 should fill the spot, and I told her at

12 time that I haven't told Eddi or anyone

13 about her daughter yet, and I told her

14 obviously, here, I said, that if you can't

15 join, I will let him know, and he would

16 understand, I'm sure he did, and I told

17 her to take the time.

18      Q.    Right.  Do you see the --

19      A.    And I --

20      Q.    Sorry.  Go ahead.

21      A.    Okay.

22      Q.    Do you see at 3:06 where she

23 wrote,  "me either.  he just needed to

24 fill some training spots so he asked and

25 at that time I thought I could participate
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2    but today we found out she will need

 3    surgery and it will likely be on wed,"  do

 4    you see that?

 5        A.    I do.

 6        Q.    Okay.  So she did inform you

 7    that her daughter would need surgery?

 8        A.    It appears so, yes.

 9        Q.    And then in response you wrote,

10    "just take the time Patty I'll let Eddy

11    know;"  and then after that you wrote,

12    "just called Eddy,"  do you see that?

13        A.    Yes.

14        Q.    So, in fact, you spoke to Eddi

15    about Patty taking time off work for her

16    daughter's illness?

17        A.    This seems all in line.  I don't

18    -- I mean, I didn't recall it at the time,

19    but this sounds like something I would do,

20    absolutely.

21        Q.    When -- actually, who

22    participated in the decision to terminate

23    Ms. Haran?

24        A.    It was me, and I conferred with

25    Eddi and Jen Lawson and it had to be
```

Adam Overton Kimmick
October 05, 2023

```
 1              A. KIMMICK

 2   approved by the head of HR would be Jenny.

 3       Q.    Jen Lawson?

 4       A.    Jen Lawson is our HR business

 5   partner, but her boss Jenny Adams or

 6   there's two Jenny's, I believe Jenny

 7   Sledge, one of those individuals would

 8   have had to approve it from an HR

 9   perspective, I don't know who was the head

10   of HR at the time, but I believe it was --

11   it could have been Jenny Sledge.

12       Q.    Did you make the recommendation

13   that Patty be terminated?

14       A.    Yes.

15       Q.    When did you discuss Patty's

16   termination with Eddi?

17       A.    We were discussing -- it

18   occurred a number of times.  As part of a

19   normal cadence with Eddi he wanted to know

20   who the top performers were and who the

21   poor performers were and Patty showed up a

22   few times as a poor performer, and he, as

23   part of his responsibilities in managing

24   the business, wanted to make sure that

25   poor performers are either put on a
```

Adam Overton Kimmick
October 05, 2023

```
1                A. KIMMICK

2    pathway to good performance or leave the

3    business and so I had a couple of

4    conversations with him probably mid year

5    the year before so maybe 2020 and

6    subsequently more than likely October so I

7    would say those conversations began during

8    the summer of 2020, if not before, when I

9    was discussing essentially rating and

10   ranking my employees and looking at the

11   full picture of everything that was

12   happening with everything that was

13   happening in the accounts, including

14   performance, but also interactions with

15   the team, interactions with the client and

16   who had the best pipeline, who was

17   struggling to have a pipeline for the

18   future.

19       Q.    And when was the decision --

20   when was the recommendation to terminate

21   her made?

22       A.    I don't know.  I don't recall

23   the date.

24       Q.    She was terminated on February

25   --
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2        A.    According to the document you

 3   showed it was February the 24th.

 4        Q.    Right.  February 24th, 2021.

 5              So vis-a-vie her actual

 6   termination, when was the recommendation

 7   to terminate her made?

 8        A.    I don't recall.

 9        Q.    Would it have been within the

10   same month, meaning in February of 2021?

11        A.    I don't recall.  I doubt it.

12   These things don't happen immediately, and

13   they take time to -- to justify.  There is

14   quite a lot of administration and

15   validation required.  HR wants to be aware

16   of -- of -- of the remediation efforts.

17   There is quite a lot of effort that goes

18   into this.

19              I would say that, you know, it

20   likely began in the summer and -- and --

21   and there were a number of conversations,

22   and I don't know when the decision was

23   made.

24        Q.    So it would have taken eight

25   months to terminate her if it started in
```

Adam Overton Kimmick
October 05, 2023

```
1               A. KIMMICK

2    the summer?

3        A.    It would have begun with a look

4    at the top performers and people who are

5    struggling and then it -- it continued --

6    if that, sort of, ranking continued, it

7    would have been a follow-up decision.  It

8    doesn't happen all at once, I mean, this

9    is something that that -- the business

10   takes very seriously.

11       Q.    So I'm not --

12       A.    We want to make sure we grow the

13   business in the future.

14       Q.    So I'm talking specifically

15   about when you arrived at the decision

16   that she would be terminated.  When was

17   that -- when did you first arrive at the

18   decision or when did you first make the

19   recommendation she would be terminated?

20            MR. GUIFOYLE:  Objection to

21       form.

22       A.    I don't recall.

23       Q.    Would that have been within two

24   months of her termination?

25            MR. GUIFOYLE:  Objection to
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2         form.   The recommendation or the

3         decision?  You asked for both in that

4         question.

5               MS. FISHER:  Okay.  Well, let me

6         break it down.

7         Q.    So when did you make the

8    recommendation that she be terminated?

9         A.    I don't recall the date.

10        Q.    When was the decision made to

11   terminate her?

12        A.    I don't recall the actual date.

13        Q.    Did you have a meeting jointly

14   with Eddi and Jen Lawson about Ms. Haran's

15   termination?

16        A.    I don't recall if we were all on

17   the same call at once.

18        Q.    What did you tell Eddi were the

19   reasons why you recommended Ms. Haran's

20   termination?

21        A.    She was a -- a person who is not

22   creating enough volume for the future

23   business, that she had issues with her

24   team and with her clients, and that she

25   was continually on the bottom of the list
```

Adam Overton Kimmick
October 05, 2023

```
1                     A. KIMMICK

2    for people who are having difficulty and

3    having performance issues, not just

4    meeting the target, but also making sure

5    that the business is healthy and were

6    maintaining good relationships and leading

7    a global team.

8         Q.    What list are you referring to?

9         A.    All of the people on my team.

10        Q.    Is there an actual list that you

11   have that she was on the bottom of?

12        A.    No.

13        Q.    And when you say she was on the

14   bottom of the list, is that in terms of

15   her quota, meeting her quota?

16        A.    No, not that alone.

17        Q.    What else are you talking about?

18        A.    I believe I already answered

19   that question.

20        Q.    Well, let me ask it again.

21             MR. GUIFOYLE:  I will object to

22        the extent it has been asked and

23        answered.

24        Q.    What -- how else was she on the

25   bottom of the list?
```

Adam Overton Kimmick
October 05, 2023

```
1                    A. KIMMICK

2        A.    Her interactions with her piers

3    and her customers, the issues that she had

4    had with her piers and her customers, and

5    the impact that her work was having on the

6    act to deliver the results that the

7    business expected in the future.

8        Q.    What impact was her work having

9    on the ability to deliver the results that

10   the business expected in the future?

11       A.    Insufficient.

12       Q.    Was there anything else that put

13   her on the bottom of the list?

14       A.    No.

15       Q.    In 2019 when she was fully

16   successful, was she at the bottom of the

17   list?

18       A.    If not at the bottom, it was

19   close, and I would say that this is a --

20   this is a discussion between me and my

21   manager that was referring to personnel

22   issues, not a formal process.

23       Q.    What do you mean?

24       A.    He asked on a regular basis are

25   these the right people to achieve our
```

Adam Overton Kimmick
October 05, 2023

```
 1                A. KIMMICK
 2   results, do you have the right people to
 3   achieve the results and, of course, it
 4   takes time and effort to replace
 5   individuals and that can be very difficult
 6   to choose to let somebody go; but in this
 7   case, she continually appeared at the
 8   bottom and Eddi and I came to the
 9   conclusion that we should probably try to
10   manage her out of the business.  This
11   discussion happened, as I said, it
12   probably began earlier than the Summer of
13   2020, and I don't know when the decision
14   was made in fact.
15        Q.   Did anyone replace Patty?
16        A.   Her territory was split up into
17   pieces and so nobody took exactly the same
18   territory that she had, no.
19        Q.   Had any other employees who have
20   reported to you at Orange complained about
21   discrimination?
22        A.   No, not to my knowledge.
23        Q.   Have any employees who report to
24   you complain about violations with the
25   Family Medical Leave Act?
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2      A.    No, not to my knowledge.

 3            MS. FISHER:  All right.  Let's

 4      take a quick break.  I'm going to

 5      review my outline.  I might be done.

 6      If not, we're close.  Let's come back

 7      in, I think, five minutes should be

 8      fine so 2:20.

 9            MR. GUIFOYLE:  Okay.

10            (Whereupon, a short recess was

11      taken.)

12            MS. FISHER:  I have put another

13      document in the chat.  I think this is

14      Kimmick 17 and it's marked OBS_00982

15      to 938.

16            (Whereupon, handwritten notes

17      bates stamped OBS_00982 to 00938 were

18      marked as Kimmick Exhibit 17 for

19      identification as of this date by the

20      Reporter.)

21      Q.    Would you take a look at this

22   document and let me know when you are

23   done?

24      A.    Okay.

25      Q.    Do you recognize this?
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2       A.    No.

 3       Q.    Is this your handwriting on this

 4   document?

 5       A.    No.

 6       Q.    Do you know whose handwriting it

 7   is?

 8       A.    No.

 9       Q.    Do you have any handwritten

10   notes regarding Patricia Haran?

11       A.    Not to my knowledge, no.

12       Q.    Have you ever seen this document

13   before today?

14       A.    No.

15            MS. FISHER:  I have no further

16       questions.

17            MR. GUIFOYLE:  I have nothing

18       for this witness.

19            MS. FISHER:  Okay.  Great.

20

21

22

23

24            (Continued on next page

25       to include jurat.)
```

Adam Overton Kimmick
October 05, 2023

```
 1                   A. KIMMICK

 2        Q.    Mr. Kimmick, thank you for your

 3   time here today.

 4        A.    Okay.

 5              THE REPORTER:  Counsel, are you

 6        ordering a copy of the transcript?

 7              MR. GUIFOYLE:  I'll take an

 8        electronic copy.

 9              (Whereupon, at 2:22 p.m., the

10        examination of this witness was

11        concluded.)

12

13              _____

14                    ADAM OVERTON KIMMICK

15

16   Subscribed and sworn to before me

17   this _____ day of _____, 2023.

18   _____

19         NOTARY PUBLIC

20

21

22

23

24

25
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2                     I N D E X

 3

 4   WITNESS           EXAMINATION BY      PAGE

 5   Adam Overton    Ms. Fisher           5
     Kimmick

 6

 7                E X H I B I T S

 8   PLAINTIFF'S      DESCRIPTION         PAGE

 9   Exhibit 1     Defendant's        39
                   objections and
10                 responses to
                   plaintiff's first
11                 set of
                   interrogatories
12
     Exhibit 2     OBS' supplemental  69
13                 interrogatory
                   responses
14
     Exhibit 3     Job description    72
15                 bates stamped
                   OBS_00406 to 00407
16
     Exhibit 4     Performance review 76
17                 bates stamped
                   OBS_00708 to 00710
18
     Exhibit 5     Performance review 89
19                 bates stamped
                   OBS_00714 to 00718
20
     Exhibit 6     Performance review 91
21                 bates stamped
                   OBS_00334 and 00343
22
     Exhibit 7     Performance review 92
23                 bates stamped
                   OBS_00344 to 00353
24

25
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2                     I N D E X

 3
                     E X H I B I T S
 4
      PLAINTIFF'S      DESCRIPTION        PAGE
 5
      Exhibit 8       Termination letter 100
 6                    bates stamped
                      P00016 through
 7                    00019

 8    Exhibit 9       Performance report 110
                      bates stamped
 9                    OBS_00711 through
                      00713
10
      Exhibit 10      2020 sales         113
11                    compensation
                      summary for Patty
12                    Haran bates
                      stamped OBS_00233
13                    to 00234

14    Exhibit 11      Excel spreadsheet  122
                      bates stamped
15                    OBS_001006

16    Exhibit 12      2020 goal sheet    125

17    Exhibit 13      Sales              132
                      compensation
18                    workbook for
                      Angela Arias bates
19                    stamped OBS_01271
                      to 01272
20
      Exhibit 14      Sales              137
21                    compensation
                      workbook for
22                    Danielle Willins
                      bates stamped
23                    OBS_01088 to 01089

24    Exhibit 15      E-mail bates       139
                      stamped OBS_00659
25
```

Adam Overton Kimmick
October 05, 2023

```
 1                    A. KIMMICK

 2                  I N D E X

 3              E X H I B I T S

 4    PLAINTIFF'S      DESCRIPTION         PAGE

 5    Exhibit 16      Chat bates stamped  146
 6                    OBS_00575 to 00576

 7    Exhibit 17      Handwritten notes   157
                      bates stamped
 8                    OBS_00982 to 00938

 9
        (Exhibits retained by the Reporter.)
10

11                  I N S E R T S

12    DESCRIPTION                PAGE/LINE

13    Name of customer              81/24

14    Names of individuals          84/16

15

16    R E Q U E S T S   F O R   P R O D U C T I O N

17    DESCRIPTION                PAGE

18    Patty's plan to improve pipeline  96
      Description
19
      Quota for 2021                104
20

21

22

23

24

25
```

Adam Overton Kimmick
October 05, 2023

1                C E R T I F I C A T E

2

3   STATE OF NEW YORK        )
                             ss.:
4   COUNTY OF NEW YORK       )

5

6

7            I, STEFANIE CALABRIA, a Notary

8   Public for and within the State of New

9   York, do hereby certify:

10           That the witness whose

11  examination is hereinbefore set forth was

12  duly sworn and that such examination is a

13  true record of the testimony given by that

14  witness.

15           I further certify that I am not

16  related to any of the parties to this

17  action by blood or by marriage and that I

18  am in no way interested in the outcome of

19  this matter.

20           IN WITNESS WHEREOF, I have

21  hereunto set my hand this 5th day of

22  October, 2023.

23

24                      _____
                              STEFANIE CALABRIA
25

Adam Overton Kimmick
October 05, 2023

```
1   STATE OF NEW YORK        )
                      ss.:
2   COUNTY OF NEW YORK       )

3       I wish to make the following changes,
    for the following reasons:
4

5   PAGE LINE

6   _____      _____    CHANGE:

7   _____

8      REASON:

9   _____

10  _____      _____    CHANGE:

11  _____

12     REASON:

13  _____

14  _____      _____    CHANGE:

15  _____

16     REASON:

17  _____

18  _____      _____    CHANGE:

19  _____

20     REASON:

21  _____

22  _____      _____    CHANGE:

23  _____

24     REASON:

25  _____
```

Adam Overton Kimmick
October 05, 2023

---

**Exhibits**

---

EX PLF-
0001 Adam Kim
mick 010523
  35:25 36:2,
  14 157:9
EX PLF-
0002 Adam Kim
mick 010523 (
1)
  66:19 157:12
EX PLF-
0003 Adam Kim
mick 010523
  69:12 157:14
EX PLF-
0004 Adam Kim
mick 010523
  73:22 157:16
EX PLF-
0005 Adam Kim
mick 010523
  86:17 157:18
EX PLF-
0006 Adam Kim
mick 010523
  88:5 157:20
EX PLF-
0007 Adam Kim
mick 010523
  89:11 157:22
EX PLF-
0008 Adam Kim
mick 010523
  97:19 158:5
EX PLF-
0009 Adam Kim
mick 010523
  107:18 158:8
EX PLF-
0010 Adam Kim
mick 010523
  110:6 158:10

EX PLF-
0011 Adam Kim
mick 010523
  119:9 158:14
EX PLF-
0012 Adam Kim
mick 010523
  122:17
  158:16
EX PLF-
0013 Adam Kim
mick 010523
  129:20
  158:17
EX PLF-
0014 Adam Kim
mick 010523 (
1)
  134:22
  158:20
EX PLF-
0015 Adam Kim
mick 010523
  136:8 158:24
EX PLF-
0016 Adam Kim
mick 010523
  143:8 159:5
EX PLF-
0017 Adam Kim
mick 010523
  154:18 159:7

---

**0**

---

0
  120:7
00019
  97:18
00234
  110:5
00343
  88:4
00353
  89:8,10
00407
  69:9,11

00576
  143:7
00710
  73:19,21
00713
  107:15,17
00718
  86:16
00938
  154:17
01089
  134:21 135:5
01272
  129:16,19

---

**1**

---

1
  32:10 35:22,
  25 36:2,7,14
  97:5,7
10
  8:9 64:22
  109:25 110:6
  119:15
100
  112:17
  115:20,21
  116:9 130:11
  131:17,22
  133:4 134:5,
  6
100.58
  111:20
101
  120:6
11
  116:3 119:5,
  9 132:20
11.33
  128:17
11771
  5:14
11:30
  65:14
11:40
  65:15

12
  28:5 122:17
13
  129:14,20
14
  134:18,22
15
  119:15 120:6
  136:4,8
16
  143:4,8
17
  154:14,18
18
  18:11,12,19
  22:19
1986
  21:10
1999
  21:15
1st
  87:25 88:13
  89:22 90:6
  108:23 123:7

---

**2**

---

2
  66:15,19
  73:10 74:2
20
  5:13 44:7
2004
  23:9
2009
  23:9
2017
  29:7 38:14
  39:4 42:3,20
  51:23 52:6,
  14 53:4,19
  54:8
2019
  17:21 73:16
  74:4 152:15
2020
  9:2 17:19

Adam Overton Kimmick
October 05, 2023

42:3 44:9,
11,18 45:19
59:14 75:10
86:6,7 87:25
88:2,13
89:22,23
90:6 101:16,
17 107:11
108:21,24
110:3,13
111:13,23
113:15
115:18
117:7,17
122:16,23
123:7,13,23
124:12 127:3
128:22
129:12
133:24
134:14 135:9
137:15
143:22
147:5,8
153:13
**2021**
24:2,7 42:4,
21 51:23
52:6,15
53:5,19
92:2,25
93:23 94:7
95:20 97:24
100:20,23,24
101:3,12,19,
21,23 102:2,
7,10,18
104:2
105:11,12,15
142:11
148:4,10
**2022**
24:7 58:21
**2023**
156:17
**234**
110:2

**24th**
97:24 148:3,
4
**25A**
5:13
**28th**
92:2
**2:20**
154:8
**2:22**
156:9

---

**3**

**3**
37:14 69:8,
12
**30-minute**
77:9
**30th**
88:2,13
**31st**
89:22 90:6
108:20,24
111:13
130:24
**343**
88:25
**3:06**
144:3,22
**3rd**
58:24

---

**4**

**4**
28:24,25
29:4 35:2
37:15,16,24
38:5 73:22
**40**
138:16
**4th**
7:17,18
10:12,13
58:24

---

**5**

**5**
29:10 32:10
37:19 38:2,
11 86:14,17
87:3
**50**
133:3,8,12
**576**
143:5
**5th**
59:2

---

**6**

**6**
38:23 87:22
88:5
**61.87**
135:14

---

**7**

**7**
89:7,11
**7th**
58:20

---

**8**

**8**
97:2,13,14,
15,19
**8th**
143:22

---

**9**

**9**
107:14,18
**938**
154:15

---

**A**

**A-END**
71:9,12
72:23 87:7
104:24
105:7,21
114:22 137:9
**ability**
6:21,25 44:4
50:3 57:8,
12,22 62:4
77:22 152:9
**able**
36:18 51:4
56:25 72:4
95:5 107:8
129:2 132:16
**absolutely**
132:23
145:20
**accept**
15:21
**acceptable**
133:5
**accepted**
15:17
**accepting**
95:24
**accommodate**
6:8
**accomplishmen
t**
116:3
**account**
29:5,14,16,
19,21,24,25
30:3,10,11
31:7,8 32:2,
5,8,12,17,
20,21 33:11,
15,16,24,25
34:4,5,7,10
35:3,5
38:10,12,19
39:9,14

Adam Overton Kimmick
October 05, 2023

40:4,10,11,
17,19,20,25
41:2,5,6,7,
8,13,21,24
42:8,9,17
43:5 45:5,6,
7 46:2,3,4
48:2,8,10,
13,15,17,18,
21 49:10,11,
16,21,22,23
50:3,24
51:7,12 53:6
57:14,15
68:20 69:18
70:22,23,25
71:9 77:9
105:2,7
106:19
125:11
131:8,19
132:4,14,15
137:7,10
**accounts**
23:7 47:16,
22 50:11,19,
20 70:8,14,
16,21 71:5,
6,8,9,12
72:7,9,21,24
74:9,10,20
87:6,7,14
94:21 104:24
105:11,15,
18,21 111:16
112:3,5,7
113:8,12
114:4 118:6,
11,12 122:7,
10,11,24,25
123:9,24
124:3,5
125:6,9,13,
15,20 132:19
147:13
**accuracy**
37:9

**accurate**
28:22 37:12
109:11 113:9
124:11,15,
17,21
**achieve**
69:4 93:18
95:3 103:2
115:17
118:15,21
120:18
134:5,6
152:25 153:3
**achieved**
111:20
120:20
**achievement**
110:20,22,25
111:4,6,9
120:25
121:19
125:18
**acknowledged**
91:15
**acquired**
133:19
**act**
60:19,22
61:9,23
62:2,9,17
65:8 152:6
153:25
**actions**
141:9
**activity**
57:19
**actual**
99:9 103:9,
10 148:5
150:12
151:10
**Adam**
5:11 14:25
29:6,20
156:13
**Adams**
146:5

**additional**
37:2 69:23
102:25
**address**
5:12 77:2
78:17
**addressed**
100:17
**adequate**
19:5
**adjust**
118:21
**adjusted**
117:9
**adjustment**
112:15
**adjustments**
72:15
**administration**
148:14
**administrative**
48:22 125:10
**advantage**
130:18
**advise**
13:16
**advisement**
93:12
**affect**
6:21,25
114:6
**aforementioned**
36:10 66:16
129:17
**afraid**
34:18
**ago**
12:5 18:4,
11,12,19
49:19 63:5
**agreed**
99:17 103:4,
16,17

**agreement**
49:23,25
50:6
**ahead**
15:6 20:2
23:17 68:13
129:11
132:17
144:20
**allowed**
71:6 123:5
140:3
**Americas**
23:7,20,21
**amount**
40:6
**amounts**
133:11
**Angela**
129:7,18,25
130:2
**announced**
140:2
**announcing**
136:18
**annual**
69:2 91:2,5
110:20
111:4,9
120:2,25
121:19
**answer**
6:3,13
13:16,19
15:2,3
27:20,25
30:8 48:7
49:6,7 56:4
94:11 109:15
141:11
**answered**
14:15 24:25
151:18,23
**answering**
79:8
**anybody**
35:12 62:11

Adam Overton Kimmick
October 05, 2023

anyone
  7:24 20:4,7,
  12 25:8
  26:12 54:7,
  18 56:6
  72:10 94:22
  102:16,18
  113:15
  115:16
  128:20
  138:12
  144:12
  153:15
appeared
  153:7
appears
  67:8,17,19,
  20 68:20,21
  73:14 75:9
  89:14 90:7
  96:22 107:10
  108:19,23
  109:16
  110:10
  119:25
  122:22 123:6
  129:6 135:7
  136:17
  137:16
  143:19 145:8
applies
  13:25 14:24
apply
  29:23
appreciate
  61:20
approached
  84:17
appropriate
  74:8 76:3,5
  112:10
appropriately
  72:5 112:11
  114:25
approve
  146:8
approved
  123:21 146:2

approximate
  137:21
approximately
  33:10,23
  91:19
April
  103:8,20
  132:9
area
  22:24
areas
  114:17
argument
  14:17
Arias
  129:7,19,25
arises
  61:3
around
  60:11 68:3,
  5,9 113:25
arrive
  149:17
arrived
  149:15
arts
  21:5,7
asked
  19:10 29:4,
  18 33:4
  62:12,21
  64:3 70:3
  115:3,8,10
  118:5 125:8
  140:4,8
  144:9,24
  150:3 151:22
  152:24
asking
  5:19 6:12
  12:25 13:22
  14:22 23:11
  60:4,5,6
  61:19,20,21,
  25 79:25
  81:8,19
  84:15 95:15

127:7 128:4
  140:24
asks
  38:23
assign
  26:8 130:21
assigned
  50:18 71:13
  101:2 114:5
  125:5
associated
  47:24 84:12
  121:18
  123:23 132:3
assume
  16:21 61:15
  62:13
assumed
  63:21
  139:12,14
assuming
  98:4
assumption
  16:22
attainment
  120:2
attempt
  83:18
attempted
  71:11
attention
  28:4 125:13
attorney
  7:14 8:4,5,7
  9:18 16:15
  27:13,20
attorneys
  7:8,21 9:22
  11:2,6,8
  12:12,24
  15:20 16:2
  27:16
August
  102:24
aware
  55:24 56:5,
  6,15,16

139:4,6,7,9
  140:19,20,
  22,25 141:4
  148:15

_____

B

B-END
  70:16 72:9
  74:10 87:6
  104:23
  105:2,9,11,
  15,18 112:5,
  7 114:22
bachelors
  21:5,7
back
  10:22 21:22
  65:15 87:2
  94:5,11 99:8
  104:21 154:6
baked
  132:9
Baker
  7:15 13:15
Barnes
  52:9,11
base
  38:9
based
  35:2 57:6
  68:25 105:24
  113:22
  125:17 130:4
  132:10
  143:14
basis
  58:3,7 69:2
  142:7 152:24
bates
  69:9,11
  73:18,21
  86:16 88:4,
  25 89:7,10
  97:2,18
  107:14,17
  109:7 110:5

Adam Overton Kimmick
October 05, 2023

119:8
129:15,19
134:20
136:4,6
143:4,6
154:17
**Bay**
5:13
**bear**
26:20 109:7
**began**
147:7 148:20
153:12
**begin**
14:16 102:23
**beginning**
24:3,4 101:3
112:5,9
117:7 121:3,
5 124:8
**begun**
149:3
**behavior**
59:7 82:12
**behaviors**
75:24 83:4,6
85:8
**behind**
65:24 139:8
140:10
**believe**
7:16 10:4,12
15:17 17:20
24:24 25:20
26:18 30:2
42:5,8 43:5
44:19 45:10
49:14,19
50:22 51:3,
5,6,11,24
53:6,20
54:14,16
62:21,25
63:6,8,13
64:17 68:10,
14 69:17
71:19 72:13
74:3 85:18

86:7 93:25
95:17 97:5
99:5,7
100:24
105:12
107:14
142:17
146:6,10
151:18
**below**
133:3,4,8,11
**besides**
30:20
**best**
6:5 61:16
147:16
**better**
83:7,17
**bit**
72:11
**black-and-white**
48:7 49:6
**blank**
78:22 81:13
**blurb**
73:11 74:2
75:20
**book**
122:7 123:10
**boss**
146:5
**bottom**
119:2 121:10
150:25
151:11,14,25
152:13,16,18
153:8
**box**
110:18
**Boyne**
53:13,15
54:15 56:17
57:21 58:6
65:24
**brands**
50:22

**break**
6:6 65:2,14,
23 150:6
154:4
**bringing**
12:12,25
**broad**
75:16 98:12
**brought**
82:21
**budget**
103:12 104:5
105:25
132:5,10,16
**budgets**
78:15 102:23
103:4,21
**building**
96:11
**built**
99:17
**business**
21:12 22:24
25:7 26:3
40:21 46:20,
24 48:25
49:4 50:6
55:5 56:3,
10,14 57:8,
11,13,17
66:4 68:17
71:3 72:11
78:11 80:15
83:9,20
93:18 96:12
98:19,21
103:3,23,24
104:18
106:11
113:25
114:2,15
116:2 117:14
126:18
135:20
146:4,24
147:3 149:9,
13 150:23
151:5 152:7,

10 153:10

---

**C**

**cadence**
41:11 146:19
**cadences**
77:8
**calendar**
44:9,11,18
45:19 131:6
**call**
19:14 70:16
93:8 101:9
110:11
137:23
150:17
**called**
122:8 143:13
145:12
**calls**
79:3,7
**Cap**
123:5
**care**
62:20,24
63:12 64:15,
18 126:15
138:2,9,13
**career**
22:2
**carry**
131:10
**carrying**
120:17
**case**
9:16 10:17
11:14,17,19,
22,25 12:4,
13,25 17:3,
25 18:7,10
20:10,14
26:19 27:14
46:17,18
51:11 83:5
111:11
121:16 153:7

Adam Overton Kimmick
October 05, 2023

| | | | |
|---|---|---|---|
| cases | changes | class | 12 92:13 |
| 49:7 83:4 | 133:21 | 135:22 | 95:8,10 |
| categories | chat | 143:15 | committee |
| 91:10 118:16 | 26:22,25 | classes | 15:16,24 |
| 124:13 | 35:24 36:17 | 60:10 | 16:13 |
| 129:24 | 66:22,24 | clearly | common |
| 133:13 | 73:3 74:24 | 105:6 | 84:18 |
| 135:11 | 86:12 87:21 | client | communicated |
| category | 89:3 96:19 | 22:21 25:5 | 101:20 |
| 116:7 | 107:6,25 | 54:23 75:25 | 102:11 |
| Celeste | 108:14 | 76:8 99:21 | communicating |
| 52:22,25 | 118:24 | 147:15 | 82:3,6 |
| cell | 122:15 | clients | communication |
| 120:5 | 128:25 | 26:2 76:10, | 77:21 105:5 |
| cells | 134:17 136:3 | 12 95:12 | company |
| 121:5 | 143:3,6 | 150:24 | 16:5 60:13 |
| Central | 154:13 | close | 133:9 |
| 22:16 | check | 56:7 104:19 | compelling |
| certain | 133:20 | 105:18,21 | 113:3 |
| 33:4 48:12 | 138:24 | 112:17 | compensate |
| 131:24 | child | 114:13 | 112:22 |
| certainly | 138:9,14 | 152:19 154:6 | compensated |
| 54:12 85:22 | children | closing | 112:11 |
| 101:16 | 138:6 | 104:7,12 | 114:25 118:2 |
| 104:25 | choose | closure | 123:4 131:10 |
| challenges | 153:6 | 106:8 | compensation |
| 96:11 | circumstance | College | 103:6,8,10, |
| chance | 30:14 | 21:8 | 16,17 |
| 75:2 89:5 | circumstances | column | 108:20,25 |
| 95:23 96:21 | 44:15 45:23 | 119:11,22,23 | 109:11 |
| 106:15 | 57:24 63:2 | 120:23 121:5 | 110:4,11,14 |
| 122:21 135:2 | 65:24 | come | 113:6 116:18 |
| 143:11 | City | 10:22 33:8 | 118:17 |
| change | 59:8 | 63:10,23 | 120:14,19 |
| 31:24 33:7 | claim | 65:15 85:21, | 121:17 |
| 71:11,16 | 61:12 | 22 124:4,6 | 123:19 |
| 113:14 | clarification | 154:6 | 124:7,20 |
| 117:16 | s | comes | 125:18 127:4 |
| 123:18 124:4 | 37:4 | 61:2 84:6 | 129:7,18 |
| 136:19 | clarify | 130:21 | 132:7 133:2, |
| 137:14 | 12:22 33:14 | comfortable | 7,17,21 |
| changed | 65:22 66:10 | 79:23 | 134:19 135:8 |
| 25:23,24 | 75:17 94:13 | comment | complain |
| 26:15 | 95:9 102:8 | 85:19 | 153:24 |
| 117:23,24 | 128:4 | comments | complained |
| 124:5 125:16 | Clarity | 9:16 10:17 | 77:20 153:20 |
| | 77:21 | 90:8 91:10, | |

Adam Overton Kimmick
October 05, 2023

complaint
  60:14
complaints
  60:12 76:10
  77:23
complete
  126:7
complex
  132:13
complexities
  132:12
complying
  5:2
concern
  99:24
concerned
  141:15
concerns
  140:5
concluded
  156:11
conclusion
  153:9
condition
  137:19
  138:14
  139:23
conditions
  56:8
conferred
  145:24
consensus
  99:17
considerable
  92:20
considerations
  55:9
considered
  100:10 115:2
  128:18
contents
  17:9,10
continually
  150:25 153:7
continue
  115:25

continued
  149:5,6
  155:24
continues
  29:9 37:18
contract
  130:16,19,
  21,22,24
  131:4,16
  132:11
contracts
  41:11
control
  71:7
conversation
  12:17,18
  13:3,21
  14:20,22
  19:9,16,19,
  21,23 20:5
  50:17 64:10
  79:23 141:23
  143:20,22
  144:2
conversations
  17:24 81:24
  140:11
  147:4,7
  148:21
copy
  156:6,8
core
  113:17,19
  114:13
  124:14
corporate
  43:15 44:6
correct
  7:22 16:23
  29:11 30:18
  32:3,4 38:7,
  16 46:12
  74:21,22
  78:6,9 79:2
  82:22 86:6
  89:20 97:22
  99:5 111:3,
  22 132:22

136:22
  137:4,5,11
  143:24 144:6
correctly
  19:14
counsel
  11:12,13
  13:14,15,18
  14:4 156:5
couple
  147:3
course
  116:10 153:3
court
  5:25 6:10,14
  20:25 94:3
  128:2
cover
  72:4 108:22
  125:9
coverage
  94:21
covered
  125:19
covering
  68:2 113:23
Covid
  44:12 71:24
  72:10 112:20
  115:7 118:7
  125:21
  126:13
created
  96:8
creating
  150:22
critical
  100:4
crosstalk
  68:12 127:24
cues
  100:3
current
  22:12 23:13
  24:10 74:7
  104:6 114:15
  115:23

customer
  76:16,21,24
  77:20 78:3,
  10,19 80:23
  82:20 100:10
  115:23,24
  130:23 134:9
customers
  19:8 40:5
  41:12 57:7
  76:17 77:14
  78:15 85:19
  98:25 99:3,
  12 106:4
  114:8 123:10
  152:3,4
cycles
  40:21

---

D

Daniel
  52:23,25
Danielle
  134:20
  135:8,11
date
  7:16 12:6
  24:8 36:15
  41:25 50:15
  53:21 56:25
  58:25 66:20
  68:22 69:13
  71:17 73:23
  86:18 88:6
  89:12 91:4,
  21,25 92:5
  97:20,23
  98:5 107:19
  110:7,24
  111:8 119:10
  122:18
  123:9,11
  129:21
  134:23 136:9
  137:20
  143:9,21
  147:23

Adam Overton Kimmick
October 05, 2023

150:9,12
154:19
dates
    11:23 24:18
    25:16 51:4,
    10 71:22,23
    94:15 102:4
    142:16
daughter
    62:25 63:3,
    12 64:15,19
    137:18
    138:20
    139:4,13
    140:18
    141:3,21
    142:7,15,23
    144:13 145:7
daughter's
    63:3 139:18,
    22 144:6,7
    145:16
day
    58:23 156:17
deal
    132:12
dealing
    40:3,4
deals
    96:9 104:7,
    9,12,20
    105:17,20
December
    89:22 90:6
    108:20
    111:12 135:9
decide
    98:14
decided
    45:25 46:21
    63:25 133:9
    136:20
deciding
    16:5
decision
    15:14,16,24
    16:12,13

55:17 57:3,
6,25 58:3,8
100:6,11
145:22
147:19
148:22
149:7,15,18
150:3,10
153:13
decisions
    70:20 87:8,
    12
deem
    84:2 130:13
    132:21,25
    135:17
deemed
    83:11 128:21
defendant
    20:16
defendant's
    35:19 36:7,
    11
defensive
    79:19 80:2,6
Defiance
    79:14
define
    29:16
defining
    46:18
definitely
    65:2
definition
    60:3,6,24
deliver
    71:2 77:22
    96:5 152:6,9
delivered
    95:25 111:17
delivering
    25:5
delivery
    40:25
demonstrate
    57:21

demonstrated
    83:23
departed
    71:20
department
    9:19,20,22
    11:15
deposition
    7:5,21 8:11
    20:21
depth
    40:8 139:9
described
    121:13
    137:24
description
    66:25 67:9,
    10,13,19
    68:21,23
    69:10
detail
    69:5 79:22
    81:21 82:15
    104:22
    105:22 139:8
    140:10
details
    63:7 66:8
    79:22,25
    81:23
    140:23,25
    141:16
determine
    89:25 90:17
determined
    104:3
diagnosed
    138:25
diagnosis
    141:7
dialogue
    78:2
differ
    70:14 111:10
difference
    39:8,12 41:6
    127:18,19

different
    22:7 39:21,
    24 41:9
    43:16,18,23
    48:25 70:4,
    5,8 89:20,25
    105:4 121:12
    122:9,11
    128:9 131:25
difficult
    72:12 99:18
    118:7 126:14
    132:6 153:5
difficulty
    142:23 151:2
digitally
    28:9 37:5
direction
    46:19 49:2
    84:12,19
directly
    61:15
director
    22:14 31:9
    38:19 40:19
    41:2 57:15
    70:22
directors
    34:4,5,8,11
    38:13 40:17
    41:14
disappointed
    92:17,19
discomfort
    83:15
discontinue
    45:25
discriminate
    60:10
discrimination
    58:11 59:18,
    24 153:21
discriminatory
    59:6

Adam Overton Kimmick
October 05, 2023

discuss
12:10,14
13:9 15:7
17:16 88:18
90:22,24
92:6 116:17
146:15
discussed
13:5,23 69:4
81:3 103:3,
21,22,23
discussing
146:17 147:9
discussion
85:23 152:20
153:11
discussions
17:2
dismiss
46:8
dismissal
19:3
dismissed
46:10 47:15
48:5
dissatisfacti
ons
81:7
distracted
84:14
doctor
138:25
document
15:12 26:21,
24 27:4,9,17
28:5,10,12,
17,21 35:19,
24 36:16,21,
25 37:6,8,12
58:4,8
66:22,24
67:6,8,24
69:7 73:2,4,
7,18 74:24
75:3,6 85:6,
11,14,24,25
86:11,14

87:2,21
88:24 89:3,
6,15 90:3,9
91:7,8,25
92:14,16
93:9 95:13
96:19 98:2,
4,8 101:10
103:13
107:6,25
108:4,6,11,
14,18 109:5,
10 110:9,16
118:24
121:20
122:6,15
127:2,6,8
128:8,25
129:5 134:17
135:4 136:3
143:3,23
148:2
154:13,22
155:4,12
documentation
24:17 31:10
100:18
128:12
documented
95:13 98:18
documents
8:10,13 9:5
11:9 99:6,13
125:24
126:10,21,
23,24
doing
106:13
112:12,23
132:17
142:24
double
72:17
doubt
148:11
drive
71:2

dual
50:9
due
138:9
duly
5:4
duties
26:8 39:16,
17,20,24
74:6

_____

**E**

E-D-D-I-Y-O-
U-K-H-A-N-N-A
9:13
e-mail
136:6,17
137:2,13
earlier
56:23 99:4
105:23 108:7
121:13
153:12
early
115:13
116:23
130:18 131:5
East
22:15 25:21
Eastern
23:15 24:14,
23 25:9
easy
72:10 99:14
Eddi
9:12,25
10:16 16:3
18:8,9,18,22
19:9,10
23:24 50:8,
13,17
139:17,20
143:13
144:10,12
145:14,25
146:16,19

150:14,18
153:8
Eddy
144:3
145:10,12
edge
132:2
education
21:4
effective
104:17
effectively
132:16
effort
80:17,21
148:17 153:4
efforts
148:16
eight
121:4 148:24
either
5:25 50:5
66:3 81:25
144:23
146:25
electronic
156:8
eliminate
46:25
eliminated
46:7 49:2,8
employed
142:13
employee
84:19 91:11
employees
101:25
102:22
126:16
147:10
153:19,23
employment
45:24 55:22
end
24:3 120:14
127:22
130:20,22

Adam Overton Kimmick
October 05, 2023

ended
27:16 77:10
ending
45:24
enforced
130:20
engaging
12:11,24
ensure
57:16
entail
22:20
entire
22:2 23:21
42:22 51:25
entirely
71:22
entitled
35:19
environment
82:4 83:14
85:8,10
episodes
99:23
equal
60:9
era
123:4
erode
49:5
essentially
147:9
estimate
23:10 33:20,
23 34:16,22
event
137:24
138:19
everybody
84:10,20
everyone
60:9 72:11
84:18 140:15
evidence
10:5 19:5
exact
19:22 21:18

24:18 25:22
33:5,20
41:25 45:7
51:9 53:7
56:25 67:13
71:17
exactly
31:22 43:4
57:23 59:15
121:2 130:16
153:17
examination
5:15 156:10
examined
5:6
Excel
119:5,7
excruciating
79:22
excuse
27:18 42:3
exhibit
35:25 36:2,
14 66:19
69:12 73:22
86:17 88:5
89:11 97:19
107:18 109:6
110:6 119:9
122:17
129:20
134:22 136:8
143:8 154:18
exhibited
75:19
exist
30:12
existing
50:11 124:3
131:22
132:11
expand
132:18
expansion
131:15
expat
42:19

expect
114:3,7
expectation
39:13 40:9
49:4 106:9
115:20,24
116:2,8
131:17,21
132:10,14
134:4
expectations
19:6 39:18,
23 40:6 41:9
43:23 55:4,7
57:11 68:25
133:6
expected
114:20
117:19
152:7,10
experience
39:11 43:17
expired
49:23 50:2
expires
130:17,19
explain
15:24 39:25
43:12 68:18
explained
132:5
express
81:6
expressed
81:11
extend
14:21
extent
13:12,17
14:2 151:22
extenuating
44:14

---

**F**

---

fact
10:16 18:20

41:8 51:10
77:8 87:16
96:3,4,14
118:19
123:16
145:14
153:14
factor
128:17
factors
134:7,10
factual
83:2,12 84:2
fail
104:19
failed
79:2,6,11
105:17,21
failure
116:13
familiar
41:17 42:14
44:23 51:14
52:8,22
53:13 60:18
family
56:7 60:18,
22 61:3,7,9,
13,22 62:2,
6,16,20,23
64:2 65:7
136:21
142:25
153:25
farmer
30:2,3 31:7
32:12 69:18
farmers
32:2,5,8,18,
22 33:11,25
favor
115:2,4
118:6,11
120:17
125:8,19
February
21:15 92:25

Adam Overton Kimmick
October 05, 2023

93:22 94:7
95:20,25
97:23 101:21
102:10,17
104:2
105:11,12,15
142:12
147:24
148:3,4,10
**feedback**
79:16 80:9
91:14 96:6
99:11,25
**fell**
131:2
**felt**
61:11 112:9
123:3 138:4
**fermented**
87:12
**figure**
72:8
**fill**
78:23 91:11
144:11,24
**filled**
90:20
**Financial**
68:7
**finding**
50:6
**fine**
14:11 33:22
64:5 154:8
**finish**
6:12 45:16
64:23,25
**fire**
44:4
**firm**
11:16 46:19
**first**
5:4 35:21
36:8,12
73:16 74:4
107:11
137:17

149:17,18
**FISHER**
5:16 13:20
14:5,12,18
15:3 26:20
35:18 36:4
64:24 65:4,
13,18 66:11,
21 69:7
72:25 73:17
74:23 86:10
87:18 88:24
89:6 93:7
94:4 96:18,
25 97:6,8,14
101:8 107:5,
13,24 108:13
109:9,18,25
118:23 119:4
122:14
128:24
129:14
134:16 135:4
136:2 143:2
150:5 154:3,
12 155:15,19
**fit**
85:5
**five**
29:10 30:21
33:13,15
34:15,21
38:21 47:11
121:4 154:7
**fix**
80:17,21
**fixed**
43:16
**FMLA**
62:16
**focus**
65:11
**focussing**
86:8
**folder**
97:11
**follow**
95:6

**follow-up**
149:7
**following**
24:4
**follows**
5:7
**force**
23:21
**form**
27:22,24
98:7 109:14
149:21 150:2
**formal**
91:8 103:13
152:22
**formalized**
103:7
**formally**
91:15
103:11,19
**format**
109:17
110:12
**forward**
46:21 83:20
106:14
**found**
145:2
**four**
33:19 34:21
38:25 39:2
118:16 121:3
124:13
**fourteen**
25:12 31:3
**fourth**
118:25
**France**
42:19 44:13
**fraught**
112:20
**French-based**
70:19
**frequently**
26:16
**front**
123:17

**full**
12:16,17
29:13 37:21
101:22,24
102:12
103:19
125:17
131:11
147:11
**fully**
74:5,14,19
88:23 99:24
132:8 152:15
**funnel**
96:10
**future**
22:23 25:7
26:2 57:17,
19 68:16
83:9 98:21
103:22
112:25
113:21
114:6,19
147:18
149:13
150:22
152:7,10

---

G

**gathered**
14:15
**gave**
6:5 11:2
63:16 68:25
102:16
**Gemini**
123:6
**general**
46:6 62:7
67:21
**generalizatio
n**
100:15
**generally**
67:25

Adam Overton Kimmick
October 05, 2023

| | | | |
|---|---|---|---|
| generate | goes | guidelines | 143:14 |
| 57:8,13,18 | 148:17 | 103:8 | 147:12,13 |
| get all | going | Guifoyle | happy |
| 31:11 | 5:18 6:3 | 7:10 13:12 | 6:7 84:21 |
| getting | 10:21 13:10 | 14:2,11,14, | Haran |
| 131:9 | 18:20 26:21 | 25 15:4 | 5:18 8:21 |
| give | 35:23 46:20 | 27:23 35:25 | 15:9,15 |
| 6:13,15 | 66:21 72:14, | 59:19 64:22 | 16:19 25:14 |
| 10:10 24:17 | 19,25 74:23 | 65:3,16,19 | 27:21 37:23 |
| 26:22,23 | 77:13 83:20 | 93:10 97:4, | 38:7 47:17 |
| 34:2 65:4 | 86:11 89:2 | 7,13,16 | 48:5 54:6 |
| 77:17 86:23 | 93:7 101:8 | 109:4,13 | 65:6,10 |
| 87:18 | 103:2 107:5 | 149:20,25 | 67:11,13,23 |
| 100:19,22 | 108:10,13 | 151:21 154:9 | 74:5 87:24 |
| 101:5,24 | 112:2 118:23 | 155:17 156:7 | 89:21 98:15 |
| 102:21 | 128:24 | | 107:22 |
| 109:18 | 134:9,16 | | 109:2,12 |
| 130:17 | 140:5,21 | **H** | 110:5,15 |
| given | 141:13,16 | | 111:2 120:4 |
| 20:19,22 | 154:4 | half | 124:12 |
| 31:3 47:17 | good | 73:16 74:4 | 145:23 |
| 69:23 76:24 | 5:17 116:24 | 75:10 86:3,5 | 155:10 |
| 102:7,18 | 147:2 151:6 | 107:11 | Haran's |
| 125:15 | graduate | 114:23 | 67:15 69:15 |
| global | 42:18 43:10, | 125:20 | 97:23 98:7 |
| 23:6 29:5, | 24 | hand | 119:14 122:7 |
| 13,19,20,24 | grant | 116:4 | 128:16 |
| 30:11 38:12, | 63:24 | handled | 137:18 |
| 19 70:25 | Great | 47:16 | 139:18 |
| 151:7 | 65:18 155:19 | handwriting | 150:14,19 |
| globally | greater | 155:3,6 | harassment |
| 71:10 | 39:19 | handwritten | 59:7 |
| goal | grow | 154:16 155:9 | Hartford |
| 103:14 | 149:12 | happen | 21:8 |
| 111:21 | growing | 70:6 77:18 | head |
| 115:18 | 48:24 96:12 | 84:13 116:10 | 6:15 16:3,8 |
| 117:2,6 | growth | 123:19 | 22:15 23:6, |
| 120:10,15 | 22:12 | 124:22 | 14,19 24:13, |
| 122:8,16,23 | guarantee | 130:15 141:9 | 22 25:9,20 |
| 123:6,13,15, | 68:23 | 148:12 149:8 | 146:2,9 |
| 20,21,22,25 | guess | happened | headquartered |
| 124:5 | 35:16 130:15 | 104:13 | 70:17 |
| goals | guessing | 121:16 | health |
| 69:3 84:12 | 23:10,25 | 137:14 | 22:23 40:24 |
| 103:3 | 33:18 | 138:23 141:6 | 48:9,16 |
| God | guidance | 153:11 | 57:17 80:15 |
| 138:11 | 77:17 | happening | 83:9 103:24 |
| | | 140:8 141:5 | 137:18 |

Adam Overton Kimmick
October 05, 2023

138:14
**healthy**
25:7 83:19
96:12 98:21
151:5
**hear**
5:25
**hearings**
20:24
**hearsay**
76:7 77:24,
25 81:4
**held**
21:24 22:4,
17 23:12
24:9 30:4,5,
15 37:22
43:21 91:6
113:2
**help**
7:11 81:8,19
**helped**
126:18
**hesitating**
48:6 56:2
**high**
133:5
**higher**
40:9 117:10
118:22
124:20
**highest**
21:3
**hire**
26:4 44:4
118:8
**hired**
27:13 69:16
70:15 106:20
**history**
104:7,12
**hit**
131:5
**hold**
21:19 23:4
31:6 127:25
128:2 143:16

**horrible**
139:3
**horrified**
139:14
**hospital**
138:3
**Hostetler**
7:15
**hostile**
83:14 85:7,
10
**hour**
8:8 77:11
**hour-and-a-
half**
77:11
**hours**
59:10
**HR**
9:19,21
11:15,18
13:21 14:23
16:2 24:17
31:10,23
32:24 57:2
61:2,7,15,17
62:14 63:18
64:6,12
69:19 83:15
96:23 146:2,
4,8,10
148:15

---

**I**

**IBM**
50:22
**ideally**
130:11
**identificatio
n**
36:14 66:19
69:13 73:23
86:18 88:6
89:12 97:20
107:19 110:7
119:9 122:18

129:21
134:23 136:8
143:8 154:19
**identified**
106:2,3
**identify**
29:5,19
**illness**
6:21 138:10
139:18
145:16
**imagine**
85:20 93:6
123:22,24
**immediately**
61:4,6,15
62:12 64:4
148:12
**impact**
16:5 152:5,8
**impacted**
64:19
**impossible**
125:2
**impression**
78:5
**improve**
92:24
**improvement**
90:15,17
**improving**
94:9
**include**
9:15 59:5
155:25
**including**
147:13
**inconsistent**
54:25
**incorrect**
30:11
**increase**
106:22
**increased**
78:13
**indicate**
114:11

**indicated**
124:7
**Indicating**
20:3
**indirect**
100:3
**indiscernible**
68:12 127:24
**individual**
28:15 46:17,
22 52:12
53:2,16
60:13
**individuals**
30:5,20
37:22 51:18,
22 60:8
81:6,10,15
121:9 146:7
153:5
**ineffective**
93:15 95:2,
18,22 96:16
105:7
**infection**
63:6,9
**inform**
65:6 139:17,
20 140:17
141:2,21
142:13 145:6
**information**
14:3,6,16,19
27:16 30:9,
13 89:15
122:3 140:9
**inhouse**
13:14
**initial**
22:4 37:20
70:18
**injured**
138:24
**injury**
140:22
141:6,8
142:2

Adam Overton Kimmick
October 05, 2023

input
  91:9
INSERT
  78:24 81:16
instant
  9:8,10,14,25
  10:15
instructions
  11:3
insufficient
  104:4 152:11
integration
  31:14 32:6
  34:23 35:4,
  5,8,12 38:8,
  24 39:2
  45:4,9 46:3,
  4 47:18,24
  48:11,14,19
  49:3 54:12
  121:10
  130:3,5
  135:12,19
intended
  95:4 120:15
interactions
  147:14,15
  152:2
interim
  23:19 72:6
interrogatori
es
  27:22 35:22
  36:9,13
  37:4,20
  38:15
interrogatory
  28:24 29:4
  35:2 37:14,
  16,24 38:2,
  5,11,23
  66:14,17
introduced
  108:6 109:6
involved
  134:8

irrelevant
  14:19
issue
  19:11 76:23
  77:19 78:9
  79:2,5,11
  80:2 82:17
  83:25 84:7
  135:22
  140:21
issues
  19:7 54:23
  55:25 75:14,
  19,23 76:9,
  15 77:2,16
  78:6,18
  80:18,21,24
  81:2 82:20,
  25 83:10,22
  84:22 95:11
  98:24 99:2,
  3,10,22
  100:5,10
  150:23 151:3
  152:3,22

_____

              J

January
  87:25 88:13
  92:2,25
  93:22 94:7
  95:19,25
  108:23,24
  122:23 123:7
  135:9 137:14
  142:12
Jen
  145:25
  146:3,4
  150:14
Jennifer
  11:20,21,24
  13:23 15:8
  17:2,16,25
  35:3,14
  51:14,17
  54:13,20

58:2
Jenny
  146:2,5,6,11
Jenny's
  146:6
job
  26:8 39:11,
  16,17,20,23
  48:18 57:10
  66:24 67:9,
  10,19 68:21,
  23,24 69:10,
  23 74:6
  106:17
  116:12
jobs
  24:18 26:16
  43:16
join
  144:15
jointly
  150:13
judge
  14:9
July
  89:22 90:6
  125:16
  130:24 131:2
June
  88:2,13
jurat
  155:25
justified
  18:24 19:2,
  12
justify
  148:13
Justin
  7:10,23,25
  8:7

_____

              K

keep
  114:2,7,14
  115:18
  123:2,5

128:16,21
  130:10
  131:13,19
keeping
  116:23
kept
  120:21
Kim
  53:13,15
  54:15 56:17
  57:21 58:6
Kim's
  65:25
Kimmick
  5:1,11,17
  6:1 7:1 8:1
  9:1 10:1
  11:1 12:1
  13:1 14:1
  15:1,5 16:1
  17:1 18:1
  19:1 20:1
  21:1 22:1
  23:1 24:1
  25:1 26:1
  27:1 28:1
  29:1,6,20
  30:1 31:1
  32:1 33:1
  34:1 35:1,22
  36:1,7,13,17
  37:1 38:1
  39:1 40:1
  41:1 42:1
  43:1 44:1
  45:1 46:1
  47:1 48:1
  49:1 50:1
  51:1 52:1
  53:1 54:1
  55:1 56:1
  57:1 58:1
  59:1 60:1
  61:1 62:1
  63:1 64:1
  65:1 66:1,
  15,18,23
  67:1 68:1

Adam Overton Kimmick
October 05, 2023

| | | | |
|---|---|---|---|
| 69:1,8,12 | 151:1 152:1 | 139:11 | **latest** |
| 70:1 71:1 | 153:1 154:1, | 141:9,12,15 | 108:3,16 |
| 72:1 73:1,22 | 14,18 155:1 | 142:3 143:10 | **Lawson** |
| 74:1 75:1 | 156:1,2,13 | 144:3,10,15 | 11:20,22,24 |
| 76:1 77:1 | **kind** | 145:11 | 13:23 15:8 |
| 78:1 79:1 | 40:7 63:7,9 | 146:9,19 | 17:3,17,25 |
| 80:1 81:1 | 105:4 125:12 | 147:22 | 145:25 |
| 82:1 83:1 | 134:10 | 148:19,22 | 146:3,4 |
| 84:1 85:1 | **knew** | 153:13 | 150:14 |
| 86:1,14,17 | 139:10 | 154:22 155:6 | **lawsuit** |
| 87:1,3,22 | 141:25 | **knowing** | 16:4 20:17 |
| 88:1,5 89:1, | **know** | 16:24 109:8 | 21:2 |
| 7,11,23 90:1 | 5:23 6:7 | **knowledge** | **lead** |
| 91:1 92:1 | 9:21 11:5,17 | 13:13,17 | 60:15 99:19 |
| 93:1 94:1 | 15:18,19 | 15:13 28:23 | **leader** |
| 95:1 96:1 | 16:22 25:18 | 32:15 34:9 | 100:4 132:14 |
| 97:1,13,14, | 27:4 28:7,25 | 37:13 38:22 | **leading** |
| 15,19,22 | 31:21 33:17 | 62:18 65:9 | 84:9 151:6 |
| 98:1 99:1 | 34:13,21 | 69:21 94:24 | **learn** |
| 100:1 101:1 | 35:14 36:17 | 128:10,15 | 76:14 137:17 |
| 102:1 103:1 | 37:15 51:2 | 153:22 154:2 | **learning** |
| 104:1 105:1 | 60:23 63:2, | 155:11 | 13:18 |
| 106:1 107:1, | 7,19 65:25 | | **leave** |
| 14,18 108:1 | 66:6 67:4,7, | | 55:20 60:19, |
| 109:1,25 | 12 73:5,6,25 | **L** | 22 61:7,9,23 |
| 110:1,6 | 74:25 79:21 | | 62:2,17,22 |
| 111:1 112:1 | 88:9 89:4 | **label** | 64:2 65:8 |
| 113:1 114:1 | 91:20,22,23 | 109:7 | 78:22 81:13 |
| 115:1 116:1 | 92:18 94:15 | **labeled** | 136:21 147:2 |
| 117:1 118:1 | 96:2,20 | 97:9 | 153:25 |
| 119:1,5,9 | 101:19 | **labelled** | **left** |
| 120:1 121:1 | 102:13,14 | 66:24 91:11 | 18:15,16 |
| 122:1,17 | 107:8 108:2, | **lack** | 23:24 110:19 |
| 123:1 124:1 | 15 109:15,23 | 65:11 | 136:25 |
| 125:1 126:1 | 116:19 | **large** | **leg** |
| 127:1 128:1 | 119:19,22 | 41:5,12 | 138:21 |
| 129:1,14,20 | 120:7,23 | 107:11 | **legal** |
| 130:1 131:1 | 121:7,23 | **largely** | 60:24 |
| 132:1 133:1 | 122:2,20 | 122:23 | **length** |
| 134:1,18,22 | 123:14,17 | 125:10,21 | 19:22 |
| 135:1 136:1, | 125:3 126:12 | **larger** | **letter** |
| 4,8 137:1 | 128:11 | 40:5 44:5 | 96:23 97:17 |
| 138:1 139:1 | 129:2,23 | 131:20 | **level** |
| 140:1 141:1 | 130:11 | 132:12 | 21:3 83:13 |
| 142:1 143:1, | 132:15 | **largest** | **limit** |
| 4,8 144:1 | 133:6,22 | 87:7 | 50:2 63:24 |
| 145:1 146:1 | 134:3,12,25 | **Larry** | |
| 147:1 148:1 | 136:11 | 120:23 | |
| 149:1 150:1 | | | |

Adam Overton Kimmick
October 05, 2023

line
  46:23 121:15
  145:17
lines
  47:20 48:12
  100:2
list
  29:10,13
  37:21 38:5,
  12 150:25
  151:8,10,14,
  25 152:13,17
listed
  30:21 32:10,
  13 38:21
  119:18 121:9
  123:25
lists
  122:6
little
  8:8
loading
  26:23
long
  6:8 8:6 18:4
  19:21 21:19
  22:17 49:19
  59:9 80:15
  106:12
longer
  14:7,8
look
  10:22 31:9
  60:2 90:8
  91:24 99:8
  104:21
  126:24
  130:10
  131:13,15
  134:6 136:10
  149:3 154:21
looked
  29:22,25
looking
  33:22 89:24
  99:12 119:23
  147:10

looks
  27:13 36:2
  37:2,19,25
  87:24 89:19
  120:4 143:12
loosely
  43:9,21
Lorna
  44:23 45:2,3
  46:10 47:6,
  15 48:3,5,10
  49:12,17
  50:23 51:7
  136:19,20
Lorna's
  137:3
lot
  73:8 148:14,
  17
love
  84:20
low
  106:9 116:4
  132:22,25
  135:18
lower
  117:5,9
  118:18
lowered
  112:16
LVMH
  123:5

_____

**M**

_____

M-HM
  87:15
made
  16:12 44:16
  55:17 57:3
  70:20 72:15
  82:3,6,14
  83:18 85:19
  87:8 92:13
  95:10 100:6
  104:5 105:25
  112:14 113:4

114:12
116:23
120:20
124:23
125:4,14
135:22 141:8
147:21
148:7,23
150:10
153:14
maintain
  40:15 41:13
  45:12 53:10
  57:19 71:3
  80:14
maintaining
  22:23 48:24
  60:12 151:6
major
  71:24
majority
  113:20
make
  66:12 70:6
  71:11,15
  72:16 77:12
  80:17,21
  84:10,17
  89:17 93:17
  99:14 106:9,
  10 112:10
  114:15,24
  115:14
  116:21
  117:25
  126:15
  132:17
  146:12,24
  149:12,18
  150:7
making
  13:5 25:6
  57:25 100:11
  151:4
manage
  22:24 63:22
  64:6 70:15
  72:3,8,12

112:7 118:6
  153:10
managed
  44:2,6 70:21
  71:10 74:11
  83:17 104:16
  113:8,12
  118:10
management
  11:15,16
  18:6,7 20:8
  22:2 24:20
  125:11,12
manager
  22:8,9,13
  29:21 30:2,
  3,11,12
  31:7,8 32:2,
  5,8,12,17
  33:11,25
  35:4,5 38:10
  39:9,10,14,
  15 41:7,8,
  22,24 42:8,
  9,17 43:6
  45:6,7 46:3,
  5 48:14,15,
  21 49:10,11,
  16 50:24
  51:7 53:6
  57:15,16
  60:15,25
  68:21 69:18
  70:23 71:9
  84:9 105:2,8
  106:19
  126:14 131:8
  138:16
  152:21
manager's
  90:8 91:12
  95:8
managers
  26:17 29:5,
  14,17,19,24
  32:20,21
  33:15,16
  40:4,10,11

Adam Overton Kimmick
October 05, 2023

45:5 48:8
77:10
**managing**
  25:4 26:2
  47:25 60:12
  71:25 72:7,
  21,23 74:20
  87:14 112:4,
  8 114:22
  115:5 118:12
  146:23
**manipulated**
  112:22
  113:22
  117:25
  124:19
  127:7,10,13,
  17 128:6,7,
  13
**manipulation**
  114:21
  124:22 126:2
**March**
  103:7,18,20
  132:9
**margin**
  68:8
**mark**
  108:10
**marked**
  36:13 66:18
  69:8,12
  73:22 86:17
  87:22 88:5
  89:11 97:19
  107:18
  110:2,6
  119:6,8
  122:17
  129:20
  134:21 136:7
  143:7
  154:14,18
**master**
  49:22,25
  50:5
**matter**
  84:4

**matter-of-
the-fact**
  19:13
**mature**
  131:25
**matured**
  96:9
**maturing**
  106:5
**mean**
  10:18 12:21
  15:25 17:4,
  12 22:7
  25:22 34:13,
  14 35:14
  39:25 43:22
  46:15 55:2
  57:13 61:10
  62:10 67:14,
  18 71:21
  72:20 77:25
  79:15,18
  80:12 84:5
  105:25
  106:11
  111:14
  113:17
  125:7,8
  139:8,13,25
  141:13,24
  145:18 149:8
  152:23
**meaning**
  48:21 95:5
  110:25
  113:19
  115:22
  120:10
  124:13
  148:10
**means**
  111:6
**measured**
  80:11 103:9
**medical**
  55:21,24
  56:8 60:19,
  22 61:7,9,22

  62:2,17 65:7
  139:22
  153:25
**medications**
  6:24
**meet**
  8:6 19:6
  44:7,20
  45:14,18
  52:5,19
  53:11 54:3
  55:4,6 78:15
  104:4 116:13
  117:19
**meeting**
  7:25 11:7
  57:9 92:2
  150:13
  151:4,15
**meetings**
  94:19
**member**
  61:13 62:6,
  20,23
**members**
  56:7 140:6,
  13
**memorialize**
  58:3,7 75:13
  82:25 98:6
**memorialized**
  15:11 28:17,
  21 75:20
  76:18
**memory**
  10:19
**message**
  19:10
**messages**
  9:8,10,14,25
  10:15
**met**
  7:8,15,20,22
  87:5 92:6,9
  124:12
**mid**
  112:15

  116:21 147:4
**mid-year**
  113:23
**midyear**
  112:6 117:23
**mine**
  91:14
**minimum**
  133:18,22
  134:12
**minute**
  27:3
**minutes**
  8:9 64:23
  154:7
**mirrors**
  37:19
**miscommunicat
ion**
  99:20,21
**misremembered**
  65:23
**mission**
  84:11
**mistaken**
  101:15 102:4
**mitigating**
  134:7
**month**
  91:22,23
  148:10
**monthly**
  77:7
**months**
  12:5,8
  18:11,12,19
  22:19 23:18
  142:12
  148:25
  149:24
**moodys**
  50:25 87:7
  136:18
  137:7,9
**morning**
  5:17

Adam Overton Kimmick
October 05, 2023

move
  44:13 86:25
  87:8 106:14
moved
  96:10
moving
  46:20 98:22
  106:5,7
multinational
s
  70:19
multiple
  101:18
  104:13,20
  111:24
  113:13,24

---

N

N&g
  113:17
name
  5:9 7:11 8:3
  35:6,11,16
  41:18 119:14
names
  34:17 37:2
  54:17 81:14
narrow
  13:4
nature
  139:9
necessarily
  48:23 114:18
necessary
  106:14
need
  21:21 24:16
  31:9 32:24
  56:10 69:19
  102:25
  140:16
  145:2,7
needed
  46:25 63:17,
  21,22 64:2,
  11 69:3

77:18 78:4
82:11 90:15,
17 96:5
114:15
125:13
137:25 138:4
139:15,16
140:18
141:3,9,22
142:6,8,10,
14,22,24
144:23
needs
  84:13 91:15
  106:10 132:4
  133:18 144:5
negotiating
  106:7
negotiation
  96:10
never
  121:25
nine
  23:3 25:12
  31:3 121:4,5
nod
  6:14
Nonperformanc
e
  98:16
nonperforming
  135:21
nonverbal
  100:3
normal
  140:22 142:2
  146:19
Notary
  5:5 156:19
note
  109:4
notes
  154:16
  155:10
number
  15:10,11,18
  16:18 33:21

112:22
113:22
114:4,12
118:14
131:19
132:21
133:11
146:18
148:21
numbers
  13:24 109:17
  114:14
  117:20
  118:18,21
  126:4 127:7,
  11,12,15
  128:7,14

---

O

oath
  5:20 26:19
object
  151:21
objection
  27:23 59:19
  109:5,13
  149:20,25
objections
  35:20 36:7,
  11
objectives
  69:3 87:5
  93:18,19
OBS
  68:22
OBS'
  66:13,17
OBS_001006
  119:6,8
OBS_00233
  110:2,5
OBS_00334
  88:4
OBS_00344
  89:8,10

OBS_00406
  69:9,11
OBS_00575
  143:7
OBS_00659
  136:5,7
OBS_00708
  73:19,21
OBS_00711
  107:15,17
OBS_00714
  86:16
OBS_00982
  154:14,17
OBS_01088
  134:21 135:5
OBS_01271
  129:15,19
OBS_0575
  143:5
OBS_335
  88:25
obviously
  39:12 139:3
  140:14
  144:14
occasion
  11:25 84:24
occurred
  146:18
October
  58:20,24
  143:22 147:6
October/
november
  103:5
offer
  13:5,7,10
  15:15 16:6,
  18
offered
  15:18
offering
  15:8
official
  20:22

Adam Overton Kimmick
October 05, 2023

okay
 6:20 7:18
 8:4 15:5
 21:3 22:3
 24:11 27:7,
 8,15 28:6,20
 29:3 30:7,19
 31:5,13
 33:10,24
 34:10,23
 35:17 36:20
 37:17 38:11,
 23 41:23
 43:2 65:3,
 13,18 66:9
 67:5,22
 73:11,17
 74:19 75:4,
 5,13 81:13
 84:22 85:13
 86:9 87:20
 88:10,21
 90:12 91:24
 93:7 94:13
 95:15 100:9
 102:5
 107:10,13,24
 108:13,17
 109:9,18,24
 110:13,25
 111:14
 113:14
 114:10
 117:15 118:4
 119:3,11,21
 120:3,22
 122:14 126:9
 127:14
 128:5,24
 129:4,13
 131:3,12
 132:24
 134:16
 135:3,24
 136:2,13
 137:9 140:9
 141:18
 142:11
 143:2,12,16,

 21 144:21
 145:6 150:5
 154:9,24
 155:19 156:4
once
 6:11 18:16
 58:16 92:21
 101:4 149:8
 150:17
one
 7:12 8:2
 11:25 19:25
 25:14,17
 26:22,23
 28:18 32:11
 34:2,18
 35:15 38:3,
 18 40:20
 41:5 45:4
 47:20 50:22
 51:18,22
 55:7,9 65:5
 73:14 76:21,
 23 84:23
 85:3,18
 86:24 87:18
 90:3 91:9
 92:9 94:20
 99:6,10
 100:8 107:6
 108:8 109:18
 112:2,3
 113:7 120:5,
 12 121:3,15
 146:7
ones
 8:18 9:7
 90:9
ongoing
 103:24 123:2
 142:7
open
 36:18 60:14
 67:3 73:4
 89:5 91:16
 109:22
opened
 108:9

opening
 27:6
opportunities
 78:16 80:13
 96:8 98:22
 104:16
 106:3,4,25
opportunity
 106:24
 108:3,16
 123:2
Orange
 13:15 18:6,
 15,16 21:12,
 14,24 22:2,
 5,10 23:25
 24:21 27:21
 33:8 42:18
 43:10,24
 45:21 46:10
 50:24 55:22
 57:20 58:12
 59:20,22
 65:25 66:6
 67:8 115:25
 136:21
 153:20
Orange's
 27:13
order
 31:10 62:6
 68:3,6,8,9
 103:2 124:3,
 6,19 129:24
 132:18
ordering
 156:6
orders
 68:16
 113:17,18
 115:18
 124:14
 128:16,21
 130:10
 131:13
 133:14,23
 134:13

organization
 41:3 43:18
original
 36:3 122:22
outcome
 50:16
outline
 154:5
outlined
 106:25
outside
 13:15 30:9
 70:17,23
 74:11
overachieving
 114:16
overlap
 48:13 51:2
overlay
 47:19 121:14
 130:2
overrule
 83:4
Overton
 5:11 156:13
Oyster
 5:13

---

**P**

p.m.
 144:3 156:9
P00016
 97:2,18
P00019
 97:3
packet
 10:5
page
 28:5,25
 29:10 37:6,
 15,16,19
 73:10 74:2
 155:24
paid
 62:22 63:24
 72:17 112:17

Adam Overton Kimmick
October 05, 2023

118:12
125:17
126:19
127:12,22
**pain**
138:21
**Paine**
44:24 45:2,3
46:11 47:6,
15 49:12
50:23
**Paine's**
48:3
**paired**
111:2
**parent**
43:15
**part**
10:5 16:14,
15 19:8
42:18,23
43:10 44:5,
12 48:22
70:22 71:24
77:7 81:9
93:19 103:23
124:9 137:11
140:2
146:18,23
**participate**
20:4 59:13
144:25
**participated**
58:10,15
145:22
**particular**
79:5 112:19
131:2 141:24
**partner**
146:5
**parts**
43:18
**past**
113:5
**pat**
48:7

**pathway**
147:2
**Patricia**
5:18 15:8
27:21 37:23
38:7 119:14
155:10
**Patrick**
52:8,11
**Patty**
8:21 12:12,
25 13:6
18:17,20
25:14,16
26:4 30:2,6
47:17 48:5
49:15,16,20
50:9 51:3,5,
6 62:15
63:10 67:11,
13,15 68:15
72:14 74:5,
12 75:19
77:3,11
78:4,25 79:4
80:24 81:7,
18 82:11
87:13,24
89:21 90:13,
20 91:13,17,
19 92:6,23
96:23 99:24
100:19
107:22
109:2,12
110:4,15
111:2,20,23
112:4,8,11,
23 113:8
114:25
120:19
123:23 124:8
126:16
136:19 137:3
138:18
139:21
140:3,4,15,
17 141:2,12

142:5 143:20
144:4
145:10,15
146:13,21
153:15
**Patty's**
17:6 19:3
27:14 30:16
50:2,18
73:15 75:9
82:21 83:18
88:11 92:11
112:15 140:8
146:15
**Paul**
41:18,20
44:17
**pay**
26:6 118:22
131:8 133:3,
8,10
**payment**
57:9 110:4,
14 113:7
**payout**
117:10
**penalty**
5:21 131:8
**pending**
6:9
**people**
6:11 22:8,
10,25 25:11,
15 29:10
30:15,21,23
31:6,23
32:13 33:6,7
35:7 37:3,24
38:6,21,25
39:2 43:16
46:8,14,17
47:2,5 48:20
54:12 62:3
103:18 132:8
149:4 151:2,
9 152:25
153:2

**percent**
111:20
112:17
115:21
116:3,9
120:6,7
128:17
130:12
131:18,22
132:20
133:3,4,8,12
134:5,6
135:15
**percentage**
115:17
128:17,21
130:9,12
131:12
132:24
133:16,18,23
134:13
**percentages**
124:24
126:5,11
128:9,12
**performance**
8:19,20,22,
25 17:6,15
19:6 46:16
54:22 55:3
64:19 73:15,
20 75:10,14,
18,22 82:22,
25 83:8
86:3,5,15
87:23 88:3,
12,15,18,22
89:9 90:5,
14,19 92:12
99:7,9
100:12,14,15
104:25
105:6,10,14
107:16
114:19
127:21
147:2,14
151:3

Adam Overton Kimmick
October 05, 2023

performer
  146:22
performers
  146:20,21,25
  149:4
performing
  125:23,25
  126:11,22
  127:9
period
  23:8,16
  24:15 29:15
  30:17,25
  32:7,14
  33:4,6,12
  34:12,20,25
  35:9 38:14,
  20 39:4,7
  40:22 42:3,
  7,22,24
  51:13,25
  52:2,6,20
  53:11,23
  54:4 72:6,
  10,13,18
  87:25 88:12
  89:20,22
  90:5 91:12,
  16 108:22
  111:18 118:7
  130:22
periods
  26:16 43:16
perjury
  5:21
person
  8:3 39:18
  41:3 44:2
  59:11 72:2
  74:11 81:25
  85:3 112:6
  115:7 116:6
  118:9 131:19
  150:21
personal
  55:21
personally
  98:2 133:3

personnel
  152:21
perspective
  61:11 83:3,8
  105:6 113:3
  126:13 146:9
Pfizer
  49:12,17,20,
  22 87:7
ph
  42:13
phone
  14:10 82:2
picture
  147:11
piece
  51:25
pieces
  17:14 107:11
  153:17
pier
  100:9
piers
  19:8 54:24
  76:3 77:14
  81:3 83:10,
  22 84:2,23
  85:17,19
  98:24 99:2,
  11 134:10
  152:2,4
pipeline
  57:18 78:14
  92:24 94:9
  98:20,23
  102:25
  103:22
  104:3,6,8,
  14,15 105:24
  106:2,6,22
  147:16,17
places
  43:15
plaintiff's
  35:21 36:8,
  12

plan
  92:23 93:3,
  14,20 94:6,
  8,14,23,25
  95:6,16,17,
  19,22,24
  96:2,3,5,16
  103:6,16,17
  106:21
  132:7,16
  133:2,7,17
played
  71:24
pleasant
  137:25
please
  5:9,12 6:12,
  15 15:5 34:3
  68:19 88:9
  136:12
plucked
  97:10
policy
  61:18 64:7
poor
  146:21,22,25
populate
  91:14
populated
  121:6 122:3
posed
  27:21
position
  21:16,23
  22:3,4,20
  23:12,13
  24:6,12
  25:18 68:7
positive
  15:20
positively
  79:17 80:10
possible
  101:22 120:9
  124:2
possibly
  55:8,23 57:9

  120:9 139:25
posted
  26:24
potential
  16:4 17:13
practice
  82:24
preparation
  8:11 11:9
prepare
  7:4,7,21
  10:25
present
  7:24 29:7
  39:5 54:8
  92:23 93:20
  94:6,22
presented
  93:14 94:23
  95:16,17,19
  103:19
  106:21
  116:25 117:6
pressured
  81:9
presumed
  6:4
pretty
  12:21 13:4
price
  130:17
prior
  24:12 95:11
  131:20
privilege
  13:24 14:9,
  21,24
privileged
  13:22 14:4,
  6,7
privy
  15:19
probably
  12:9 92:9
  121:15 147:4
  153:9,12

Adam Overton Kimmick
October 05, 2023

problematic
81:19
problems
85:16
procedure
140:20
procedures
6:18 60:11
139:7,11
141:5,19
142:4
proceeding
16:7
process
77:7 123:18
132:5 152:22
produce
98:19 113:20
124:19
produced
9:17,22
103:15
123:15,20
producing
104:17
product
46:22 47:20
48:12
121:15,18,19
production
93:8 101:9
productive
84:19,21
products
47:23 113:19
114:2 130:5,
7 131:25
132:2
profitability
46:22
profitable
22:22
program
42:18 43:11,
13,14,25
44:6 59:6

projects
106:12
promise
116:22
120:21 124:9
promising
43:15
promote
69:20
promotion
70:13
proper
66:4
proposed
78:13 106:6
proposing
40:7
protected
60:10
provide
27:15,19
41:12 103:13
126:5
provided
28:16 30:13
69:6 126:3
public
5:5 20:24
156:19
pull
10:19 17:11
pulled
121:17
pursue
106:24
put
26:21 35:23
36:16 60:14
66:21 72:25
74:23 86:11,
22 87:20
89:2,17
91:13 93:3,
10 107:6
108:14
118:23
128:25

134:17 143:2
146:25
152:12
154:12
puts
91:8
putting
96:18 107:24
122:14 136:2

_____

**Q**

question
5:22,25 6:3,
4,9,13 12:22
13:4 24:25
29:17,18,22
33:14 45:17
49:6 56:12,
13,14 62:13
79:9 94:6,11
95:21 98:12
117:21
126:20
141:18 150:4
151:19
questions
5:19 6:16
27:20 143:17
155:16
quick
154:4
quickly
118:9
quite
24:18 63:5
148:14,17
quota
42:10 43:7,
21,25 44:7,
16,20 45:11,
14,18 52:3,
5,17,19
53:8,11,25
54:3 55:6
57:9 72:16
100:19,22

101:5 103:25
104:4 111:2,
7 112:15,16
113:14
116:14
117:5,16,22,
24 124:12
126:6 130:22
151:15
quotas
40:14 41:14

_____

**R**

ragged
132:2
ranking
147:10 149:6
rate
26:6
rating
88:22 90:13
147:9
read
17:12 68:24
94:5,11 95:8
100:2
reading
94:2
real
127:11,16
reason
26:15 71:23
116:14
120:11
reasons
46:24 55:21
98:6,10
150:19
recall
8:14,15,16,
18,24 9:5
10:7,14
11:23 12:5,
16,17,20
13:3 15:10
16:14 17:18,

Adam Overton Kimmick
October 05, 2023

22,24 18:3
19:14,16,22
20:15 21:18,
21 22:6
25:16,21
26:14 31:2
32:23 34:17
35:6,11
41:25 43:4
44:10,15,22
45:4,7,15,20
47:4,8,14
49:14,18,24
50:15,21
51:21 52:7,
16,21 53:7,
12,24 54:5,
11,17 55:8,
11,16,23
56:18,22
57:23 58:5,
9,16 59:15
63:8 64:16
65:12 66:8
69:17 71:14,
17 76:13,22,
25 78:21
80:22,24,25
81:12,20
82:15 91:4
93:5,13,25
96:17 98:9
99:4 102:3,
6,15,20
104:10
105:16,19,22
107:4 112:4
113:16
115:19
116:5,19
128:23
137:20,21
138:15
139:19,24
140:10,11
141:23
142:16
145:18
147:22

148:8,11
149:22
150:9,12,16
**received**
21:4 90:13
**recent**
12:3 58:18
**recess**
65:20 109:20
154:10
**recognize**
27:9,11
36:21,23
67:6 73:13
75:5,8
108:18
109:10
110:9,12
129:5 135:6
136:14,16
143:17
154:25
**recognized**
72:14,19
**recollection**
64:13
**recommend**
69:22,25
**recommendatio
n**
146:12
147:20 148:6
149:19
150:2,8
**recommended**
150:19
**record**
5:10 35:18
36:6 66:12
73:18 78:23
81:14 87:23
97:5 102:8
119:4
**recorded**
20:24 86:3
**records**
21:22

**rectify**
79:6,11
**redacted**
73:8 89:16
90:2,9
107:12,21
**redundancy**
66:3,8
**redundant**
135:23
**refer**
60:25 61:4,
6,14,17
62:14 63:18
64:12
**referred**
64:6 94:10
**referring**
100:6 127:2
151:8 152:21
**reflect**
67:15 111:25
113:11
117:10 123:8
125:25
126:8,21
**reflected**
67:24 100:12
117:5 143:23
**reflective**
113:7
**reflects**
128:8
**refresh**
10:18
**regarding**
80:24 94:8
100:3 107:22
155:10
**region**
16:3,8
**regular**
152:24
**relaid**
13:14 16:19
**related**
87:6

**relation**
125:11
**relationship**
19:7 40:8,23
47:22 57:7
71:4,8 76:11
**relationships**
22:22 25:5
54:23,24
76:2 134:9
151:6
**relay**
14:5
**relaying**
14:3
**release**
65:25 66:6
140:9
**relevant**
16:6 30:13
**reliant**
121:14
**remained**
49:9
**remains**
14:4
**remediation**
148:16
**remember**
8:3 16:25
24:2,8 64:9
71:18 81:22
137:23
138:17
**remind**
25:2
**removed**
135:20
**Renassia**
41:18,20
44:17
**renew**
114:3,5
116:9
**renewal**
116:14
130:15

Adam Overton Kimmick
October 05, 2023

renewals
  115:20,22
  130:6 131:20
  132:20,25
renewed
  131:4,7,17
renewing
  50:5 131:9
renews
  131:16
repeat
  6:2 108:6
rephrase
  5:24 27:18
  83:24
replace
  50:7 153:4,
  15
report
  25:17 26:12
  42:2,20,24
  107:16
  153:23
reported
  25:19 29:6,
  14,20 32:17
  33:6,11 37:3
  38:13,20
  83:15 84:8,
  23 85:2
  101:25
  138:12
  153:20
reporter
  5:8 6:2,10,
  14 20:25
  36:15 66:20
  69:14 73:24
  86:19 88:7
  89:13 94:3,
  12 97:21
  107:20 110:8
  119:10
  122:19 128:3
  129:22
  134:24 136:9
  143:9 154:20
  156:5

reporting
  23:2 25:8
  30:20,24
  31:14,18,24
  32:2,9,22
  34:11,24
  39:3 102:22
  115:16
represent
  5:18 110:23
  111:5 112:25
  137:2
representatio
n
  114:19,20
representativ
e
  74:13
represented
  80:2 97:25
  117:5
representing
  27:14 95:18
request
  50:18 70:6,
  10
requested
  61:5,7 71:5
  72:24 122:25
required
  62:5 68:16
  103:2 104:18
  148:15
requirements
  57:10 67:21
  77:13 102:24
  105:5
requires
  123:19
reread
  36:5
reset
  116:20,25
Respect
  60:8
respond
  5:20

responded
  38:15
response
  6:5 29:9
  38:25 79:13
  92:11,16
  99:18 144:4
  145:9
responses
  6:16 27:12,
  17,19 28:16,
  20 35:20
  36:8,11
  37:20 66:14,
  18 77:23
responsibilit
ies
  25:25 48:4,
  19,23 49:9
  67:16,18
  68:2 69:23
  70:2,4,9
  71:2 105:13
  117:14
  120:17
  126:17
  137:4,7
  146:23
responsibilit
y
  23:20 57:16
  60:15,24
  70:12,25
  87:13 105:3
responsible
  22:21 25:4,6
  40:11,18,23
  41:4,15
  42:11 43:8,
  25 47:19,21,
  23,25 48:9,
  11,16 50:4
  52:17 67:23
  122:12
responsivenes
s
  77:22

result
  80:11 83:3,7
  112:21
  118:21
  120:19
  124:4,19
resulted
  78:13
results
  74:8 83:18,
  23 86:8 95:3
  96:6,7 99:23
  104:17
  113:23
  120:13
  121:17
  124:18
  152:6,9
  153:2,3
return
  125:18
revenue
  22:22 25:5
  26:3 40:6,
  24,25 48:17,
  24 68:7 71:3
  111:14,15,21
  112:21
  114:6,7,12
  118:15
  119:25 123:3
  124:13
  129:24
  132:18
  133:14,19
  135:14
revenues
  57:19 113:21
review
  8:10,13,25
  9:4 17:19,21
  27:4 28:12
  31:10 36:18
  37:8 67:3
  69:5 73:15,
  20 75:2,10
  76:4,6 77:6
  78:12 85:15

Adam Overton Kimmick
October 05, 2023

86:15 87:4,
23 88:3,8,
12,16,19,22
89:5,9 90:5,
14,19 91:2,
25 92:7,12,
22 94:17
95:11,14,21
96:21 98:18
99:7,9
100:13,14
107:9,11
108:3,16
113:3 122:21
129:3 135:2
143:11 154:5
**reviewed**
10:9,11 73:5
96:3 114:9
**reviewing**
11:8 16:4
87:3 90:10
109:23
**reviews**
8:19,20,23
9:2 17:6,7,
15 68:15
85:18 91:5
99:10 126:3,
4
**revised**
101:3
**right**
10:9 14:12,
25 23:12
32:18 36:5
60:14 85:9
86:10 89:17
90:16 96:24
101:13
109:16 116:2
120:3 126:5,
6 134:11
142:2 144:18
148:4 152:25
153:2 154:3
**rights**
65:7

**risen**
83:13
**Rob**
16:9,10,11
**role**
43:24 46:5,
14,25 47:3,
18,19 49:8
50:9 66:3
70:4,5,7,11
118:10
**roles**
24:20 121:14
**Rossdale**
35:3 51:15,
17 54:13,20
58:2
**Route**
5:13
**Row**
120:5
**Rows**
119:15
**Roxanne**
42:13,16

---

**S**

**salary**
39:11
**sales**
21:25 22:14,
15 23:14,19,
21 24:13,19,
22 25:9,20
40:12 41:3
67:21 100:4
108:19,25
109:11
110:3,10,14
113:6
116:12,17
127:3 129:6,
18 134:19
**salespeople**
57:14 121:6

**salesperson**
119:12 134:4
**sat**
69:2
**satisfactory**
131:14
**saying**
104:13 117:4
127:15,16
**says**
30:8 74:14
84:7 87:11
91:25 98:4
110:16,19
111:19
119:12 120:6
144:7
**scale**
63:20
**scheduled**
94:20
**scheduling**
77:10
**scope**
30:9 41:10
**scroll**
73:9 119:21
120:22
**second**
26:22,23
65:5 75:10
86:3,4,24
87:4,19
107:7 109:19
125:20
**section**
73:15 107:21
**see**
15:2 26:24
29:7 35:15
37:18 66:23
74:14 85:5
87:3,9,11
91:8 92:2
110:18
119:11,14
135:14

144:18,22
145:4,12
**seeks**
30:9
**selling**
47:20,23
48:12
**semiannual**
69:5
**send**
136:18
142:19
**senior**
11:16 18:6,7
20:8 22:13
24:20 30:3
31:8 32:2,5,
8,12,19
33:15,17,24
34:7 35:3
38:10 39:9,
14,18 40:4,
10 41:3,7,
21,24 42:9
45:6 46:4
57:15 69:18
70:7,10
**sentence**
87:4
**separated**
120:12,13
**series**
5:19 126:17
**seriously**
149:10
**service**
31:14 34:24
35:8,12
38:24 39:3
49:22,25
54:13 135:12
**services**
40:7 41:11
45:5,9 46:3,
4 47:24
48:14,20
49:3 50:5

Adam Overton Kimmick
October 05, 2023

| | | | |
|---|---|---|---|
| 78:13 113:19 | showed | space | 121:8,24 |
| 121:10 | 80:6,9 | 96:9 | 123:14 |
| 130:3,5,6 | 146:21 148:3 | **speak** | **split** |
| 132:2 | **showing** | 11:18,21 | 153:16 |
| **sessions** | 74:8 | 18:9,13,18 | **spoke** |
| 77:9 94:20 | **shows** | 20:7,12 | 11:6,24 |
| **set** | 127:7,8 | 50:8,13 | 12:4,24 18:5 |
| 26:6 35:21 | **sickness** | 78:25 79:4, | 91:16 145:14 |
| 36:8,12 | 63:4 | 10 82:8,11 | **spoken** |
| 70:8,9 112:2 | **sign** | 91:18 | 11:13 18:16 |
| 113:8 120:12 | 28:9 37:5 | **speaking** | **sponsored** |
| 132:6,7,10 | 78:10 | 11:7 83:21 | 43:14 |
| **sets** | **significant** | **specialist** | **spot** |
| 60:11 113:25 | 141:25 | 35:4,5,13 | 144:11 |
| 120:11 | **signing** | 45:9 46:23 | **spots** |
| **settlement** | 28:13 37:9 | 47:18 49:3 | 144:24 |
| 13:8 16:18 | **similar** | 121:11 130:4 | **spreadsheet** |
| **seven** | 39:17 59:13 | 135:12 | 119:2,6,7 |
| 114:16 121:4 | 115:17 | **specialists** | 121:20 122:4 |
| **severe** | **simple** | 31:14 32:6 | **stamped** |
| 139:2,12 | 19:10 141:6 | 34:24 35:8 | 69:9,11 |
| 142:4 | **simply** | 38:9,24 39:3 | 73:18,21 |
| **sexual** | 112:2 | 48:11 54:13 | 86:16 88:4, |
| 59:7 | **situation** | 135:20 | 25 89:7,10 |
| **shake** | 61:3 144:8 | **specific** | 97:2,18 |
| 6:15 | **situations** | 10:15 68:3,9 | 107:15,17 |
| **share** | 99:19 100:16 | 98:13 141:19 | 110:5 119:8 |
| 140:4 | **size** | 143:17 | 129:15,19 |
| **shared** | 41:10 | **specifically** | 134:21 135:5 |
| 78:4 140:7 | **Sledge** | 10:2 23:11 | 136:4,7 |
| **sheet** | 146:7,11 | 77:16 83:21 | 143:4,6 |
| 103:14 117:2 | **slightly** | 93:5 98:17 | 154:17 |
| 122:8,16,23 | 25:24 39:24 | 117:23 | **start** |
| 123:7,13,15, | 41:9 105:4 | 118:25 | 21:13 |
| 20,21,22,25 | 121:12 | 140:12 | **started** |
| 124:6 | **small** | 141:20 | 58:17 148:25 |
| **sheets** | 73:11 | 149:14 | **starts** |
| 120:10 | **sold** | **specifics** | 28:25 |
| **short** | 130:7 | 17:4 18:3 | **state** |
| 65:20 109:20 | **sort** | **specified** | 5:5,9,12 |
| 154:10 | 149:6 | 95:7 | 144:3 |
| **shots** | **sounds** | **specifies** | **statement** |
| 106:13 | 145:19 | 95:11 | 75:16 111:12 |
| **show** | **source** | **specify** | **states** |
| 10:3,6 | 14:18 | 76:8 | 22:16 23:15 |
| 126:10 | **South** | **speculating** | 70:18,21,24 |
| | 22:15 | 119:20 120:9 | 71:5 74:12 |

Adam Overton Kimmick
October 05, 2023

87:5
status
  125:16
Stefanie
  36:6 66:11
  86:13 94:4
step
  72:2
stepped
  126:16
stop
  11:5
strategic
  113:24,25
  114:13
  124:15
  134:14
strategy
  99:17
streams
  71:3
structure
  46:20
struggling
  147:17 149:5
subject
  5:21
subjective
  131:24
submitted
  94:14
Subscribed
  156:16
subsequent
  123:13
subsequently
  147:6
successful
  74:5,15,20
  88:23 131:18
  152:16
sue
  18:21
suffered
  55:25 56:7
suffering
  6:20

sufficient
  78:14 80:14
  83:19 98:23
summary
  108:20
  109:2,11
  110:4,14
  111:24 113:7
  116:18
  118:17 127:4
summer
  147:8 148:20
  149:2 153:12
supervise
  26:10
supplemental
  35:20 36:2,
  25 66:13,14,
  17
support
  61:13,16
  62:6 83:6,19
  140:15
supported
  83:6
supporting
  66:4
supposed
  118:15
sure
  10:20,21
  14:17 15:4
  17:5 25:6
  66:7,12
  71:22,23
  72:16 77:12
  84:10,17
  89:17 112:10
  114:24
  116:21
  117:25
  126:15
  132:17
  144:16
  146:24
  149:12 151:4
surgery
  139:5,10

140:18,23,25
141:3,20,22
144:6,8
145:3,7
sworn
  5:5 20:19
  156:16

_____

_____

T

tab
  118:25
Tabool
  42:13
take
  6:6 27:3
  38:3 61:12
  62:5,15,19,
  23 63:11,17,
  22 64:10,14,
  22 65:2,14
  79:16 93:11
  96:4 105:9
  126:17
  136:10
  138:2,8,13
  139:15,21
  142:6,8,9,
  14,21 144:5,
  17 145:10
  148:13
  154:4,21
  156:7
taken
  6:24 48:25
  55:20 65:21
  70:2 89:15
  109:21 132:4
  148:24
  154:11
takes
  149:10 153:4
taking
  80:9 126:15
  137:3 145:15
talk
  9:24 19:24

78:16 94:21
102:24
116:20
talked
  17:5 75:25
  92:20
talking
  6:11 78:19
  102:23
  104:23 127:3
  128:3 149:14
  151:17
target
  101:2,17,19,
  23 102:7,12
  106:10
  111:7,16
  113:5 115:21
  116:3,20,25
  117:12,20
  118:14,17
  124:23
  125:4,15
  130:25
  131:5,11
  132:6,8
  151:4
targets
  40:25 68:4,
  6,8,9 93:19
  101:18,24
  102:17,19,22
  103:9,11,19
  120:11
  121:12 130:4
tasks
  48:22 125:10
team
  44:3 51:19,
  23 52:13
  53:3,17,18
  54:7 61:6
  81:9 84:8,
  11,13,18,21
  95:12 99:18
  140:5,6,7,12
  147:15
  150:24

Adam Overton Kimmick
October 05, 2023

| | | | |
|---|---|---|---|
| 151:7,9 | 66:2,7 96:22 | 156:2 | 49:4,12,21 |
| **Teams** | 97:17,23 | **theoretically** | 50:23 51:7 |
| 9:9 | 98:7,11 | 122:10 | 52:6,20 |
| **telephone** | 146:16 148:6 | **they'** | 53:11,23 |
| 19:18 | 149:24 | 62:5 | 54:4,19 |
| **tell** | 150:15,20 | **thing** | 62:4,5,15, |
| 17:13 56:10, | **terms** | 89:18 | 19,22,24 |
| 25 65:10 | 68:16 151:14 | **things** | 63:5,11,16, |
| 77:15 80:20 | **territories** | 20:23 78:18 | 17,20,23,24 |
| 82:9,13 | 33:7 100:25 | 84:16 125:12 | 64:11,14,17 |
| 96:15 125:2 | 111:24 | 134:8 148:12 | 69:6,16 |
| 141:12 142:5 | 113:13,24 | **think** | 72:12 74:8, |
| 143:13 | **territory** | 29:18 34:14 | 21 75:15 |
| 150:18 | 25:24 34:20 | 35:6 60:16 | 87:25 88:12 |
| **telling** | 69:2 70:18 | 86:14 93:24 | 89:20,21 |
| 127:13 144:4 | 71:25 72:3, | 94:5 126:12 | 90:5 91:13, |
| **ten** | 5,15,22 74:7 | 133:4 154:7, | 16 92:9,10, |
| 47:13 | 105:4 111:17 | 13 | 21 100:2 |
| **tenure** | 112:3,13,14 | **third** | 102:17 |
| 22:10 | 113:2 114:4, | 110:18 | 106:23 107:3 |
| **term** | 22 115:6 | **thought** | 108:22 |
| 80:15 130:21 | 120:13 | 18:23,25 | 111:17 |
| **terminate** | 122:24 | 19:11 77:18 | 112:10 |
| 55:18 57:4 | 125:22 | 83:17 96:16 | 116:9,11 |
| 58:2 98:14 | 126:13 | 144:25 | 126:14 128:4 |
| 100:7,11 | 137:12 | **three** | 131:9 137:14 |
| 116:14 | 153:16,18 | 23:18 31:12 | 138:2,8 |
| 145:22 | **testified** | 33:19 35:7 | 139:15,21 |
| 147:20 | 5:6 12:23 | 121:3,9 | 140:15 |
| 148:7,25 | 18:2,5 20:13 | 124:12 | 142:6,9,10, |
| 150:11 | 31:19,25 | **threw** | 14,22 144:5, |
| **terminated** | 93:22 99:4 | 72:10 | 12,17,25 |
| 47:6,7 54:7, | 105:23 | **time** | 145:10,15,18 |
| 14,15,21 | **testify** | 6:6 7:16 | 146:10 |
| 55:10 56:17 | 6:22,25 7:13 | 12:3 16:4,9 | 148:13 153:4 |
| 57:24 66:5 | 26:19 31:22 | 21:17 23:8, | 156:3 |
| 101:21 | 33:5,9 51:4, | 16 24:15 | **timeframe** |
| 102:10 | 10 53:21 | 25:13,17,19 | 137:22 |
| 106:16,23 | 98:3 109:17 | 26:17 29:15, | **timeline** |
| 136:24 | **testifying** | 25 30:3,16, | 103:5 |
| 146:13 | 33:20 | 17,24 31:4 | **timely** |
| 147:24 | **testimony** | 32:7,13 | 77:23 |
| 149:16,19 | 20:20,23 | 33:5,12 | **times** |
| 150:8 | **text** | 34:12,25 | 58:14 |
| **terminating** | 143:20 | 35:9 38:4, | 104:13,20 |
| 58:6 128:18 | **thank** | 14,20 39:4,7 | 131:25 |
| **termination** | 65:3,19 | 42:3,7,23 | 146:18,22 |
| | 97:16 138:11 | 43:3,17 47:6 | |

Adam Overton Kimmick
October 05, 2023

title
  21:18,20
  22:6,12,14,
  18 23:4
  24:9,10
  25:22 29:21,
  25 30:4,6,
  10,16 32:16
  37:22,25
  38:6,10 42:6
  43:2,5 45:5,
  8 46:2,7,9
  51:20 52:14
  53:4,7,22
  69:15 130:3
titles
  22:7 25:23
  31:5,12,17,
  24 34:3
  40:14
today
  5:20 6:22
  7:2,5 10:25
  11:9 58:25
  59:2 121:21
  145:2 155:13
  156:3
told
  18:23,25
  63:16 64:10
  81:18 115:13
  138:18
  142:9,21
  144:11,12,
  13,16
tolerated
  59:20,22
tool
  121:17
top
  91:24 146:20
  149:4
topic
  139:25
topics
  19:24
total
  111:15

tough
  116:12
traditionally
  74:10
training
  58:11,15,19
  59:5,9,14
  143:14
  144:24
trampoline
  138:22 141:7
transcribe
  6:11,14
transcript
  156:6
transferred
  34:19 48:4,
  20
transition
  71:25
transpire
  40:22
treating
  60:9
Trinity
  21:8
true
  28:19,21
  87:16 101:11
  136:21
truthful
  6:5 37:12
try
  80:21 124:9
  130:14 153:9
trying
  72:8 89:25
  114:23,24
  120:18
  126:15
  127:17,18
Tuesday
  59:3
turn
  28:4
twice
  119:15,18

two
  6:11 21:22
  35:7 47:9,20
  55:14 56:21
  59:10 100:25
  120:10 121:3
  122:25
  129:24
  135:10 146:6
  149:23
type
  70:5 128:3
typical
  41:6 141:8
typically
  40:5,19 41:5
  70:19 77:8
  82:24 91:6
  102:21
  130:10,14
  131:7,15,18

---

**U**

U.S.
  24:14,23
  25:9 72:4
  74:12
unable
  9:20 78:17
  98:19 114:14
unacceptable
  128:22
  130:13
  133:10
  135:25
uncomfortable
  82:4,7,10,14
  84:8
uncovering
  80:14
underperformi
ng
  46:6,14,15
understand
  5:23 6:17
  28:2 117:21

  127:17,18
  144:16
understanding
  16:17 59:17,
  25 60:5,7,21
  61:8,22,24,
  25 62:3,7
  99:25
understands
  84:11
understood
  6:4 77:12
  116:22
United
  22:16 23:15
  70:18,21,24
  71:4 74:12
unpleasant
  138:19
unreasonable
  133:7
unwilling
  78:15

---

**V**

vacating
  118:10
Vaguely
  27:10 36:22
  60:20
valid
  61:16 62:13
validate
  32:24 57:2
  69:19 102:13
validated
  28:18
validating
  16:20
validation
  148:15
varied
  25:12
various
  121:6

Adam Overton Kimmick
October 05, 2023

| | | | |
|---|---|---|---|
| **vast** | **ways** | 129:7,18 | 23:22 24:2, |
| 113:20 | 39:22 | 134:20 135:8 | 3,5,9 40:22 |
| **velocity** | **wed** | **worked** | 44:9,11,18, |
| 98:23 104:15 | 145:3 | 49:13,17 | 21 55:12 |
| **verbal** | **Wednesday** | 50:23 51:8, | 56:19 58:16 |
| 6:15 85:23 | 59:3 | 12 52:12 | 71:18,20 |
| **verbiage** | **week** | 53:2,16 | 101:4,16 |
| 73:10 | 59:4 | **working** | 110:24 |
| **verify** | **weekly** | 21:11,13 | 111:7,8,25 |
| 32:25 | 77:7 79:3,7 | 106:12 | 112:6,9,15, |
| **versus** | 94:19 | 125:6,10 | 19,20 114:8, |
| 111:9 126:2 | **went** | **workplace** | 23 115:13 |
| **village** | 138:24 | 58:12 59:18 | 116:21,23 |
| 20:22 | **wide** | **works** | 117:7 120:19 |
| **violations** | 12:22 | 65:16 | 124:8 125:21 |
| 153:24 | **Willcock** | **write** | 127:22 |
| **virtual** | 16:9,11 | 74:17 75:11 | 128:22 |
| 59:11,12 | **Willins** | 76:3,6,17 | 129:12 |
| **vis-a-vie** | 134:20 | 88:15 107:22 | 130:25 |
| 148:5 | 135:8,11 | **writing** | 131:6,11 |
| **volume** | **window** | 76:19 81:5 | 133:21,24 |
| 39:23 150:22 | 26:25 | 82:17,20,25 | 135:9 147:4, |
| | **withdrawn** | 85:22 93:4, | 5 |
| ——————— | 93:21 | 11 101:6 | **years** |
| W | **witness** | 142:18,20 | 8:22 17:16 |
| | 5:4 13:13,16 | **written** | 55:15 56:21 |
| **wait** | 14:14 155:18 | 103:11 | 138:16 |
| 6:12 11:4 | 156:10 | **wrote** | **yesterday** |
| **want** | **work** | 73:25 92:15 | 7:22 8:9 |
| 6:6 11:5 | 26:10 50:3, | 136:20 | 10:9 58:22 |
| 35:16 64:23 | 10 53:18 | 144:23 | **York** |
| 65:15 66:12 | 54:25 61:12 | 145:9,11 | 5:6,14 25:21 |
| 84:10,17 | 62:5,16,20, | | 59:7,8 |
| 86:25 130:18 | 24 63:11 | ——————— | **Youkhanna** |
| 140:4 149:12 | 64:15,18 | Y | 9:12 16:3 |
| **wanted** | 72:17 82:4 | | 18:8 23:24 |
| 71:8 79:21 | 83:14 84:15 | **yeah** | 50:9 97:2,5, |
| 140:14 | 85:7,10 | 10:12,20 | 7,9,10,11 |
| 142:24 | 112:12,23 | 18:11 64:24 | 139:17,20 |
| 146:19,24 | 132:18 | 65:4 72:9 | **YTD** |
| **warrant** | 138:9,13 | 73:9 106:11 | 110:19,22 |
| 46:23 | 139:21 | 108:10 | |
| **way** | 142:6,15 | 110:12 | ——————— |
| 16:20,23 | 144:5 145:15 | 121:25 | Z |
| 64:20 66:3,5 | 152:5,8 | 134:11 138:4 | |
| 81:8 82:2,5 | **workbook** | 139:8 | **Z10** |
| 84:14,15 | 110:11 126:8 | **year** | 120:5 |
| 109:7 142:3 | | 9:2 21:22 | |

# Exhibit B

### In the Matter Of:

*Haran vs*

*Orange Business Services Inc.*

---

## *PATRICIA HARAN*

## *April 26, 2023*

---



1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
3  - - - - - - - - - - - - - - - - - - - - - - -x
   PATRICIA HARAN,
4

5                              Plaintiff,

6
                               Index No.:
7                              1:21-CV-10585-VSB

8
                -against-
9

10
   ORANGE BUSINESS SERVICES INC.,
11

12
                               Defendant.
13 - - - - - - - - - - - - - - - - - - - - - - -x

14    IN-PERSON DEPOSITION

15                    OF

16

17     TAKEN ON:  April 26, 2023

18 - - - - - - - - -- - - - - - - - - - - - - -x

19

20

21

22

23

24

25

Haran vs                                                           Patricia Haran
Orange Business Services Inc.                                       April 26, 2023

2

```
 1                        I N D E X

 2    WITNESS              EXAMINATION BY         PAGE

 3    PATRICIA HARAN     MR. GUILFOYLE              9

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

3

```
 1                        I N D E X

 2                 MARKED FOR IDENTIFICATION

 3      EXHIBIT           DESCRIPTION             PAGE

 4      Exhibit 1         Bates OBS5 - OBS11       25

 5

 6      Exhibit 2         Bates OBS13              28

 7

 8      Exhibit 3         a document               29

 9

10      Exhibit 4         BATES OBS334 - 343       30

11

12      Exhibit 5         BATES OBS344 - 353       35

13

14      Exhibit 6         a document               44

15

16      Exhibit 7         a document               45

17

18      Exhibit 8         a document               52

19

20      Exhibit 9         Bates OBS381 - 383       56

21

22      Exhibit 10        a document               60

23

24      Exhibit 11        Bates OBS926 - 927       65

25
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

```
                                                              4
 1                    I N D E X

 2              MARKED FOR IDENTIFICATION

 3    EXHIBIT            DESCRIPTION            PAGE

 4    Exhibit 12        Bates OBS930 - 931       69

 5

 6    Exhibit 13        Bates OBS575 - 576      107

 7

 8    Exhibit 14        Bates OBS910 - 911      143

 9

10    Exhibit 15        Bates OBS821 - 919      147

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Haran vs                                                                 Patricia Haran
Orange Business Services Inc.                                            April 26, 2023

5

```
 1                    I N D E X

 2              REQUESTS FOR PRODUCTION

 3   DESCRIPTION                     PAGE

 4   timeline                        129

 5   2022 W-2                        141

 6   Unemployment documents          142

 7   documents                       155

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

6

1

2   ***************************************************

3   IN-PERSON DEPOSITION of PATRICIA HARAN, held on

4   April 26, 2023, at 10:00 a.m., at Baker &

5   Hostetler, 45 Rockefeller Plaza, 14th Floor, New

6   York, New York 10111, was reported by AMBRIA

7   IANAZZI, a Registered Professional Reporter,

8   Certified Realtime Reporter, and Certified

9   Shorthand Reporter.

10  ***************************************************

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

7

```
 1                  A P P E A R A N C E S :

 2   FISHER TAUBENFELD LLP
          Attorneys for Plaintiff
 3        225 Broadway, Suite 1700
          New York, New York 10007
 4
       BY:  LIANE FISHER, ESQ.
 5           liane@fischertaubenfeld.com

 6

 7   BAKER HOSTETLER
          Attorneys for Defendant
 8        45 Rockefeller Plaza, 14th Floor
          New York, New York 10111
 9

10   BY:  JUSTIN A. GUILFOYLE, ESQ.
          jguilfoyle@bakerlaw.com
11
          AMY I TRAUB, ESQ.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Haran vs                                                                        Patricia Haran
Orange Business Services Inc.                                                   April 26, 2023

8

1

2                        - o 0 o -

3

4               P A T R I C I A    H A R A N,

5          having been first duly sworn by a Notary

6     Public of the State of New York was examined and

7                    testified herein:

8

9                        - o 0 o -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Haran vs                                                                  Patricia Haran
Orange Business Services Inc.                                             April 26, 2023

9

```
 1                      P. HARAN

 2              THE COURT REPORTER:  State

 3      your first and last name for the record,

 4      please.

 5              THE WITNES:  Patricia Haran.

 6              THE COURT REPORTER:  And what

 7      is your address?

 8              THE WITNESS:  53 Cirrus Road,

 9      Holbrook, New York, 11741.

10   EXAMINATION BY

11   MR. GUILFOYLE:

12   BY MR. GUILFOYLE:

13          Q.   Good morning, Ms. Haran.

14          A.   Good morning.

15          Q.   My name is Justin Guilfoyle.

16      I'm attorney here at Baker Hostetler.

17      We represent the defendant Orange

18      Business Services, NA in this matter.

19      Just so that we have an understanding

20      for the record, I'm going to take a

21      moment to go over some ground rules, the

22      purpose of this deposition, and the

23      rules that govern it; okay?

24          A.   Sure.

25          Q.   Have you ever had your
```

Haran vs
Orange Business Services Inc.

Patricia Haran
April 26, 2023

10

```
1                     P. HARAN

2     deposition taken before?

3          A.   No.

4          Q.   Okay.  So this deposition

5     gives me the opportunity to ask you

6     questions and have you answer those

7     questions under oath.  The court

8     reporter to your left, to my right, who

9     had just administered that oath to you,

10    will be writing down everything that is

11    said during today's session; okay?

12         A.   Mh-hm.

13         Q.   You've been placed under oath.

14    That oath is the same as it would be if

15    you were in a court before a judge and a

16    jury; do you understand that?

17         A.   Yes.

18         Q.   The same rules that govern

19    your testimony, including the law

20    regarding perjury, apply here today just

21    as they would in front of a judge and

22    jury as if you were in court; do you

23    understand that?

24         A.   Yes.

25         Q.   Just some basic ground rules
```

Haran vs
Orange Business Services Inc.

Patricia Haran
April 26, 2023

11

```
 1              P. HARAN

 2   that we both need to follow for purposes

 3   of this deposition.  First is that your

 4   response, it must be audible.  So no

 5   head nods or uh-huhs because the court

 6   reporter can only take down the things

 7   that we say; do you understand that?

 8        A.   Yes.

 9        Q.   And it's human nature to kind

10   of want to jump in and interrupt if you

11   know where my question is going, but I

12   ask that you let me finish the question

13   and then answer and I'll give you that

14   same courtesy; okay?

15        A.   Yes.

16        Q.   And if I ask a question that

17   you don't understand, please just let me

18   know, I'll rephrase it or I'll ask it

19   again because if you answer one of my

20   questions, I'll presume that you

21   understood it and answered it properly;

22   okay?

23        A.   Yes.

24        Q.   Okay.  And during the

25   deposition while I'm asking you
```

Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

                                                                              12
1                    P. HARAN

2    questions, you're not allowed to

3    communicate or speak with your attorney

4    in any way; okay?

5         A.   Yes.

6         Q.   And if you need a break at any

7    time just let me know, breaks are freely

8    given.  I just ask that if I have a

9    question pending, you answer that

10   question and then we could take that

11   break; okay?

12        A.   Yes.

13        Q.   All right.  Did you take any

14   drugs or medication in the last 24 hours

15   that would in any way affect your

16   ability to give your best testimony

17   today?

18        A.   No.

19        Q.   Okay.  Do you know of any

20   reason why you can't give your best

21   testimony today?

22        A.   No.

23        Q.   Do you know of any reason why

24   you can't accurately and honestly

25   testify here today?

Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

13

```
 1                    P. HARAN

 2        A.   No.

 3        Q.   Okay.  Have you done anything

 4   to prepare for today's deposition?

 5        A.   Yes, my attorney and I had a

 6   preparation session for last week, I

 7   think.

 8        Q.   Without disclosing anything

 9   you discussed with your attorney, when

10   did you talk to her?

11        A.   I don't recall exactly.  I

12   think it was last Thursday or Wednesday.

13        Q.   And how long did you speak

14   with your attorney for?

15        A.   Maybe about three-and-a-half

16   hours.

17        Q.   And another ground rule here

18   for the deposition, is I'm never asking

19   for any information or conversations

20   that you've had with your attorney as

21   those are privileged; okay?

22        A.   Yes.

23        Q.   Okay.  Did you review any

24   documents in preparation for today's

25   deposition?
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 231 of 479
Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

14

1                    P. HARAN

2         A.   Yes.

3         Q.   And what documents did you

4    take a look at?

5         A.   I reviewed my timeline that I

6    had put together, and I had looked at

7    some of the Complaint documents that

8    were filed.  So, yeah, that was pretty

9    much just some of the previous court

10   filings to just refresh on what was in

11   there.

12        Q.   Okay.  Did you review any

13   emails or anything like that?

14        A.   No.

15        Q.   And then other than your

16   attorney, have you discussed today's

17   deposition with anyone?

18        A.   Yes.

19        Q.   And who is that?

20        A.   My husband, my therapist, my

21   mother.

22        Q.   And when did you speak with

23   your husband about today's deposition?

24        A.   Sort of ongoing discussion.

25        Q.   And what about your mother?

Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

15

1              P. HARAN

2      A.   Same.  Ongoing -- I mean, you

3    know, it's weekly call conversation type

4    thing.

5      Q.   Okay.  What about your

6    therapist?

7      A.   So, I spoke with her about it

8    at some point during my almost two years

9    that I would see -- in therapy.  It was

10   probably, maybe, midway in the sessions

11   that I talked to her about it.

12     Q.   Okay.  What were these

13   conversations about with your therapist

14   regarding the deposition?

15     A.   I just let her know that --

16   that it was underway and that I wanted

17   her to know that she was going to

18   probably be requested to release some of

19   the documents that we had shared, so

20   that she knew what it was about.  And,

21   you know, I just shared some of my

22   thoughts about, you know, the whole --

23   the whole kind of stress and things that

24   were associated with making the decision

25   to go through with the lawsuit.

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 233 of 479
Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

16

```
 1              P. HARAN

 2      Q.   Anyone else you can recall

 3  talking about today's deposition to?

 4      A.   No.

 5      Q.   Okay.  Have you gone by any

 6  other names other than Patricia Haran?

 7      A.   My maiden name.

 8      Q.   What is that?

 9      A.   Patricia -- excuse me,

10  Matejovic.  It's M-A-T-E-J-O-V-I-C.

11      Q.   I believe you stated you still

12  lived at that 53 Cirrus Road in Holbrook

13  address?

14      A.   Correct.

15      Q.   How long have you lived there?

16      A.   About -- I think since 1999 --

17  '98.  So it's like over 20 years.

18      Q.   Okay.  And where did you live

19  before that?

20      A.   Various addresses.  I don't

21  know if you want me to go over all of

22  them.

23      Q.   What's the one immediately

24  preceding that address?

25      A.   I lived on Blue Point Road.  I
```

Haran vs                                               Patricia Haran
Orange Business Services Inc.                          April 26, 2023

17

```
 1              P. HARAN

 2   forgot the exact address.  It's an

 3   apartment on Blue Point Road in

 4   Holtsville, New York.

 5        Q.  What year were you born?

 6        A.  1972.

 7        Q.  Okay.  And where were you

 8   born.

 9        A.  I was born in Brookhaven, New

10   York?

11        Q.  Are you currently married?

12        A.  Yes.

13        Q.  What is your husband's name?

14        A.  Patrick.

15        Q.  Do you have any children?

16        A.  Yes.

17        Q.  How many children?

18        A.  Two.

19        Q.  And what are their names?

20        A.  Liam and Julia.

21        Q.  And how old is Liam?

22        A.  He's 19.

23        Q.  How old is Julia?

24        A.  Eighteen.

25        Q.  What is the highest level of
```

Haran vs                                                                Patricia Haran
Orange Business Services Inc.                                           April 26, 2023

18

```
 1                    P. HARAN

 2   formal education that you've completed?

 3        A.    Bachelor's degree.

 4        Q.    And did you graduate high

 5   school?

 6        A.    Yes.

 7        Q.    When did you graduate high

 8   school?

 9        A.    1990.

10        Q.    Okay.  And for your BA where

11   did you obtain that from?

12        A.    Stony Brook University.

13        Q.    And what year did you get that

14   degree?

15        A.    1994.

16        Q.    Did you attend any secondary

17   educational institutions?

18        A.    Since then?

19        Q.    (Nodding.)

20        A.    I'm currently pursuing my MBA

21   at Purdue University Global.

22        Q.    Is that an online program?

23        A.    Yes.

24        Q.    Why did you decide to seek

25   your MBA?
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

19

```
 1                   P. HARAN

 2        A.   Why?

 3        Q.   Yes.

 4        A.   I wanted to further my

 5   education and just kind of be more

 6   educated, you know, in the space of IT

 7   and business.

 8        Q.   After you graduated from

 9   college, what was the first job that you

10   held?

11        A.   I worked for Car Business

12   Machines.

13        Q.   Okay.  And do you know the

14   dates of employment there?

15        A.   Yeah, I think I started in --

16   must have been, you know, some time

17   in -- I forget the month exactly, but it

18   was in 1994.

19        Q.   Okay.  What was your position

20   at Core?

21        A.   Car, C-A-R.  I was a sales

22   rep.

23        Q.   What were your

24   responsibilities in that position?

25        A.   Selling copiers and fax
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 237 of 479

Haran vs
Orange Business Services Inc.

Patricia Haran
April 26, 2023

20

```
 1                  P. HARAN

 2    machines.

 3         Q.   Were those direct sales to

 4    individual customers or to companies?

 5         A.   No, to companies.

 6         Q.   How long did you hold that

 7    position?

 8         A.   I was there probably about a

 9    year.

10         Q.   And why did that employment

11    end?

12         A.   I resigned for another

13    opportunity.

14         Q.   Were you ever disciplined

15    during your employment at Car?

16         A.   No.

17         Q.   What was the company that you

18    joined following Car?

19         A.   MFS Intelenet.

20         Q.   And do you remember the years

21    that you were employed there?

22         A.   Roughly I was there from, I

23    guess it was probably '90 -- I graduated

24    in '94, '95.  It's going back a long

25    time, so I think I was there from like
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

21

```
 1                    P. HARAN

 2      '95 to '97, 1995 to 1997.

 3           Q.   What was your position there?

 4           A.   Sales rep.

 5           Q.   What your responsibilities as

 6      a sales rep at MFS?

 7           A.   Selling telecommunication

 8      services to business.

 9           Q.   Why did that employment end?

10           A.   I resigned.

11           Q.   Was that for another job?

12           A.   Yes.

13           Q.   Were you disciplined at any

14      time during your employment?

15           A.   No.

16           Q.   At MFS?  What was your next

17      job after MFS?

18           A.   My next job was Teleport

19      Communications Group.

20           Q.   And what was your role there?

21           A.   Sales rep, titles, you know,

22      it varied, but essentially that's it.

23           Q.   How long were you at Teleport?

24           A.   I was at Teleport from 1997

25      until -- I was there -- there was an
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

22

```
 1                    P. HARAN

 2     acquisition, so they were acquired by

 3     AT&T, so I was there throughout that

 4     acquisition and I stayed until 2004.

 5          Q.   Were you ever disciplined

 6     during your time there?

 7          A.   No.

 8          Q.   And what was your next job?

 9          A.   So, after that job, then I

10     worked for a customer for a short time

11     from 2005 to 2006.  I worked at Simal

12     Technologies, they were a former client

13     of mine.

14          Q.   What did you do for them?

15          A.   I was a -- in like marketing

16     in their executive briefing center.

17          Q.   Okay.  And what made you step

18     out of that sales rep role to take on

19     this new job for them, for that client?

20          A.   I had two small children at

21     home and it was kind of close to home,

22     and so it was something that I thought

23     maybe would be a good way for me to

24     balance things with two small children.

25          Q.   And were you ever disciplined
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

23

```
 1                    P. HARAN

 2    during your employment there?

 3         A.    No.

 4         Q.    Okay.  And what was your next

 5    job?

 6         A.    So then I went to TW -- TW

 7    Telecom.

 8         Q.    Okay.  And what was your role

 9    there?

10         A.    Sales rep, essentially.

11         Q.    And what years did you hold

12    that position?

13         A.    So, I was at TW through the

14    acquisition of Level -- they were

15    acquired by Level 3 Communications,

16    which is now known as Lumen

17    Technologies.  And I was there until

18    2017, so like 11 years between the two,

19    you know, the acquisition.

20         Q.    Why did you leave at that

21    time, I guess, ultimately Level 3 or

22    Lumen?

23         A.    I was recruited to work at

24    Orange Business Services.

25         Q.    Were you ever disciplined
```

Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

24

```
1              P. HARAN

2    during your employment of Level 3 or

3    Lumen?

4         A.   No.

5         Q.   When were you hired by Orange

6    Business Services -- and just for the

7    record, I'm going to be referring to

8    Orange Business Services NA, Inc. as

9    Orange or OBS throughout the deposition;

10   is that okay?

11        A.   Yes.

12        Q.   So when were you hired by

13   Orange?

14        A.   I was hired -- I believe it

15   was May of 2017.

16        Q.   And what was the position for

17   which you were hired?

18        A.   Account manager.

19        Q.   Does it have a specific title

20   at Orange?

21        A.   I believe it was account

22   manager --

23        Q.   Okay.

24        A.   -- was the technical title.

25        Q.   Do you recall if you signed
```

Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

25

```
 1                    P. HARAN

 2        any agreements, when you started working

 3        at Orange?

 4             A.   Yes, I did.

 5             Q.   Okay.  I'm going to show you a

 6        document that we'll have marked as

 7        Defendant's A.

 8        (Whereupon,  Bates  OBS5  -  OBS11   was

 9        marked as Exhibit  1  for  identification,

10        as of April 26th, 2023.)

11             Q.   And it bears OBS 5 through OBS

12        11.  You could take a look at that

13        document.

14             A.   Thank you.

15   BY MR. GUILFOYLE:

16             Q.   Ms. Haran, do you recognize

17        this document?

18             A.   Yes.

19             Q.   Okay.  And is this the

20        Confidentiality Proprietary Rights and

21        Non-solicitation Agreement U.S. that you

22        signed at Orange when you started?

23             A.   Yes.

24             Q.   Okay.  We turn to the last

25        page.  Is that your signature on May 11,
```

Haran vs                                                            Patricia Haran
Orange Business Services Inc.                                       April 26, 2023

26

1           P. HARAN

2    2017?

3        A.   Yes.

4        Q.   Did you always have the same

5    role throughout your entire tenure at

6    Orange?

7        A.   Yes.

8        Q.   So you never changed roles?

9        A.    No.  As far as titles, you

10   know, if that's what you mean -- titles

11   is -- has -- did not change.

12       Q.   Did your responsibilities

13   change at any time while at Orange?

14       A.   Just accounts that I was

15   working on would have changed.

16       Q.   When did that change?

17       A.   Probably several times over my

18   tenure there.  You know, just sort of

19   like somebody resigned, so we need you

20   to take on these accounts, and also work

21   on your other accounts, we're going to

22   move that account to somebody else, that

23   kind of thing.

24       Q.   Did there ever come a time

25   where you started taking on more

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 244 of 479
Haran vs                                                       Patricia Haran
Orange Business Services Inc.                                  April 26, 2023

27

```
 1              P. HARAN
 2   responsibilities for A-end accounts?
 3        A.   Yeah.   Yeah.   That was part
 4   of -- somebody left, somebody resigned.
 5   And I was asked to handle some of her
 6   A-end accounts during -- because she had
 7   left the company.
 8        Q.   So that's not something that
 9   you requested to take on?
10        A.   Well, at that time it was
11   brought to me.   I mean, over the years I
12   had spoken about the potential of
13   working on A-end accounts, yes, but
14   these particular accounts, you know, I
15   was asked to work on them because the
16   person who had them had resigned from
17   the company.
18        Q.   Do you recall about when that
19   was?
20        A.   I recall not exactly sure, but
21   I want to say it was in the January
22   of 20 -- I guess it would have been
23   January of 2020 timeframe, I believe.
24        Q.   And who is the person that
25   left that you're referring to?
```

Haran vs
Orange Business Services Inc.

Patricia Haran
April 26, 2023

28

```
 1                    P. HARAN

 2          A.   Lorna Paine.

 3          Q.   I'm going to show you the

 4     documenter.  Mark this as Haran 2.

 5     (Whereupon,  Bates  OBS13  was  marked  as

 6     Exhibit  2  for  identification,  as   of

 7     April 26th, 2023.)

 8               MR. GUILFOYLE:  For the

 9     record, this is a one-page document

10     bearing Bates OBS 13.

11          Q.   Ms. Haran, do you recognize

12     this document?

13          A.   Vaguely, I recognize it.  I

14     mean, it says Employee Handbook

15     acknowledgment for the United States.

16     So, I mean, I think there was a big pile

17     of paper that I signed when I went on

18     board and I'm sure this was one of them.

19     I don't specifically recall it, but it's

20     my signature.

21          Q.   Okay.  That's dated May 11,

22     2017?

23          A.   Yes.

24          Q.   I'm going to show you another

25     document that will be marked as Haran 3.
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

29

```
 1              P. HARAN

 2   (Whereupon,  a  document  was  marked  as

 3   Exhibit  3  for  identification,  as   of

 4   April 26th, 2023.)

 5       Q.   And do you recognize this

 6   document as one of those documents you

 7   mentioned that you signed when you were

 8   onboarding?

 9       A.   I don't recognize it in

10   particular, but it is my signature and

11   like I said there was a big pile of

12   papers that I was asked to sign when I

13   was onboarded.

14       Q.   Okay.  That signature is dated

15   May 18, 2017?

16       A.   Yes.

17       Q.   Who did you report to during

18   your employment with Orange?

19       A.   I reported to Adam Kimmick.

20       Q.   Do you know Adam Kimmick's

21   title?

22       A.   Sales director.  Head of

23   sales, I think.  I'm not sure.

24       Q.   Okay.  What.

25   (Simultaneous speaking.)
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

30

```
 1                    P. HARAN

 2        A.   Sales director.

 3        Q.   Was that for a specific region

 4   of the United States?

 5        A.   He was responsible for the

 6   northeast and the midwest regions.

 7        Q.   Did you report to anyone else?

 8        A.   No.

 9        Q.   During your employment at

10   Orange, did you receive performance

11   evaluations?

12        A.   Yes.

13        Q.   Did you meet with anyone to

14   discuss those performance evaluations?

15        A.   Yes.

16        Q.   And who was that?

17        A.   Adam Kimmick.

18        Q.   Anyone else?

19        A.   No.

20        Q.   I'm going to show you a

21   document that will be marked as Haran 4.

22   (Whereupon, BATES OBS334 - 343 was

23   marked as Exhibit 4 for identification,

24   as of April 26th, 2023.)

25             MR. GUILFOYLE:  And for the
```

Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

31

```
 1                        P. HARAN

 2    record this is a document bearing Bates

 3    OBS334 through 343.

 4            Q.   Ms. Haran, do you recognize

 5      this document?

 6            A.   Let me just take a look here.

 7            Q.   Take your time.

 8            A.   Okay.

 9            Q.   Okay.  And do you recognize

10      this document?

11            A.   I do.

12            Q.   And what is this document?

13            A.   A performance review.

14            Q.   And is this for the first half

15      of 2020?

16            A.   Yes.  It appears to be.

17            Q.   Do you know who created this

18      performance review?

19            A.   It was created by Adam Kimmick

20      and myself.

21            Q.   Okay.  And if I could just

22      bring your attention --

23            A.   I mean it was filled in, I

24      would say, by us.  It wasn't created by

25      us.  It was created by a company, I
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

32

1            P. HARAN

2    assume.  It's a performance review plan

3    that I think everybody fills in, but it

4    was populated by myself and Adam.

5         Q.   So the templates for the

6    performance review was created by

7    Orange?

8         A.   Correct.

9         Q.   And then the contents of what

10   went in there specific to you were

11   inputted by Adam and yourself?

12        A.   Correct, yes.

13        Q.   Okay.  If I can bring your

14   attention to page 8 of 10, if you look

15   on the lower right corner.

16        A.   Lower right corner.

17        Q.   Yes, so now if I bring your

18   attention to where it says manager's

19   comments, do you see that at the top of

20   the page?

21        A.   Yes.

22        Q.   Okay.  Could you read the

23   first two sentences under manager's

24   comments for me?

25        A.   Yes.  "First half 2020 was a

Haran vs                                                                Patricia Haran
Orange Business Services Inc.                                           April 26, 2023

                                                                              33

1                    P. HARAN

2     challenge for Patty in her new

3     territory.  Results on revenue were in

4     line with the expectations that fell

5     short of target in both keep and new and

6     get orders."

7          Q.   What is the next sentence

8     there?

9          A.   "Her qualified pipeline is not

10    currently sufficient to meet her 2020

11    financial objectives, and the new

12    opportunities created in 2019 with her

13    B-end accounts exploring partnership and

14    sell with opportunities to expand our

15    portfolio, have not yet matured as ample

16    opportunities."

17         Q.   Okay.  What does it mean that

18    your qualified pipe library is not

19    currently sufficient to meet 2020

20    financial objectives?

21         A.   Well, I mean I'd be

22    speculating on what Adam means there; is

23    that what would you like for me to do?

24         Q.   Sure.  What is your

25    understanding of what that means?

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

34

1           P. HARAN

2       A.   My understanding is that

3    pipeline is a sales forecast and

4    typically sales forecasts, you know, are

5    larger than what the quota is that's

6    assigned.  And so when he's saying that

7    he thinks that my pipeline is not, you

8    know, his words here, my pipeline is not

9    sufficient, then he doesn't feel that I

10   have enough opportunities in my sales

11   forecast to meet my target quota for

12   2020.

13       Q.   If we could turn to the next

14   page, please?

15   (Witness complies.)

16       Q.   And do you see where it says

17   acknowledgment by the employee the 30th

18   of July 2020?

19       A.   Yes.

20       Q.   Okay.  Do you recall having

21   completed the performance review on or

22   about July 30, 2020?

23       A.   Yes.

24       Q.   And is that typical for

25   first-half performance reviews to be

Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

                                                                        35

```
 1                        P. HARAN

 2      done towards the end of July, in your

 3      experience?

 4           A.   I don't know.  I'd have to --

 5      you know, I really don't know.  I mean

 6      typically they'd be done somewhere

 7      around the end of the first half, so it

 8      seems a little late, but that's just,

 9      you know, it's probably -- it's

10      probably, you know, it could be done

11      earlier in June or something, so, but,

12      you know, it's not -- it seems to be at

13      the end of July, so.

14           Q.   Okay.  I'm going to show you

15      another document.

16                MR. GUILFOYLE:  For the

17      record, this will be Haran 5.

18      (Whereupon, BATES OBS344 - 353   was

19      marked as Exhibit 5 for identification,

20      as of April 26th, 2023.)

21           Q.   I just ask that you take a

22      moment and look through that document,

23      please.

24                MR. GUILFOYLE:  For the

25      record, it's OBS344 through 353.
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

36
1               P. HARAN

2        Q.   Do you recognize this

3   document?

4        A.   Yes.

5        Q.   What do you recognize it to

6   be?

7        A.   A performance review.

8        Q.   Do you know who input the

9   substance of text within this review?

10       A.   Yes.

11       Q.   Who was that?

12       A.   Adam Kimmick and myself.

13       Q.   If I could bring your

14  attention to the page identified by nine

15  out of ten.  Can you tell me what the

16  overall rating is there?

17       A.   Yes.  The rating is two,

18  improvement needed.

19       Q.   Okay.  And with the evaluation

20  process at Orange, you were given the

21  opportunity to respond to your manager's

22  comments and conclusions in here, right?

23       A.   Correct.

24       Q.   Okay.  And it looks like you

25  did so below the manager's comments here

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 254 of 479
Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

37

```
 1                        P. HARAN

 2        on this page?

 3             A.   Yes.

 4             Q.   Okay.  Did you note anywhere

 5        in this performance review that you

 6        believed your improvement needed rating

 7        was due to you having taken time off in

 8        connection with your daughter's or your

 9        mother's illness?

10             A.   Could you repeat the question?

11             Q.   Sure.

12             MR. GUILFOYLE:  Could you read

13     that back for me?

14        (Whereupon, the requested portion  was

15        read back by the reporter.)

16             A.   No, it's -- I don't see that

17        in here.

18  BY MR. GUILFOYLE:

19             Q.   Do you see anything on this

20        page about your lack of focus?

21             A.   There's just a comment that

22        says, "urgent focus, it needs to be on

23        identifying new opportunities and moving

24        these progressively through the

25        pipeline."  It's the last sentence.
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

38

1              P. HARAN

2      Q.   Okay.  But you see anything

3   regarding specifically the phrase lack

4   of focus?

5      A.   I do not.

6      Q.   As part of this case, you

7   claim that Mr. Kimmick informed you as

8   part of this evaluation that you had a

9   lack of focus; when did he say that to

10  you?

11     A.   So, when we went over this

12  review in conversation, he said that to

13  me.  He also mentioned it to me on

14  several other occasions.  We had weekly

15  calls.  And we also -- during one of

16  those weekly calls, I presented to him a

17  plan for the forecast.  Even though I

18  didn't have a quota assigned to me for

19  2021, it was never given to me, I took

20  the initiative to try to create a

21  forecast assumption based on what my

22  quota the previous year was.  And I

23  presented a plan to him about how I was

24  going to build -- funnel that was

25  sufficient to -- or pipeline as he

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

                                                                     39
 1                        P. HARAN

 2         termed it, to be sufficient to make that

 3         number that I was guessing at because I

 4         hadn't been given a number yet.

 5                        And, you know, again the lack

 6         of focus feedback was given to me by

 7         Adam.

 8                        MR. GUILFOYLE:  Okay.  I would

 9     move to strike the nonresponsive portion

10     of that answer.

11             Q.    The question was about when

12         Adam mentioned a lack of focus to you?

13                        MS. FISHER:  I think that's

14     what she just said.  During that latter

15     conversation he also mentioned it.

16 BY MR. GUILFOYLE:

17             Q.    What did you say in response

18         when Adam mentioned a lack of focus

19         during this performance review?

20             A.    So, during this performance

21         review when he talked to me about the

22         lack of focus, my response was that I

23         disagreed, you know, with that

24         assumption or that assessment and that,

25         you know, I was dealing with my

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

                                                                    40

```
 1              P. HARAN

 2   daughter's illness.  I was dealing with

 3   all of those activities that were

 4   related to it and I was doing my best to

 5   focus on the job and the

 6   responsibilities that I had while I was

 7   managing all of the appointments and

 8   diagnosis, and aftermath of her illness,

 9   and surgery, and recovery, and

10   investigation of everything that was

11   wrong.

12           So, I was -- you know, I was

13   offended because I thought, you know,

14   well I'm trying here to do what I can to

15   keep my focus, given all of these

16   factors that are mitigating, you know,

17   for me, in my -- related to the -- all

18   of those activities with her, my

19   daughter.

20       Q.   And did Mr. Kimmick elaborate

21   on what he meant by, "lack of focus"?

22       A.   Well, yes, he did.  And his --

23   one of his comments was about how I had

24   not been successful with creating

25   coaches within my accounts that would
```

Haran vs                                              Patricia Haran
Orange Business Services Inc.                         April 26, 2023

                                                            41
1              P. HARAN

2    have enabled me to get past certain

3    obstacles that we had in the sales

4    cycle.  And so what he mentioned in

5    particular was that we had a legal -- a

6    legal impasse with an account, Pfizer,

7    and due to that legal impasse we were

8    not able to sign a contract.  And he

9    said that had I been more focused on

10   developing a relationship with somebody

11   at that account that could have helped

12   navigate us past that obstacle, then we

13   would have closed that business.

14            And so that was sort of one of

15   the examples, that he felt that I was

16   not focused enough to make that -- to

17   make that connection that would have

18   given somebody a pass on these -- these

19   very onerous, legal issues that were,

20   you know, outside of my control.

21       Q.   Did Mr. Kimmick say anything

22   about you taking time off in connection

23   with your daughter's or your mother's

24   illnesses during this performance

25   evaluation?

Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

42

P. HARAN

1

2         A.    It was -- we did discuss it,

3    yes.  I brought it up to him and said

4    you know again like I've mentioned in my

5    earlier statement, you know, I was

6    dealing with the -- my mother -- my

7    daughter's illness.  I was dealing with

8    all of the events that were preceding

9    that and that it was difficult for me

10   to, you know, juggle that along with

11   everything else that my responsibilities

12   were for the job.

13        MR. GUILFOYLE:  Okay.  I'm

14   going to move to strike the nonresponsive

15   answer.

16        Q.    The question was:  Did

17   Mr. Kimmick say anything about you

18   taking time off in connection with your

19   daughter's or mother's illness; not if

20   you said anything?

21        A.    He did not bring it up, but he

22   responded to my bringing it up, did

23   that --

24        Q.    Makes sense?

25        A.    Makes sense.

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

43

1             P. HARAN

2       Q.   So what makes you think that

3   your two rating here has anything to do

4   with the days you take off in connection

5   with your daughter's illness in October?

6       A.   Well, the focus commentary

7   that we had, and in the conversation

8   that the lack of focus was his

9   assessment around why he thought that I

10  was not able to -- to meet the objective

11  in this -- in this overall rating.

12      Q.   And do you believe you had

13  a -- you did indeed have a lack of focus

14  during this time?

15      A.   Yeah, I mean, it was something

16  that was -- it was something that I was

17  trying to work through, and, you know,

18  balance as best as I could to do the

19  right thing for the company, to do the

20  right thing to advance all of my sales,

21  and also, you know, manage my daughter's

22  illness and all -- everything that was

23  associated with that, so yeah.

24      Q.   Let me show you another

25  document.

Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                    April 26, 2023

                                                                        44
 1                        P. HARAN

 2              And this will be Haran 6.

 3      (Whereupon,  a  document  was  marked  as

 4      Exhibit  6  for  identification,  as    of

 5      April 26th, 2023.)

 6         Q.   Okay.  I just ask you to take

 7      a moment and review that document.

 8         A.   (Perusing.)

 9         Q.   Do you recognize this

10      document, Ms. Haran?

11         A.   Yes.

12         Q.   What do you understand this

13      document to be?

14         A.    This is the formal complaint

15      that was filed with the court for my

16      lawsuit.

17         Q.   Did you review this document

18      prior to it being filed?

19         A.   Yes.

20         Q.    Is the information contained

21      in this document accurate?

22         A.   Yes.

23         Q.   I'm going to show you another

24      document.

25              MR. GUILFOYLE:  And this will

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

45

```
 1                    P. HARAN

 2    be Haran 7.

 3       (Whereupon, a document was marked as

 4       Exhibit 7 for identification, as   of

 5       April 26th, 2023.)

 6          Q.   I ask that you take a moment

 7       and review that document for me, please.

 8          A.   (Perusing.)

 9               Okay.

10          Q.   Do you recognize this

11       document?

12          A.   Yes.

13          Q.   What do you recognize it to

14       be?

15          A.   It is the Interrogatories, I

16       believe, for all of the people that I

17       listed as having knowledge of -- related

18       to the case.

19          Q.   So these were your Responses

20       to Interrogatories that were sent over

21       to you by Orange; is that correct?

22          A.   Yes.

23          Q.   Did you review this document

24       prior to it being served in this case?

25          A.   Yes.
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 263 of 479

Haran vs
Orange Business Services Inc.

Patricia Haran
April 26, 2023

46

```
 1                  P. HARAN

 2        Q.   Okay.  And do you see your

 3   signature anywhere on this document?

 4        A.   I would have to look through

 5   it again.

 6        Q.   If you don't mind, please.

 7        A.   I do not see it.

 8        Q.   Is there a reason why you

 9   didn't sign this document?

10        A.   I believe I did sign it.

11        Q.   Okay.  Is there any reason why

12   Orange wouldn't be in possession of

13   these responses with your signature?

14        A.   I don't know.

15        Q.   Okay.  Well, I'll ask that you

16   sign a copy here and date and then we

17   can have that for our records and

18   introduce it as an exhibit in this

19   deposition.

20             MS. FISHER:  That won't be

21   necessary.  I think she sent me a

22   verification and I think it was my neglect

23   in not sending it to you.

24             MR. GUILFOYLE:  Could we have

25   that during a break and avoid having to do
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 264 of 479
Haran vs                                                                    Patricia Haran
Orange Business Services Inc.                                              April 26, 2023

47

```
 1                    P. HARAN

 2      this here?

 3                    MS. FISHER:  Let me see if I

 4      have it right now.  I might be able to --

 5      go ahead.

 6                    MR. GUILFOYLE:  Okay.

 7   BY MR. GUILFOYLE:

 8         Q.   Switching gears a little bit.

 9      Do you know an employee at Orange named

10      Michelle Rocco?

11         A.   Yes.

12         Q.   Okay.  How do you know

13      Michelle?

14         A.   Michelle is in human

15      resources.  She was part of the

16      recruited -- she recruited me.  She was

17      part of the hiring team that brought me

18      onboard, and then I also knew her from

19      seeing her in the office, speaking with

20      her over the years.

21         Q.   Okay.  Was there some sort of

22      charity event contest that Michelle was

23      involved in where you won a prize?

24         A.   Yes.

25         Q.   At some point in time did you
```

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 265 of 479
Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

48

1              P. HARAN

2    arrange to meet up with Michelle Rocco

3    at a pizzeria to get your prize?

4        A.   Yes.

5        Q.   Okay.  And do you know when

6    you ultimately met up with Ms. Rocco to

7    get your prize?

8        A.   I -- it was around

9    October 18th, if my memory serves me,

10   but I'm not -- I would have to look at

11   the -- you know, the appointment

12   confirmation, but I believe it was on or

13   around October 18, 2020.

14       Q.   And when you met Michelle at

15   the pizzeria, what did you two talk

16   about?

17       A.   Well, we met for about 40

18   minutes, so we spoke about several

19   things.  I mean, we spoke about -- I

20   told her about my daughter's illness.  I

21   told her about the ongoing -- the

22   ongoing issues that I was having with

23   the school and getting her homeschooling

24   situated because she was not allowed to

25   go back to school.  She was -- the

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 266 of 479
Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

49

```
 1                    P. HARAN

 2    doctor recommended that she not return

 3    to class until January.  So she was

 4    being homeschooled and I needed to go

 5    through the social worker at the

 6    hospital to help with getting all of the

 7    paperwork established so that her

 8    homeschooling would be approved and

 9    done.  So I told her all about that.

10            And she talked a little bit

11    about, you know, just school, dealing

12    with schools in general and how that can

13    be frustrating and difficult at times.

14    And then we also spoke about -- I told

15    her that, you know, my daughter's

16    surgery had -- had happened and that she

17    was recovering at home, and I said that

18    we were hopeful but that -- at that

19    time, her diagnosis was -- the doctor

20    said that she might have to have another

21    surgery.  And so I told her that we were

22    hoping and praying that she was not

23    going to need another surgery.

24            And I told her that she also

25    had, when they did all of the, you know,
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 267 of 479
Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

50

```
 1              P. HARAN
 2   the diagnosis, they found other
 3   potential areas in her bones that had
 4   infection, and so there was ongoing, you
 5   know, infectious disease doctor visits
 6   that I was doing in order to have me --
 7   to try to make sure that there was
 8   nothing there with that -- with other
 9   parts of her bones that might be
10   affected.
11              And so I, you know, told her
12   about everything that, you know, was
13   happening in relation to the, you know,
14   what was to come, what had happened,
15   and, you know, the day-by-day sort of.
16   We talked about -- I talked about the
17   struggle that I was having related to
18   working and, you know, taking time off
19   and I had -- I apologized because I was
20   supposed to meet with her on a different
21   date and I wasn't able to meet with her
22   because I couldn't get there because of
23   my daughter having -- I think she was
24   just coming home from the hospital at
25   that point, somewhere around that time.
```

Haran vs                                                           Patricia Haran
Orange Business Services Inc.                                      April 26, 2023

51

```
 1              P. HARAN

 2   So I had to reschedule.

 3             So we talked about the ongoing

 4   challenge, you know, of juggling the

 5   demands that I had.  I talked about the

 6   increase pressure that I was

 7   experiencing in terms of the sales

 8   environment and the challenges that, you

 9   know, I had in trying to close the deals

10   and that, you know, it was -- these were

11   all, you know, ongoing competing

12   priorities that were a struggle for me.

13             We also talked about the

14   social worker that I -- I told her, you

15   know, that the social worker that helped

16   me with the school, that she also had

17   given me some advice about the future

18   with my son, who was a little closer to

19   becoming college age, and she had a

20   daughter who was in the same boat.  So

21   we talked about the scholarship process

22   and how that's something that could

23   be -- so I told her that I would share

24   with her some information.  And I

25   believe I shared that with her after our
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 269 of 479
Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

52

```
 1              P. HARAN

 2     conversation.

 3              So it was like a 40-minute

 4     kind of back and forth discussion.

 5              MR. GUILFOYLE:  Thank you.

 6     That was efficient.

 7          Would you have a problem if I

 8     amended this to the exhibit currently in

 9     evidence?

10              MS. FISHER:  No, of course

11     not.

12              MR. GUILFOYLE:  And that'll be

13     Exhibit 7.

14          Q.   I'm going to show you a

15     document that will be marked as Haran 8.

16     (Whereupon,  a  document  was  marked  as

17     Exhibit  8  for  identification,  as   of

18     April 26th, 2023.)

19          Q.   I just ask that you take a

20     look at this document.

21          A.   (Perusing.)

22              Okay.

23          Q.   Do you recognize this

24     document?

25          A.   I do.
```

Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

53
 1                    P. HARAN

 2        Q.   What do you recognize it to

 3   be?

 4        A.   I actually -- I mean, I

 5   recognize it now.  I hadn't -- it's been

 6   a while since, you know, I wrote this,

 7   so I recognize it to be a correspondence

 8   between Michelle Rocco and myself.

 9        Q.   Okay.  And in these emails did

10   you request any sort of leave for any

11   time off from Michelle Rocco?

12        A.   No.

13        Q.   Okay.  How did you come to

14   learn that your employment at Orange had

15   been terminated?

16        A.   I was invited to a call, I

17   believe it might have even been my

18   weekly -- I don't know, it was a call

19   that I was invited to by Adam Kimmick,

20   WebEx.

21        Q.   A virtual meeting type thing?

22        A.   Yes.

23        Q.   And do you recall when that

24   was?

25        A.   It was -- I believe, it was

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

54

```
 1                    P. HARAN

 2     February 24, 2021.

 3          Q.   And do you know where Adam was

 4     during this meeting?

 5          A.   Physically?

 6          Q.   Yes.

 7          A.   I don't recall.

 8          Q.   Okay.  Was anyone else present

 9     at this meeting?

10          A.   Yes.

11          Q.   Who was that?

12          A.   Jennifer Lawson.

13          Q.   And who is Jennifer Lawson?

14          A.   She's a human resources

15     manager or associate.  I don't know her

16     title exactly.

17          Q.   And did they provide a reason

18     for your termination during that

19     meeting?

20          A.   There were two reasons

21     provided.

22          Q.   And what were those two

23     reasons?

24          A.   The reason number one, I

25     believe it was Adam who said -- well,
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 272 of 479
Haran vs                                                                  Patricia Haran
Orange Business Services Inc.                                             April 26, 2023

55

```
 1              P. HARAN

 2  Jennifer first said, as I recall, when I

 3  asked her why I was terminated, she said

 4  it was because you didn't make your 2020

 5  quota or something along those lines.

 6  Don't quote me exactly, but it was that

 7  I didn't -- maybe it was my sales

 8  achievement I don't know how she said

 9  it, but it was my 2020 quota.  And then

10  Adam jumped in and said no, it's because

11  you don't have an adequate forecast for

12  2021.  But as I had mentioned earlier I

13  did not get a quota, and I said this to

14  him in that conversation, I was never

15  given a quota for 2021.

16      Q.   Okay.  And I believe you had

17  testified before that you only reported

18  to Adam Kimmick; is that correct?

19      A.   Correct.

20      Q.   And Ms. Lawson was not your

21  supervisor, correct?

22      A.   Correct.

23      Q.   Do you know who made the

24  decision to terminate your employment

25  from Orange?
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 273 of 479
Haran vs                                                                    Patricia Haran
Orange Business Services Inc.                                               April 26, 2023

56

|     | P. HARAN |
| --- | --- |
| 1 | |
| 2 | A.   I could speculate, but I don't |
| 3 | know if that makes sense to guess, you |
| 4 | know, I mean -- I -- I'm not a hundred |
| 5 | percent sure who made the decision, but |
| 6 | I believe it was Adam Kimmick who made |
| 7 | the decision. |
| 8 | And I believe that he -- Eddy |
| 9 | Youkhanna was also part of that decision |
| 10 | process.  He was a sales director that |
| 11 | Adam reported to. |
| 12 | Q.   Okay.  So he was one level |
| 13 | higher than Mr. Kimmick? |
| 14 | A.   Correct. |
| 15 | Q.   All right.  I'm going to show |
| 16 | you a document that will be marked as |
| 17 | Haran 9. |
| 18 | (Whereupon, Bates OBS381 - 383   was |
| 19 | marked as Exhibit  9  for  identification, |
| 20 | as of April 26th, 2023.) |
| 21 | MR. GUILFOYLE:  And for the |
| 22 | record, this is a document bearing Bates |
| 23 | OBS381 through 383. |
| 24 | Q.   And Ms. Haran, I just ask that |
| 25 | you take a moment and review this |

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

57
```
 1              P. HARAN

 2   document.

 3        A.   Okay.

 4        Q.   Do you recognize this

 5   document?

 6        A.   Yes.

 7        Q.   What do you recognize it to

 8   be?

 9        A.   It's a termination letter that

10   I received after -- after I was

11   terminated.

12        Q.   Do you recall on what date you

13   received this letter?

14        A.   I do not recall exactly what

15   date.  It was -- it has the 24th in the

16   letter.  I don't know if that's what --

17   it was emailed to me.  I don't remember

18   the day that it was emailed to me.

19        Q.   And did you receive this

20   letter after your meeting with

21   Mr. Kimmick and Ms. Lawson?

22        A.   Yes.

23        Q.   Prior to your termination, did

24   you ever feel that your employment could

25   be in jeopardy because of your
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                              April 26, 2023

58

```
 1                    P. HARAN
 2    performance?
 3         A.   Yes.
 4         Q.   Okay.  Did you discuss that
 5    with anyone?
 6         A.   Yes.
 7         Q.   Who did you discuss that with?
 8         A.   Well, the question is who did
 9    I discuss the concerns that I had about
10    it being in jeopardy about my
11    employment?
12         Q.   Because of your performance.
13         A.   Because of my performance.
14              Well, I mean, when we say it
15    was because of my performance, it was
16    also because of the time off, you know,
17    that I was taking and the lack of focus,
18    and the perception that was there.  So
19    it wasn't just one thing, you know, it
20    was -- but performance was part of that.
21    So I just want to be careful about how
22    to answer that so that -- because
23    usually it was like a combined
24    conversation.  It was sort of like, Hey,
25    the performance is, you know, always an
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

59

```
 1              P. HARAN

 2    increasing pressure that I'm receiving

 3    and then it's tied into the fact that I

 4    have these pressing caregiving

 5    responsibilities that I'm juggling.

 6            So I just want to make sure

 7    that we're, you know, because it was --

 8    the conversation was twofold.

 9        Q.   Okay.  Do you -- my question

10    is:  Do you recall, prior to being

11    terminated, any conversations you had

12    with someone about feeling your

13    employment was in jeopardy?

14        A.   Yes.

15        Q.   Because of your performance?

16            And who is that?

17        A.   Well, I talked to -- let me

18    look back.  A list, right, to help here.

19    I talked to Michelle Rocco as I shared

20    with you earlier.  I talked to Adam

21    Kimmick about as well.  I talked to

22    Peter Singh about it.  I talked to Lou

23    Boudreau about it.  I talked to Danielle

24    Willins about it.  I talked to German

25    Romero about it.
```

Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

60

```
 1              P. HARAN

 2         I talked to Marie-Cecile

 3   Deraedt about it.  I talked to Paul

 4   Reticker about it.  I talked to Phillipe

 5   Melegrito did about it, and I talked to

 6   M.J. Hubert about it.

 7         Q.   Let me show you a document

 8   that's going to be marked as Haran 10.

 9   (Whereupon,  a  document  was  marked  as

10   Exhibit  10  for  identification,  as  of

11   April 26th, 2023.)

12         A.   Okay.

13         Q.   Do you recognize this

14   document?

15         A.   I -- yeah, I mean, it's --

16   I've not seen it before, so -- but I

17   recognize, you know, the -- that it's --

18   looks like a Teams chat.

19         Q.   Okay.  Who is that Teams chat

20   between?

21         A.   Myself and Peter Singh.

22         Q.   Your email address while at

23   Orange was Patty.Haran@Orange.com?

24         A.   Yes.

25         Q.   Prior to your termination from
```

Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

                                                                    61
1               P. HARAN

2   Orange, were you ever looking for a new

3   job?

4        A.   Well, when you're in sales

5   there's always new job opportunities,

6   you know, that are -- that you're

7   looking at, and that are, you know,

8   coming to you from recruiters and

9   things.  So it's kind of a constant

10  thought of, you know, is this -- what

11  else is out there, so, yeah, I mean.

12       Q.   Were you using a recruiter at

13  any time while you were employed at

14  Orange to look for other employment?

15       A.   Was I using a recruiter?  I

16  had recruiters contacting me over the

17  course of my employment several times,

18  you know, so yeah.  I mean, there wasn't

19  a particular recruiter.  They would call

20  and say, Hey I might have a job that

21  would be a good fit for you, do you want

22  to talk about it?  That was a common

23  occurrence with salespeople.

24       Q.   Were there any instances where

25  you took the recruiter up on the offer

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 279 of 479
Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

62

```
 1                    P. HARAN

 2    to discuss the potential new role?

 3        A.   Yes.

 4        Q.   Okay.  When was that?  When

 5    was the first time you did that while

 6    employed at Orange?

 7        A.   I don't recall all the exact

 8    times that I did that.  I mean,

 9    sometimes somebody would call or send a

10    message or something, you know, and

11    you'd say -- so I really don't recall

12    every one.  I don't want to, you know,

13    guess incorrectly, so, you know, because

14    it's not something that was like, Let me

15    make a note of this.

16            You know, it's such a common

17    occurrence that you would have a

18    recruiter reaching out or having

19    conversations, that I can't specify

20    exactly which -- every time that it

21    happened, you know, if that makes sense.

22        Q.   That's fair.  How often would

23    you say that you engaged with a

24    recruiter who had reached out to you

25    regarding a new position while you were
```

Haran vs                                                            Patricia Haran
Orange Business Services Inc.                                       April 26, 2023

63

```
 1               P. HARAN

 2   employed at Orange?

 3       A.   I don't -- I can't guess.  I

 4   don't know.  I don't recall exactly,

 5   like I said, every time.  I mean, you

 6   know, it was -- I don't -- I can't

 7   venture a guess.  I don't want to state

 8   inaccurately, because I don't really

 9   remember every time.

10       Q.   Would you say that it was more

11   than five times?

12       A.   Over my entire tenure there?

13       Q.   Yes.

14       A.   I really don't recall.  I

15   don't recall how many times.  I don't

16   know if it was three times or seven

17   times or I don't -- I'm not really sure,

18   but it's a common occurrence like I

19   said.  You know, it's any salesperson

20   will tell you the same thing.  It's, you

21   know, you get calls, sometimes you talk,

22   sometimes you don't.  It's just part of

23   the nature of the job.

24       Q.   Prior to your termination from

25   Orange did you ever speak with anyone at
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 281 of 479
Haran vs                                                    Patricia Haran
Orange Business Services Inc.                              April 26, 2023

64

1          P. HARAN

2   Orange regarding looking for a new job?

3       A.   Yes.

4       Q.   Who would those people at

5   Orange be?

6       A.   Well, again, you know, trying

7   to recall every instance is difficult,

8   you know, of -- because it's banter

9   sometimes, you know, around

10  conversation.  Hey, you know, how long

11  you gonna stay here for?  Things are

12  challenged.  These are just, you know,

13  so -- I mean, it's hard to say.  It's

14  just one of those things that is, again,

15  part of the sales, you know, DNA is that

16  you know you're looking at what, you

17  know, is the grass greener, you know, do

18  I stay, what's happening, what changes,

19  what's the quota this year?  So it was

20  just an ongoing sort of conversation

21  that happens.

22      Q.   Do you have a recollection of

23  specific individuals that you had these

24  kind of conversations with?

25      A.   I don't recall the specifics.

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 282 of 479
Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

65

```
 1                      P. HARAN

 2              MR. GUILFOYLE:  I'm going to

 3    show you what'll be marked as Haran 11.

 4          For the record, it's a document

 5    bearing Bates OBS926 through 927.

 6      (Whereupon,  Bates  OBS926  -   927   was

 7      marked as Exhibit 11  for  identification,

 8      as of April 26th, 2023.)

 9          Q.   I just ask that you take a

10      moment and review that document for me.

11          A.   Okay.

12          Q.   Do you recognize this

13      document?

14          A.   I have not seen this document

15      before, but it appears to be a -- a

16      Teams chat, again, between Peter Singh

17      and myself.

18          Q.   And it appears that these were

19      dated February 10, 2021; is that

20      correct?

21          A.   Yes.

22          Q.   Following being notified of

23      your termination from Orange, did you

24      speak about that termination with any

25      Orange employees?
```

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 283 of 479
Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

66

| | |
|---|---|
| 1 | P. HARAN |
| 2 | A.   Yes. |
| 3 | Q.   Who were those Orange |
| 4 | employees? |
| 5 | A.   Again, I'd have to look at the |
| 6 | list here of the people that -- |
| 7 | So your question is did I talk |
| 8 | to people about the fact that I was |
| 9 | terminated?  Did I tell people who |
| 10 | worked at Orange that I had been |
| 11 | terminated? |
| 12 | Q.   Did you discuss your |
| 13 | termination? |
| 14 | A.   Okay. |
| 15 | Q.   With any Orange employees? |
| 16 | A.   Well, yeah.  I mean, I |
| 17 | discussed it with Adam Kimmick during my |
| 18 | exit.  I discussed it with Peter Singh. |
| 19 | I discussed it with Lou Boudreau. |
| 20 | I discussed it with German |
| 21 | Romero.  I discussed it with Danielle |
| 22 | Willins.  Obviously, I discussed it with |
| 23 | Jennifer Lawson.  I discussed it with |
| 24 | Xavier Pichon.  I discussed it with |
| 25 | Marie-Cecile Deraedt.  I mean, people |

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 284 of 479

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

                                                                    67

```
 1                    P. HARAN

 2   called me, so -- you know, and said,

 3   Hey, I heard you got terminated.  And so

 4   Peter, Paul Reticker.  I mean, so yeah,

 5   I mean, it was -- I spoke to Phillipe

 6   Melegrito.  I spoke to Michel.  I forgot

 7   his last name.  I spoke to Christophe

 8   Robert.  I spoke to Natalie Theron.  I

 9   spoke to M.J. Hubert.

10        Q.   Were these conversations

11   taking place on February 24th or on some

12   date later?

13        A.   I don't recall all the exact

14   dates of when I spoke to everybody, but,

15   yeah, I mean it was -- I don't recall

16   the exact dates of when I spoke to

17   everybody.

18        Q.   Did they take place while you

19   were still employed on February 24th or

20   at some time after you were notified of

21   your termination?

22        A.   I don't recall the exact

23   dates, you know, it was -- I don't think

24   every single one of them happened on the

25   24th.  I don't recall the exact dates,
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

68

```
 1              P. HARAN
 2   though.
 3        Q.   What was the purpose of these
 4   conversations?
 5        A.   So, they were different
 6   conversations with different people.
 7   And so they were transition
 8   conversations around accounts in some
 9   cases, as far as, you know, handing over
10   activities that were underway to people
11   who had a -- you know, a -- that was I
12   was teaming with on these specific
13   different customer activities and
14   accounts and things.  So some of them
15   were, you know, friends -- friendship
16   sort of lamenting type conversations
17   about, you know, they heard or, you
18   know.
19              I was told that Adam made an
20   announcement on a call to several people
21   that I was terminated against my wish,
22   you know, against -- that I was
23   involuntary termination.  So, you know,
24   it was -- some of it was also that sort
25   of lamenting type of conversation.
```

Haran vs                                                                      Patricia Haran
Orange Business Services Inc.                                                 April 26, 2023

69

```
 1                      P. HARAN

 2          Q.   I'll show you what will be

 3     marked as Haran 12.

 4     (Whereupon, Bates OBS930 -  931   was

 5     marked as Exhibit 12  for  identification,

 6     as of April 26th, 2023.)

 7               MR. GUILFOYLE:  For the

 8   record, it's a two-page document bearing

 9   Bates OBS930 through 931.

10          A.   Yes.

11          Q.   I just ask that you take a

12     moment and review that document and let

13     me know when you've had the opportunity

14     to do so.

15          A.   Okay.

16          Q.   Do you recognize this

17     document?

18          A.   This is the first time I'm

19     seeing this document, but it looks like

20     a text exchange that were a Teams

21     exchange I believe between Xavier Pichon

22     and myself.

23          Q.   Okay.  And who is Xavier

24     Pichon?

25          A.   Global account director at
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

70

P. HARAN

1

2    Orange.

3         Q.    And that's Orange NA?

4         A.    No, Orange Business Services.

5    To my knowledge, I believe that's the

6    employer that he was also --

7    (Simultaneous speaking.)

8         A.    I'm just wondering -- I think

9    he's also with Orange Business Services.

10   I don't know, you know, on the France

11   side, if it's Orange or -- Orange

12   France, you know, or what his exact

13   employer, you know, company list is,

14   but he's with Orange.

15        Q.    But he worked out of France?

16        A.    Correct.

17             MR. GUILFOYLE:  We've been

18   going for well over an hour.  Take ten

19   minutes and.

20             MS. FISHER:  Sure, yeah.

21             MR. GUILFOYLE:  Okay.  I

22   appreciate that.

23   (Whereupon, a short recess was taken.)

24  BY MR. GUILFOYLE:

25        Q.    Ms. Haran, do you understand