# 24-2312

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

PATRICIA HARAN,

*Plaintiff-Counter-Defendant-Appellant,*

—against—

ORANGE BUSINESS SERVICES INC.,

*Defendant-Counter-Claimant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**JOINT APPENDIX
VOLUME III OF III
(Pages JA591 to JA845)**

AMY J. TRAUB
JUSTIN A. GUILFOYLE
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200

*Attorneys for Defendant-Counter-
Claimant-Appellee*

MICHAEL TAUBENFELD
LIANE FISHER
FISHER TAUBENFELD LLP
225 Broadway, Suite 1700
New York, New York 10007
(212) 571-0700

*Attorneys for Plaintiff-Counter-
Defendant-Appellant*

# TABLE OF CONTENTS

PAGE

District Court Docket Sheet .............................................. JA1

Defendant's Notice of Motion for Summary Judgment,
dated February 13, 2024 .......................................... JA12

Defendant's Memorandum of Law in Support of Motion for Summary
Judgment, dated February 13, 2024 ................................ JA15

Declaration of Amy J. Traub, for Defendant, in Support of Motion
for Summary Judgment, dated February 13, 2024 ................... JA44

    Exhibit A to Traub Declaration—
    Orange Business Services' Policy Against Unlawful
    Discrimination and Harassment..................................... JA47

    Exhibit B to Traub Declaration—
    Excerpts from Deposition Transcript of Non-Party
    Adam Kimmick, dated October 5, 2023 ........................... JA51

    Exhibit C to Traub Declaration—
    Excerpts from Deposition Transcript of Non-Party
    Eddy Youkhanna, dated October 4, 2023 ......................... JA121

    Exhibit D to Traub Declaration—
    Excerpts from the Deposition Transcript of Patricia Haran,
    dated April 26, 2023 ............................................ JA141

    Exhibit E to Traub Declaration—
    Acknowledgement of Employee Handbook........................ JA203

    Exhibit F to Traub Declaration—
    Family and Medical Leave Act (FMLA) Policy................... JA205

    Exhibit G to Traub Declaration—
    Acknowledgement of Notice of Employee Rights
    and Responsibilities under the Family and Medical Leave Act..... JA211

ii

PAGE

Exhibit H to Traub Declaration—
Patricia Haran's First Half 2020 Performance Evaluation ......... JA215

Exhibit I to Traub Declaration—
Patricia Haran's Second Half 2020 Performance Evaluation ....... JA226

Exhibit J to Traub Declaration—
February 24, 2021 Termination Letter ........................... JA237

Exhibit K to Traub Declaration—
Microsoft Teams chats with former coworker Peter Singh
on February 10, 2021 ........................................... JA241

Exhibit L to Traub Declaration—
Microsoft Teams chats with former coworker Peter Singh
on February 1, 2021 ............................................ JA244

Exhibit M to Traub Declaration—
Microsoft Teams chats with former coworker Xavier Pichon
on February 24, 2021 ........................................... JA249

Exhibit N to Traub Declaration—
Objections and Responses to Defendant's First Set
of Interrogatories ............................................. JA252

Exhibit O to Traub Declaration—
Microsoft Teams chats with former supervisor Adam Kimmick
Singh on October 8, 2020 ....................................... JA258

Defendant's Statement of Undisputed Facts, dated February 13, 2024 .. JA261

Plaintiff's Memorandum of Law in Opposition to Motion
for Summary Judgment, dated March 26, 2024 ................... JA272

Plaintiff's Response to Statement of Material Facts,
dated March 26, 2024 ........................................... JA304

Declaration of Patricia Haran, dated March 26, 2024 .................. JA783

iii

PAGE

Declaration of Liane Fisher, for Plaintiff, in Opposition to Motion
for Summary Judgment, dated March 26, 2024 . . . . . . . . . . . . . . . . . .  JA788

Defendant's Reply Memorandum of Law in Further Support
of Motion for Summary Judgment, dated April 19, 2024 . . . . . . . . .  JA790

Defendant's Response to Counterstatement of Facts,
dated April 19, 2024 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA804

Declaration of Justin A. Guilfoyle, for Defendant, in Further Support
of Motion for Summary Judgment, dated April 19, 2024 . . . . . . . . .  JA821

Exhibit A to Guilfoyle Declaration—
Microsoft Teams chats with supervisor Adam Kimmick,
on August 21, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA822

Exhibit B to Guilfoyle Declaration—
Email Chain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  JA824

Opinion and Order of the Honorable Dale E. Ho, dated July 29, 2024 . .  JA833

Plaintiff's Notice of Appeal, dated August 26, 2024. . . . . . . . . . . . . . . . . .  JA845

Haran vs                                                                Patricia Haran
Orange Business Services Inc.                                           April 26, 2023

71

```
 1              P. HARAN
 2   you're still under oath?
 3       A.   Yes.
 4       Q.   Okay.  If I could bring your
 5   attention back to what's been marked as
 6   Exhibit 7, which are your responses to
 7   Interrogatories.
 8       A.   Exhibit 7?
 9       Q.   Yes.
10       A.   That's 12.  Okay.
11       Q.   In these responses you list
12   several individuals who you believe may
13   have knowledge or information concerning
14   the subject matter of your federal
15   complaint; could you please review
16   those?  They're in the response to
17   interrogatory number one.
18       A.   Do you want me to read the
19   names?
20       Q.   Just review them to yourself,
21   please.
22       A.   Okay.
23       Q.   Is your Response to
24   Interrogatory Number 1 accurate?
25       A.   Yes.
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 289 of 479

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                              April 26, 2023

72

```
 1                    P. HARAN

 2        Q.   Does Michelle Rocco have any

 3   additional information regarding your

 4   complaint other than what we've

 5   discussed so far today?

 6        A.   I don't know what Ms. Rocco is

 7   in possession of.  I don't know --

 8        Q.   Okay?

 9        A.   So, I would guess what she has

10   possession of.

11        Q.   So the question here for

12   Interrogatory Number 1 asks you to

13   identify persons who you believe may

14   have knowledge or information concerning

15   the subject matter of your complaint.

16        A.   Mh-hm.

17        Q.   Defendant's defenses,

18   defendant's counterclaims and your

19   defenses to defendant's counterclaims;

20   do you see that?

21        A.   Yes.

22        Q.   Okay.  So my question is, what

23   knowledge or information does Ms. Rocco

24   have regarding your complaint other than

25   what we've discussed so far today?
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 290 of 479
Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

73

```
 1                    P. HARAN

 2        A.   I don't -- I don't think -- as

 3   we talked about earlier, I told her all

 4   about it.  I'm, you know, when we met at

 5   the pizza place, I don't think -- I

 6   don't know what else -- what other

 7   information she might have outside of

 8   that.

 9        Q.   And does Mr. Kimmick have any

10   additional information regarding your

11   complaint other than what we've

12   discussed so far today?

13        A.   I think that we haven't really

14   talked a lot about, you know, all of the

15   conversations about her -- you know, the

16   health conditions that I've had with

17   him, but that's the knowledge that he

18   has, is everything that I told him about

19   the health conditions of my daughter and

20   my mother.

21        Q.   And what information does Eddy

22   Youkhanna have regarding your complaint?

23        A.   Well, as I -- as it referenced

24   in here, I had communicated with him

25   about my daughter's surgery and my
```

Haran vs                                                         Patricia Haran
Orange Business Services Inc.                                    April 26, 2023

74

```
1                    P. HARAN

2     inability to attend a training that he

3     had wanted me to be apart of.  So he was

4     aware of my daughter's condition, and he

5     was aware of, you know, the time off

6     that I needed to care for her.

7          Q.   And when did you have that

8     conversation with Mr. Youkhanna?

9          A.   So I had a -- I don't remember

10    the exact date of the conversation, but

11    it was at some point in between --

12    between September and October before her

13    surgery.

14         Q.   And when was your daughter

15    diagnosed with her illness?

16         A.   Well, the diagnosis exact

17    date, I don't recall, but it was

18    somewhere in the late-September,

19    early-October timeframe.  And it was in

20    a series of discoveries, the diagnosis.

21    It was several different appointments

22    and things, you know, where we got bits

23    of information that added to the

24    diagnosis.

25         Q.   And that was in 2020?
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

                                                                      75
```
 1                     P. HARAN

 2        A.   Correct.

 3        Q.   And who is Peter Singh?

 4        A.   He's a technical director at

 5   Orange.

 6        Q.   Okay.  And what information do

 7   you believe Mr. Singh has with regard to

 8   your complaint?

 9        A.   So, he was aware of the

10   increased pressure and stress and

11   scrutiny that I was under about

12   developing my quota and making my

13   numbers.  He was aware of -- that -- my

14   daughter's illness, and that -- my

15   belief that there was a connection and

16   that that was something that was, you

17   know, causing the increased pressure.

18   So, yeah, he was aware of all that.

19        Q.   Okay.  When did you have these

20   conversations with Mr. Singh?

21        A.   So, we had the Teams

22   conversations.  We also met in person

23   in -- in February.  I don't know the

24   exact date, but it was some time in

25   February.  We had coffee in New York
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 293 of 479
Haran vs                                                         Patricia Haran
Orange Business Services Inc.                                    April 26, 2023

76

```
 1                   P. HARAN

 2    City.

 3         Q.   Was that the date you took

 4    some time off to take your mother to a

 5    doctor in New York City?

 6         A.   Yes.

 7         Q.   Who is Lou Boudreau?

 8         A.   He is a collaboration manager

 9    at Orange.

10         Q.   And what information do you

11    believe Mr. Boudreau has with regard to

12    your complaint?

13         A.   So, I -- he has the

14    information about my daughter's illness,

15    about the increased pressure that I was

16    under to perform and to bring in numbers

17    very quickly.  He knew quite well what I

18    was going through because his daughter

19    and -- at one point in time had

20    similar -- similar scare medically.  But

21    yeah, I mean, he was aware of all of

22    that.

23         Q.   Okay.  Daniel Willins; who is

24    that?

25         A.   It's a typo.  It should be
```

Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

77

```
 1              P. HARAN

 2   Danielle Willins.  It's a woman.  She's

 3   an integration services account manager.

 4        Q.   Okay.  What information do you

 5   believe Ms. Willins has with regard to

 6   your complaint?

 7        A.   She was same as everybody

 8   else.  She was aware of -- her and I

 9   spoke regularly about Adam and the

10   increased pressure that I was under and

11   he -- she was well aware of my

12   daughter's medical situation.  She and I

13   worked together on several accounts and

14   we had -- she was overlay to me as an

15   integration services manager, so she was

16   responsible for a subset of services in

17   my accounts that we both were -- would

18   be compensated for when we sold.  So,

19   she had Pfizer, she had Moody's, and she

20   had other accounts as well that she

21   was -- her and I worked together on.

22        Q.   And who is German Romero?

23        A.   A presales engineer.

24        Q.   What information do you

25   believe Mr. Romero has with regard to
```

Haran vs                                                                    Patricia Haran
Orange Business Services Inc.                                               April 26, 2023

78

```
 1              P. HARAN

 2   your complaint?

 3        A.   So he was a sales engineer

 4   that supported me on some of my

 5   accounts, and he and I had regular

 6   weekly conversations and we talked about

 7   the increased pressure for getting sales

 8   closed, and we talked about the

 9   responsibilities and, you know, the

10   medical condition of my daughter, and,

11   you know, the juggling that was

12   associated with all of that.

13        Q.   Okay.  And we previously

14   talked a little bit about Jennifer

15   Lawson.  What information do you believe

16   that Ms. Lawson has with regard to your

17   complaint other than things we've

18   discussed so far today?

19        A.   I don't think -- I don't know

20   what else she has other than what's

21   written in here, what she, you know,

22   what we've discussed.

23        Q.   And when you say written in

24   here, what do you mean by that?

25        A.   Just in the Interrogatory
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 296 of 479
Haran vs                                                                    Patricia Haran
Orange Business Services Inc.                                               April 26, 2023

79

1                    P. HARAN

2     that -- that -- I mean, she was -- she

3     was part of the termination

4     conversation.  I told her, you know,

5     I -- but prior to that, I don't think

6     that she had any awareness of anything.

7     She was just really there as a

8     spokesperson to, I think, do the

9     termination.

10         Q.    And she was a member of HR?

11         A.    Correct.

12         Q.    And we say the situation, do

13    you mean your daughter's illness what

14    she was unaware of?

15         A.    I don't know what she was

16    aware, you know, I hadn't told her

17    before -- before my termination date

18    about it.

19         Q.    We previously discussed a

20    little bit about Xavier Pichon.  What

21    information do you believe he has

22    regarding your complaint?

23         A.    We spoke regularly.  He had

24    information about the increased pressure

25    that I was receiving Adam to move sales

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 297 of 479
Haran vs                                                         Patricia Haran
Orange Business Services Inc.                                    April 26, 2023

80

P. HARAN

1

2    more quickly through the funnel and

3    close things, you know that coincided

4    with my daughter's, you know, medical

5    activities.

6        Q.    Why do you believe the

7    increased pressure that you've mentioned

8    a few times regarding getting sales

9    closed and moving sales quickly, had

10   anything to do with your daughter's

11   condition?

12       A.    So, Adam felt that, as I

13   mentioned to your earlier, that I lacked

14   focus and so he'd think -- he thought --

15   his commentary was around the fact that

16   I wasn't as focused on developing, you

17   know, these accounts more quickly, and

18   that I could take off if I needed to

19   take off, but I needed to get this --

20   sales completed.  And so, you know, it

21   was just a real lack of -- a lack of,

22   you know, it was kind of just cold and,

23   you know, and unsympathetic like, you

24   know, you've got to get this done.

25               And, you know, I don't

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 298 of 479
Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

81

1            P. HARAN

2   really -- it was like stonewalling, you

3   know, any time I talked about, you know,

4   needing time off.  It was kind of like,

5   I don't want to hear about that, I just

6   want you to close these sales.  And so

7   that's why -- that was the situation

8   that I was experiencing.

9        Q.   Okay.  Did you believe that

10  your performance expectation should be

11  changed as a result of you needing to

12  take time off to care for your daughter?

13       A.   Did I believe that?  I thought

14  that I should be -- yeah, I mean given

15  some accommodation to account for, you

16  know, what I was -- what I -- trying to

17  juggle it all.  But it was also -- I

18  think that, you know, the expectations

19  were -- the expectations there were --

20  were heightened, you know, during the --

21  all of the episodes around my daughter's

22  condition.  It was kind of like, you

23  know, it changed at that time and became

24  more, you know, focused and more, you

25  know, persistent around, you know, the

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 299 of 479
Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

82

1                     P. HARAN

2          need for me to close those sales.

3               Q.   Did those expectations

4          actually change because of your

5          daughter's illness?  I'm just trying to

6          understand.

7                    MS. FISHER:  Objection.

8    BY MR. GUILFOYLE:

9               Q.   You can answer.

10              A.   I -- you know, it's hard to

11         speculate on what, you know, whether or

12         not -- I just know that it was like, you

13         know --

14              Q.   I'm not asking you to

15         speculate, I'm only asking what you

16         know.

17              A.   Make sure I understand, repeat

18         the question again.

19              Q.   Sure.  You had mentioned that

20         you believed expectations changed, and I

21         was asking if you were ever informed

22         that your sales or quota or your numbers

23         changed at any point in 2020?

24              A.   No, my numbers didn't --

25         weren't changed in 2020.

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 300 of 479

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

                                                                      83
1                    P. HARAN

2       Q.   And at some point in 2020 did

3   you take on more responsibilities for

4   A-end accounts?

5       A.   As I mentioned earlier, Lorna

6   Paine had resigned in January 2020 and I

7   was asked to take on responsibility for

8   her accounts while I was also

9   maintaining the module of accounts that

10  I had been previously responsible for.

11      Q.   When in 2020 did she resign?

12      A.   Some time in January.

13      Q.   So the beginning of the year?

14      A.   Some time in January -- I, you

15  know, of 20 -- 2020.  I -- as you

16  recall, it was, you know, I don't know

17  the exact date.

18      Q.   Sure.  That's fair.  So just

19  so I understand it, you had your set of

20  responsibilities prior to January 2020?

21      A.   Mh-hm.

22      Q.   And then this woman resigned

23  then you took on additional

24  responsibilities that were previously

25  hers?

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

84

                        P. HARAN

1

2        A.    Correct.

3        Q.    Todd Hames, who is that?

4        A.    Todd was a sales director on

5    the Hunter team at Orange.

6        Q.    What information do you

7    believe he has with regard to your

8    complaint?

9        A.    I mean, he was just aware

10   of -- he and I work talked together

11   about, you know, we -- I don't know that

12   he knew about my complaint in

13   particular.  I don't think I had him

14   listed in -- you know, he's just

15   somebody that was kind of like a

16   reference for me as far as my work and

17   everything that -- that, you know, I did

18   with him.  We -- in his role there.

19       Q.    Who is Marie-Cecile Deraedt?

20       A.    She was a global account

21   manager in France, and she and I worked

22   together very closely on one account in

23   particular, so her and I talked

24   regularly.  And, you know, she -- she

25   knew as well that -- that, you know,

Haran vs                                                                  Patricia Haran
Orange Business Services Inc.                                              April 26, 2023

85

```
 1                   P. HARAN

 2    that there was a lot of pressure on

 3    bringing sales in.

 4         Q.   What account did she work on

 5    with you?

 6         A.   Capgemini.

 7         Q.   Who is Paul Reticker?

 8         A.   A global account director at

 9    OBS.

10         Q.   And what information do you

11    believe he has with regard to your

12    complaint?

13         A.   Well, he -- he was aware of my

14    daughter's illness, and he was aware of

15    the increased pressure that I was

16    receiving to close sales and move

17    things.  He called me on the day that my

18    daughter was released from the hospital

19    and his call was made to me at the

20    request of Adam Kimmick.  Adam told him

21    to call me to say that if I couldn't

22    come back to work that, you know,

23    that -- that week that, you know, he was

24    able to step in and to handle some of my

25    accounts.
```

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 303 of 479

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

86

1              P. HARAN

2       Q.    Who is Nadine

3   Foulon-Belkacemi?

4       A.    She was a executive VP of the

5   major clients OBS France.

6       Q.    What information do you

7   believe she has with regard to your

8   complaint?

9       A.    She's a -- kind of a reference

10  for somebody who is aware of my positive

11  work performance.  She had recognized me

12  in January of 2020 for positive

13  performance that I had done with the

14  conjunction with the -- they call it --

15  DGC, the France led accounts in terms

16  of, you know, sales efforts with her --

17  her team.  She was the leader of that

18  group.  So she recognized me like a

19  sales kickoff for my -- my work --

20  working with her team.

21      Q.    Is that with respect with

22  B-end accounts or A-end accounts?

23      A.    That was B-end accounts.

24      Q.    And then Laurie Saint Gal de

25  Pons?

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                      April 26, 2023

                                                                        87
1                        P. HARAN

2              MR. GUILFOYLE:  And I'll get

3    you all the names.

4         Q.   Who is she?

5         A.   Global account manager and she

6    was promoted to sales director in France

7    of major accounts within this DGC group.

8         Q.   Okay.  What information do you

9    believe she has with regard to your

10   complaint?

11        A.   She's, again, a reference for

12   my positive work performance.

13        Q.   And Phillipe Melegrito, who is

14   that?

15        A.   He's a presales engineer at

16   Orange.

17        Q.   What information do you

18   believe he has with regard to your

19   complaint?

20        A.   So, he was aware of -- so he

21   was an overlay sales engineer that

22   supported me on my accounts.  He was

23   aware of my daughter's condition.  He

24   was aware of the increased pressure at

25   that time that I was receiving from Adam

Haran vs                                                                      Patricia Haran
Orange Business Services Inc.                                                 April 26, 2023

88

1                    P. HARAN

2    for, you know, bringing in results and

3    performance.  And, you know, he -- he

4    was aware of the -- and that's it, stop

5    with that.

6         Q.    Who is Michel Lacosto?

7         A.    A cloud architect at Orange.

8         Q.    What is a cloud architect?

9         A.    Technical overlay, like a

10   technical support person for designing

11   network cloud solutions.

12        Q.    And what does this person --

13   do you believe he has knowledge of

14   regarding your complaint?

15        A.    I believe that he is a

16   positive work performance reference for

17   me.  That's, you know -- so he was aware

18   of -- but he was -- I wasn't working

19   with him at that time as extensively.

20   So he's a positive work performance

21   reference.

22        Q.    Okay.  Who is Christophe

23   Robert?

24        A.    A global key account manager

25   on -- in Orange France.

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 306 of 479
Haran vs                                                               Patricia Haran
Orange Business Services Inc.                                          April 26, 2023

89

```
1                    P. HARAN

2        Q.   And what information do you

3   believe Mr. Robert has with regard to

4   your complaint?

5        A.   He would be aware of my

6   positive work performance and on working

7   the -- with him.

8        Q.   Who is Natalie Theron?

9        A.   A major account manager at

10  Orange France.

11       Q.   What information do you

12  believe she has with regard to your

13  complaint?

14       A.   She was aware that I was

15  working to build my funnel for 2021, my

16  sales funnel, and she and I negotiated

17  together to add a new account to my

18  module that would not have more quota

19  assigned to it, but that would help me

20  to build my funnel up.

21       Q.   What account was that?

22       A.   IBM.

23       Q.   Who is M.J. Hubert?

24       A.   She is a international

25  client-partner at Orange.
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 307 of 479
Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

90

P. HARAN

1

2      Q.   What information do you

3   believe she has with regard to your

4   complaint?

5      A.   She was aware of the -- of the

6   increased pressure that I was under.

7   She was aware of my daughter's illness,

8   and she was aware that I was working to

9   juggle all the responsibilities and try

10  to -- she was helping as well with

11  adding like the IBM account into my

12  module in order to give me a larger

13  funnel.

14     Q.   How did those discussions come

15  about regarding adding IBM to your sales

16  funnel?

17     A.   With who?

18     Q.   With Ms. Hubert.

19     A.   I had regular calls with her.

20  She was -- part of her job

21  responsibility was to manage and oversee

22  the relations between Orange U.S. and

23  Orange France.  So, she and I talked

24  about how we could -- it was, you know,

25  constant conversation around the

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 308 of 479

Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

91

                          P. HARAN

1

2    accounts that were in my module and then

3    accounts like this that had potential to

4    bring more business to the region.

5         Q.    When did you first start

6    discussing the prospect of bringing IBM

7    into your sales funnel with Ms. Hubert?

8         A.    I don't recall the exact date.

9    I don't recall the exact date.  I would

10   have to refer to my, you know, emails

11   and things that were probably -- but it

12   was at some point in -- I don't know the

13   exact date.

14        Q.    Was it in 2020?

15        A.    I don't recall if it was --

16   what -- exactly when it was, but it

17   was -- it could have been -- but I would

18   have to check, you know.  I'm sure it's

19   in the records of my emails and things.

20        Q.    And how did it come about

21   discussing the sales funnel and bringing

22   IBM into that with Ms. Theron?

23        A.    Ms. Theron?

24        Q.    Yes.

25        A.    Oh, Natalie.

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

92

```
 1                 P. HARAN

 2        Q.   Yes.

 3        A.   So, I believe I met her when I

 4    went to France some point prior to that,

 5    and there was some conversation about

 6    the possibility of doing it, and then I

 7    don't know -- I think M.J. probably put

 8    us together.  I don't recall the

 9    specifics, though, of how it came about.

10        Q.   And when did you travel to

11    France?

12        A.   I think it was 2019.

13        Q.   Okay.  Also in these responses

14    to Oranges's Interrogatories which is

15    Exhibit 7 here.  In response Number 10

16    you list several individuals who you

17    claim to have given notice and/or

18    complained or otherwise informed of the

19    fact that you believed you were

20    discriminated and/or retaliated against;

21    can you please read through those names

22    for us?

23        A.   Sure.  So a response here is

24    number one, family members; number two,

25    Cassandra Hernandez, LMHC; three, Peter
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

93

1                    P. HARAN

2    Singh; four, Lou Boudreau; five,

3    Danielle Willins; six, Xavier Pichon;

4    seven, Marie-Cecile Deraedt; eight Paul

5    Reticker; nine, M.J. Hubert.

6          Q.   And is that answer correct?

7          A.   Yes.

8          Q.   Okay.  What exactly did you

9    discuss with Peter Singh in this regard?

10         A.   I discussed the increased

11   pressure that I was receiving from Adam

12   at that time, and I discussed how I was

13   not able to -- that conversations that I

14   tried have with Adam about, you know,

15   the -- my daughter were met with kind of

16   just no -- like a stonewalled response.

17   And, you know, I talked about how I was

18   concerned, you know, about my job.

19         Q.   This interrogatory asked about

20   people who you informed or otherwise

21   made aware of the fact that you believed

22   you were discriminated and/or retaliated

23   against, so what conversation did you

24   have with Peter Singh in that context?

25         A.   Well, I mean the retaliation,

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 311 of 479
Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

94

```
1              P. HARAN

2     you know, was termination of my

3     employment, right?  That's -- so I

4     talked to him about my termination and

5     how that was -- that's the retaliation.

6     I talked to him about the discrimination

7     around the, you know, the increased

8     pressure and scrutiny that was being --

9     that I was being subject to during the

10    time of taking these -- this time off to

11    care for my daughter and my mother.

12         Q.   Are these conversations with

13    Mr. Singh in writing?

14         A.   I don't recall the specifics

15    of them.  Phone calls is -- but I don't

16    recall the specifics of all the method

17    of communication.

18         Q.   What was Mr. Singh's response

19    when you told him this?

20         A.   You know, he was sympathetic

21    to my situation and, you know, he

22    talked -- he talked about, you know,

23    alternatives that I'd have, like looking

24    for another job or taking time off.

25         Q.   Was anyone else present during
```

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 312 of 479
Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

95

| 1 | P. HARAN |
| 2 | your conversations with Mr. Singh? |
| 3 | A.   No. |
| 4 | Q.   What did you discuss |
| 5 | specifically with Lou Boudreau with |
| 6 | regard Interrogatory Number 10? |
| 7 | A.   So, again, same thing.  We |
| 8 | talked about the increased pressure, |
| 9 | talked about the termination and the -- |
| 10 | the increased scrutiny around, you know, |
| 11 | me having to -- not having the focus |
| 12 | because I was taking time off for my |
| 13 | daughter, and Adam's, you know, |
| 14 | commentary to me in that regard. |
| 15 | Q.   Okay.  When did these |
| 16 | conversations take place? |
| 17 | A.   I had regular calls with Lou. |
| 18 | We were working together on several |
| 19 | sales opportunities, so it was regular |
| 20 | conversations related to -- that, you |
| 21 | know, we had on the phone. |
| 22 | Q.   Okay.  And you said you |
| 23 | discussed your termination with Lou, so |
| 24 | you had to have spoken sometime after |
| 25 | you were terminated, correct? |

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 313 of 479
Haran vs                                                             Patricia Haran
Orange Business Services Inc.                                        April 26, 2023

96

P. HARAN

1

2      A.   Yes.

3      Q.   And do you recall when those

4   conversations took place?

5      A.   I don't.

6      Q.   Do you know who contacted who?

7      A.   I don't.

8      Q.   Were those conversations in

9   writing?

10      A.   I don't think so, but I -- I

11   don't recall exactly.  They were mostly,

12   I believe, phone calls.

13      Q.   What was Mr. Boudreau's

14   response, when you had these discussions

15   with him?

16      A.   That he was sympathetic to my

17   situation and that he didn't think it

18   was fair, and that, you know, I would --

19   I should go look for another job, and

20   that he wasn't sure himself, you know.

21   That he felt that, you know, the

22   environment, you know, that I

23   experienced was disheartening.

24      Q.   Was anyone else present for

25   these conversations?

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

97

```
 1                    P. HARAN

 2        A.   No.

 3        Q.   What did you discuss with

 4   Danielle Willins in this regard?

 5        A.   So Danielle Willins, the same

 6   conversation.  You know, the same

 7   conversation that I just explained, you

 8   know, around the discussion of, you

 9   know, the time off and the increased

10   pressure.  And she, you know, she said

11   she wasn't seeing the same pressure.

12             She had a lot of the same

13   accounts that I did.  She was involved

14   in some of the same, you know, losses

15   that we experienced and she -- she

16   wasn't experiencing the same pressure

17   from Adam as -- was her commentary at

18   that time.  And so it was, again,

19   sympathetic and, you know, I hope it all

20   works out.

21        Q.   And what was Ms. Willins title

22   at Orange?

23        A.   Integration services manager,

24   I believe, is the title.  Let me just

25   look back.
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 315 of 479
Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

98

P. HARAN

1

2      Q.   And that's not a title that

3   you held?

4      A.   No.

5      Q.   Do you know when you had these

6   conversations with Ms. Willins?

7      A.   Leading up to and after the

8   termination.

9      Q.   Do you recall any specific

10   dates of these conversations?

11      A.   No.

12      Q.   Were these conversations in

13   writing?

14      A.   No.  I don't think.  I mean,

15   there were text with Danielle prior to,

16   but I don't remember the specifics of,

17   you know -- after it was definitely not

18   in writing.

19      Q.   Have you produced those text

20   messages as part of this case?

21      A.   No, no, the Teams -- anything

22   that would have been on the Teams

23   conversations.  That's what it was.

24      Q.   Okay.  So you didn't mean to

25   use the word text there?

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 316 of 479
Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

99

|    |                                            |
|----|--------------------------------------------|
| 1  | P. HARAN                                   |
| 2  | A.   No, I didn't.  I say that             |
| 3  | as -- but Teams is the term, sorry, that   |
| 4  | I meant.                                    |
| 5  | Q.   And was anyone else present           |
| 6  | for these conversations with               |
| 7  | Ms. Willins?                                |
| 8  | A.   No.                                    |
| 9  | Q.   Okay.  And what did you               |
| 10 | discuss with Xavier Pichon in this         |
| 11 | regard?                                     |
| 12 | A.   We discussed the, you know, we        |
| 13 | didn't talk -- we talked about the         |
| 14 | increased pressure, we talked about the    |
| 15 | time off for my daughter, and the, you     |
| 16 | know, the treatment that I was getting     |
| 17 | from Adam and how, you know, it was --     |
| 18 | it was unfair.  And that was, you know,    |
| 19 | on the phone and then I believe there's    |
| 20 | another document here, but the -- there    |
| 21 | was also Teams conversations.              |
| 22 | Q.   Okay.  You've said that you           |
| 23 | believe the treatment from Adam was        |
| 24 | unfair.  Unfair in what respect?           |
| 25 | A.   So it was a stonewalling              |

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 317 of 479
Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

100

```
 1              P. HARAN

 2    around, you know, anything that was just

 3    kind of unfair, that unrealistic

 4    expectations, you know, for things, and

 5    things like the example I gave earlier

 6    with the Pfizer legal issue where, you

 7    know, the feedback and the scrutiny was,

 8    Well, you know, you didn't manage to

 9    overcome this legal obstacle by finding

10    a friend at this company that was going

11    to get that removed as an obstacle.  It

12    was unfair expectation, you know, that's

13    just one example.

14        Q.   Did Adam in fact give you

15    credit on your quota numbers for the

16    Pfizer deal?

17        A.   Did he give me credit on my

18    quota numbers?  What do you mean by

19    credit?

20        Q.   As if you had signed the deal

21    with Pfizer for purposes of new metrics?

22        A.   I never got a final statement.

23    I have, you know, I think in evidence

24    there's like a -- but I don't believe

25    so; not that I know of.
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 318 of 479

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

101

1              P. HARAN

2      Q.   Was anyone else present for

3   your conversations with Mr. Pichon?

4      A.   No.

5      Q.   What did you discuss with

6   Marie-Cecile Deraedt?

7      A.   We discussed the, you know, in

8   terms of the unfair, we talked about

9   the -- the, you know, the scrutiny and

10  the increased pressure.  We talked about

11  my daughter's, you know, illness, and we

12  talked about, you know, the expectation

13  that these deals were going to advance

14  more quickly, you know, was not fair,

15  and not realistic, and not, you know,

16  something that was -- that was realistic

17  to do given the complexities of what we

18  were dealing with.

19      Q.   Were these conversations in

20  writing?

21      A.   There were conversations on

22  the phone, so I don't know if there were

23  any Teams conversations.

24      Q.   And what did Marie-Cecile

25  Deraedt say in response?

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 319 of 479
Haran vs                                                                      Patricia Haran
Orange Business Services Inc.                                                 April 26, 2023

102

P. HARAN

1

2     A.   She said, you know, that she

3   was sympathetic, you know, to my

4   situation.  And you know, she didn't

5   think that it was fair, and, you know,

6   she was sorry to see it happening.

7     Q.   Was anyone else present for

8   these conversations?

9     A.   No.

10     Q.   What did you discuss with Paul

11   Reticker in this regard?

12     A.   Well, with Paul Reticker, you

13   know, I discussed the -- the treatment

14   from Adam, the increased pressure and

15   scrutiny, the time off with my daughter,

16   and, yeah -- I mean, discussed all of

17   those things and, again -- but go ahead

18   and ask the question.

19     Q.   Were these discussions in

20   writing?

21     A.   No.

22     Q.   What was Paul's response?

23     A.   Paul's response was, you know,

24   go look for another job, leave.  You

25   know, you'll find another job and just

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 320 of 479
Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

103

1            P. HARAN

2    sorry that it's happening, but yeah.

3        Q.    You had mentioned a

4    conversation that Paul told you he had

5    with Adam regarding coverage if you

6    needed to take more time off?

7        A.    Mh-hm.

8        Q.    When did that conversation

9    take place?

10       A.    It was -- I don't have the --

11   I don't recall the exact date, but it

12   was on the day that my daughter came

13   back from surgery.  I don't recall the

14   exact date.  I would have to look

15   through the records to find it.  It was

16   in that timeframe.

17       Q.    So that would be some time in

18   October of 2020?

19       A.    Yeah.

20       Q.    Was anyone else present for

21   your conversations with Paul?

22       A.    No.

23       Q.    What did you discuss with M.J.

24   Hubert in this regard?

25       A.    The same things that, you

Haran vs
Orange Business Services Inc.

Patricia Haran
April 26, 2023

104

1          P. HARAN

2     know, I discussed with the others, you

3     know, around the -- the treatment and

4     the increased pressure and the time off

5     from my daughter and, you know, the --

6     yeah, all that stuff.

7          Q.   Were these conversations in

8     writing?

9          A.   Unless there were any Teams

10    conversations that I don't recall what

11    they would have been, they were phone

12    calls.

13         Q.   What was M.J.'s response?

14         A.   Her response was, you know,

15    just, Hang in there kid, you know, kind

16    of thing and, you know, it'll all work

17    out.

18         Q.   Was anyone else present for

19    that conversations?

20         A.   No.

21         Q.   For these phone conversations

22    with the individuals we just discussed,

23    were those taking place during working

24    hours?

25         A.   Sometimes, yeah, I would, you

Haran vs                                                                    Patricia Haran
Orange Business Services Inc.                                               April 26, 2023

105

1              P. HARAN

2     know, it was -- I don't know the all the

3     exact times of the conversations, but I

4     would say for the most part, yes.

5          Q.   All right.  And in this

6     lawsuit you have a claim of FMLA

7     interference, how do you contend that

8     Orange interfered with your FMLA rights?

9          A.   So, I believe that when I took

10    the time off to care for my mother and

11    my daughter, that that time should have

12    been counted as FMLA.  It should have

13    been offered to me as an option at that

14    time and it was not, and it was held

15    against me and, you know, then I was

16    retaliated against by being terminated.

17         Q.   Is that all the ways that you

18    believe Orange interfered with your FMLA

19    rights?

20         A.   Yeah, I believe so.

21         Q.   Did Orange prohibit you from

22    taking any time off for your daughter's

23    procedure and recovery?

24         A.   No.

25         Q.   Okay.  For the days you took

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 323 of 479

Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                    April 26, 2023

106

1                    P. HARAN

2      off, you used paid time off or PTO; is

3      that right?

4           A.   Yeah, sometimes and then

5      sometimes it was just, Just go do what

6      you need to do, you know.  So, it was

7      sometimes half days and partial days and

8      things like that.  Because I was trying

9      to, you know, juggle it all.

10          Q.   You were paid for those days

11     that you took off or the half days you

12     took off as well?

13          A.   Yeah, the system doesn't -- I

14     don't think has a way to pay for half

15     days.

16          Q.   So you were --

17          A.    It was salary not hourly.

18          Q.   So for all the days you took

19     off, you were paid for those days?

20          A.   Yes.

21          Q.   Did Orange prohibit you from

22     taking any time off to take your mother

23     to the eye doctor?

24          A.   No.

25          Q.   And for the days that you took

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 324 of 479

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

107

```
 1                    P. HARAN

 2    off or half days that you took off as

 3    well to take your mom to the eye doctor,

 4    did you use PTO for that?

 5        A.    Yes.

 6        Q.    So you were paid for those

 7    days off?

 8        A.    Yes.

 9             MR. GUILFOYLE:  I'm going to

10    show you what will be marked as Haran 13.

11    (Whereupon,  Bates  OBS575  -   576    was

12    marked as Exhibit 13  for  identification,

13    as of April 26th, 2023.)

14             MR. GUILFOYLE:  And for the

15    record, it's Bates OBS575 to 576.

16        Q.    I ask that you take a moment

17    and review that document and let me know

18    when you've had the opportunity to do

19    so?

20        A.    Okay.

21        Q.    Do you recognize that

22    document?

23        A.    It looks like a Teams exchange

24    between Adam and I.

25        Q.    It appears to be on
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 325 of 479
Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

108

| | |
|---|---|
| 1 | P. HARAN |
| 2 | October 8th of 2020? |
| 3 | A.   Mh-hm. |
| 4 | Q.   Okay.  And you also have a |
| 5 | claim of FMLA retaliation in this case; |
| 6 | how do you contend that Orange |
| 7 | retaliated against you in violation of |
| 8 | the FMLA? |
| 9 | A.   By firing me. |
| 10 | Q.   Okay.  Is that all the ways |
| 11 | that you believe Orange retaliated |
| 12 | against you in violation of the FMLA? |
| 13 | A.   Yes. |
| 14 | Q.   Did you ever take FMLA leave |
| 15 | while at Orange? |
| 16 | A.   No. |
| 17 | Q.   Did you ever request FMLA |
| 18 | leave while employed at Orange -- |
| 19 | A.   No. |
| 20 | Q.   -- so if we turn back to |
| 21 | Exhibit 7, your Interrogatory Responses |
| 22 | -- |
| 23 | A.   Okay. |
| 24 | Q.   -- so Number 15 there. |
| 25 | A.   Fifteen? |

Haran vs
Orange Business Services Inc.

Patricia Haran
April 26, 2023

109

```
1                    P. HARAN

2       Q.   Correct.

3       A.   The person --

4       Q.   Interrogatory Number 15.

5  There's no page numbers it's a little

6  difficult I appreciate that.

7       A.   Number 15 --

8       Q.   Do you see that this

9  interrogatory asks you identify each day

10 off work you took to take your daughter

11 to doctor's appointments and for

12 treatment as alleged in the Paragraph 19

13 of the complaint.  Do you see that?

14      A.   Yes.

15      Q.   Do you see your response that

16 identifies October 14th half day,

17 October 15th through the 19th --

18      A.   Mh-hm.

19      Q.   November 11, December 18,

20 December 28th, December 30, and

21 February 12th; do you see that?

22      A.   Yes.

23      Q.   Okay.  Is that answer

24 accurate?

25      A.   I believe so; yeah, to the
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

                                                                    110
```
 1              P. HARAN

 2    best of my knowledge.

 3         Q.   If you turn to response

 4    Interrogatory Number 8 within this

 5    document.

 6              And this interrogatory asks

 7    you to identify each employee, agent or

 8    representative of defendant who you

 9    purport subjected you to discrimination

10    or retaliation; do you see that?

11         A.   Mh-hm, yes.

12         Q.   And you identified Adam

13    Kimmick and Eddy Youhanna (sic), which I

14    believe should be Youkhanna; is that

15    correct?

16         A.   Yes.

17         Q.   Okay.  Is that answer

18    accurate?

19         A.   Yes.

20         Q.   Okay.  You also have a claim

21    for discrimination under the New York

22    City Human Rights Law; how do you

23    contend that Orange discriminated

24    against you in violation of the New York

25    City Human Rights Law?
```

Haran vs                                                                   Patricia Haran
Orange Business Services Inc.                                              April 26, 2023

111

```
 1                  P. HARAN

 2        A.   So, my lawyer filed, you know,

 3   the details.  You know, in summary

 4   it's -- it's because of being a

 5   caregiver to my mother and my daughter,

 6   then needing to have accommodation to

 7   take care of them.  And I believe that

 8   that -- that's -- the contention is the

 9   fact that I was terminated in

10   retaliation for taking that time off.

11   It's related to that New York State law

12   that you're referring to.

13        Q.   That claim is only for

14   discrimination and not retaliation; are

15   you aware of that?

16        A.   Okay.

17        Q.   And you mentioned an

18   accommodation; did you ever request an

19   accommodation from Orange?

20        A.   So, I didn't.  No, I didn't.

21        Q.   And when you were hired by

22   Orange, you were already a mother of two

23   children, correct?

24        A.   Yes.

25        Q.   At the time you were hired by
```

Haran vs                                                                Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

                                                                              112

```
 1                    P. HARAN

 2    Orange, you were also a daughter to your

 3    mother, correct?

 4         A.   Yes.

 5         Q.   Other than what you just

 6    mentioned, are you there any other ways

 7    you believe that Orange discriminated

 8    against you based upon your status as a

 9    mother?

10         A.   No.

11         Q.   If you could go back to

12    Exhibit 7, the Interrogatory Responses,

13    specifically Interrogatory Number 8?

14         A.   Okay.

15         Q.   And do you see that this

16    interrogatory asked you to identify each

17    employee, agent, representative of

18    defendant who you purport subjected you

19    to discrimination or retaliation; do you

20    see that?

21         A.   Yes.

22         Q.   You identified Mr. Kimmick and

23    Mr. Youkhanna?

24         A.   Yes.

25         Q.   Is that answer accurate and
```

113

```
 1                    P. HARAN

 2    complete?

 3         A.   Yes.

 4         Q.   If you could turn to the next

 5    page, Interrogatory Number 9.  It asks

 6    to you identify each and every

 7    discriminatory and/or retaliatory

 8    comment, behavior or action that you

 9    contend defendant or defendant's agents,

10    representatives and/or employees made

11    two or concerning you; do you see that?

12         A.   Yes.

13         Q.   And do you see your response

14    below?

15         A.   Yes.

16         Q.   Okay.  And is your response --

17    your response to this interrogatory

18    accurate?

19         A.   Yes.

20         Q.   Is this response complete?

21         A.   Yes.

22         Q.   Did anyone at Orange ever make

23    any negative comments about your

24    daughter's illness?

25         A.   Can you explain what you mean
```

Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

114

1                    P. HARAN

2    by negative comments?

3         Q.   Did anyone at Orange make any

4    disparaging comments about your

5    daughter's illness?

6         A.   No.

7         Q.   Did anyone at Orange ever make

8    any negative or disparaging comments

9    about you taking days off in connection

10   with your daughter's illness?

11        A.   Not specifically about taking

12   days off.  It was about the lack of

13   focus.

14        Q.   Move to strike.

15             My question was did anyone at

16   Orange ever make any negative or

17   disparaging comments about you taking

18   days off --

19        A.   No.

20        Q.    -- in connection with --

21   okay.

22             Did anyone at Orange ever make

23   any negative or disparaging comments

24   about your mother's illness?

25        A.   No.

Haran vs                                                         Patricia Haran
Orange Business Services Inc.                                    April 26, 2023

                                                                      115

1                        P. HARAN

2        Q.   Did anyone at Orange ever make

3   any negative or disparaging comments

4   about you taking days off in connection

5   with your mother's illness?

6        A.   No.

7        Q.   During your employment with

8   Orange, did you ever report

9   discrimination or retaliation to anyone

10  at Orange?

11       A.   No.

12       Q.   Why not?

13       A.   I was afraid that I would

14  ruffle feathers if I went and took up my

15  request to human resources, or to higher

16  up the leadership chain.  I just thought

17  that it was -- I was already feeling --

18  yeah, so I -- I was afraid to.

19       Q.   And you're aware that as part

20  of this lawsuit you're seeking damages

21  in this case?

22       A.   Yes.

23       Q.   And are you aware of what

24  damages you're seeking here?

25       A.   Yes.

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 333 of 479
Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

116

```
 1                      P. HARAN

 2          Q.   And what are those?

 3          A.   So the damages being the

 4     monetary damages, the -- I'm not sure I

 5     understand the question.

 6          Q.   Sure.  If I could bring your

 7     attention to Exhibit 6.  It's the

 8     Complaint in this matter?

 9          A.   Okay.

10          Q.   If you turn to page seven --

11          A.   Okay.

12          Q.   -- do you see the -- the

13     paragraph in the middle of the page?

14          A.   Yes.

15          Q.   Are those the damages you're

16     seeking in this case?

17          A.   Yes.

18          Q.   And what is the basis for

19     those damages?

20               MS. FISHER:  Objection.

21   BY MR. GUILFOYLE:

22          Q.   You can answer.

23          A.   The basis for those damages, I

24     mean, the -- I'm not sure I know how to

25     answer that question.  I don't know if I
```

Haran vs                                                           Patricia Haran
Orange Business Services Inc.                                      April 26, 2023

117

1                   P. HARAN

2    really understand it.

3        Q.   Sure.  Why do you believe

4    you're entitled to the damages

5    identified here?

6        A.   Well, I believe that.

7             MS. FISHER:  Objection.

8        A.   I believe that I took time off

9    to care for my daughter and my mother,

10   and that that was, you know, held

11   against me; and that it should have been

12   categorized as, you know, FMLA time and

13   it was not; and then, you know, I was

14   terminated.

15             So, you know, it caused me,

16   you know, emotional distress during that

17   time and I -- I don't want to answer too

18   far in advance, but, I mean, that's what

19   all of these damages are associated

20   with, are the repercussions of that --

21   of that situation.

22       Q.   Are you seeking any money more

23   lost pay?

24       A.   I believe so.

25       Q.   And how much you seeking in

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                              April 26, 2023

118

```
 1              P. HARAN

 2   lost pay?

 3       A.   I would have to look through

 4   the documents.  I don't recall off the

 5   top of my head exactly how much of it is

 6   that.

 7       Q.   What documents are you

 8   referring to?

 9       A.   I'm assuming that -- the

10   documents that were filed would have

11   maybe had that in there.  I don't know

12   if they are.

13       Q.   Have you done any calculations

14   as to what you believe you're entitled

15   to for purposes of backpay?

16       A.   I had discussed it with my

17   lawyer, so.

18       Q.   I'm not asking -- I just don't

19   want to make sure that we don't get into

20   any conversations you had your attorney?

21       A.   Okay.

22       Q.   Other than that, did you take

23   any other steps to calculate your

24   backpay?

25       A.   No.
```

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 336 of 479
Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

119

P. HARAN

1

2      Q.   And are you claiming any

3   emotional distress damages in this

4   lawsuit?

5      A.   Yes.

6      Q.   And could you describe the

7   nature of your emotional distress?

8      A.   Sure.  So, I mean, I was in --

9   I've been in therapy for -- I was in

10  therapy of a total of almost two years.

11  And this is, you know, there were many

12  things that I worked through during, you

13  know, therapy related to anxiety and

14  stress and how to manage those things

15  and how -- how I dealt with them during

16  this time, you know, and how it had such

17  an impact on me.  You know, the stress

18  at work and, you know, the -- the

19  treatment that I was receiving and, you

20  know, just how -- how to manage that

21  stress and anxiety.

22          It impacted my

23  self-confidence, you know, it was

24  something that I tried to work on with

25  my therapist as far as trying to regain

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 337 of 479
Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

120

1              P. HARAN

2    my confidence, you know.  I felt like a

3    failure, you know, after this happened,

4    you know, the termination, and I had --

5    I had a preexisting condition with my

6    sinuses and that condition is worsened

7    by the tress and anxiety.  So that

8    caused me more, you know, dealing with

9    that from -- with my ENT to try to work

10   through some of, you know, what I could

11   do to manage that, you know, because the

12   stress impacts inflammation, which

13   impacts the sinus issue and makes it

14   worse.

15            So I mean, there's -- I had

16   lost sleep, insomnia, situations around

17   dealing with the, you know, the --

18   trying to, you know, manage through the

19   situation, you know, with Adam and, you

20   know, with that stonewalling and kind of

21   contempt that I was getting from him,

22   and, you know, how to kind of regain my

23   confidence back again.

24            I mean, going into my new job,

25   you know, I continued to talk to the

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 338 of 479
Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                    April 26, 2023

121

1                      P. HARAN

2    therapist, because I felt like I was

3    hyper aware of, you know, of how do I

4    regain trust, you know, for my -- for my

5    manager, for my coworkers, for, you

6    know, just feeling like I was not going

7    to be subject to poor treatment.

8         Q.   And when did you start seeing

9    this therapist?

10        A.   I don't recall the exact dates

11   without looking at the details, but I

12   believe, you know, the records are on

13   file with the court of, you know, when I

14   saw that therapist.

15        Q.   And it was after you were

16   terminated from the Orange, correct?

17        A.   Correct.

18        Q.   You had mentioned insomnia.

19   Were you diagnosed by a medical

20   professional with insomnia?

21        A.   No.

22        Q.   Did you have any other

23   physical manifestations of this

24   emotional distress other than that sinus

25   issue that you referred to?

Haran vs                                                                    Patricia Haran
Orange Business Services Inc.                                               April 26, 2023

                                                                                    122

1                            P. HARAN

2          A.   No.

3          Q.   Do you know when you stopped

4     going to this therapist?

5          A.   I don't recall the exact date.

6     It would have been within the HIPAA

7     release documents, I believe.

8          Q.   Would September of last year,

9     2022, sound about right?

10         A.   Yeah.

11         Q.   And that therapist was

12    Ms. Fernandez?

13         A.   Yes.

14         Q.   Anyone else?

15         A.   No.

16         Q.   And what was the nature of the

17    treatment you sought with Ms. Fernandez?

18         A.   It was therapy sessions.

19         Q.   Talk therapy?

20         A.   Yes.

21         Q.   And how often were you meeting

22    with her?

23         A.   Again, I would defer to the

24    records that I -- you know, that HIPAA

25    release records that I signed that show

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 340 of 479
Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

123

1              P. HARAN

2      all of them, but I would say roughly it

3      was like -- it went from weekly, every

4      other weekly, you know, type of cadence,

5      depending on availability and

6      everything.

7          Q.   And did it ever get to

8      monthly?

9          A.   Yes, I believe so at some

10     point.

11         Q.   And did Ms. Fernandez

12     diagnosis you with anything?

13         A.   Not that I know of.  I don't

14     know whether a therapist can diagnose

15     somebody or not.  I don't know what

16     they're -- if they're not like a medical

17     doctor.  Can they diagnosis?  I don't

18     know.

19         Q.   Do you recall reporting to

20     Ms. Fernandez that as early as April 20,

21     2021, that you were doing well?

22         A.   Yeah, I mean, you know, as far

23     as the conversation, you know, every

24     conversation when somebody asks me how

25     I'm doing, I start off and say I'm doing

Haran vs                                                                Patricia Haran
Orange Business Services Inc.                                           April 26, 2023

                                                                              124
1              P. HARAN

2    well.  And then we spend an hour talking

3    about everything.

4         Q.   Were you prescribed any

5    medication?

6         A.   Not -- no, not by the

7    therapist.

8         Q.   By anyone else relating to the

9    damages you're claiming in this case?

10        A.   You know, the ENT, you know, I

11   was seeing you know that.  So I was

12   on -- taking different types of

13   anti-inflammatory type options to manage

14   that situation.

15        Q.   Do you recall what those

16   medications were?

17        A.   I would defer to the

18   documents, you know, I don't want to

19   misquote the names of things and all

20   that, you know.  It would be all in

21   the -- in the release documents.

22        Q.   To the best of your

23   recollection what were the medications

24   you were prescribed by this ENT?

25        A.   I was prescribed steroids as I

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

125

1              P. HARAN

2    think I said.  Did I say that?  I

3    think -- and I was also working through

4    getting Dupixent which is another type

5    of anti-inflammatory medication.

6         Q.   Are you still taking those

7    medications?

8         A.   No.

9         Q.   How long did you take those

10   medications for?

11        A.   Well, I mean steroids you

12   can't take for very long, you know, so,

13   but the Dupixent was a longer term.  I

14   would have to, again, defer to the

15   records.

16        Q.   Do you know when you started

17   first taking the Dupixent?

18        A.   I don't recall the date.

19        Q.   Do you have any previous

20   history of mental or emotional stress?

21        A.   No.

22        Q.   Do you have any -- did you

23   have any other stressors in your life

24   following your separation from Orange?

25        A.   Well, finding a new job.  I

Haran vs                                                      Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

126

```
 1              P. HARAN

 2   mean.

 3        Q.   Were there any illnesses in

 4   your family that were added stressors in

 5   your life?

 6        A.   Nothing new.

 7        Q.   Any deaths in your family?

 8        A.   No.

 9        Q.   Any financial hardships?

10        A.   No.

11        Q.   Any loss of friendships?

12        A.   No.

13        Q.   Any stress as a result of from

14   your current job?

15        A.   No.

16        Q.   So if your therapist recorded

17   that you expressed stress and anxiety as

18   a result of your job at T-Mobile, that

19   would be incorrect?

20        A.   So, this is going back to the

21   conversation -- that would not be

22   incorrect, no, to answer your question.

23   And the -- but it's -- it was related to

24   the confidence and working through, you

25   know, the trust and the, you know,
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 344 of 479
Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

127

1              P. HARAN

2    getting back to my -- that

3    self-confidence issue that -- stemming.

4    So that was you know self-induced

5    stress, I'll call it.

6         Q.   And that was in connection

7    with how you were dealing with your new

8    job?

9         A.   Yes.

10        Q.   Other than what we've seen

11   here in the Complaint, are you claiming

12   any other damages?

13        A.   Not outside of what's in the

14   Complaint.

15        Q.   If we could turn back to

16   Exhibit 7, your Interrogatory Responses,

17   please?  Interrogatory Number 17.

18        A.   Interrogatory where?

19        Q.   Towards the end.

20   Interrogatory Number 17 asks you to

21   identify all the individuals, employees

22   or agents affiliated with defendant's

23   clients with whom you have

24   communicated --

25        A.   Mh-hm.

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 345 of 479

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

128

```
 1                      P. HARAN

 2        Q.   Strike that.  I apologize.

 3   Could we turn to Interrogatory Number

 4   18.

 5             And this asks you to identify

 6   individuals and documents relating to

 7   the damages in this matter; do you see

 8   that?

 9        A.   Yes.  Well, yes, mh-hm.

10        Q.   And you identify your family

11   members and Cassandra Fernandez?

12        A.   Yes.

13        Q.   Is that answer accurate?

14        A.   Yes.

15        Q.   And earlier when we started

16   you had mentioned that you reviewed a

17   timeline you created in preparation for

18   your deposition; do you recall that?

19        A.   Yes.

20        Q.   I'm going to request

21   production of that timeline?

22             MS. FISHER:  It's a timeline

23   that she did for me, so it's privileged

24   communication.

25             MR. GUILFOYLE:  Okay.
```

Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

```
                                                                129
 1                        P. HARAN

 2                  MS. FISHER:  It was an

 3       exchange of correspondence between the two

 4       of us.

 5                  MR. GUILFOYLE:  She referred

 6       to a timeline that she reviewed in

 7       preparation for this.

 8                  MS. FISHER:  That was a

 9       correspondence.  So we won't be returning

10       that over.

11                  MR. GUILFOYLE:  I'll make a

12       request in writing.

13                  MS. FISHER:  Okay.

14                  MR. GUILFOYLE:  Put it on the

15       privilege log.

16         (Request for production.)

17                  MS. FISHER:  Okay.

18                  MR. GUILFOYLE:  I think this

19       is a good time for lunch.

20                  MS. FISHER:  Sure.

21         (Whereupon, a short recess was taken.)

22    BY MR. GUILFOYLE:

23            Q.   Ms. Haran, you understand

24         you're still under oath, correct?

25            A.   Yes.
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

130

1                    P. HARAN

2        Q.   Did there come a time after

3    your termination from Orange that you

4    started looking for another job?

5        A.   After my termination from

6    Orange, you said?

7        Q.   Yes.

8        A.   Yes.

9        Q.   And when did you start looking

10   for a new job?

11       A.   I started looking immediately.

12       Q.   What types of jobs did you

13   look for?

14       A.   Sales jobs in technology.

15       Q.   How did you search for jobs?

16       A.   I used LinkedIn.  I had

17   several recruiters that had called me,

18   that I knew from previous -- you know,

19   that I just knew from the industry and

20   friends, yeah.  Primarily company

21   websites that I was interested in maybe

22   looking at -- working for them?

23       Q.   What was the geographic scope

24   of your job search?

25       A.   Primarily jobs where either I

Haran vs                                                     Patricia Haran
Orange Business Services Inc.                                April 26, 2023

131

1              P. HARAN

2    could work in here, in the New York

3    metro area or, you know, work remotely,

4    yeah.  But no, I wasn't really looking

5    to relocate, if that's what you're

6    asking.

7         Q.   That's fair.  I know you

8    mentioned that online MBA program at

9    Purdue; do you recall when you started

10   that program?

11        A.   September of 2022.

12        Q.   Did you seek any additional

13   training or education after your

14   separation from Orange?

15        A.   No.

16        Q.   Was there a certain salary

17   that you were looking for when you were

18   applying for jobs?

19        A.   Yes, I was looking to at least

20   match the salary that I had at Orange.

21        Q.   What do you recall that salary

22   being?

23        A.   I believe that it was -- I

24   don't recall exactly what it was.  I

25   could guess, but I don't know.

Case: 24-2312, 12/11/2024, DktEntry: 33.1, Page 66 of 259
**JA652**

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 349 of 479
Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

132

1              P. HARAN

2       Q.    I don't want you to guess,

3   if -- do you have any estimate as to

4   generally?

5       A.    So probably -- I mean the base

6   salary was somewhere in the -- maybe

7   128,000-dollar range, total

8   compensation.  So I was looking at

9   comparable, you know, both the base and

10  the total compensation.

11      Q.    Do you recall what your total

12  compensation was at Orange for the

13  last --

14      A.    Maybe 200K.

15      Q.    And do you have any job

16  interviews as a result of your search

17  efforts?

18      A.    Yes.

19      Q.    Where were those interviews?

20  With -- Strike that.

21            With whom were those

22  interviews?

23      A.    Like with people or the

24  companies?

25      Q.    The company, representatives

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 350 of 479
Haran vs                                                                    Patricia Haran
Orange Business Services Inc.                                               April 26, 2023

133

```
1                    P. HARAN

2    of the company.

3         A.   The names of the

4    representatives?

5         Q.   The names of the companies.

6         A.   The names of the companies.  I

7    don't remember all of them.  It was a

8    flurry, so I don't want to -- I could

9    name obviously T-Mobile, where I wound

10   up working, was one of them.  But there

11   were -- I mean, I did a whole bunch.  It

12   was like a job.  I was trying to manage

13   a bunch.

14          So for -- Verizon I talked to

15   for sure.  I remember that, but I'm sure

16   that there's some that I'm missing

17   because I was entertaining all kinds of

18   conversations at that point.

19          I believe -- I don't know,

20   I -- I would have to go back through my

21   records, you know, of who else it was

22   that I -- I think I had an interview

23   with maybe, I don't know, IBM.  I was

24   looking at them at one point, or

25   Kyndryl, which is the spin off there.
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 351 of 479
Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                  April 26, 2023

134

1               P. HARAN

2       Q.   Sitting here today, do you

3   have any specific recollection of other

4   interviews?

5       A.   Not -- you know, again, there

6   were others, but I'm just not

7   remembering exactly everyone that I

8   talked to at that time.

9       Q.   As a result of those job

10  interviews, were any job offers extended

11  to you?

12      A.   Yes.

13      Q.   And who made the -- what

14  companies extend the job offer to you?

15      A.   T-Mobile.

16      Q.   Anyone else?

17      A.   Verizon.

18      Q.   Anyone else?

19      A.   No.

20      Q.   Do you have records verifying

21  your job search after your separation

22  from Orange?

23      A.   I mean, as far as like what

24  kind of records, like?

25      Q.   Job applications?

Case 1:21-cv-10585-DEH-JW     Document 72     Filed 03/26/24     Page 352 of 479
Haran vs                                                                        Patricia Haran
Orange Business Services Inc.                                                    April 26, 2023

135

```
1                    P. HARAN

2        A.   Emails.

3   (Simultaneous speaking.)

4        A.   Yeah, yeah.

5        Q.   Emails.  Okay.  And do you

6   know if you produced all of those

7   documents as part of this litigation?

8        A.   I do remember producing some

9   of them and sending some of them to my

10  lawyer.  It's been a while, but I do

11  remember the ones that I had record of.

12  Some of them were different

13  conversations and things, but yeah, I do

14  recall submitting those -- those

15  documents to -- as part of the discovery

16  process.

17       Q.   Okay.  You used the word some.

18  Are there certain documents relating to

19  your job search efforts that you didn't

20  produce?

21       A.   No, no.  I'm just saying that

22  some of those were different

23  conversations and things so I don't --

24  but, yeah, no, there were -- you know,

25  like I said texts or wherever, but those
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

                                                                          136

```
1                      P. HARAN

2    for the most part texts were -- well,

3    not texts.  I mean, it would be

4    different conversations that I had about

5    potential jobs.

6         Q.   Were those conversations in

7    writing?

8         A.   No, I mean, I think I

9    submitted everything that I had to

10   submit at the time, you know, that

11   was -- that I had a record of.

12        Q.   Do you still have a copy of

13   all of those records?

14        A.   I would imagine so.  I haven't

15   looked, you know, lately.  I don't know

16   whether or not there's things, you know,

17   whatever, that go into archive or

18   whatever.  I don't know, because it's

19   old.  Some of this is, you know, two

20   years ago now.

21        Q.   Fair enough.  And do you have

22   any handwritten notes regarding your job

23   search efforts?

24        A.   No.

25        Q.   Have you held any jobs since
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 354 of 479
Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

137

1           P. HARAN

2  your separation from Orange?

3       A.   Yes.

4       Q.   What's the name of that

5  employer?

6       A.   T-Mobile.

7       Q.   And what's your position at

8  T-Mobile?

9       A.   Client partner executive.

10       Q.   And what are your job duties

11  as a client partner executive?

12       A.   I'm responsible for sales

13  quota and selling to business customers,

14  selling our -- to -- T-Mobile's products

15  and services to business customers, I --

16  that I have.

17       Q.   And what types of products and

18  services of T-Mobile's are you selling

19  to businesses?

20       A.   So I'm selling cellular plans,

21  phone plans and connected, like, data

22  plans for laptops.  And I'm selling IOT

23  services, Internet of Things, anything

24  that takes a SIM card and has a cellular

25  connection essentially.  So yeah, that

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 355 of 479
Haran vs                                                       Patricia Haran
Orange Business Services Inc.                                 April 26, 2023

138

1             P. HARAN

2    includes all sorts of devices, including

3    phones and tablets.  And I'm also -- we

4    also have a fixed wireless service,

5    which is like an Internet service that

6    works.  But, yeah it's pretty much all

7    cellular-related, you know,

8    technologies.

9         Q.   When did you obtain that job

10   at T-Mobile?

11        A.   When?

12        Q.   Yes.

13        A.   I believe I started April 4th,

14   I think it was, 2021, but I'm not

15   hundred percent sure.

16        Q.   Okay.  And the termination

17   date at Orange was February 24, 2021?

18        A.   I believe so.

19        Q.   And what's your current salary

20   at T-Mobile?

21        A.   I believe I submitted that

22   with the discovery documents.  I want to

23   say that I believe it's like 150, off

24   the top of my head.  I'd have to look at

25   my records, but -- for the records that

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

                                                                    139

 1                    P. HARAN

 2    were submitted, but I think it was like

 3    150.

 4         Q.   Do you receive any commissions

 5    or other compensations?

 6         A.   Yes.  Yeah.

 7         Q.   And what do you receive?

 8         A.   Well, it depends on what I

 9    sell, but.

10         Q.   What forms of compensation,

11    other than the salary, so like

12    commissions and things like that?

13         A.   Yeah, commission.  I mean,

14    depending on what I sell, commission

15    would vary, right?  And then I have -- I

16    don't actually have health insurance

17    through them.  I have that through like

18    my husband's plan, so I have some -- I

19    have like a stock option purchase plan,

20    but it's like I'm paying for it and

21    things.  So I don't know if that counts

22    or not because it's just discounted.  I

23    don't know.  I'm not sure what else I'm

24    missing.

25         Q.   Are you eligible for any sort

Haran vs                                                                    Patricia Haran
Orange Business Services Inc.                                               April 26, 2023

140

```
1                      P. HARAN

2     of bonuses at T-Mobile?

3          A.   No.

4          Q.   Okay.  And how did you find

5     this job at T-Mobile?

6          A.   A recruiter.

7          Q.   Is that recruiter with a

8     company?

9          A.   He, I think, ran his own --

10    his own firm.  I don't know that he had

11    a company name, that I am aware of.

12         Q.   Are you still employed with

13    T-Mobile?

14         A.   Yes.

15         Q.   Did you receive a W-2 for the

16    tax year 2021 from T-Mobile?

17         A.   Yes.

18         Q.   I'm just going no call

19    production of the 2020 -- strike that.

20              Did you receive a W-2 for 2022

21    from T-Mobile?

22         A.   Yeah.

23              MR. GUILFOYLE:  I'll call for

24    production of the 2022 W-2.

25              MS. FISHER:  Are you going to
```

Haran vs                                                          Patricia Haran
Orange Business Services Inc.                                     April 26, 2023

```
                                                            141
 1                       P. HARAN

 2      put it in writing?

 3                  MR. GUILFOYLE:  I could follow

 4      up in writing.

 5                  MS. FISHER:  Okay.

 6                  MR. GUILFOYLE:  That's fine.

 7         (Request for production.)

 8   BY MR. GUILFOYLE:

 9           Q.   After your separation from

10      Orange, did you receive any sort of

11      state benefits such as unemployment

12      benefits?

13           A.   Yes.

14           Q.   Anything else other than

15      unemployment benefits?

16           A.   No.

17           Q.   Okay.  And do you know how

18      much the amount of those unemployment

19      benefits were?

20           A.   I don't recall.

21           Q.   Do you recall when you started

22      receiving those unemployment benefits?

23           A.   It was some time after my

24      termination and I think there's like --

25      I don't know if there's a week gap.  I
```

142

```
 1                      P. HARAN

 2        don't recall the laws of New York State

 3        with unemployment, but whatever I was

 4        entitled to, I applied for and received.

 5             Q.   And did those benefits cease

 6        when you started working at T-Mobile?

 7             A.   Yes.

 8                 MR. GUILFOYLE:  I'll call for

 9      production of any documents relating to

10      New York State Unemployment Insurance

11      benefits.  And I'll follow up in writing.

12        (Request for production.)

13  BY MR. GUILFOYLE:

14             Q.   Did there come a time after

15        you were notified of your termination

16        that you sought to regain access to your

17        Orange account in the Orange system?

18             A.   Orange account, what do you

19        mean?

20             Q.   Your email account?

21             A.   My email account, yes.

22             Q.   Okay.  So let me show you a

23        document.

24             A.   Did you say after --

25             Q.   There's no question pending.
```

Haran vs                                                                          Patricia Haran
Orange Business Services Inc.                                                     April 26, 2023

143

                             P. HARAN

1

2        (Whereupon,  Bates  OBS910  -  911   was

3        marked as Exhibit 14  for  identification,

4        as of April 26th, 2023.)

5                    MR. GUILFOYLE:  For the

6     record, this is a document bearing OBS910

7     through 911.

8          Q.   Ms. Haran, I ask that you take

9       a look at this document, and let me know

10      when you've had the opportunity to do

11      so.

12         A.   Okay.

13         Q.   Do you recognize this

14      document?

15         A.   No.  I mean, I see what it is,

16      but it's not something I've seen before.

17         Q.   Do you see the sender here and

18      the from line of the email is

19      IThelpdesk@Orange.com; is that correct?

20         A.   Yes.

21         Q.   And what date was this sent?

22         A.   It says 2/24/2021.

23         Q.   Who was this email sent to?

24         A.   Looks like my Orange email

25      address Patty Haran@orange.  I think.

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

144

1              P. HARAN

2      Q.   So did you contact IT at

3  Orange to unlock your email account

4  after you had been terminated?

5      A.   On the 24th, yeah, the day of,

6  I did.

7      Q.   So after being notified of

8  your termination?

9      A.   Yes.

10      Q.   And why did you do that?

11      A.   Well, I wanted to get the

12  access back into my computer.

13      Q.   And why did you want to get

14  access back into your computer?

15      A.   So, I wanted to obtain

16  documents that I hadn't had a chance to

17  obtain.

18      Q.   Okay.  What are those

19  documents that you wanted to obtain?

20      A.   So, I wanted to get copies of

21  documents that I needed to ensure that I

22  was going to get paid commission on

23  things that were -- that I was eligible

24  to be paid commission on, and so I

25  pulled -- I went in and wanted to pull

Haran vs                                                            Patricia Haran
Orange Business Services Inc.                                        April 26, 2023

145

```
 1                    P. HARAN

 2    those documents.  And I also wanted to

 3    communicate any -- any documents that I

 4    might have needed for transition

 5    activities that were still underway with

 6    the accounts that I was transitioning to

 7    the people who were, you know, still

 8    with the company.

 9        Q.   Do you recall any specific

10    documents that you sent to yourself?

11        A.   I would have to refer -- I

12    know I've provided that information.  I

13    don't recall.  I would have to see the

14    documents that I already provided that

15    information on.

16        Q.   You mentioned that --

17    (Simultaneous speaking.)

18        A.   I --

19        Q.   Go ahead I apologize.

20        A.   No, no, go ahead.

21        Q.   You mentioned that one of the

22    purposes that you wanted to have

23    information and the documents regarding

24    the transition of matters after you left

25    Orange; is that correct?
```

Case 1:21-cv-10585-DEH-JW   Document 72   Filed 03/26/24   Page 363 of 479
Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

146

|    |                                                    |
|----|----------------------------------------------------|
| 1  | P. HARAN                                           |
| 2  | A.   The transition of matters?                    |
| 3  | You mean --                                         |
| 4  | Q.   Like accounts?                                |
| 5  | A.   Yes.                                           |
| 6  | Q.   Okay.  And -- but at that time                |
| 7  | you had already been notified of your              |
| 8  | termination, correct?                              |
| 9  | A.   Yes.                                           |
| 10 | Q.   Okay.  And is it your belief                  |
| 11 | that you were still providing services             |
| 12 | for Orange at that time?                           |
| 13 | A.   I was transitioning with the                  |
| 14 | teams that I had been working with that            |
| 15 | were -- that I was working on deals that           |
| 16 | were part of -- so it was a teaming                |
| 17 | effort, right, with other people.  And             |
| 18 | so I was doing activities towards the              |
| 19 | sales effort, and then the people who              |
| 20 | were still going to be working on those            |
| 21 | accounts needed to -- they were looking            |
| 22 | to get the transition activity so that             |
| 23 | they could pick up where I was leaving             |
| 24 | off.  It was a transition.                         |
| 25 | Q.   Did anyone instruct you to                    |

Haran vs                                                                    Patricia Haran
Orange Business Services Inc.                                               April 26, 2023

147

```
 1                          P. HARAN

 2         take those actions with respect to

 3         transitioning accounts?

 4              A.   Say the question again.

 5              Q.   Did anyone instruct you?

 6              A.   Um --

 7              Q.   To take those actions with

 8         respect to transitioning?

 9              A.   No.

10              Q.   Okay.  All right.  Just give

11         me two minutes.  I'm just going to get

12         those emails.

13         (Whereupon, a short recess was taken.)

14    BY MR. GUILFOYLE:

15              Q.   Okay.  I'm going to show you

16         what we've marked as Haran 14.

17                   MS. FISHER:  That will be 15.

18                   MR. GUILFOYLE:  Fifteen, all

19         right.

20         (Whereupon,  Bates  OBS821  -  919   was

21         marked as Exhibit 15  for  identification,

22         as of April 26th, 2023.)

23                   MR. GUILFOYLE:  And for the

24         record it's a multiple-page document

25         bearing Bates OBS821 through 919.
```

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 365 of 479
Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

148

```
1              P. HARAN

2        Q.   Ms. Haran, I ask that you take

3   some time and review the emails within

4   this document and let me know when you

5   had the opportunity to do so.

6        A.   Okay.  There's a lot in here.

7   I don't --

8        Q.   That's fine, if you could just

9   take the time and review them all.

10       A.   Are these all documents that

11  we provided to you or are these a

12  mixture of documents that you all have

13  pulled from the email?

14       Q.   I can't answer your questions,

15  unfortunately, so if you could just take

16  a look and familiarize yourself with

17  them and then I could ask you a few

18  questions?

19       A.   Okay.  Okay.  I think I'm okay

20  to go on here.

21       Q.   Have you ever had the

22  opportunity to review those emails?

23       A.   Briefly.  At a high level,

24  yeah.

25       Q.   Do you recognize those emails?
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

149

```
 1                    P. HARAN

 2         A.   Some of them, yes.

 3         Q.   What do you recognize these

 4    emails to be?

 5         A.   Emails, looks like, that I

 6    wrote.

 7         Q.   Are these all emails that you

 8    had forwarded from your Orange email

 9    account to your personal Gmail account?

10         A.   I don't know if they're all

11    that, it looks like some of them are.

12         Q.   If you could bring my

13    attention to any of that or not.

14         A.   Oh.  Okay.  It looks like they

15    all are.

16         Q.   Have you communicated with any

17    of the companies that are identified in

18    these emails, following your separation

19    from Orange?

20         A.   No.

21         Q.   Have you communicated with any

22    individuals that are identified in these

23    emails, following your separation from

24    Orange?

25         A.   Yeah, I -- just in following
```

Haran vs                                                              Patricia Haran
Orange Business Services Inc.                                         April 26, 2023

150

1                    P. HARAN

2    up to let them know that I left.  So, I

3    sent some notes to say, Capgemini, to

4    say that I had moved on and that I

5    enjoyed working with them.

6        Q.    Any other companies that

7    you've sent notes to?

8        A.    I believe it was Capgemini.

9    Possible -- I don't recall if I sent

10   them to somebody at Moody's or not.  I

11   don't know if that's in here, that I

12   missed, but I'm pretty sure it was

13   Capgemini primarily.  I believe that was

14   it.

15       Q.    You produced all of those

16   communications as part of this

17   litigation?

18       A.    Yes.

19       Q.    There's nothing you have

20   regarding communications with former

21   Orange employees that you have not

22   produced in this litigation?

23       A.    No.

24       Q.    You mentioned before that

25   you're currently a client partner

Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

151

```
1                    P. HARAN

2    executive at T-Mobile; is that correct?

3         A.   Yes.

4         Q.   How are your job duties in

5    that role at T-Mobile different than

6    your job responsibilities were at Orange

7    when you separated?

8         A.   Well, different accounts and

9    different solution set.

10        Q.   When you say solution set what

11   does that mean?

12        A.   That means the things that I

13   was able to sell were different between

14   T-Mobile and Orange.

15        Q.   So like products and services?

16        A.   Correct.

17        Q.   When you say different

18   accounts, what accounts are you

19   currently working with at T-Mobile?

20        A.   So, as of now, I'm working on

21   three accounts, and they are Bank of New

22   York Mellon, Morgan Stanley and Wells

23   Fargo.

24        Q.   Have you worked with any

25   other --
```

Haran vs                                                    Patricia Haran
Orange Business Services Inc.                               April 26, 2023

                                                                152
 1                      P. HARAN

 2              MS. FISHER:  Sorry.  I just

 3      want to designate this part of this

 4      transcript as confidential.

 5              MR. GUILFOYLE:  That's fine.

 6          Q.   And have you worked with any

 7      other accounts with T-Mobile other than

 8      the three you just identified?

 9          A.   Yes.

10          Q.   And what are those other

11      accounts?

12          A.   I worked on Samsung.  I worked

13      on American Express, Credit Suisse.  I'm

14      trying to think if there's another one

15      I'm missing.  Nope, that was it.  That's

16      all of them.

17          Q.   How is your current job at

18      T-Mobile similar to what you were doing

19      at Orange?

20          A.   Just responsible for sales.

21          Q.   And do you have targets and

22      quotas to meet at T-Mobile?

23          A.   Yes.

24          Q.   Are you aware of Orange's

25      counterclaims against you in this

153

                              P. HARAN

1

2        lawsuit?

3              A.   Yes.

4              Q.   Have you reached out to any

5        former or current Orange clients or

6        accounts to see if they'd be interested

7        in utilizing T-Mobile services?

8              A.   Not to my knowledge.  I mean,

9        I don't know whether or not some

10       customers might have been about an

11       Orange account or not, but not to my

12       knowledge.

13             Q.   Have you reached out to any

14       Orange clients or accounts to which you

15       were responsible for?

16             A.   No.

17             Q.   Okay.  Give me five minutes

18       and I think I'll be able to wrap up?

19                  MR. GUILFOYLE:  Off the

20     record.

21       (Whereupon,  a  discussion  was  held  off

22       the record.)

23   BY MR. GUILFOYLE:

24             Q.   Ms. Haran, do you understand

25       you're still under oath?

Haran vs                                                        Patricia Haran
Orange Business Services Inc.                                   April 26, 2023

154

1                        P. HARAN

2        A.   Yes.

3        Q.   I apologize.

4        A.   Okay.

5        Q.   And you mentioned a recruiter

6   before that you used to get the T-Mobile

7   job; do you recall that testimony?

8        A.   Yes.

9        Q.   Okay.  What is his name?

10       A.   I -- I'm -- his name was --

11  I'm probably pronouncing it wrong, I

12  think it was, like, Shaman Lesterson or

13  something.  I don't know, though.

14       Q.   What was that last name you

15  believe?

16       A.   Lesterson or something.

17       Q.   And did you --

18       A.   I don't know though.  I'm

19  trying to remember and I probably should

20  just say I don't know.

21       Q.   Sure.

22       A.   I think his first name

23  something like Shaman.

24       Q.   And did you have an engagement

25  letter or contract with this recruiter?

Haran vs                                          Patricia Haran
Orange Business Services Inc.                      April 26, 2023

155

1                    P. HARAN

2          A.   No.

3          Q.   Did you correspond with this

4     recruiter at all?

5          A.   It was phone calls primarily.

6     I mean, I sent him a copy of my resume,

7     I'm sure.

8          Q.   Did you email with him at all

9     other than sending him your resume?

10          A.   No, it was pretty much all

11     over the phone.

12          Q.   Okay.

13              MR. GUILFOYLE:  We're just

14     going to call for production of documents

15     relating to Plaintiff's search efforts in

16     connection with this recruiter Shaman.

17     We'll follow up in writing.

18       (Request for production.)

19              MR. GUILFOYLE:  Nothing

20     further.

21

22

23

24

25

Haran vs                                                                 Patricia Haran
Orange Business Services Inc.                                            April 26, 2023

156

```
1                          P. HARAN

2                MS. FISHER:  Okay.  Great.

3                THE COURT REPORTER:  Are you

4    ordering a copy?

5                MS. FISHER:  Yes.

6

7                      -o0o-

8      (Whereupon, the  examination  of  PATRICIA

9      HARAN was concluded at 2:08 p.m.)

10

11

12                 _____

13                    PATRICIA HARAN

14

15

16

17

18

19

20

21

22

23

24

25
```

Haran vs                                                                Patricia Haran
Orange Business Services Inc.                                           April 26, 2023

157

```
1              C E R T I F I C A T E

2              I, AMBRIA IANAZZI, a Registered

3   Professional Reporter, Certified Realtime

4   Reporter, New York Association Certified Reporter,

5   New York Realtime Certified Reporter, Certified

6   Shorthand Reporter and Notary Public in New York

7   do hereby certify:

8              That PATRICIA HARAN whose

9   examination is hereinbefore set forth, was duly

10  sworn, and that such examination is a true record

11  of the testimony given by PATRICIA HARAN.

12              I further certify that I am not

13  related to any of the parties to this action by

14  blood or marriage; and that I am in no way

15  interested in the outcome of this matter.

16

17       In  witness  whereof,  I   have    hereunto   set

18  my hand this 2nd day of May, 2023.

19

20

21  _____

22        AMBRIA IANAZZI, RPR, CRR, CSR

23

24

25
```

**-**

**-o0o-** 156:7

**0**

**0** 8:2,9

**1**

**1** 25:9 71:24 72:12
**10** 32:14 60:8,10 65:19 92:15 95:6
**11** 23:18 25:12,25 28:21 65:3,7
109:19
**11741** 9:9
**12** 69:3,5 71:10
**128,000-dollar** 132:7
**12th** 109:21
**13** 28:10 107:10,12
**14** 143:3 147:16
**14th** 109:16
**15** 108:24 109:4,7 147:17,21
**150** 138:23 139:3
**15th** 109:17
**17** 127:17,20
**18** 29:15 48:13 109:19 128:4
**18th** 48:9
**19** 17:22 109:12
**1972** 17:6
**1990** 18:9
**1994** 18:15 19:18
**1995** 21:2
**1997** 21:2,24
**1999** 16:16
**19th** 109:17

**2**

**2** 28:4,6
**2/24/2021** 143:22
**20** 16:17 27:22 83:15 123:20

**2004** 22:4
**2005** 22:11
**2006** 22:11
**200K** 132:14
**2017** 23:18 24:15 26:2 28:22 29:15
**2019** 33:12 92:12
**2020** 27:23 31:15 32:25 33:10,19
34:12,18,22 48:13 55:4,9 74:25
82:23,25 83:2,6,11,15,20 86:12 91:14
103:18 108:2 140:19
**2021** 38:19 54:2 55:12,15 65:19
89:15 123:21 138:14,17 140:16
**2022** 122:9 131:11 140:20,24
**2023** 25:10 28:7 29:4 30:24 35:20
44:5 45:5 52:18 56:20 60:11 65:8
69:6 107:13 143:4 147:22
**24** 12:14 54:2 138:17
**24th** 57:15 67:11,19,25 144:5
**26th** 25:10 28:7 29:4 30:24 35:20
44:5 45:5 52:18 56:20 60:11 65:8
69:6 107:13 143:4 147:22
**28th** 109:20
**2:08** 156:9

**3**

**3** 23:15,21 24:2 28:25 29:3
**30** 34:22 109:20
**30th** 34:17
**343** 30:22 31:3
**353** 35:18,25
**383** 56:18,23

**4**

**4** 30:21,23
**40** 48:17
**40-minute** 52:3
**4th** 138:13

**5**

**5** 25:11 35:17,19
**53** 9:8 16:12

**576** 107:11,15

**6**

**6** 44:2,4 116:7

**7**

**7** 45:2,4 52:13 71:6,8 92:15 108:21
112:12 127:16

**8**

**8** 32:14 52:15,17 110:4 112:13
**8th** 108:2

**9**

**9** 56:17,19 113:5
**90** 20:23
**911** 143:2,7
**919** 147:20,25
**927** 65:5,6
**931** 69:4,9
**94** 20:24
**95** 20:24 21:2
**97** 21:2
**98** 16:17

**A**

**A-END** 27:2,6,13 83:4 86:22
**ability** 12:16
**access** 142:16 144:12,14
**accommodation** 81:15 111:6,18,19
**account** 24:18,21 26:22 41:6,11
69:25 77:3 81:15 84:20,22 85:4,8
87:5 88:24 89:9,17,21 90:11 142:17,
18,20,21 144:3 149:9 153:11
**accounts** 26:14,20,21 27:2,6,13,14
33:13 40:25 68:8,14 77:13,17,20 78:5
80:17 83:4,8,9 85:25 86:15,22,23
87:7,22 91:2,3 97:13 145:6 146:4,21
147:3 151:8,18,21 152:7,11 153:6,14
**accurate** 44:21 71:24 109:24 110:18
112:25 113:18 128:13

# JA679

**accurately** 12:24

**achievement** 55:8

**acknowledgment** 28:15 34:17

**acquired** 22:2 23:15

**acquisition** 22:2,4 23:14,19

**action** 113:8

**actions** 147:2,7

**activities** 40:3,18 68:10,13 80:5 145:5 146:18

**activity** 146:22

**Adam** 29:19,20 30:17 31:19 32:4,11 33:22 36:12 39:7,12,18 53:19 54:3,25 55:10,18 56:6,11 59:20 66:17 68:19 77:9 79:25 80:12 85:20 87:25 93:11, 14 97:17 99:17,23 100:14 102:14 103:5 107:24 110:12 120:19

**Adam's** 95:13

**add** 89:17

**added** 74:23 126:4

**adding** 90:11,15

**additional** 72:3 73:10 83:23 131:12

**address** 9:7 16:13,24 17:2 60:22 143:25

**addresses** 16:20

**adequate** 55:11

**administered** 10:9

**advance** 43:20 101:13 117:18

**advice** 51:17

**affect** 12:15

**affected** 50:10

**affiliated** 127:22

**afraid** 115:13,18

**aftermath** 40:8

**age** 51:19

**agent** 110:7 112:17

**agents** 113:9 127:22

**Agreement** 25:21

**agreements** 25:2

**ahead** 47:5 102:17 145:19,20

**alleged** 109:12

**allowed** 12:2 48:24

**alternatives** 94:23

**amended** 52:8

**American** 152:13

**amount** 141:18

**ample** 33:15

**and/or** 92:17,20 93:22 113:7,10

**announcement** 68:20

**anti-inflammatory** 124:13 125:5

**anxiety** 119:13,21 120:7 126:17

**apartment** 17:3

**apologize** 128:2 145:19 154:3

**apologized** 50:19

**appears** 31:16 65:15,18 107:25

**applications** 134:25

**applied** 142:4

**apply** 10:20

**applying** 131:18

**appointment** 48:11

**appointments** 40:7 74:21 109:11

**approved** 49:8

**April** 25:10 28:7 29:4 30:24 35:20 44:5 45:5 52:18 56:20 60:11 65:8 69:6 107:13 123:20 138:13 143:4 147:22

**architect** 88:7,8

**archive** 136:17

**area** 131:3

**areas** 50:3

**arrange** 48:2

**asks** 72:12 109:9 110:6 113:5 123:24 127:20 128:5

**assessment** 39:24 43:9

**assigned** 34:6 38:18 89:19

**associate** 54:15

**assume** 32:2

**assuming** 118:9

**assumption** 38:21 39:24

**AT&T** 22:3

**attend** 18:16 74:2

**attention** 31:22 32:14,18 36:14 71:5 116:7 149:13

**attorney** 9:16 12:3 13:5,9,14,20 14:16 118:20

**audible** 11:4

**availability** 123:5

**avoid** 46:25

**aware** 74:4,5 75:9,13,18 76:21 77:8, 11 79:16 84:9 85:13,14 86:10 87:20, 23,24 88:4,17 89:5,14 90:5,7,8 93:21 111:15 115:19,23 121:3 140:11 152:24

**awareness** 79:6

---

**B**

**B-END** 33:13 86:22,23

**BA** 18:10

**Bachelor's** 18:3

**back** 20:24 37:13,15 48:25 52:4 59:18 71:5 85:22 97:25 103:13 108:20 112:11 120:23 126:20 127:2, 15 133:20 144:12,14

**backpay** 118:15,24

**Baker** 9:16

**balance** 22:24 43:18

**Bank** 151:21

**banter** 64:8

**base** 132:5,9

**based** 38:21 112:8

**basic** 10:25

**basis** 116:18,23

**Bates** 25:8 28:5,10 30:22 31:2 35:18 56:18,22 65:5,6 69:4,9 107:11,15 143:2 147:20,25

**bearing** 28:10 31:2 56:22 65:5 69:8 143:6 147:25

**bears** 25:11

**beginning** 83:13

**behavior** 113:8

**belief** 75:15 146:10

**believed** 37:6 82:20 92:19 93:21

**benefits** 141:11,12,15,19,22 142:5, 11

**big** 28:16 29:11

**bit** 47:8 49:10 78:14 79:20

**bits** 74:22

**Blue** 16:25 17:3

**board** 28:18

**boat** 51:20

**bones** 50:3,9

**bonuses** 140:2

**born** 17:5,8,9

**Boudreau** 59:23 66:19 76:7,11 93:2 95:5

**Boudreau's** 96:13

**break** 12:6,11 46:25

**breaks** 12:7

**briefing** 22:16

**Briefly** 148:23

**bring** 31:22 32:13,17 36:13 42:21 71:4 76:16 91:4 116:6 149:12

**bringing** 42:22 85:3 88:2 91:6,21

**Brook** 18:12

**Brookhaven** 17:9

**brought** 27:11 42:3 47:17

**build** 38:24 89:15,20

**bunch** 133:11,13

**business** 9:18 19:7,11 21:8 23:24 24:6,8 41:13 70:4,9 91:4 137:13,15

**businesses** 137:19

---

**C**

**C-A-R** 19:21

**cadence** 123:4

**calculate** 118:23

**calculations** 118:13

**call** 15:3 53:16,18 61:19 62:9 68:20 85:19,21 86:14 127:5 140:18,23 142:8 155:14

**called** 67:2 85:17 130:17

**calls** 38:15,16 63:21 90:19 94:15 95:17 96:12 104:12 155:5

**Capgemini** 85:6 150:3,8,13

**Car** 19:11,21 20:15,18

**card** 137:24

**care** 74:6 81:12 94:11 105:10 111:7 117:9

**careful** 58:21

**caregiver** 111:5

**caregiving** 59:4

**case** 38:6 45:18,24 98:20 108:5 115:21 116:16 124:9

**cases** 68:9

**Cassandra** 92:25 128:11

**categorized** 117:12

**caused** 117:15 120:8

**causing** 75:17

**cease** 142:5

**cellular** 137:20,24

**cellular-related** 138:7

**center** 22:16

**chain** 115:16

**challenge** 33:2 51:4

**challenged** 64:12

**challenges** 51:8

**chance** 144:16

**change** 26:11,13,16 82:4

**changed** 26:8,15 81:11,23 82:20,23, 25

**charity** 47:22

**chat** 60:18,19 65:16

**check** 91:18

**children** 17:15,17 22:20,24 111:23

**Christophe** 67:7 88:22

**Cirrus** 9:8 16:12

**City** 76:2,5 110:22,25

**claim** 38:7 92:17 105:6 108:5 110:20 111:13

**claiming** 119:2 124:9 127:11

**class** 49:3

**client** 22:12,19 137:9,11 150:25

**client-partner** 89:25

**clients** 86:5 127:23 153:5,14

**close** 22:21 51:9 80:3 81:6 82:2 85:16

**closed** 41:13 78:8 80:9

**closely** 84:22

**closer** 51:18

**cloud** 88:7,8,11

**coaches** 40:25

**coffee** 75:25

**coincided** 80:3

**cold** 80:22

**collaboration** 76:8

**college** 19:9 51:19

**combined** 58:23

**comment** 37:21 113:8

**commentary** 43:6 80:15 95:14 97:17

**comments** 32:19,24 36:22,25 40:23 113:23 114:2,4,8,17,23 115:3

**commission** 139:13,14 144:22,24

**commissions** 139:4,12

**common** 61:22 62:16 63:18

**communicate** 12:3 145:3

**communicated** 73:24 127:24 149:16,21

**communication** 94:17 128:24

**communications** 21:19 23:15 150:16,20

**companies** 20:4,5 132:24 133:5,6 134:14 149:17 150:6

**company** 20:17 27:7,17 31:25 43:19 70:13 100:10 130:20 132:25 133:2 140:8,11 145:8

**comparable** 132:9

**compensated** 77:18

**compensation** 132:8,10,12 139:10

**compensations** 139:5

**competing** 51:11

**complained** 92:18

**complaint** 14:7 44:14 71:15 72:4,15, 24 73:11,22 75:8 76:12 77:6 78:2,17 79:22 84:8,12 85:12 86:8 87:10,19 88:14 89:4,13 90:4 109:13 116:8 127:11,14

**complete** 113:2,20

completed 18:2 34:21 80:20

complexities 101:17

complies 34:15

computer 144:12,14

concerned 93:18

concerns 58:9

concluded 156:9

conclusions 36:22

condition 74:4 78:10 80:11 81:22
87:23 120:5,6

conditions 73:16,19

confidence 120:2,23 126:24

confidential 152:4

Confidentiality 25:20

confirmation 48:12

conjunction 86:14

connected 137:21

connection 37:8 41:17,22 42:18
43:4 75:15 114:9,20 115:4 127:6
137:25 155:16

constant 61:9 90:25

contact 144:2

contacted 96:6

contacting 61:16

contained 44:20

contempt 120:21

contend 105:7 108:6 110:23 113:9

contention 111:8

contents 32:9

contest 47:22

context 93:24

continued 120:25

contract 41:8 154:25

control 41:20

conversation 15:3 38:12 39:15 43:7
52:2 55:14 58:24 59:8 64:10,20 68:25
74:8,10 79:4 90:25 92:5 93:23 97:6,7
103:4,8 123:23,24 126:21

conversations 13:19 15:13 59:11
62:19 64:24 67:10 68:4,6,8,16 73:15
75:20,22 78:6 93:13 94:12 95:2,16,20
96:4,8,25 98:6,10,12,23 99:6,21

101:3,19,21,23 102:8 103:21 104:7,
10,19,21 105:3 118:20 133:18
135:13,23 136:4,6

copiers 19:25

copies 144:20

copy 46:16 136:12 155:6 156:4

Core 19:20

corner 32:15,16

correct 16:14 32:8,12 36:23 45:21
55:18,19,21,22 56:14 65:20 70:16
75:2 79:11 84:2 93:6 95:25 109:2
110:15 111:23 112:3 121:16,17
129:24 143:19 145:25 146:8 151:2,16

correspond 155:3

correspondence 53:7 129:3,9

counted 105:12

counterclaims 72:18,19 152:25

counts 139:21

court 9:2,6 10:7,15,22 11:5 14:9
44:15 121:13 156:3

courtesy 11:14

coverage 103:5

coworkers 121:5

create 38:20

created 31:17,19,24,25 32:6 33:12
128:17

creating 40:24

credit 100:15,17,19 152:13

current 126:14 138:19 152:17 153:5

customer 22:10 68:13

customers 20:4 137:13,15 153:10

cycle 41:4

---

**D**

damages 115:20,24 116:3,4,15,19,
23 117:4,19 119:3 124:9 127:12
128:7

Daniel 76:23

Danielle 59:23 66:21 77:2 93:3 97:4,
5 98:15

data 137:21

date 46:16 50:21 57:12,15 67:12
74:10,17 75:24 76:3 79:17 83:17

91:8,9,13 103:11,14 122:5 125:18
138:17 143:21

dated 28:21 29:14 65:19

dates 19:14 67:14,16,23,25 98:10
121:10

daughter 40:19 50:23 51:20 73:19
74:14 76:18 78:10 81:12 85:18 93:15
94:11 95:13 99:15 102:15 103:12
104:5 105:11 109:10 111:5 112:2
117:9

daughter's 37:8 40:2 41:23 42:7,19
43:5,21 48:20 49:15 73:25 74:4 75:14
76:14 77:12 79:13 80:4,10 81:21 82:5
85:14 87:23 90:7 101:11 105:22
113:24 114:5,10

day 57:18 85:17 103:12 109:9,16
144:5

day-by-day 50:15

days 43:4 105:25 106:7,10,11,15,18,
19,25 107:2,7 114:9,12,18 115:4

de 86:24

deal 100:16,20

dealing 39:25 40:2 42:6,7 49:11
101:18 120:8,17 127:7

deals 51:9 101:13 146:15

dealt 119:15

deaths 126:7

December 109:19,20

decide 18:24

decision 15:24 55:24 56:5,7,9

defendant 9:17 110:8 112:18 113:9

defendant's 25:7 72:17,18,19 113:9
127:22

defenses 72:17,19

defer 122:23 124:17 125:14

degree 18:3,14

demands 51:5

depending 123:5 139:14

depends 139:8

deposition 9:22 10:2,4 11:3,25 13:4,
18,25 14:17,23 15:14 16:3 24:9 46:19
128:18

Deraedt 60:3 66:25 84:19 93:4
101:6,25

**describe** 119:6

**designate** 152:3

**designing** 88:10

**details** 111:3 121:11

**developing** 41:10 75:12 80:16

**devices** 138:2

**DGC** 86:15 87:7

**diagnose** 123:14

**diagnosed** 74:15 121:19

**diagnosis** 40:8 49:19 50:2 74:16,20,
24 123:12,17

**difficult** 42:9 49:13 64:7 109:6

**direct** 20:3

**director** 29:22 30:2 56:10 69:25 75:4
84:4 85:8 87:6

**disagreed** 39:23

**disciplined** 20:14 21:13 22:5,25
23:25

**disclosing** 13:8

**discounted** 139:22

**discoveries** 74:20

**discovery** 135:15 138:22

**discriminated** 92:20 93:22 110:23
112:7

**discrimination** 94:6 110:9,21
111:14 112:19 115:9

**discriminatory** 113:7

**discuss** 30:14 42:2 58:4,7,9 62:2
66:12 93:9 95:4 97:3 99:10 101:5
102:10 103:23

**discussed** 13:9 14:16 66:17,18,19,
20,21,22,23,24 72:5,25 73:12 78:18,
22 79:19 93:10,12 95:23 99:12 101:7
102:13,16 104:2,22 118:16

**discussing** 91:6,21

**discussion** 14:24 52:4 97:8 153:21

**discussions** 90:14 96:14 102:19

**disease** 50:5

**disheartening** 96:23

**disparaging** 114:4,8,17,23 115:3

**distress** 117:16 119:3,7 121:24

**DNA** 64:15

**doctor** 49:2,19 50:5 76:5 106:23
107:3 123:17

**doctor's** 109:11

**document** 25:6,13,17 28:9,12,25
29:2,6 30:21 31:2,5,10,12 35:15,22
36:3 43:25 44:3,7,10,13,17,21,24
45:3,7,11,23 46:3,9 52:15,16,20,24
56:16,22 57:2,5 60:7,9,14 65:4,10,13,
14 69:8,12,17,19 99:20 107:17,22
110:5 142:23 143:6,9,14 147:24
148:4

**documenter** 28:4

**documents** 13:24 14:3,7 15:19 29:6
118:4,7,10 122:7 124:18,21 128:6
135:7,15,18 138:22 142:9 144:16,19,
21 145:2,3,10,14,23 148:10,12
155:14

**drugs** 12:14

**due** 37:7 41:7

**duly** 8:5

**Dupixent** 125:4,13,17

**duties** 137:10 151:4

---

### E

**earlier** 35:11 42:5 55:12 59:20 73:3
80:13 83:5 100:5 128:15

**early** 123:20

**early-october** 74:19

**Eddy** 56:8 73:21 110:13

**educated** 19:6

**education** 18:2 19:5 131:13

**educational** 18:17

**efficient** 52:6

**effort** 146:17,19

**efforts** 86:16 132:17 135:19 136:23
155:15

**Eighteen** 17:24

**elaborate** 40:20

**eligible** 139:25 144:23

**email** 60:22 142:20,21 143:18,23,24
144:3 148:13 149:8 155:8

**emailed** 57:17,18

**emails** 14:13 53:9 91:10,19 135:2,5
147:12 148:3,22,25 149:4,5,7,18,23

**emotional** 117:16 119:3,7 121:24
125:20

**employed** 20:21 61:13 62:6 63:2
67:19 108:18 140:12

**employee** 28:14 34:17 47:9 110:7
112:17

**employees** 65:25 66:4,15 113:10
127:21 150:21

**employer** 70:6,13 137:5

**employment** 19:14 20:10,15 21:9,
14 23:2 24:2 29:18 30:9 53:14 55:24
57:24 58:11 59:13 61:14,17 94:3
115:7

**enabled** 41:2

**end** 20:11 21:9 35:2,7,13 127:19

**engaged** 62:23

**engagement** 154:24

**engineer** 77:23 78:3 87:15,21

**enjoyed** 150:5

**ensure** 144:21

**ENT** 120:9 124:10,24

**entertaining** 133:17

**entire** 26:5 63:12

**entitled** 117:4 118:14 142:4

**environment** 51:8 96:22

**episodes** 81:21

**essentially** 21:22 23:10 137:25

**established** 49:7

**estimate** 132:3

**evaluation** 36:19 38:8 41:25

**evaluations** 30:11,14

**event** 47:22

**events** 42:8

**evidence** 52:9 100:23

**exact** 17:2 62:7 67:13,16,22,25 70:12
74:10,16 75:24 83:17 91:8,9,13
103:11,14 105:3 121:10 122:5

**examination** 9:10 156:8

**examined** 8:6

**examples** 41:15

**exchange** 69:20,21 107:23 129:3

**excuse** 16:9

**JA683**

Haran                                                                    Patricia Haran
Orange Business Services Inc.                                            April 26, 2023

**executive** 22:16 86:4 137:9,11 151:2

**exhibit** 25:9 28:6 29:3 30:23 35:19 44:4 45:4 46:18 52:8,13,17 56:19 60:10 65:7 69:5 71:6,8 92:15 107:12 108:21 112:12 116:7 127:16 143:3 147:21

**exit** 66:18

**expand** 33:14

**expectation** 81:10 100:12 101:12

**expectations** 33:4 81:18,19 82:3,20 100:4

**experience** 35:3

**experienced** 96:23 97:15

**experiencing** 51:7 81:8 97:16

**explain** 113:25

**explained** 97:7

**exploring** 33:13

**Express** 152:13

**expressed** 126:17

**extend** 134:14

**extended** 134:10

**extensively** 88:19

**eye** 106:23 107:3

---

**F**

**fact** 59:3 66:8 80:15 92:19 93:21 100:14 111:9

**factors** 40:16

**failure** 120:3

**fair** 62:22 83:18 96:18 101:14 102:5 131:7 136:21

**familiarize** 148:16

**family** 92:24 126:4,7 128:10

**Fargo** 151:23

**fax** 19:25

**feathers** 115:14

**February** 54:2 65:19 67:11,19 75:23, 25 109:21 138:17

**federal** 71:14

**feedback** 39:6 100:7

**feel** 34:9 57:24

**feeling** 59:12 115:17 121:6

**fell** 33:4

**felt** 41:15 80:12 96:21 120:2 121:2

**Fernandez** 122:12,17 123:11,20 128:11

**Fifteen** 108:25 147:18

**file** 121:13

**filed** 14:8 44:15,18 111:2 118:10

**filings** 14:10

**filled** 31:23

**fills** 32:3

**final** 100:22

**financial** 33:11,20 126:9

**find** 102:25 103:15 140:4

**finding** 100:9 125:25

**fine** 141:6 148:8 152:5

**finish** 11:12

**firing** 108:9

**firm** 140:10

**first-half** 34:25

**FISHER** 39:13 46:20 47:3 52:10 70:20 82:7 116:20 117:7 128:22 129:2,8,13,17,20 140:25 141:5 147:17 152:2 156:2,5

**fit** 61:21

**fixed** 138:4

**flurry** 133:8

**FMLA** 105:6,8,12,18 108:5,8,12,14, 17 117:12

**focus** 37:20,22 38:4,9 39:6,12,18,22 40:5,15,21 43:6,8,13 58:17 80:14 95:11 114:13

**focused** 41:9,16 80:16 81:24

**follow** 11:2 141:3 142:11 155:17

**forecast** 34:3,11 38:17,21 55:11

**forecasts** 34:4

**forget** 19:17

**forgot** 17:2 67:6

**formal** 18:2 44:14

**forms** 139:10

**forwarded** 149:8

**Foulon-belkacemi** 86:3

**found** 50:2

**France** 70:10,12,15 84:21 86:5,15 87:6 88:25 89:10 90:23 92:4,11

**freely** 12:7

**friend** 100:10

**friends** 68:15 130:20

**friendship** 68:15

**friendships** 126:11

**front** 10:21

**frustrating** 49:13

**funnel** 38:24 80:2 89:15,16,20 90:13, 16 91:7,21

**future** 51:17

---

**G**

**Gal** 86:24

**gap** 141:25

**gave** 100:5

**gears** 47:8

**general** 49:12

**generally** 132:4

**geographic** 130:23

**German** 59:24 66:20 77:22

**give** 11:13 12:16,20 90:12 100:14,17 147:10 153:17

**global** 18:21 69:25 84:20 85:8 87:5 88:24

**Gmail** 149:9

**good** 9:13,14 22:23 61:21 129:19

**govern** 10:3 10:18

**graduate** 18:4,7

**graduated** 19:8 20:23

**grass** 64:17

**Great** 156:2

**greener** 64:17

**ground** 9:21 10:25 13:17

**group** 21:19 86:18 87:7

**guess** 20:23 23:21 27:22 56:3 62:13 63:3,7 72:9 131:25 132:2

---

# JA684

**guessing** 39:3

**Guilfoyle** 9:11,12,15 25:15 28:8 30:25 35:16,24 37:12,18 39:8,16 42:13 44:25 46:24 47:6,7 52:5,12 56:21 65:2 69:7 70:17,21,24 82:8 87:2 107:9,14 116:21 128:25 129:5, 11,14,18,22 140:23 141:3,6,8 142:8, 13 143:5 147:14,18,23 152:5 153:19, 23 155:13,19

## H

**half** 31:14 32:25 35:7 106:7,11,14 107:2 109:16

**Hames** 84:3

**Handbook** 28:14

**handing** 68:9

**handle** 27:5 85:24

**handwritten** 136:22

**Hang** 104:15

**happened** 49:16 50:14 62:21 67:24 120:3

**happening** 50:13 64:18 102:6 103:2

**Haran** 9:1,5,13 10:1 11:1 12:1 13:1 14:1 15:1 16:1,6 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1,16 26:1 27:1 28:1,4,11,25 29:1 30:1,21 31:1,4 32:1 33:1 34:1 35:1,17 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1,2,10 45:1,2 46:1 47:1 48:1 49:1 50:1 51:1 52:1,15 53:1 54:1 55:1 56:1,17,24 57:1 58:1 59:1 60:1,8 61:1 62:1 63:1 64:1 65:1, 3 66:1 67:1 68:1 69:1,3 70:1,25 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1,10 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1,23 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1,8 144:1 145:1 146:1 147:1,16 148:1,2 149:1 150:1 151:1 152:1 153:1,24 154:1 155:1 156:1,9,13

**Haran@orange** 143:25

**hard** 64:13 82:10

**hardships** 126:9

**head** 11:5 29:22 118:5 138:24

**health** 73:16,19 139:16

**hear** 81:5

**heard** 67:3 68:17

**heightened** 81:20

**held** 19:10 98:3 105:14 117:10 136:25 153:21

**helped** 41:11 51:15

**helping** 90:10

**Hernandez** 92:25

**Hey** 58:24 61:20 64:10 67:3

**high** 18:4,7 148:23

**higher** 56:13 115:15

**highest** 17:25

**HIPAA** 122:6,24

**hired** 24:5,12,14,17 111:21,25

**hiring** 47:17

**history** 125:20

**Holbrook** 9:9 16:12

**hold** 20:6 23:11

**Holtsville** 17:4

**home** 22:21 49:17 50:24

**homeschooled** 49:4

**homeschooling** 48:23 49:8

**honestly** 12:24

**hope** 97:19

**hopeful** 49:18

**hoping** 49:22

**hospital** 49:6 50:24 85:18

**Hostetler** 9:16

**hour** 70:18 124:2

**hourly** 106:17

**hours** 12:14 13:16 104:24

**HR** 79:10

**Hubert** 60:6 67:9 89:23 90:18 91:7 93:5 103:24

**human** 11:9 47:14 54:14 110:22,25 115:15

**hundred** 56:4 138:15

**Hunter** 84:5

**husband** 14:20,23

**husband's** 17:13 139:18

**hyper** 121:3

## I

**IBM** 89:22 90:11,15 91:6,22 133:23

**identification** 25:9 28:6 29:3 30:23 35:19 44:4 45:4 52:17 56:19 60:10 65:7 69:5 107:12 143:3 147:21

**identified** 36:14 110:12 112:22 117:5 149:17,22 152:8

**identifies** 109:16

**identify** 72:13 109:9 110:7 112:16 113:6 127:21 128:5,10

**identifying** 37:23

**illness** 37:9 40:2,8 42:7,19 43:5,22 48:20 74:15 75:14 76:14 79:13 82:5 85:14 90:7 101:11 113:24 114:5,10, 24 115:5

**illnesses** 41:24 126:3

**imagine** 136:14

**immediately** 16:23 130:11

**impact** 119:17

**impacted** 119:22

**impacts** 120:12,13

**impasse** 41:6,7

**improvement** 36:18 37:6

**inability** 74:2

**inaccurately** 63:8

**includes** 138:2

**including** 10:19 138:2

**incorrect** 126:19,22

**incorrectly** 62:13

**increase** 51:6

**increased** 75:10,17 76:15 77:10 78:7 79:24 80:7 85:15 87:24 90:6 93:10 94:7 95:8,10 97:9 99:14 101:10 102:14 104:4

**increasing** 59:2

**individual** 20:4

**individuals** 64:23 71:12 92:16 104:22 127:21 128:6 149:22

**industry** 130:19

**infection** 50:4

**infectious** 50:5

**inflammation** 120:12

**information** 13:19 44:20 51:24
71:13 72:3,14,23 73:7,10,21 74:23
75:6 76:10,14 77:4,24 78:15 79:21,24
84:6 85:10 86:6 87:8,17 89:2,11 90:2
145:12,15,23

**informed** 38:7 82:21 92:18 93:20

**initiative** 38:20

**input** 36:8

**inputted** 32:11

**insomnia** 120:16 121:18,20

**instance** 64:7

**instances** 61:24

**institutions** 18:17

**instruct** 146:25 147:5

**insurance** 139:16 142:10

**integration** 77:3,15 97:23

**Intelenet** 20:19

**interested** 130:21 153:6

**interfered** 105:8,18

**interference** 105:7

**international** 89:24

**Internet** 137:23 138:5

**Interrogatories** 45:15,20 71:7 92:14

**interrogatory** 71:17,24 72:12 78:25
93:19 95:6 108:21 109:4,9 110:4,6
112:12,13,16 113:5,17 127:16,17,18,
20 128:3

**interrupt** 11:10

**interview** 133:22

**interviews** 132:16,19,22 134:4,10

**introduce** 46:18

**investigation** 40:10

**invited** 53:16,19

**involuntary** 68:23

**involved** 47:23 97:13

**IOT** 137:22

**issue** 100:6 120:13 121:25 127:3

**issues** 41:19 48:22

**ITHELPDESK@ORANGE.COM**
143:19

---

**J**

**January** 27:21,23 49:3 83:6,12,14,20
86:12

**Jennifer** 54:12,13 55:2 66:23 78:14

**jeopardy** 57:25 58:10 59:13

**job** 19:9 21:11,17,18 22:8,9,19 23:5
40:5 42:12 61:3,5,20 63:23 64:2
90:20 93:18 94:24 96:19 102:24,25
120:24 125:25 126:14,18 127:8
130:4,10,24 132:15 133:12 134:9,10,
14,21,25 135:19 136:22 137:10 138:9
140:5 151:4,6 152:17 154:7

**jobs** 130:12,14,15,25 131:18 136:5,
25

**joined** 20:18

**judge** 10:15,21

**juggle** 42:10 81:17 90:9 106:9

**juggling** 51:4 59:5 78:11

**Julia** 17:20,23

**July** 34:18,22 35:2,13

**jump** 11:10

**jumped** 55:10

**June** 35:11

**jury** 10:16,22

**Justin** 9:15

---

**K**

**key** 88:24

**kickoff** 86:19

**kid** 104:15

**Kimmick** 29:19 30:17 31:19 36:12
38:7 40:20 41:21 42:17 53:19 55:18
56:6,13 57:21 59:21 66:17 73:9 85:20
110:13 112:22

**Kimmick's** 29:20

**kind** 11:9 15:23 19:5 22:21 26:23
52:4 61:9 64:24 80:22 81:4,22 84:15
86:9 93:15 100:3 104:15 120:20,22
134:24

**kinds** 133:17

**knew** 15:20 47:18 76:17 84:12,25
130:18,19

**knowledge** 45:17 70:5 71:13 72:14,
23 73:17 88:13 110:2 153:8,12

**Kyndryl** 133:25

---

**L**

**lack** 37:20 38:3,9 39:5,12,18,22
40:21 43:8,13 58:17 80:21 114:12

**lacked** 80:13

**Lacosto** 88:6

**lamenting** 68:16,25

**laptops** 137:22

**larger** 34:5 90:12

**late** 35:8

**late-september** 74:18

**Laurie** 86:24

**law** 10:19 110:22,25 111:11

**laws** 142:2

**Lawson** 54:12,13 55:20 57:21 66:23
78:15,16

**lawsuit** 15:25 44:16 105:6 115:20
119:4 153:2

**lawyer** 111:2 118:17 135:10

**leader** 86:17

**leadership** 115:16

**Leading** 98:7

**learn** 53:14

**leave** 23:20 53:10 102:24 108:14,18

**leaving** 146:23

**led** 86:15

**left** 10:8 27:4,7,25 145:24 150:2

**legal** 41:5,6,7,19 100:6,9

**Lesterson** 154:12,16

**letter** 57:9,13,16,20 154:25

**level** 17:25 23:14,15,21 24:2 56:12
148:23

**Liam** 17:20,21

**library** 33:18

**life**  125:23 126:5

**lines**  55:5

**Linkedin**  130:16

**list**  59:18 66:6 70:13 71:11 92:16

**listed**  45:17 84:14

**litigation**  135:7 150:17,22

**live**  16:18

**lived**  16:12,15,25

**LMHC**  92:25

**log**  129:15

**long**  13:13 16:15 20:6,24 21:23 64:10
125:9,12

**longer**  125:13

**looked**  14:6 136:15

**Lorna**  28:2 83:5

**loss**  126:11

**losses**  97:14

**lost**  117:23 118:2 120:16

**lot**  73:14 85:2 97:12 148:6

**Lou**  59:22 66:19 76:7 93:2 95:5,17,23

**lower**  32:15,16

**Lumen**  23:16,22 24:3

**lunch**  129:19

---

**M**

**M-A-T-E-J-O-V-I-C**  16:10

**M.J.**  60:6 67:9 89:23 92:7 93:5
103:23

**M.j.'s**  104:13

**machines**  19:12 20:2

**made**  22:17 55:23 56:5,6 68:19 85:19
93:21 113:10 134:13

**maiden**  16:7

**maintaining**  83:9

**major**  86:5 87:7 89:9

**make**  39:2 41:16,17 50:7 55:4 59:6
62:15 82:17 113:22 114:3,7,16,22
115:2 118:19 129:11

**makes**  42:24,25 43:2 56:3 62:21
120:13

**making**  15:24 75:12

**manage**  43:21 90:21 100:8 119:14,
20 120:11,18 124:13 133:12

**manager**  24:18,22 54:15 76:8 77:3,
15 84:21 87:5 88:24 89:9 97:23 121:5

**manager's**  32:18,23 36:21,25

**managing**  40:7

**manifestations**  121:23

**Marie-cecile**  60:2 66:25 84:19 93:4
101:6,24

**Mark**  28:4

**marked**  25:6,9 28:5,25 29:2 30:21,23
35:19 44:3 45:3 52:15,16 56:16,19
60:8,9 65:3,7 69:3,5 71:5 107:10,12
143:3 147:16,21

**marketing**  22:15

**married**  17:11

**match**  131:20

**Matejovic**  16:10

**matter**  9:18 71:14 72:15 116:8 128:7

**matters**  145:24 146:2

**matured**  33:15

**MBA**  18:20,25 131:8

**means**  33:22,25 151:12

**meant**  40:21 99:4

**medical**  77:12 78:10 80:4 121:19
123:16

**medically**  76:20

**medication**  12:14 124:5 125:5

**medications**  124:16,23 125:7,10

**meet**  30:13 33:10,19 34:11 43:10
48:2 50:20,21 152:22

**meeting**  53:21 54:4,9,19 57:20
122:21

**Melegrito**  60:5 67:6 87:13

**Mellon**  151:22

**member**  79:10

**members**  92:24 128:11

**memory**  48:9

**mental**  125:20

**mentioned**  29:7 38:13 39:12,15,18
41:4 42:4 55:12 80:7,13 82:19 83:5
103:3 111:17 112:6 121:18 128:16

131:8 145:16,21 150:24 154:5

**message**  62:10

**messages**  98:20

**met**  48:6,14,17 73:4 75:22 92:3 93:15

**method**  94:16

**metrics**  100:21

**metro**  131:3

**MFS**  20:19 21:6,16,17

**mh-hm**  10:12 72:16 83:21 103:7
108:3 109:18 110:11 127:25 128:9

**Michel**  67:6 88:6

**Michelle**  47:10,13,14,22 48:2,14
53:8,11 59:19 72:2

**middle**  116:13

**midway**  15:10

**midwest**  30:6

**mind**  46:6

**mine**  22:13

**minutes**  48:18 70:19 147:11 153:17

**misquote**  124:19

**missed**  150:12

**missing**  133:16 139:24 152:15

**mitigating**  40:16

**mixture**  148:12

**module**  83:9 89:18 90:12 91:2

**mom**  107:3

**moment**  9:21 35:22 44:7 45:6 56:25
65:10 69:12 107:16

**monetary**  116:4

**money**  117:22

**month**  19:17

**monthly**  123:8

**Moody's**  77:19 150:10

**Morgan**  151:22

**morning**  9:13,14

**mother**  14:21,25 42:6 73:20 76:4
94:11 105:10 106:22 111:5,22 112:3,
9 117:9

**mother's**  37:9 41:23 42:19 114:24
115:5

**move**  26:22 39:9 42:14 79:25 85:16

114:14

**moved** 150:4

**moving** 37:23 80:9

**multiple-page** 147:24

---

**N**

**NA** 9:18 24:8 70:3

**Nadine** 86:2

**named** 47:9

**names** 16:6 17:19 71:19 87:3 92:21 124:19 133:3,5,6

**Natalie** 67:8 89:8 91:25

**nature** 11:9 63:23 119:7 122:16

**navigate** 41:12

**needed** 36:18 37:6 49:4 74:6 80:18, 19 103:6 144:21 145:4 146:21

**needing** 81:4,11 111:6

**negative** 113:23 114:2,8,16,23 115:3

**neglect** 46:22

**negotiated** 89:16

**network** 88:11

**Nodding** 18:19

**nods** 11:5

**Non-solicitation** 25:21

**nonresponsive** 39:9 42:14

**northeast** 30:6

**Notary** 8:5

**note** 37:4 62:15

**notes** 136:22 150:3,7

**notice** 92:17

**notified** 65:22 67:20 142:15 144:7 146:7

**November** 109:19

**number** 39:3,4 54:24 71:17,24 72:12 92:15,24 95:6 108:24 109:4,7 110:4 112:13 113:5 127:17,20 128:3

**numbers** 75:13 76:16 82:22,24 100:15,18 109:5

---

**O**

**oath** 10:7,9,13,14 71:2 129:24 153:25

**Objection** 82:7 116:20 117:7

**objective** 43:10

**objectives** 33:11,20

**OBS** 24:9 25:11 28:10 85:9 86:5

**OBS11** 25:8

**OBS13** 28:5

**OBS334** 30:22 31:3

**OBS344** 35:18,25

**OBS381** 56:18,23

**OBS5** 25:8

**OBS575** 107:11,15

**OBS821** 147:20,25

**OBS910** 143:2,6

**OBS926** 65:5,6

**OBS930** 69:4,9

**obstacle** 41:12 100:9,11

**obstacles** 41:3

**obtain** 18:11 138:9 144:15,17,19

**occasions** 38:14

**occurrence** 61:23 62:17 63:18

**October** 43:5 48:9,13 74:12 103:18 108:2 109:16,17

**offended** 40:13

**offer** 61:25 134:14

**offered** 105:13

**offers** 134:10

**office** 47:19

**onboard** 47:18

**onboarded** 29:13

**onboarding** 29:8

**one-page** 28:9

**onerous** 41:19

**ongoing** 14:24 15:2 48:21,22 50:4 51:3,11 64:20

**online** 18:22 131:8

**opportunities** 33:12,14,16 34:10 37:23 61:5 95:19

**opportunity** 10:5 20:13 36:21 69:13 107:18 143:10 148:5,22

**option** 105:13 139:19

**options** 124:13

**Orange** 9:17 23:24 24:5,8,9,13,20 25:3,22 26:6,13 29:18 30:10 32:7 36:20 45:21 46:12 47:9 53:14 55:25 60:23 61:2,14 62:6 63:2,25 64:2,5 65:23,25 66:3,10,15 70:2,3,4,9,11,14 75:5 76:9 84:5 87:16 88:7,25 89:10, 25 90:22,23 97:22 105:8,18,21 106:21 108:6,11,15,18 110:23 111:19,22 112:2,7 113:22 114:3,7,16, 22 115:2,8,10 121:16 125:24 130:3,6 131:14,20 132:12 134:22 137:2 138:17 141:10 142:17,18 143:24 144:3 145:25 146:12 149:8,19,24 150:21 151:6,14 152:19 153:5,11,14

**Orange's** 152:24

**Oranges's** 92:14

**order** 50:6 90:12

**ordering** 156:4

**orders** 33:6

**overcome** 100:9

**overlay** 77:14 87:21 88:9

**oversee** 90:21

---

**P**

**p.m.** 156:9

**paid** 106:2,10,19 107:6 144:22,24

**Paine** 28:2 83:6

**paper** 28:17

**papers** 29:12

**paperwork** 49:7

**paragraph** 109:12 116:13

**part** 27:3 38:6,8 47:15,17 56:9 58:20 63:22 64:15 79:3 90:20 98:20 105:4 115:19 135:7,15 136:2 146:16 150:16 152:3

**partial** 106:7

**partner** 137:9,11 150:25

**partnership** 33:13

**parts** 50:9

**pass** 41:18

**past** 41:2,12

**Patricia** 9:5 16:6,9 156:8,13

**Patrick** 17:14

**Patty** 33:2 143:25

**Patty.haran@orange.com** 60:23

**Paul** 60:3 67:4 85:7 93:4 102:10,12 103:4,21

**Paul's** 102:22,23

**pay** 106:14 117:23 118:2

**paying** 139:20

**pending** 12:9 142:25

**people** 45:16 64:4 66:6,8,9,25 68:6, 10,20 93:20 132:23 145:7 146:17,19

**percent** 56:5 138:15

**perception** 58:18

**perform** 76:16

**performance** 30:10,14 31:13,18 32:2,6 34:21,25 36:7 37:5 39:19,20 41:24 58:2,12,13,15,20,25 59:15 81:10 86:11,13 87:12 88:3,16,20 89:6

**perjury** 10:20

**persistent** 81:25

**person** 27:16,24 75:22 88:10,12 109:3

**personal** 149:9

**persons** 72:13

**Perusing** 44:8 45:8 52:21

**Peter** 59:22 60:21 65:16 66:18 67:4 75:3 92:25 93:9,24

**Pfizer** 41:6 77:19 100:6,16,21

**Phillipe** 60:4 67:5 87:13

**phone** 94:15 95:21 96:12 99:19 101:22 104:11,21 137:21 155:5,11

**phones** 138:3

**phrase** 38:3

**physical** 121:23

**Physically** 54:5

**Pichon** 66:24 69:21,24 79:20 93:3 99:10 101:3

**pick** 146:23

**pile** 28:16 29:11

**pipe** 33:18

**pipeline** 33:9 34:3,7,8 37:25 38:25

**pizza** 73:5

**pizzeria** 48:3,15

**place** 67:11,18 73:5 95:16 96:4 103:9 104:23

**Plaintiff's** 155:15

**plan** 32:2 38:17,23 139:18,19

**plans** 137:20,21,22

**point** 15:8 16:25 17:3 47:25 50:25 74:11 76:19 82:23 83:2 91:12 92:4 123:10 133:18,24

**Pons** 86:25

**poor** 121:7

**populated** 32:4

**portfolio** 33:15

**portion** 37:14 39:9

**position** 19:19,24 20:7 21:3 23:12 24:16 62:25 137:7

**positive** 86:10,12 87:12 88:16,20 89:6

**possession** 46:12 72:7,10

**possibility** 92:6

**potential** 27:12 50:3 62:2 91:3 136:5

**praying** 49:22

**preceding** 16:24 42:8

**preexisting** 120:5

**preparation** 13:6,24 128:17 129:7

**prepare** 13:4

**presales** 77:23 87:15

**prescribed** 124:4,24,25

**present** 54:8 94:25 96:24 99:5 101:2 102:7 103:20 104:18

**presented** 38:16,23

**pressing** 59:4

**pressure** 51:6 59:2 75:10,17 76:15 77:10 78:7 79:24 80:7 85:2,15 87:24 90:6 93:11 94:8 95:8 97:10,11,16 99:14 101:10 102:14 104:4

**presume** 11:20

**pretty** 14:8 138:6 150:12 155:10

**previous** 14:9 38:22 125:19 130:18

**previously** 78:13 79:19 83:10,24

**primarily** 130:20,25 150:13 155:5

**prior** 44:18 45:24 57:23 59:10 60:25 63:24 79:5 83:20 92:4 98:15

**priorities** 51:12

**privilege** 129:15

**privileged** 13:21 128:23

**prize** 47:23 48:3,7

**problem** 52:7

**procedure** 105:23

**process** 36:20 51:21 56:10 135:16

**produce** 135:20

**produced** 98:19 135:6 150:15,22

**producing** 135:8

**production** 128:21 129:16 140:19, 24 141:7 142:9,12 155:14,18

**products** 137:14,17 151:15

**professional** 121:20

**program** 18:22 131:8,10

**progressively** 37:24

**prohibit** 105:21 106:21

**promoted** 87:6

**pronouncing** 154:11

**properly** 11:21

**Proprietary** 25:20

**prospect** 91:6

**provide** 54:17

**provided** 54:21 145:12,14 148:11

**providing** 146:11

**PTO** 106:2 107:4

**Public** 8:6

**pull** 144:25

**pulled** 144:25 148:13

**purchase** 139:19

**Purdue** 18:21 131:9

**purport** 110:9 112:18

**purpose** 9:22 68:3

**purposes** 11:2 100:21 118:15 145:22

**pursuing** 18:20

**put** 14:6 92:7 129:14 141:2

Hargis v.
Orange Business Services Inc.

Patricia Haran
April 26, 2023

**Q**

qualified 33:9,18

question 11:11,12,16 12:9,10 37:10 39:11 42:16 58:8 59:9 66:7 72:11,22 82:18 102:18 114:15 116:5,25 126:22 142:25 147:4

questions 10:6,7 11:20 12:2 148:14, 18

quickly 76:17 80:2,9,17 101:14

quota 34:5,11 38:18,22 55:5,9,13,15 64:19 75:12 82:22 89:18 100:15,18 137:13

quotas 152:22

quote 55:6

**R**

ran 140:9

range 132:7

rating 36:16,17 37:6 43:3,11

reached 62:24 153:4,13

reaching 62:18

read 32:22 37:12,15 71:18 92:21

real 80:21

realistic 101:15,16

reason 12:20,23 46:8,11 54:17,24

reasons 54:20,23

recall 13:11 16:2 24:25 27:18,20 28:19 34:20 53:23 54:7 55:2 57:12,14 59:10 62:7,11 63:4,14,15 64:7,25 67:13,15,22,25 74:17 83:16 91:8,9,15 92:8 94:14,16 96:3,11 98:9 103:11,13 104:10 118:4 121:10 122:5 123:19 124:15 125:18 128:18 131:9,21,24 132:11 135:14 141:20,21 142:2 145:9,13 150:9 154:7

receive 30:10 57:19 139:4,7 140:15, 20 141:10

received 57:10,13 142:4

receiving 59:2 79:25 85:16 87:25 93:11 119:19 141:22

recess 70:23 129:21 147:13

recognize 25:16 28:11,13 29:5,9 31:4,9 36:2,5 44:9 45:10,13 52:23 53:2,5,7 57:4,7 60:13,17 65:12 69:16

107:21 143:13 148:25 149:3

recognized 86:11,18

recollection 64:22 124:23 134:3

recommended 49:2

record 9:3,20 24:7 28:9 31:2 35:17, 25 56:22 65:4 69:8 107:15 135:11 136:11 143:6 147:24 153:20,22

recorded 126:16

records 46:17 91:19 103:15 121:12 122:24,25 125:15 133:21 134:20,24 136:13 138:25

recovering 49:17

recovery 40:9 105:23

recruited 23:23 47:16

recruiter 61:12,15,19,25 62:18,24 140:6,7 154:5,25 155:4,16

recruiters 61:8,16 130:17

refer 91:10 145:11

reference 84:16 86:9 87:11 88:16,21

referenced 73:23

referred 121:25 129:5

referring 24:7 27:25 111:12 118:8

refresh 14:10

regain 119:25 120:22 121:4 142:16

regard 75:7 76:11 77:5,25 78:16 84:7 85:11 86:7 87:9,18 89:3,12 90:3 93:9 95:6,14 97:4 99:11 102:11 103:24

region 30:3 91:4

regions 30:6

regular 78:5 90:19 95:17,19

regularly 77:9 79:23 84:24

related 40:4,17 45:17 50:17 95:20 111:11 119:13 126:23

relating 124:8 128:6 135:18 142:9 155:15

relation 50:13

relations 90:22

relationship 41:10

release 15:18 122:7,25 124:21

released 85:18

relocate 131:5

remember 20:20 57:17 63:9 74:9

98:16 133:7,15 135:8,11 154:19

remembering 134:7

remotely 131:3

removed 100:11

rep 19:22 21:4,6,21 22:18 23:10

repeat 37:10 82:17

repercussions 117:20

rephrase 11:18

report 29:17 30:7 115:8

reported 29:19 55:17 56:11

reporter 9:2,6 10:8 11:6 37:15 156:3

reporting 123:19

represent 9:17

representative 110:8 112:17

representatives 113:10 132:25 133:4

request 53:10 85:20 108:17 111:18 115:15 128:20 129:12,16 141:7 142:12 155:18

requested 15:18 27:9 37:14

reschedule 51:2

resign 83:11

resigned 20:12 21:10 26:19 27:4,16 83:6,22

resources 47:15 54:14 115:15

respect 86:21 99:24 147:2,8

respond 36:21

responded 42:22

response 11:4 39:17,22 71:16,23 92:15,23 93:16 94:18 96:14 101:25 102:22,23 104:13,14 109:15 110:3 113:13,16,17,20

responses 45:19 46:13 71:6,11 92:13 108:21 112:12 127:16

responsibilities 19:24 21:5 26:12 27:2 40:6 42:11 59:5 78:9 83:3,20,24 90:9 151:6

responsibility 83:7 90:21

responsible 30:5 77:16 83:10 137:12 152:20 153:15

result 81:11 126:13,18 132:16 134:9

results 33:3 88:2

**resume** 155:6,9

**retaliated** 92:20 93:22 105:16 108:7, 11

**retaliation** 93:25 94:5 108:5 110:10 111:10,14 112:19 115:9

**retaliatory** 113:7

**Reticker** 60:4 67:4 85:7 93:5 102:11, 12

**return** 49:2

**returning** 129:9

**revenue** 33:3

**review** 13:23 14:12 31:13,18 32:2,6 34:21 36:7,9 37:5 38:12 39:19,21 44:7,17 45:7,23 56:25 65:10 69:12 71:15,20 107:17 148:3,9,22

**reviewed** 14:5 128:16 129:6

**reviews** 34:25

**rights** 25:20 105:8,19 110:22,25

**Road** 9:8 16:12,25 17:3

**Robert** 67:8 88:23 89:3

**Rocco** 47:10 48:2,6 53:8,11 59:19 72:2,6,23

**role** 21:20 22:18 23:8 26:5 62:2 84:18 151:5

**roles** 26:8

**Romero** 59:25 66:21 77:22,25

**roughly** 20:22 123:2

**ruffle** 115:14

**rule** 13:17

**rules** 9:21,23 10:18,25

——————

**S**

**Saint** 86:24

**salary** 106:17 131:16,20,21 132:6 138:19 139:11

**sales** 19:21 20:3 21:4,6,21 22:18 23:10 29:22,23 30:2 34:3,4,10 41:3 43:20 51:7 55:7 56:10 61:4 64:15 78:3,7 79:25 80:8,9,20 81:6 82:2,22 84:4 85:3,16 86:16,19 87:6,21 89:16 90:15 91:7,21 95:19 130:14 137:12 146:19 152:20

**salespeople** 61:23

**salesperson** 63:19

**Samsung** 152:12

**scare** 76:20

**scholarship** 51:21

**school** 18:5,8 48:23,25 49:11 51:16

**schools** 49:12

**scope** 130:23

**scrutiny** 75:11 94:8 95:10 100:7 101:9 102:15

**search** 130:15,24 132:16 134:21 135:19 136:23 155:15

**secondary** 18:16

**seek** 18:24 131:12

**seeking** 115:20,24 116:16 117:22,25

**self-confidence** 119:23 127:3

**self-induced** 127:4

**sell** 33:14 139:9,14 151:13

**selling** 19:25 21:7 137:13,14,18,20, 22

**send** 62:9

**sender** 143:17

**sending** 46:23 135:9 155:9

**sense** 42:24,25 56:3 62:21

**sentence** 33:7 37:25

**sentences** 32:23

**separated** 151:7

**separation** 125:24 131:14 134:21 137:2 141:9 149:18,23

**September** 74:12 122:8 131:11

**series** 74:20

**served** 45:24

**serves** 48:9

**service** 138:4,5

**services** 9:18 21:8 23:24 24:6,8 70:4,9 77:3,15,16 97:23 137:15,18,23 146:11 151:15 153:7

**session** 10:11 13:6

**sessions** 15:10 122:18

**set** 83:19 151:9,10

**Shaman** 154:12,23 155:16

**share** 51:23

**shared** 15:19,21 51:25 59:19

**short** 22:10 33:5 70:23 129:21 147:13

**show** 25:5 28:3,24 30:20 35:14 43:24 44:23 52:14 56:15 60:7 65:3 69:2 107:10 122:25 142:22 147:15

**sic** 110:13

**side** 70:11

**sign** 29:12 41:8 46:9,10,16

**signature** 25:25 28:20 29:10,14 46:3,13

**signed** 24:25 25:22 28:17 29:7 100:20 122:25

**SIM** 137:24

**Simal** 22:11

**similar** 76:20 152:18

**simultaneous** 29:25 70:7 135:3 145:17

**Singh** 59:22 60:21 65:16 66:18 75:3, 7,20 93:2,9,24 94:13 95:2

**Singh's** 94:18

**single** 67:24

**sinus** 120:13 121:24

**sinuses** 120:6

**Sitting** 134:2

**situated** 48:24

**situation** 77:12 79:12 81:7 94:21 96:17 102:4 117:21 120:19 124:14

**situations** 120:16

**sleep** 120:16

**small** 22:20,24

**social** 49:5 51:14,15

**sold** 77:18

**solution** 151:9,10

**solutions** 88:11

**son** 51:18

**sort** 14:24 26:18 41:14 47:21 50:15 53:10 58:24 64:20 68:16,24 139:25 141:10

**sorts** 138:2

**sought** 122:17 142:16

**sound** 122:9

**space** 19:6

**speak** 12:3 13:13 14:22 63:25 65:24

**speaking** 29:25 47:19 70:7 135:3 145:17

**specific** 24:19 30:3 32:10 64:23 68:12 98:9 134:3 145:9

**specifically** 28:19 38:3 95:5 112:13 114:11

**specifics** 64:25 92:9 94:14,16 98:16

**speculate** 56:2 82:11,15

**speculating** 33:22

**spend** 124:2

**spin** 133:25

**spoke** 15:7 48:18,19 49:14 67:5,6,7, 8,9,14,16 77:9 79:23

**spoken** 27:12 95:24

**spokesperson** 79:8

**Stanley** 151:22

**start** 91:5 121:8 123:25 130:9

**started** 19:15 25:2,22 26:25 125:16 128:15 130:4,11 131:9 138:13 141:21 142:6

**state** 8:6 9:2 63:7 111:11 141:11 142:2,10

**stated** 16:11

**statement** 42:5 100:22

**States** 28:15 30:4

**status** 112:8

**stay** 64:11,18

**stayed** 22:4

**stemming** 127:3

**step** 22:17 85:24

**steps** 118:23

**steroids** 124:25 125:11

**stock** 139:19

**stonewalled** 93:16

**stonewalling** 81:2 99:25 120:20

**Stony** 18:12

**stop** 88:4

**stopped** 122:3

**stress** 15:23 75:10 119:14,17,21 120:12 125:20 126:13,17 127:5

**stressors** 125:23 126:4

**strike** 39:9 42:14 114:14 128:2 132:20 140:19

**struggle** 50:17 51:12

**stuff** 104:6

**subject** 71:14 72:15 94:9 121:7

**subjected** 110:9 112:18

**submit** 136:10

**submitted** 136:9 138:21 139:2

**submitting** 135:14

**subset** 77:16

**substance** 36:9

**successful** 40:24

**sufficient** 33:10,19 34:9 38:25 39:2

**Suisse** 152:13

**summary** 111:3

**supervisor** 55:21

**support** 88:10

**supported** 78:4 87:22

**supposed** 50:20

**surgery** 40:9 49:16,21,23 73:25 74:13 103:13

**Switching** 47:8

**sworn** 8:5

**sympathetic** 94:20 96:16 97:19 102:3

**system** 106:13 142:17


**T**

**T-MOBILE** 126:18 133:9 134:15 137:6,8 138:10,20 140:2,5,13,16,21 142:6 151:2,5,14,19 152:7,18,22 153:7 154:6

**T-Mobile's** 137:14,18

**tablets** 138:3

**takes** 137:24

**taking** 26:25 41:22 42:18 50:18 58:17 67:11 94:10,24 95:12 104:23 105:22 106:22 111:10 114:9,11,17 115:4 124:12 125:6,17

**talk** 13:10 48:15 61:22 63:21 66:7 99:13 120:25 122:19

**talked** 15:11 39:21 49:10 50:16 51:3, 5,13,21 59:17,19,20,21,22,23,24 60:2,3,4,5 73:3,14 78:6,8,14 81:3 84:10,23 90:23 93:17 94:4,6,22 95:8, 9,99:13,14 101:8,10,12 133:14 134:8

**talking** 16:3 124:2

**target** 33:5 34:11

**targets** 152:21

**tax** 140:16

**team** 47:17 84:5 86:17,20

**teaming** 68:12 146:16

**teams** 60:18,19 65:16 69:20 75:21 98:21,22 99:3,21 101:23 104:9 107:23 146:14

**technical** 24:24 75:4 88:9,10

**technologies** 22:12 23:17 138:8

**technology** 130:14

**Telecom** 23:7

**telecommunication** 21:7

**Teleport** 21:18,23,24

**templates** 32:5

**ten** 36:15 70:18

**tenure** 26:5,18 63:12

**term** 99:3 125:13

**termed** 39:2

**terminate** 55:24

**terminated** 53:15 55:3 57:11 59:11 66:9,11 67:3 68:21 95:25 105:16 111:9 117:14 121:16 144:4

**termination** 54:18 57:9,23 60:25 63:24 65:23,24 66:13 67:21 68:23 79:3,9,17 94:2,4 95:9,23 98:8 120:4 130:3,5 138:16 141:24 142:15 144:8 146:8

**terms** 51:7 86:15 101:8

**territory** 33:3

**testified** 8:7 55:17

**testify** 12:25

**testimony** 10:19 12:16,21 154:7

**text** 36:9 69:20 98:15,19,25

**texts** 135:25 136:2,3

**that'll** 52:12

**therapist** 14:20 15:6,13 119:25

## JA692

training 74:2 131:13

transcript 152:4

transition 68:7 145:4,24 146:2,22,24

transitioning 145:6 146:13 147:3,8

travel 92:10

treatment 99:16,23 102:13 104:3 109:12 119:19 121:7 122:17

tress 120:7

trust 121:4 126:25

turn 25:24 34:13 108:20 110:3 113:4 116:10 127:15 128:3

TW 23:6,13

two-page 69:8

twofold 59:8

type 15:3 53:21 68:16,25 123:4 124:13 125:4

types 124:12 130:12 137:17

typical 34:24

typically 34:4 35:6

typo 76:25

**U**

U.S. 25:21 90:22

uh-huhs 11:5

ultimately 23:21 48:6

unaware 79:14

understand 10:16,23 11:7,17 44:12 70:25 82:6,17 83:19 116:5 117:2 129:23 153:24

understanding 9:19 33:25 34:2

understood 11:21

underway 15:16 68:10 145:5

unemployment 141:11,15,18,22 142:3,10

unfair 99:18,24 100:3,12 101:8

United 28:15 30:4

University 18:12,21

unlock 144:3

unrealistic 100:3

unsympathetic 80:23

121:2,9,14 122:4,11 123:14 124:7 126:16

therapy 15:9 119:9,10,13 122:18,19

Theron 67:8 89:8 91:22,23

thing 15:4 26:23 43:19,20 53:21 58:19 63:20 95:7 104:16

things 11:6 15:23 22:24 48:19 61:9 64:11,14 68:14 74:22 78:17 80:3 85:17 91:11,19 100:4,5 102:17 103:25 106:8 119:12,14 124:19 135:13,23 136:16 137:23 139:12,21 144:23 151:12

thinks 34:7

thought 22:22 40:13 43:9 61:10 80:14 81:13 115:16

thoughts 15:22

three-and-a-half 13:15

Thursday 13:12

tied 59:3

time 12:7 19:16 20:25 21:14 22:6,10 23:21 26:13,24 27:10 31:7 37:7 41:22 42:18 43:14 47:25 49:19 50:18,25 53:11 58:16 61:13 62:5,20 63:5,9 67:20 69:18 74:5 75:24 76:4,19 81:3,4,12,23 83:12,14 87:25 88:19 93:12 94:10,24 95:12 97:9,18 99:15 102:15 103:6,17 104:4 105:10,11,14,22 106:2,22 111:10,25 117:8,12,17 119:16 129:19 130:2 134:8 136:10 141:23 142:14 146:6,12 148:3,9

timeframe 27:23 74:19 103:16

timeline 14:5 128:17,21,22 129:6

times 26:17 49:13 61:17 62:8 63:11, 15,16,17 80:8 105:3

title 24:19,24 29:21 54:16 97:21,24 98:2

titles 21:21 26:9,10

today 10:20 12:17,21,25 72:5,25 73:12 78:18 134:2

today's 10:11 13:4,24 14:16,23 16:3

Todd 84:3,4

told 48:20,21 49:9,14,21,24 50:11 51:14,23 68:19 73:3,18 79:4,16 85:20 94:19 103:4

top 32:19 118:5 138:24

total 119:10 132:7,10,11

urgent 37:22

utilizing 153:7

**V**

Vaguely 28:13

varied 21:22

vary 139:15

venture 63:7

verification 46:22

verifying 134:20

Verizon 133:14 134:17

violation 108:7,12 110:24

virtual 53:21

visits 50:5

VP 86:4

**W**

W-2 140:15,20,24

wanted 15:16 19:4 74:3 144:11,15, 19,20,25 145:2,22

ways 105:17 108:10 112:6

Webex 53:20

websites 130:21

Wednesday 13:12

week 13:6 85:23 141:25

weekly 15:3 38:14,16 53:18 78:6 123:3,4

Wells 151:22

what'll 65:3

Willins 59:24 66:22 76:23 77:2,5 93:3 97:4,5,21 98:6 99:7

wireless 138:4

WITNES 9:5

woman 77:2 83:22

won 47:23

wondering 70:8

word 98:25 135:17

words 34:8

work 23:23 26:20 27:15 43:17 84:10, 16 85:4,22 86:11,19 87:12 88:16,20

Hagans    Patricia Haran
Orange Business Services Inc.    April 26, 2023

89:6 104:16 109:10 119:18,24 120:9
131:2,3

**worked**  19:11 22:10,11 66:10 70:15
77:13,21 84:21 119:12 151:24 152:6,
12

**worker**  49:5 51:14,15

**working**  25:2 26:15 27:13 50:18
86:20 88:18 89:6,15 90:8 95:18
104:23 125:3 126:24 130:22 133:10
142:6 146:14,15,20 150:5 151:19,20

**works**  97:20 138:6

**worse**  120:14

**worsened**  120:6

**wound**  133:9

**wrap**  153:18

**writing**  10:10 94:13 96:9 98:13,18
101:20 102:20 104:8 129:12 136:7
141:2,4 142:11 155:17

**written**  78:21,23

**wrong**  40:11 154:11

**wrote**  53:6 149:6

---

### X

**Xavier**  66:24 69:21,23 79:20 93:3
99:10

---

### Y

**year**  17:5 18:13 20:9 38:22 64:19
83:13 122:8 140:16

**years**  15:8 16:17 20:20 23:11,18
27:11 47:20 119:10 136:20

**York**  8:6 9:9 17:4,10 75:25 76:5
110:21,24 111:11 131:2 142:2,10
151:22

**Youhanna**  110:13

**Youkhanna**  56:9 73:22 74:8 110:14
112:23

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICIA HARAN,

        Plaintiff,

        -against-

ORANGE BUSINESS SERVICES INC.,

        Defendants.

Case No.: 1:21-cv-10585 VSB

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Plaintiff Patricia Haran ("Plaintiff") for her Objections and Responses to Defendant's First Set of Interrogatories, by and through her undersigned attorneys, Fisher Taubenfeld LLP, hereby states as follows:

## GENERAL OBJECTIONS, COMMENTS AND QUALIFICATIONS

Plaintiff makes the objections and answers contained herein without waiver of any right or privilege to object to the introduction in evidence, in this or any other action or proceeding, of any information contained herein or in any of the documents or the introduction of any of the documents themselves, upon the grounds of competency, relevancy, hearsay, lack of foundation, authenticity or any other proper ground.

The information contained here in and the documents furnished herewith have been compiled based on information currently known to Plaintiff. Plaintiff reserves the right to supplement these answers if, and when, appropriate.

Plaintiff objects to the voluminous and unduly burdensome nature of Defendants' First Set for Interrogatories and, accordingly, assert that Plaintiff should not be required to answer these Interrogatories unless they have been tailored to elicit information reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to Defendants' First Set for Interrogatories on the grounds that they are overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff objects to Defendants' First Set for Interrogatories to the extent they request information which represents confidential communications between attorney and client and/or materials prepared by counsel in anticipation of litigation which contain the mental impressions, legal theories or conclusions of Plaintiff's counsel on the grounds that said information is protected from disclosure by the attorney/client privilege, the work-product privilege, the self-evaluative privilege, and/or by any other privilege recognized by statute, at common law or by the rules of this court.

Plaintiff objects to Defendants' First Set for Interrogatories to the extent they seek to impose an obligation on Plaintiff beyond that required by the Federal Rules of Civil Procedure or the Local Rules of the District Court of the Eastern District of New York.

Plaintiff objects to Defendants' First Set for Interrogatories to the extent they exceed the number of allowable interrogatories under Fed.R.Civ.P.33.

Plaintiff objects to Defendants' First Set for Interrogatories to the extent they seek legal theories or conclusions rather than factual responses and, therefore, are beyond the permissible scope of discovery.

Plaintiff objects to Defendants' First Set for Interrogatories on the grounds that the timeframe for the Interrogatories is neither reasonable nor appropriate.

The foregoing General Objections, Comments and Qualifications are incorporated as if fully restated in each and every response to Defendants' First Set for Interrogatories.

## INTERROGATORY NO. 1

Identify each and every person whom you believe may have knowledge or information (whether admissible or inadmissible) concerning the subject matter of the Complaint, Defendant's defenses to the Complaint, Defendant's counterclaims, and/or your defenses to Defendant's counterclaims.

## RESPONSE

The following persons have knowledge or information regarding this matter:

1) <u>Michelle Rocco</u> – HR Representative at Orange Business Services - <u>michelle.rocco@orange.com.</u> Ms. Rocco may be reached through defense counsel. Ms. Rocco was involved in Ms. Haran's hiring at Orange. Ms. Rocco was aware of the general terms and conditions of Ms. Haran's employment. Ms. Rocco is also aware of Ms. Haran's daughter's illness and Ms. Haran's ongoing need for accommodation due to her daughter's illness.

2) <u>Adam Kimmick - Sales Director at Orange Business Services and Ms. Haran's direct manager.</u> Mr. Kimmick may be reached through defense counsel. Mr. Kimmick was aware of Ms. Haran daughter's serious health condition and the serious health condition of Ms. Haran's mother. Mr. Kimmick was aware that Ms. Haran needed FMLA leave for her daughter and mother's serious health conditions. Mr. Kimmick was aware of the background of Ms. Haran's employment, general terms and conditions of Ms. Haran's employment, and Ms. Haran's job performance. Mr. Kimmick is aware of Defendants' discriminatory and retaliatory conduct as set forth in the complaint.

3) <u>Peter Singh - Sr. Technical Director at Orange Business Services.</u> Mr. Singh may be reached at (917) 494-0903. Ms. Haran does not have possess Mr. Singh's address.

Ms. Haran complained to Mr. Singh about Defendants discriminating against her based on her leave of absences for her daughter's illness.  Mr. Singh has knowledge of Ms. Haran's positive work performance.

4)  Lou Boudreau - Collaboration Manager at Orange Business Services. Mr. Boudreau may be reached at (917) 691-7488. Ms. Haran does not possess Mr. Boudreau's address. Ms. Haran complained to Mr. Boudreau about Defendants discriminating against her based on her leave of absences for her daughter's illness.  Mr. Boudreau has knowledge of Ms. Haran's positive work performance.

5)  Eddy Youhanna – Vice President of Sales in North America. Mr. Youhanna may be reached through defense counsel. Ms. Haran informed Mr. Youhanna that she was unable to attend one of the company's trainings due to her daughter's surgery.  Upon information and belief, Mr. Youhanna participated in the decision to terminate Ms. Haran based on her leave of absences for her daughter and mother's illnesses.

6)  Daniel Willins – Integration Services Account Manager at Orange. Ms. Willins may be reached at (732) 272-2732. Ms. Haran does not possess Ms. Willins' address.  Ms. Willins falls outside Ms. Haran's protected group insofar as she did not require FMLA leave for her own serious health condition or the serious health condition of a close family member. She is aware of the velocity of her own sales funnel and that it was below Company expectations, yet she was retained by the Company while Ms. Haran was discharged. Ms. Haran complained to Ms. Willins about Defendants discriminating against her based on her leave of absences for her daughter's illness.

7)  German Romero – Sr. Pre-Sales Engineer with OBS until Q4 2021. Mr. Romero may be reached at (551) 482-7449. Ms. Haran does not possess Mr. Romero's address.

Mr. Romero has knowledge of Ms. Haran's positive work performance. Mr. Romero is also aware of Ms. Haran's daughter's disability/serious health condition.

8)  <u>Jennifer Lawson – HR Representative OBS.</u>  Ms. Lawson may be reached at (678) 346-3145.  Ms. Haran does not have Ms. Lawson's address. Ms. Lawson is aware of Ms. Haran's general terms and conditions of employment and the circumstances of her termination. Upon information and belief, Ms. Lawson participated in the decision to terminate Ms. Haran.  Ms. Lawson is aware of Defendants' unlawful conduct as set forth in the complaint.

9)  <u>Xavier Pichon – Orange team lead for Capgemini account based in France.</u> Mr. Pichon may be reached through defense counsel.  Ms. Haran complained to Mr. Pichon about Defendants discriminating against her based on her leave of absences for her daughter's illness.  Mr. Pichon is also aware of Ms. Haran's positive work performance.

10) <u>Todd Hames – Sales Director, Hunter Team until January 2021.</u>  He can be reached at (571) 888-1308.  Ms. Haran does not possess Mr. Hames' address. Mr. Hames is aware of Ms. Haran's positive work performance.

11) <u>Marie-Cecile Deraedt – Global Account Manager at OBS, France.</u> Ms. Daraedt may be reached through defense counsel. Ms. Haran complained to Ms. Deraedt about Defendants discriminating against her based on her leave of absences for her daughter's illness.  Ms. Daraedt is also aware of Ms. Haran's positive work performance.

12) <u>Paul Reticker – Global Account Director at OBS.</u> Mr. Reticker may be reached through defense counsel. Ms. Haran complained to Mr. Reticker Defendants discriminating against her based on her leave of absences for her daughter's illness.

13) <u>Nadine Foulon Belkacemi – EVP, Major Clients OBS, France.</u> Ms. Foulon Belkacemi may be reached through defense counsel. Ms. Foul Belkacemi is aware of Ms. Haran's positive work performance.

14) <u>Laurie Saint Gal de Pons – Global Account Manager, Capgemini account at OBS until December 2019. Promoted to Sales Director Major Accounts, France to present.</u> Ms. Saint Gal de Pons may be reached through defense counsel. Ms. Saint Gal de Pons is aware of Ms. Haran's positive work performance.

15) <u>Philippe Melegrito – OBS Pre-Sales Engineer.</u> Mr. Melegrito may be reached at (347) 989-4760. Ms. Haran does not possess Mr. Melegrito's address. Mr. Melegrito is aware of Defendants' unlawful conduct as set forth in the complaint.

16) <u>Mikhail Gloukhovstev – Orange Cloud Architect until Q1 2022.</u> Mr. Gloukhovstev may be reached at (215) 687-0504. Mr. Gloukhovstev is aware of Ms. Haran's positive work performance.

17) <u>Christophe Robert – Global Key Account Manager, Sanofi Account, France.</u> Mr. Robert may be reached through defense counsel. Mr. Robert has knowledge of Ms. Haran's positive work performance.

18) <u>Nathalie Thouron – OBS Major Account Manager.</u> Ms. Thouron may be reached at Nathalie.thouron@orange.com. Ms. Haran does not possess Ms. Thouron's telephone number or address. Ms. Thouron has knowledge of Ms. Haran's positive work performance.

19) <u>MJ Hubert – International Client Partner, French MNCs</u>.  Ms. Hubert is aware of Ms. Haran's positive work performance.  Ms. Hubert is also aware of Ms. Haran's daughter's illness and the resulting increased pressure to increase her sales funnel from Mr. Kimmick.

### INTERROGATORY NO. 2

Identify all persons who you believe may have possession, custody, or control of documents or information concerning the subject matter of the Complaint, Defendant's defenses to the Complaint, Defendant's counterclaims, and/or your defenses to Defendant's counterclaims.

### RESPONSE

All persons identified in response to Interrogatory No. 1 may have documents or information relevant to the Complaint, defenses, counterclaims and/or defenses to counterclaims.

## INTERROGATORY NO. 3

Identify all current or former employees, agents, or representatives of Defendant with whom you or any of your attorneys or representatives have communicated or interviewed concerning the allegations in your Complaint, Defendant's defenses to the Complaint, Defendant's counterclaims, and/or your defenses to Defendant's counterclaims.

## RESPONSE

See document bates stamped P49, P70-109, P119-142, 150-161.

Plaintiff's counsel has not communicated with any individuals relating to this matter other than Plaintiff.

Plaintiff has communicated with family members regarding her allegations in this matter.

### INTERROGATORY NO. 4

Identify all oral, written, or recorded statements (including audio and video recordings) you or any representative on your behalf obtained from any person or source concerning the allegations in your Complaint, Defendant's defenses to the Complaint, Defendant's counterclaims, and/or your defenses to Defendant's counterclaims.

### OBJECTIONS

Plaintiff objects to this interrogatory in so far as it requests information that is more appropriately obtained through deposition.

Plaintiff further objects to this interrogatory as it seeks information beyond the scope of the Local Rules.

### RESPONSE

Plaintiff has not obtained any written statements regarding this matter.

## INTERROGATORY NO. 5

Identify each hospital treatment center or healthcare provider from which/whom you have sought consultation or treatment, including, but not limited to, any doctor, nurse, psychiatrist, therapist, psychologist, social worker, physiologist, physical therapist, chiropractor, pharmacist, drug or alcohol counselor, and/or nutritionist in connection with any damages you claim you suffered as a result of any action or inaction taken by Defendant. If you have not already done so, please sign and return a notarized HIPAA-compliant authorized release form for each such health professional, in the form attached as **Exhibit A** to Defendant's First Set of Document Requests.

## OBJECTIONS

Plaintiff objects to Defendants' First Set of Interrogatories to the extent it fails to identify an applicable time period or to the extent the time period is neither reasonable nor appropriate.

## RESPONSE

Subject to and without waiving the foregoing objections, Plaintiff consulted the following treatment providers:

1. Thomas R. O'Donnell, M.D – Otolaryngologist.  2929 Expressway Drive North, Suite 225, Islandia, NY 11749. (877) 354-8490.

2. Darren L. Hirsch, M.D – Allergy doctor.  240 Patchogue Yaphank Rd Suite 1, Patchogue, NY 11772.  (877) 354-8490.

3. Medsolutions, Inc. – Subcontraactor that did remote monitoring of Ms. Haran's daughter's heart, which was covered as part of treatment with Barry Goldberg, cardiologist.  43 Pulaski St, Brooklyn, NY 11206.  (949( 743-4404.

4. Cassandra Fernandes LMHC. 585 Stewart Ave # 700, Garden City, NY 11530-4785. (516) 280-7285.

5.  Plaintiff's mother, Rosanne Bradley, saw Stephen H Tsang, MD - 635 West 165th Street, New York, NY 10032.  (212) 305-9535.

## INTERROGATORY NO. 6

Identify each hospital treatment center or healthcare provider from which/whom Julia Haran has sought consultation or treatment, including, but not limited to, any doctor, nurse, psychiatrist, therapist, psychologist, social worker, physiologist, physical therapist, chiropractor, pharmacist, drug or alcohol counselor, and/or nutritionist concerning the tumor in her femur bone. If you have not already done so, please sign and return a notarized HIPAA-compliant authorized release form for each such health professional, in the form attached as **Exhibit A** to Defendant's First Set of Document Requests.

## RESPONSE

See attached HIPAA authorization forms. Julia Haran consulted and/or treated with the following health providers:

1.  Barry Goldberg MD – Pediatrician.  1001 Franklin Ave, Suite 110, Garden City, NY 11530.  (631) 539-5400. Mr. Goldberg investigated chest pain Julia Haran was experiencing to see if there was an infection and to determine root cause.

2.  Doris Amran LMSW.  269-01 76th Ave New Hyde Park, NY 11040. (718) 470-3000.

3.  LIJ Medical Center.  270-05 76th Ave, Queens, NY 11040.  Julia Haran had a hospital stay here. (718) 470-7000.

4.  Samuel Kenan, MD – Orthopedic Surgeon.  1001 Franklin Ave Suite 110, Garden City, NY 11530.  (516) 321-7555. Conducted surgery and followup for Julia Haran.

5.  Alex K. Williamson MD- Pathologist.  6 Ohio Dr, New Hyde Park, NY 11042. (646) 667-6568. Julia Haran had in-patient care with Dr. Williamson for a diagnosis.

6.  Dr. Yelena Melman, MD – Pediatrician.  88 E Main St, East Islip, NY 11730.  (631) 563-2294.  Julia Haran had her annual physical/well visit with Dr. Melman.

7.  Dr. Foazia Siddiq, MD – Pediatrician.  88 E Main St, East Islip, NY 11730. (631) 563-2294. Julia Haran had a vist with Dr. Siddiq to discuss her leg pain again and ask for an x-ray.

8.  Dr. Richard J. Tabershaw, MD – Orthopedic.  375 E Main St #1, Bay Shore, NY 11706.  (631) 665-8790. Julia Haran had her first consultation after x-ray with Dr. Tabershaw.

9.  North Shore University Hospital - 300 Community Dr, Manhasset, NY 11030. Julia Haran had a surgery and recovery at this facility.

10. Coopersmith Helise MD – Radiologist.  300 Community Dr, Manhasset, NY 11030. (516) 562-3560. Dr. Helise provided in-patient care to Julia Haran.

11. John B. Amodio, MD – Radiologist.  269-01 76th Ave, Queens, NY 11040.  (718) 470-7175.  Dr. Amodio provided in-patient care and diagnosis to Julia Haran.

12. Mundeep Kaur Kainth, DO, MPH. Pediatrician. 410 Lakeville Rd Suite 202, New Hyde Park, NY 11042. (866) 945-7291. Dr. Kaur Kainth provided in-patient care and diagnosis to Julia Haran.

13. Dr. Michelle Sewnarine, MD, Pediatrician Infectious Disease. 269-01 76th Avenue, New Hyde Park, NY.  (866) 945-7291. Dr. Sewnarine provided in-patient care and diagnosis to Julia Haran.

14. Dr. Christopher J. Palestro, MD – Nuclear Medicine Specialist. 270-05 76th Ave, Glen Oaks, NY 11004. (718) 470-7144. Dr. Palestro provided in-patient care and diagnosis to Julia Haran.

15. Sunil Kumar Sood, MD – Infectious Disease Physician. 410 Lakeville Rd Suite 202, New Hyde Park, NY 11042.  (631) 539-5400. Dr. Kumar Sood investigated the root cause of Julia Haran's infection.

16. Ralph Anthony Milillo, MD – Radiologist, Musculoskeletal.  611 Northern Blvd Suite 250, Great Neck, NY 11021.  (516) 325-7203. Dr. Milillo provided bone imaging for Julia Haran.

17. Snehal Amin, MD – Dermatologist for scar review and checkup.  309 E Main St Smithtown, NY 11787. (631) 762-3376.  Dr. Amin performed scar review and conducted a checkup for Julia Haran.

## <u>INTERROGATORY NO. 7</u>

Identify each hospital treatment center or healthcare provider from which/whom you have sought consultation or treatment for emotional distress and mental anguish, including, but not limited to, any doctor, nurse, psychiatrist, therapist, psychologist, social worker, physiologist, physical therapist, chiropractor, pharmacist, drug or alcohol counselor, and/or nutritionist for the period of the last ten (10) years. If you have not already done so, please sign and return a notarized HIPAA-compliant authorized release form for each such health professional, in the form attached as Exhibit A to Defendant's First Set of Document Requests.

### <u>OBJECTION</u>

Plaintiff objects to Defendants' First Set of Interrogatories to the extent it fails to identify an applicable time period or to the extent the time period is neither reasonable nor appropriate.

### <u>RESPONSE</u>

Cassandra Fernandes LMHC.

<u>**INTERROGATORY NO. 8**</u>

Identify each employee, agent, or representative of Defendant who you purport subjected you to discrimination or retaliation.

<u>**RESPONSE**</u>

Adam Kimmick and Eddy Youhanna

### INTERROGATORY NO. 9

Identify each and every discriminatory and/or retaliatory comment, behavior, or action that you contend Defendant or Defendant's agents, representatives, and/or employees made to or concerning you.

### OBJECTIONS

Plaintiff objects to Interrogatory No. 9 on grounds that it seeks information beyond what is required by the Local Rules.

### RESPONSE

Subject to and without waiving the foregoing objections, see Plaintiff's Complaint.

Defendants made unlawful comments to Plaintiff regarding her alleged lack of focus due to her taking time off work for her daughter's illness.

Defendants subjected Ms. Haran to heightened pressure to increase her sales funnel and did not give her a chance to increase her sales funnel for the 2021 fiscal year.

Defendants terminated Ms. Haran based on her taking leave to care for her daughter, Julia Haran, and mother, both of whom suffered from serious health conditions under the FMLA.

Defendants failed to notify Ms. Haran of her rights under the FMLA and discriminated and retaliated against Ms. Haran for exercising her rights under the FMLA.

<u>**INTERROGATORY NO. 10**</u>

Identify each employee, agent, or representative of Defendant to whom you gave notice and/or complained, or otherwise informed, either in writing or orally, of the fact that you believed you were discriminated and/or retaliated against.

<u>**RESPONSE**</u>

1. Family members

2. Cassandra Fernandes LMHC.

3. Peter Singh

4. Lou Boudreau

5. Daniel Willins

6. Xavier Pichon

7. Marie-Cecile Deraedt

8. Paul Reticker

9. MJ Hubert

## <u>INTERROGATORY NO. 11</u>

Identify all third parties, including government agencies, courts or tribunals, to whom/which you gave notice and/or complained, or otherwise informed, either in writing or orally, of the fact that you believed you were discriminated and/or retaliated against by Defendant.

### <u>RESPONSE</u>

1.  Family members

2.  Cassandra Fernandes LMHC

3.  United States Equal Employment Opportunity Commission.

## INTERROGATORY NO. 12

Identify each employee, agent, or representative of Defendant who you told about your daughter's health issue as alleged in the Complaint.

## RESPONSE

1. Michelle Rocco

2. Adam Kimmick

3. Peter Singh

4. Lou Boudreau

5. Eddy Youhanna

6. Daniel Willins

7. German Romero

8. Xavier Pichon

9. Marie-Cecile Deraedt

10. Paul Reticker

11. Philippe Melegrito

12. MJ Hubert

### INTERROGATORY NO. 13

Identify all individuals who provided you with "positive recognition" as alleged in Paragraph 15 of the Complaint.

### Response:

Please see document bates stamped P000143.

1. Adam Kimmick

2. German Romero

3. Xavier Pichon

4. Todd Hames

5. Marie-Cecile Deraedt

6. Nadine Foulon Belkacemi

7. Laurie Saint Gal de Pons

8. Mikhail Gloukhovstev

9. Christophe Robert

10. Nathalie Thouron

11. MJ Hubert

12. Lou Boudreau

13. Peter Singh

<u>**INTERROGATORY NO. 14**</u>

Identify each employee, agent, or representative of Defendant to whom you requested

leave to care for your daughter as alleged in Paragraph 17 of the Complaint.

<u>**RESPONSE**</u>

1. Adam Kimmick

2. Michelle Rocco

3. Eddy Youhanna

<u>**INTERROGATORY NO. 15**</u>

Identify each day off work you took to take your daughter to doctor's appointments and for treatment as alleged in Paragraph 19 of the Complaint.

<u>**RESPONSE**</u>

Plaintiff recalls taking time off work on the below-listed days. Plaintiff may have taken additional time off work in connection with her daughter's illness. Some of those days may be recorded in the Company's PTO system and other days may have been approved informally by Adam Kimmick but not recorded.

October 14th – half day

October 15th, 2020 – October 19th 2020 – PTO for Plaintiffs daughter's surgery

November 11th, 2020 – PTO for Ms. Haran's doctor's appointment

December 18th, 2020 – PTO for doctor's appointment

December 28th, 2020 – PTO for Plaintiff's daughters doctor's appointment

December 30th, 2020 - PTO for Plaintiff's daughters doctor's appointment

February 12th, 2021 – PTO for Plaintiffs mother's doctor's appointment

<u>**INTERROGATORY NO. 16**</u>

Identify each employee, agent, or representative of Defendant that was aware you had taken FMLA leave as alleged in Paragraph 35 of the Complaint.

<u>**RESPONSE**</u>

1. Michelle Rocco

2. Adam Kimmick

3. Peter Singh

4. Lou Boudreau

5. Eddy Youhanna

6. Daniel Willins

7. German Romero

8. Xavier Pichon

9. Marie-Cecile Deraedt

10. Paul Reticker

11. Philippe Melegrito

12. MJ Hubert

### <u>INTERROGATORY NO. 17</u>

Identify all individuals, employees, or agents affiliated with Defendant's clients with whom you have communicated subsequent to the termination of your employment with Defendant.

### <u>RESPONSE</u>

Please see document bates stamped P49.

## INTERROGATORY NO. 18

Identify all documents concerning, and persons you believe may have knowledge of, any damages that you allegedly suffered as a result of any action taken or not taken by Defendant.

### RESPONSE

1. Plaintiff's family members

2. Cassandra Fernandes LMHC

## INTERROGATORY NO. 19

Identify each and every expert whom you have consulted and/or whom you expect to call as a witness at trial. As to each: (a) state the subject matter on which the expert is expected to testify, (b) state the substance of the facts and opinions to which each expert is expected to testify, (c) provide a summary of the grounds for each fact and opinion, and (d) identify all documents on which each expert witness relied for the basis of his/her opinion, including, but not limited to, each expert's report, curriculum vitae, and all documents that support each expert's report or are referred to in each expert's report.

## OBJECTION

Plaintiff objects to Request No. 19 as it is premature.

## RESPONSE

Plaintiff will supplement this response at the appropriate time.

## INTERROGATORY NO. 20

Identify each and every e-mail and social media account (e.g., Facebook, Twitter, Instagram, TikTok, LinkedIn, etc.) that you created, accessed, used, and/or maintained between May 2017 to the present, including the identities of each username(s) that you used to activate the account(s) or the username by which you were known when using the account(s).

## OBJECTION

Plaintiff objects to Request No. 20 to the extent it seeks documents and information that are irrelevant and not likely to lead to the discovery of admissible evidence.

Plaintiff further objects to Request No. 20 to the extent it is harassing.

## RESPONSE

Plaintiff never used social media to discuss claims or damages in this case or any other aspect of this case.

<u>**INTERROGATORY NO. 21**</u>

Identify all documents concerning, and witnesses with knowledge of, the allegations that Defendant's actions were "willful and intentional" as alleged in paragraphs 40, 44, and 48 of the Complaint.

<u>**Response:**</u>

Please see documents bates stamped P1- P207.

1. Adam Kimmick

2. Jennifer Lawson

3. Eddy Youhanna.

   Plaintiff reserves the right to amend or supplement these responses up to and including trial.

Dated: July 26, 2022     By: _____
    New York, New York       Liane Fisher
               FISHER TAUBENFELD LLP
               225 Broadway, Suite 1700
               New York, New York 10007
               (212) 571-0700
               *ATTORNEYS FOR PLAINTIFF*

# Exhibit D

Michelle Rocco
May 17, 2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


PATRICIA HARAN             )
                           )
        Plaintiff,         )
                           ) Case No.
    -against-              ) 1:21-cv-10585-VSB
                           )
ORANGE BUSINESS SERVICES   )
INC.,                      )
                           )
            Defendant.     )
----------------------------

        Wednesday May 17, 2023
        10:05 a.m.

        Deposition of MICHELLE ROCCO, held
    via Videoconference, New York, pursuant
    to a Notice, before RACHEL WOLVOVSKY, a
    Notary Public of the State of New York.


Reported by:
RACHEL WOLVOVSKY
JOB NO. 6377456

Michelle Rocco
May 17, 2023

```
 1

 2        A P P E A R A N C E S:

 3

 4           FISHER TAUBENFELD LLP

 5        Attorneys for PLAINTIFF

 6                225 Broadway Suite 1700

 7                New York, New York 10007

 8        BY:   LIANE FISHER, ESQ.

 9

10           BAKER & HOSTETLER LLP

11        Attorneys for DEFENDANT

12                45 Rockefeller Plaza

13                New York, New York 10111

14        BY:   JUSTIN GUILFOYLE, ESQ.

15                AMY TRAUB, ESQ.

16

17

18

19

20

21

22

23

24

25
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco

 2              IT IS HEREBY STIPULATED AND AGREED,

 3      by and between counsel for the respective

 4      parties hereto, that the filing, sealing and

 5      certification of the within deposition shall

 6      be and the same are hereby waived;

 7              IT IS FURTHER STIPULATED AND AGREED

 8      that all objections, except as to the form

 9      of the question, shall be reserved to the

10      time of the trial;

11              IT IS FURTHER STIPULATED AND AGREED

12      that the within deposition may be signed

13      before any Notary Public with the same force

14      and effect as if signed and sworn to before

15      the Court.

16

17

18

19

20

21

22

23

24

25
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco

 2           THE REPORTER:  The attorneys

 3      participating in this deposition

 4      acknowledge that I am not physically

 5      present in the deposition room and that

 6      I will be reporting this deposition

 7      remotely.  They further acknowledge that

 8      in lieu of an oath administered in

 9      person, I will place the witness under

10      penalty of perjury.

11           The parties and their counsel

12      consent to this arrangement and waive

13      any objection to this manner of

14      reporting.  Please indicate your

15      agreement by stating your name and your

16      agreement on the record.

17           MS. FISHER:  Liane Fisher.  Agreed.

18           MR. GUILFOYLE:  Justin Guilfoyle on

19      behalf of defendants.  I agree.

20           MS. TRAUB:  Amy Traub.  Agreed.

21           THE REPORTER:  Will the witness

22      kindly present his/her government-issued

23      identification by holding it up to the

24      camera for verification?

25           (Witness complied.)
```

Michelle Rocco
May 17, 2023

```
1                      Rocco
2    M I C H E L L E   R O C C O, called as a
3    witness, having been duly sworn by a Notary
4    Public, was examined and testified as
5    follows:
6              THE REPORTER:  Please state your
7         full name for the record.
8              THE WITNESS:  Michelle Rocco.
9              THE REPORTER:  Please state your
10        full address for the record.
11             THE WITNESS:  9 Bonny Road, Center
12        Reach, New York, 11720.
13   EXAMINATION BY:
14   MS. FISHER:
15        Q.   Good morning, Ms. Rocco.  My name
16   is Liane Fisher.  I represent Patricia Haran
17   in a matter that she's brought against Orange
18   Business Services.  I'm going to be asking
19   you a series of questions here today to which
20   you will respond under oath.  If there's any
21   question that you don't understand, please
22   let me know and I'll be happy to rephrase it
23   for you.  If there's any question that you
24   didn't hear either I will repeat it for you
25   or the court reporter will repeat it for you.
```

Michelle Rocco
May 17, 2023

```
1                    Rocco
2         The court reporter cannot type two
3    people talking at once, so please wait for me
4    to finish asking my questions before you
5    provide responses, and I'll do the same in
6    turn.
7         If you answer a question, it's
8    going to be presumed that you understood the
9    question and gave your best and most accurate
10   response.
11        If at any time you want to take a
12   break, I'd be happy to accommodate you.  You
13   just have to answer any questions that is
14   pending before we break.  Also, the court
15   reporter cannot type a nod or a shake of the
16   head or "hmm mm" or "uh huh", so please give
17   proper verbal responses to my questions.  Do
18   you understand these procedures?
19        A.   Yes.
20        Q.   Okay.  Great.  Are you suffering
21   from any illnesses that would affect your
22   ability to testify truthfully and accurately
23   here today?
24        A.   No.
25        Q.   Have you ever provided sworn
```

**JA734**

Michelle Rocco
May 17, 2023

```
 1                    Rocco
 2     testimony before?
 3          A.    No.
 4          Q.    Where do you currently work?
 5          A.    Orange Business.
 6          Q.    How long have you been working
 7     there?
 8          A.    20 years.
 9          Q.    What was your start date?
10          A.    It was sometime in March 20 years
11     ago.  So 2013.
12          Q.    Okay.  And what was your position
13     when you started?
14          A.    America's projects and programs.
15          Q.    That was your title?
16          A.    Yes.
17          Q.    How long did you hold that title?
18          A.    Approximately seven years.
19          Q.    And what position did you have
20     after that?
21          A.    HR business support for sales of
22     Americas.
23          Q.    How long did you hold that title?
24          A.    Approximately the same number of
25     years.  Seven.
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco

 2         Q.    And what title did you hold next?

 3         A.    Americas HR PMO.

 4         Q.    When did you start holding that

 5    title?

 6         A.    I can't confirm the date exactly.

 7         Q.    Do you remember a year?

 8         A.    No.  Not off the top of my head.

 9         Q.    What were your job duties in that

10    capacity?

11         A.    To support the business partner --

12    oh, I'm sorry, for the Americas PMO.  That

13    was to support HR initiatives and projects

14    that were rolled out from group to each of

15    the regiones.

16         Q.    What was the approximate timeframe

17    that you held this position?

18         A.    I'm really not sure.

19         Q.    Okay.  Did you hold any other

20    positions after that?

21         A.    Yes.

22         Q.    What position was that?

23         A.    I was an HR consultant.  I was the

24    HR BP project and program support for

25    international sales.  And those were my prior
```

Michelle Rocco
May 17, 2023

```
1                    Rocco

2      positions to that.

3           Q.   When did you hold that position?

4           A.   Which one?

5           Q.   Well, okay.  So you just gave me

6      two titles.  Is that right?

7           A.   Correct.

8           Q.   Okay.  So the first one.  What was

9      that title again?

10          A.   HR consultant.

11          Q.   And how long did you hold that

12     position?

13          A.   Approximate five years.

14          Q.   What was the timeframe for that?

15          A.   I really couldn't say.

16          Q.   Okay.  What was the second position

17     that you noted?

18          A.   Americas projects and programs.

19          Q.   When did you hold that position?

20          A.   We're in '23.  So I changed

21     positions in '21.  So '21 and a couple of

22     years prior to that.

23          Q.   What position did you hold in 2020?

24          A.   Americas HR PMO.

25          Q.   What does PMO stand for?
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco
 2         A.    Project management office.
 3         Q.    What were your job duties in that
 4     capacity?
 5         A.    To manage projects and programs
 6     within the Americas region.
 7         Q.    What types of projects and
 8     programs?
 9         A.    HR related projects, so things
10     related to compliance or recruitment,
11     directives, new tool rollout.
12         Q.    What is your current position?
13         A.    Head of HR international projects
14     and programs for international HR services.
15         Q.    Have you received any training
16     while working for Orange on the Family
17     Medical Leave Act?
18         A.    Yes.
19         Q.    When did you receive training on
20     the Family Medical Leave Act?
21         A.    When I was an HR consultant.
22         Q.    And again, you don't have an
23     approximate timeframe for that?
24         A.    I really couldn't say.
25         Q.    Was that within the last five
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco

 2     years?

 3          A.   I really couldn't say.

 4          Q.   Okay.  What did the training on the

 5     Family Medical Leave Act consist of?

 6          A.   We had to become -- HR consultants

 7     have to become familiar with the policy as

 8     it's written in the employee handbook, and

 9     general reporting.

10          Q.   And again, you held the position of

11     HR consultant prior to your position in 2020

12     as Americas HR PMO?

13          A.   Yes.

14          Q.   What does the Family Medical Leave

15     Act policy for Orange state in general terms?

16               MR. GUILFOYLE:  Objection.  You

17          could answer.

18               THE WITNESS:  The FMLA is a federal

19          policy, not an Orange policy.  So it is

20          on job protection and to take leave for

21          the caring of someone in your home for a

22          medical necessity.

23          Q.   At the time that you held the

24     position on Americas HR PMO you were familiar

25     with the policy on the Family Medical Leave
```

Michelle Rocco
May 17, 2023

```
1                    Rocco

2      Act at Orange?

3           A.   Yes.

4           Q.   Do you know Patrician Haran?

5           A.   Yes.

6           Q.   How do you know her?

7           A.   She worked for Orange.

8           Q.   When did you first become

9      acquainted with her?

10          A.   When she was recruited.

11          Q.   Did you participate in her hiring

12     at Orange in any way?

13          A.   Yes, I was her HR consultant at the

14     time.

15          Q.   Did you participate in the decision

16     to hire her?

17          A.   No, that's between the managers.

18          Q.   How frequently did you interact

19     with Ms. Haran in 2020?

20          A.   Not at all.

21          Q.   Did there come a time when you

22     spoke with Ms. Haran about her daughter being

23     sick?

24          A.   Yes.

25          Q.   When did you first speak with her
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco

 2     about her daughter being ill?

 3          A.   When I met with her to provide a

 4     prize that she had won at an event that was

 5     held.

 6          Q.   Could you explain that a little bit

 7     more?

 8          A.   Sure.  We held an online event for

 9     a bingo where participants had to make a

10     donation to United Way that gained them entry

11     into an online bingo event where we went

12     ahead and divvied up prizes to those who had

13     won the different bingo games that we played.

14          Q.   And Ms. Haran was one of the

15     winners?

16          A.   Yes.

17          Q.   When was this?

18          A.   It was fall of 2020, I believe.

19          Q.   Okay.  I'm going to put a document

20     in the chat.  Just give me one second.

21               Okay.  Do you see a document in the

22     chat?

23          A.   Yes.

24          Q.   Okay.

25               MS. FISHER:  Does everyone see
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco

 2          that?

 3                  MR. GUILFOYLE:  Yes.

 4                  MS. FISHER:  Great.

 5          Q.   So if you could just open that

 6     document, please.  Were you able to open it?

 7          A.   It's asking me to save it.  One

 8     moment.

 9          Q.   Okay.

10          A.   Okay.

11          Q.   Okay.  And were you able to open

12     it?

13          A.   Yes.

14                  (Rocco Exhibit 1, Jabber

15          Conversation, marked for identification,

16          as of this date.)

17          Q.   Okay.  Great.  So this document is

18     going to be marked as Rocco Exhibit 1.  And

19     it is bates stamped OBS 918 to 919.

20                  Ms. Rocco, would you just take a

21     look at this document, scroll through it, and

22     let me know when you're done reviewing it?

23          A.   Okay.

24          Q.   Do you recognize this document?

25          A.   Yes.
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco
 2        Q.   What do you recognize it to be?
 3        A.   It's a jabber conversation between
 4   patty and myself.
 5        Q.   And what was this conversation
 6   regarding?
 7        A.   This was to give her the prizes, to
 8   meet up so I could give her the prize for
 9   winning the bingo game.
10        Q.   Okay.  I'm going to put another
11   document in the chat.  Just give me one
12   second.  Do you see that second document
13   there?
14        A.   Yes.
15        Q.   Okay.  Great.  Let's see if you
16   could open it.
17        A.   Okay.
18             (Rocco Exhibit 2, E-mail, marked
19        for identification, as of this date.)
20        Q.   This document is Rocco Exhibit 2,
21   stamped OBS 404 to 405.  Would you take a
22   look at this document and let me know when
23   you're done reviewing it?
24        A.   Okay.
25        Q.   Do you recognize this document?
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco
 2          A.    Yes.
 3          Q.    What do you recognize it to be?
 4          A.    It's an e-mail between Patty and I
 5     after our meeting.
 6          Q.    Also, if you could just scroll to
 7     the last page, the bottom portion that starts
 8     with "Original appointment from Haran, Patty
 9     sent October 13."  Do you see that?
10          A.    Yes.
11          Q.    Okay.  And that e-mail is an e-mail
12     from Patty to you prior to your meeting.  Is
13     that correct?
14          A.    Yes.
15          Q.    Okay.  What day did you meet with
16     Patty?
17          A.    I'm not 100 percent sure.  It looks
18     like we were scheduled to meet, according to
19     this, on October 23 at 11:30.
20          Q.    Okay.  Where did you meet with her?
21          A.    At a pizza place in Holbrook.
22          Q.    Was anyone else present for your
23     meeting with her?
24          A.    No.
25          Q.    How long was your meeting with her?
```

Michelle Rocco
May 17, 2023

```
1                        Rocco
2            A.   Approximately 30 minutes.
3            Q.   Did you give her the prize?
4            A.   Yes.
5            Q.   During your meeting, what did Ms.
6       Haran say to you about her daughter's
7       illness?
8            A.   I don't remember exact details.  I
9       know she had talked about her daughter having
10      something with her leg, an issue, a medical
11      issue with her leg.
12           Q.   Did she tell you the nature of her
13      daughter's illness with her leg?
14           A.   I don't recall that.
15           Q.   What did you say to her in response
16      to that?
17           A.   I remember that we were talking
18      about our children and surgeries that they
19      had gone through.  I explained to her that my
20      son was premature and we spent three months
21      in the hospital with him and he had multiple
22      surgeries, so I understood what it was like
23      to have to deal with your child being sick.
24           Q.   Did Ms. Haran tell you that her
25      daughter had to have surgery?
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco
 2        A.   I don't recall that.
 3        Q.   Did she tell you that her daughter
 4   might possibly have any upcoming surgeries?
 5        A.   I don't recall that.
 6        Q.   Did she tell you that she needed to
 7   take time off work to help her daughter given
 8   her illness?
 9        A.   I don't recall the details, no.
10        Q.   At any time did you inform Ms.
11   Haran about her rights under the Family
12   Medical Leave Act?
13        A.   No, I did not.
14        Q.   Did you notify anyone else within
15   HR or anyone else at Orange about Ms. Haran
16   needing to take time off work or about her
17   daughter being sick?
18             MR. GUILFOYLE:  Objection to form.
19        You could answer.
20             THE WITNESS:  No.
21        Q.   Did you speak to anyone else at
22   Orange about Ms. Haran's daughter's illness?
23        A.   No.
24        Q.   Did you speak to Ms. Haran again
25   after your conversation with her in the pizza
```

Michelle Rocco
May 17, 2023

```
1                        Rocco

2       shop about her daughter's illness?

3            A.   No.

4            Q.   Other than the e-mail that I had

5       you review that's up on the screen, have you

6       spoken to Ms. Haran since your conversation

7       with her at the pizza shop?

8            A.   No.

9            Q.   Is it part of your job to

10      administer FMLA leave to any employees at

11      Orange?

12               MR. GUILFOYLE:  Objection.  Just

13          which job are we talking about at this

14          point in time?

15               MS. FISHER:  Sorry.

16           Q.   So in 2020, was it part of your job

17      to administer Family Medical Leave Act leave

18      to any employee of Orange?

19           A.   No.

20           Q.   Who is responsible for, or who was

21      responsible for that in 2020?

22           A.   Her HR consultant.

23           Q.   Do you know who that was?

24           A.   I don't recall who was assigned.

25               MS. FISHER:  Okay.  Just give me
```

Michelle Rocco
May 17, 2023

```
1                       Rocco

2           five minutes.  I think I might be done.

3                   MR. GUILFOYLE:  Okay.

4                   (Recess taken.)

5           Q.   I just have a few more questions

6      for you.  So during your meeting at the pizza

7      shop with Ms. Haran, did she inform you that

8      her daughter Julia would need to be home

9      schooled?

10          A.   I don't recall that.

11          Q.   Did she talk to you about a social

12     worker that was helping to set-up the home

13     schooling for her daughter?

14          A.   I don't recall that.

15          Q.   Okay.  Did she tell you that her

16     daughter might need a repeat surgery?  Do you

17     remember that?

18          A.   No.

19          Q.   Did she tell you what her

20     daughter's diagnosis was?

21          A.   I don't recall that.

22          Q.   Did she tell you about her daughter

23     needing to attend various doctors'

24     appointments?

25          A.   I don't recall that.
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco
 2        Q.   Is there anything else that you
 3   recall about your conversation with Ms. Haran
 4   pertaining to her daughter that you recall?
 5        A.   No.  It was -- no, I really can't.
 6             MS. FISHER:  Okay.  I have no
 7        further questions.
 8             MR. GUILFOYLE:  No questions for
 9        this witness at the time.
10             THE REPORTER:  Mr. Guilfoyle, would
11        you like a copy of this transcript?
12             MR. GUILFOYLE:  Sure.  Electronic
13        is fine.
14             (Time noted:  10:33 a.m.)
15                  _____
16                  MICHELLE ROCCO
17
18   Subscribed and sworn to before me
19   this ___ day of _____, 2023.
20
21   _____
22
23
24
25
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco

 2              C E R T I F I C A T E

 3    STATE OF NEW YORK     )

 4                              : ss.

 5    COUNTY OF KINGS        )

 6

 7            I, RACHEL WOLVOVSKY, a Notary

 8        Public within and for the State of New

 9        York, do hereby certify:

10            That MICHELLE ROCCO, the witness

11        whose deposition is hereinbefore set

12        forth, was duly sworn by me and that

13        such deposition is a true record of the

14        testimony given by the witness.

15            I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage, and that I

18        am in no way interested in the outcome

19        of this matter.

20            IN WITNESS WHEREOF, I have hereunto

21        set my hand this 17th day of May, 2023.

22                      _Rachel Wolvovsky_

23        _____

24              RACHEL WOLVOVSKY

25
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco

 2     --------------- I N D E X --------------------

 3

 4     WITNESS              EXAMINATION BY        PAGE

 5     MS. ROCCO         MS. FISHER                 5

 6

 7

 8     ---------------- EXHIBITS --------------------

 9

10     ROCCO                             FOR ID.

11     1.............Jabber Conversation..........14

12     2..............E-mail....................15

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Michelle Rocco
May 17, 2023

```
 1                    Rocco

 2      ---------E R R A T A   S H E E T-------------

 3

 4      CORRECTION                 PAGE      LINE

 5      _____

 6      _____

 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23

24

25
```

Michelle Rocco
May 17, 2023

---

**Exhibits**

---

Exhibit 1 Mic
helle Rocco 0
5.17.23
 14:14,18
 23:11
Exhibit 2 Mic
helle Rocco 0
5.17.23
 15:18,20
 23:12

---

**1**

---

1
 14:14,18
100
 16:17
10:33
 21:14
11720
 5:12
11:30
 16:19
13
 16:9

---

**2**

---

2
 15:18,20
20
 7:8,10
2013
 7:11
2020
 9:23 11:11
 12:19 13:18
 19:16,21
2023
 21:19
21
 9:21

---

23
 9:20 16:19

---

**3**

---

30
 17:2

---

**4**

---

404
 15:21
405
 15:21

---

**9**

---

9
 5:11
918
 14:19
919
 14:19

---

**A**

---

a.m.
 21:14
ability
 6:22
able
 14:6,11
accommodate
 6:12
accurate
 6:9
accurately
 6:22
acquainted
 12:9
Act
 10:17,20
 11:5,15 12:2
 18:12 19:17
address
 5:10

---

administer
 19:10,17
affect
 6:21
ago
 7:11
ahead
 13:12
America's
 7:14
Americas
 7:22 8:3,12
 9:18,24 10:6
 11:12,24
answer
 6:7,13 11:17
 18:19
anyone
 16:22 18:14,
 15,21
appointment
 16:8
appointments
 20:24
approximate
 8:16 9:13
 10:23
Approximately
 7:18,24 17:2
asking
 5:18 6:4
 14:7
assigned
 19:24
attend
 20:23

---

**B**

---

bates
 14:19
believe
 13:18
best
 6:9
bingo

---

13:9,11,13
 15:9
bit
 13:6
Bonny
 5:11
bottom
 16:7
BP
 8:24
break
 6:12,14
brought
 5:17
business
 5:18 7:5,21
 8:11

---

**C**

---

called
 5:2
capacity
 8:10 10:4
caring
 11:21
Center
 5:11
changed
 9:20
chat
 13:20,22
 15:11
child
 17:23
children
 17:18
come
 12:21
compliance
 10:10
confirm
 8:6
consist
 11:5

---

Michelle Rocco
May 17, 2023

consultant
  8:23 9:10
  10:21 11:11
  12:13 19:22
consultants
  11:6
conversation
  14:15 15:3,5
  18:25 19:6
  21:3
copy
  21:11
correct
  9:7 16:13
couple
  9:21
court
  5:25 6:2,14
current
  10:12

**D**

date
  7:9 8:6
  14:16 15:19
daughter
  12:22 13:2
  17:9,25
  18:3,7,17
  20:8,13,16,
  22 21:4
daughter's
  17:6,13
  18:22 19:2
  20:20
day
  16:15 21:19
deal
  17:23
decision
  12:15
details
  17:8 18:9
diagnosis
  20:20

different
  13:13
directives
  10:11
divvied
  13:12
doctors'
  20:23
document
  13:19,21
  14:6,17,21,
  24 15:11,12,
  20,22,25
donation
  13:10
duly
  5:3
duties
  8:9 10:3

**E**

e-mail
  15:18 16:4,
  11 19:4
either
  5:24
Electronic
  21:12
employee
  11:8 19:18
employees
  19:10
entry
  13:10
event
  13:4,8,11
everyone
  13:25
exact
  17:8
exactly
  8:6
EXAMINATION
  5:13

examined
  5:4
Exhibit
  14:14,18
  15:18,20
explain
  13:6
explained
  17:19

**F**

fall
  13:18
familiar
  11:7,24
Family
  10:16,20
  11:5,14,25
  18:11 19:17
federal
  11:18
fine
  21:13
finish
  6:4
first
  9:8 12:8,25
Fisher
  5:14,16
  13:25 14:4
  19:15,25
  21:6
five
  9:13 10:25
  20:2
FMLA
  11:18 19:10
follows
  5:5
form
  18:18
frequently
  12:18
full
  5:7,10

**G**

gained
  13:10
game
  15:9
games
  13:13
gave
  6:9 9:5
general
  11:9,15
give
  6:16 13:20
  15:7,8,11
  17:3 19:25
given
  18:7
going
  5:18 6:8
  13:19 14:18
  15:10
Good
  5:15
Great
  6:20 14:4,17
  15:15
group
  8:14
Guilfoyle
  11:16 14:3
  18:18 19:12
  20:3 21:8,
  10,12

**H**

handbook
  11:8
happy
  5:22 6:12
Haran
  5:16 12:4,
  19,22 13:14
  16:8 17:6,24
  18:11,15,24

Michelle Rocco
May 17, 2023

19:6 20:7
21:3
Haran's
  18:22
head
  6:16 8:8
  10:13
hear
  5:24
held
  8:17 11:10,
  23 13:5,8
help
  18:7
helping
  20:12
hire
  12:16
hiring
  12:11
hmm
  6:16
Holbrook
  16:21
hold
  7:17,23 8:2,
  19 9:3,11,
  19,23
holding
  8:4
home
  11:21 20:8,
  12
hospital
  17:21
HR
  7:21 8:3,13,
  23,24 9:10,
  24 10:9,13,
  14,21 11:6,
  11,12,24
  12:13 18:15
  19:22

**I**

identificatio
n
  14:15 15:19
ill
  13:2
illness
  17:7,13
  18:8,22 19:2
illnesses
  6:21
inform
  18:10 20:7
initiatives
  8:13
interact
  12:18
international
  8:25 10:13,
  14
issue
  17:10,11

**J**

jabber
  14:14 15:3
job
  8:9 10:3
  11:20 19:9,
  13,16
Julia
  20:8

**K**

know
  5:22 12:4,6
  14:22 15:22
  17:9 19:23

**L**

leave
  10:17,20
  11:5,14,20,
  25 18:12
  19:10,17
leg
  17:10,11,13
Liane
  5:16
little
  13:6
long
  7:6,17,23
  9:11 16:25
look
  14:21 15:22
looks
  16:17

**M**

make
  13:9
manage
  10:5
management
  10:2
managers
  12:17
March
  7:10
marked
  14:15,18
  15:18
matter
  5:17
medical
  10:17,20
  11:5,14,22,
  25 17:10
  18:12 19:17
meet
  15:8 16:15,

18,20
meeting
  16:5,12,23,
  25 17:5 20:6
met
  13:3
Michelle
  5:8 21:16
minutes
  17:2 20:2
mm
  6:16
moment
  14:8
months
  17:20
morning
  5:15
multiple
  17:21

**N**

name
  5:7,15
nature
  17:12
necessity
  11:22
need
  20:8,16
needed
  18:6
needing
  18:16 20:23
nod
  6:15
Notary
  5:3
noted
  9:17 21:14
notify
  18:14
number
  7:24

Michelle Rocco
May 17, 2023

| O | P | | |
|---|---|---|---|

**O**

oath
  5:20
Objection
  11:16 18:18
  19:12
OBS
  14:19 15:21
October
  16:9,19
office
  10:2
okay
  6:20 7:12
  8:19 9:5,8,
  16 11:4
  13:19,21,24
  14:9,10,11,
  17,23 15:10,
  15,17,24
  16:11,15,20
  19:25 20:3,
  15 21:6
once
  6:3
one
  9:4,8 13:14,
  20 14:7
  15:11
online
  13:8,11
open
  14:5,6,11
  15:16
Orange
  5:17 7:5
  10:16 11:15,
  19 12:2,7,12
  18:15,22
  19:11,18
Original
  16:8

**P**

page
  16:7
part
  19:9,16
participants
  13:9
participate
  12:11,15
partner
  8:11
Patricia
  5:16
Patrician
  12:4
patty
  15:4 16:4,8,
  12,16
pending
  6:14
people
  6:3
percent
  16:17
pertaining
  21:4
pizza
  16:21 18:25
  19:7 20:6
place
  16:21
played
  13:13
please
  5:6,9,21
  6:3,16 14:6
PMO
  8:3,12 9:24,
  25 11:12,24
point
  19:14
policy
  11:7,15,19,
  25

portion
  16:7
position
  7:12,19
  8:17,22 9:3,
  12,16,19,23
  10:12 11:10,
  11,24
positions
  8:20 9:2,21
possibly
  18:4
premature
  17:20
present
  16:22
presumed
  6:8
prior
  8:25 9:22
  11:11 16:12
prize
  13:4 15:8
  17:3
prizes
  13:12 15:7
procedures
  6:18
program
  8:24
programs
  7:14 9:18
  10:5,8,14
project
  8:24 10:2
projects
  7:14 8:13
  9:18 10:5,7,
  9,13
proper
  6:17
protection
  11:20
provide
  6:5 13:3
provided
  6:25

Public
  5:4
put
  13:19 15:10

**Q**

question
  5:21,23 6:7,
  9
questions
  5:19 6:4,13,
  17 20:5
  21:7,8

**R**

Reach
  5:12
recall
  17:14 18:2,
  5,9 19:24
  20:10,14,21,
  25 21:3,4
receive
  10:19
received
  10:15
recess
  20:4
recognize
  14:24 15:2,
  25 16:3
record
  5:7,10
recruited
  12:10
recruitment
  10:10
regarding
  15:6
region
  10:6
regiones
  8:15

Michelle Rocco
May 17, 2023

related
  10:9,10
remember
  8:7 17:8,17
  20:17
repeat
  5:24,25
  20:16
rephrase
  5:22
reporter
  5:6,9,25
  6:2,15 21:10
reporting
  11:9
represent
  5:16
respond
  5:20
response
  6:10 17:15
responses
  6:5,17
responsible
  19:20,21
review
  19:5
reviewing
  14:22 15:23
right
  9:6
rights
  18:11
Road
  5:11
rocco
  5:1,8,15 6:1
  7:1 8:1 9:1
  10:1 11:1
  12:1 13:1
  14:1,14,18,
  20 15:1,18,
  20 16:1 17:1
  18:1 19:1
  20:1 21:1,16
rolled
  8:14

rollout
  10:11

_____

          S

sales
  7:21 8:25
save
  14:7
scheduled
  16:18
schooled
  20:9
schooling
  20:13
screen
  19:5
scroll
  14:21 16:6
second
  9:16 13:20
  15:12
see
  13:21,25
  15:12,15
  16:9
series
  5:19
services
  5:18 10:14
set-up
  20:12
seven
  7:18,25
shake
  6:15
shop
  19:2,7 20:7
sick
  12:23 17:23
  18:17
social
  20:11
son
  17:20

speak
  12:25 18:21,
  24
spent
  17:20
spoke
  12:22
spoken
  19:6
stamped
  14:19 15:21
stand
  9:25
start
  7:9 8:4
started
  7:13
starts
  16:7
state
  5:6,9 11:15
Subscribed
  21:18
suffering
  6:20
support
  7:21 8:11,
  13,24
sure
  8:18 13:8
  16:17 21:12
surgeries
  17:18,22
  18:4
surgery
  17:25 20:16
sworn
  5:3 6:25
  21:18

_____

          T

take
  6:11 11:20
  14:20 15:21
  18:7,16

taken
  20:4
talk
  20:11
talked
  17:9
talking
  6:3 17:17
  19:13
tell
  17:12,24
  18:3,6
  20:15,19,22
terms
  11:15
testified
  5:4
testify
  6:22
testimony
  7:2
things
  10:9
think
  20:2
three
  17:20
time
  6:11 11:23
  12:14,21
  18:7,10,16
  19:14 21:9,
  14
timeframe
  8:16 9:14
  10:23
title
  7:15,17,23
  8:2,5 9:9
titles
  9:6
today
  5:19 6:23
tool
  10:11
top
  8:8

Michelle Rocco
May 17, 2023

| | |
|---|---|
| training<br> 10:15,19<br> 11:4<br>transcript<br> 21:11<br>truthfully<br> 6:22<br>turn<br> 6:6<br>two<br> 6:2 9:6<br>type<br> 6:2,15<br>types<br> 10:7 | winners<br> 13:15<br>winning<br> 15:9<br>witness<br> 5:3,8,11<br> 11:18 18:20<br> 21:9<br>won<br> 13:4,13<br>work<br> 7:4 18:7,16<br>worked<br> 12:7<br>worker<br> 20:12<br>working<br> 7:6 10:16<br>written<br> 11:8 |

| | |
|---|---|
| **U** | |
| uh<br> 6:16<br>understand<br> 5:21 6:18<br>understood<br> 6:8 17:22<br>United<br> 13:10<br>upcoming<br> 18:4 | **Y**<br><br>year<br> 8:7<br>years<br> 7:8,10,18,25<br> 9:13,22 11:2<br>York<br> 5:12 |

**V**

various
 20:23
verbal
 6:17

**W**

wait
 6:3
want
 6:11
way
 12:12 13:10
went
 13:11

# Exhibit E

Case 1:21-cv-10585-DEH-JW    Document 72    Filed 03/26/24    Page 456 of 479

 **performance review**

 (5) **Completion**

PATTY HARAN, H2 2020, Performance Review from 01-jul-2020 to 31-dec-2020.

**The steps of the review process during the year / semester:**

     

| Preparation step (Employee and Manager) | Self-assessment (Employee) | Evaluation (Manager) | Acknowledgement (Employee) | **Completion** (Manager) |

## Review

**Evaluated by :**  ADAM KIMMICK

**Department :** Sales NAM 3

**Date of preparation meeting :** 04-jan-2021

**Date of review meeting :** 28-jan-2021

**Attachment(s) :** --
--

## Job description

**Job :**  (F00860)

**Job starting date :** 10-apr-2017

**Job title :** Local account manager (farmer)

**Assignment and main activities :** Develop relationships in support of selling across the OBS portfolio- act as local account manager as part of global team. B End for 3 GAM accounts, develop A end accounts Pfizer and Moody's.

**JA760**

# Content

The performance review is a privileged time for exchange between the employee and their manager. The dialogue that takes place on this occasion serves three purposes :

- Give a feedback on the action of everyone, in a broader context, that of business and enterprise, but also in the specificity of his job,

- Recognize and develop the performance of everyone,

- Anticipate and prepare the career evolutions.

Competencies.................................................................................................3
    Job..........................................................................................................3
    Main competencies observed...................................................................3
    Main competencies to strengthen............................................................4
    Known languages...................................................................................4

Objectives....................................................................................................5
    Current objectives, H2 2020....................................................................5

Training.......................................................................................................8
    Development needs.................................................................................8

Overall rating...............................................................................................9
    Overall rating.........................................................................................9
    Manager's comments..............................................................................9
    Employee's comments............................................................................9

Career plan.................................................................................................10
    Development wishes..............................................................................10
    Action plan...........................................................................................10
    Manager view........................................................................................10

PH_Performance_Review_01-jul-2020_31-dec-2020.pdf
Editing step « Completion ».

P000171

 Competencies

The dialogue focused on competencies enables the identification of possible development and training activities in line with company operational needs and employee career development aspirations.

The Job has a profile of core competencies which are listed in the section "Job Competencies".

## Job

Detail (group referential):

## Main competencies observed

| › Strategic approach to customers | |
|---|---|
| **Comments from preparation step :** | Develop account plans and sales strategies for new A end accounts in module: Moody's and Pfizer. Continue to refine them for existing B end accounts including KPMG, Sanofi & Capgemini. Research business drivers and how Orange solutions can support them. Meet with strategic partners to understand landscape and strategic opportunities to pursue on all accounts. |
| **Comments from self-assessment / evaluation steps :** | Employee, PATTY HARAN : Developed plans for all assigned accounts. Worked to engage with newly identified and existing decision makers. As a result Orange was invited to bid on new projects including: KPMG global FinOps and Canadian member firm security initiative. Capgemini contact center sell to and sell with, Pfizer contact center, Moody's Riverbed refresh, Pfizer Riverbed hw. license & prof. services support. |

| › High level customer relationship | |
|---|---|
| **Comments from preparation step :** | Create and execute on contact plans for all accounts. Reach out to C levels based on business drivers. Met with VP of Moody's and Pfizer to understand strategic roadmap and communicate OBS value proposition. Hosted workshop for business development on sell with for Capgemini North America. Complete transition for accounts moving to new B end DGC AM: L'Oreal and LVMH brands in Americas. |
| **Comments from self-assessment / evaluation steps :** | Employee, PATTY HARAN : Developed account plans for Pfizer & Moody's. Engaged with ZScaler team on joint pursuit at Moody's. Engaged with Genesys on Pfizer and also with Orange affiliate BlueSoft on discovery for joint development to compliment digital launch platform - such as implementation and cloud hosting support in various regions. Supported L'Oreal transition and supported warm introduction for new LAM with global CIO. |

| › Knows our products & services | |
|---|---|
| **Comments from preparation step :** | Continue completing solution trainings as assigned. Focus on Altify to support strategic deal development. Understand software and data analytics portfolios and applications within assigned verticals such as pharma and financial. |

# JA762

| Comments from self-assessment / evaluation steps : | Employee, PATTY HARAN : Participated in contact center trainings with Genesys and in practice to develop solution for client. Engaged with new partner CloudCheckr to introduce service to AME teams FinOps from KPMG oppty. Started utilizing LinkedIn Sales Navigator to identify and engage with new contacts - followed Orange training. ALso participated in several other trainings including UC and conferencing, HR related trainings, OJ calls etc. |
|---|---|

### › Being results oriented

| Comments from preparation step : | Attain sales targets for strategic accounts and execute to further to close revenue gap due to losses on departing accounts such as NBA and Coty. |
|---|---|
| Comments from self-assessment / evaluation steps : | Employee, PATTY HARAN : Pending FT transfer and true-up on $2.3M remaining to reach SCORE in new/get for 2020. |

### › Being creative and innovative

| Comments from preparation step : | Continue to engage with partners and expand reach into assigned accounts utilizing strategic product portfolio, digital & data, Orange Healthcare, wholesale for subsea cable and high capacity connectivity and other divisions to expand our value proposition within assigned accounts. Look for new business units and teaming with other Orange entities. |
|---|---|
| Comments from self-assessment / evaluation steps : | Employee, PATTY HARAN : In addition to previously mentioned areas of FinOps, security, Capgemini sell with areas and engagement with partners, on Sanofi account was able to engage with 3rd party consultant Mobitz and identify activity involving SDWAN pilot with Palo Alto. Meeting in January with Mobitz \, based in CA, to introduce Orange and determine possible joint partnership with them. |

## Main competencies to strengthen

### › Knows our tools and processes

| Comments from preparation step : | Follow DAC processes and engage early. Utilize resources and overlay support such as contact center, IS and software specialists to bring opportunities to closure efficiently. |
|---|---|
| Comments from assessment step : | Employee, PATTY HARAN : Engaged directly on DAC and got Moody's renewal SRB adjustments approved for 2 year term. Working with overlay teams such as contact center on several opptys. Worked with presales consultants and IS overlay on refining sales strategy on Moody's and Pfizer accounts in series of sessions to develop account plan. |

## Known languages

| Language | Proficiency levels |
|---|---|
| English | |

 # Objectives

## Current objectives, H2 2020

> **Global Account Teaming**

| | |
|---|---|
| **Objective description :** | Act as a leader of the global team – gain commitment and engagement as required to ensure the right expertise is in place when required by the client to move opportunities to closure, attain CSAT targets and ensure internal and external customer satisfaction. Continue to further develop a leadership role with the global team in order to effect a structure and successful team.  Manage the budget process to ensure AME is recording results commensurate to region anticipation. |
| **Measurement :** | Direct Management of team objectives, subjective and Customer feedback |
| **Due date :** | 31-dec-2020 |
| **Evaluation :** | 3-Achieved |
| **Comments :** | Employee, PATTY HARAN : Acted as a team lead on Moody's, Pfizer. B end for Sanofi & Capgemini. On Capgemini good teaming example is  business development on contact center BsV oppty. I discovered opportunity with client and engaged global DGC team,  BU and Cisco team to develop multifaceted approach to partnership and opportunity development. This continues in 2021. On Pfizer led plan for global team including mgmt, legal and CISO to refresh & update MSA terms. Engaged with partners including new partnership with CloudCheckr. C level meetings with procurement and IT to review areas of business development and renewal of existing EAM and cobrand. On Sanofi made contact and introduction to new consultant Mobiz engaged with Sanofi on SDWAN. Also scheduled meeting with regional IT leaders, BU and I to review SDWAN roadmap and capabilities. Brought in presales support with Ampacet for voice SIP, network monitoring. For L'Oreal I arranged warm handover and meeting for new AM to meet with global CIO. |

> **Customer Satisfaction**

| | |
|---|---|
| **Objective description :** | Ensure customer satisfaction rating is high, both in terms of CLI and in general customer loyalty.  Address and resolve key areas of concern.  Manage and grow a leardership and consultative relationship with assigned accounts. |
| **Measurement :** | Meet CSAT objectves for 2020 as defined on goal sheet. |
| **Due date :** | 31-dec-2020 |
| **Evaluation :** | 2-Partially Achieved |

| Comments : | Employee, PATTY HARAN : Moody's: renewal of MSA & BVPN secured for 2 years. Working to rebuild loyalty and develop new relationships in support of earning new business. We have grown voice business in 2020, added new BVPN & have been invited to participate in new bids for ERS/IS space such as Riverbed and Juniper. Working to improve CSAT feedback by ensuring Moody's key contacts are included in ops reviews, and are updated on Orange team resources and processes. Hosted meetings with Moody's key IT and procurement contacts to review network transformation plans and Orange alignment. Developed Zoom Phone BYOC opportunity for 2021 pipeline. |
|---|---|
| | Capgemini: CSAT result-Myself and IS AA both got called out for kudos from IT procurement contact at Capgemini on good responsiveness and support overall in the space of ERS/ IS. Met with global Procurement and CIS BU executives to expand scope of contacts. Engaged on expansion of Software sales IR prognosis with migration to MS Teams and alignment with BYOC oppty. |
| | Ampacet: SIP opened after negative CSAT review by Dan Batten at Ampacet. I also directly reviewed and clarified with him the features of My Service Space platform including proactive incident notifications. CSM to schedule refresh training and further review of improvement on service delivery and other possible areas of improvement with client experience. |

### › Target Achievement

| Objective description : | Achieve order, revenue, strategic orders and profitability targets for 2020 YTD as agreed in 2020 Compensation Plan and Goal Sheet.  Ensure a healthy funnel to achieve order target and focus on strategic products. |
|---|---|
| Measurement : | Achieve Revenue, orderbook, strategic orders, AR and profitability targets for second half 2020 |
| Due date : | 31-dec-2020 |
| Evaluation : | 3-Achieved |
| Comments : | Employee, PATTY HARAN : 2020 results (pending December results): expect to be 100% on revenue, order book 100%. Funnel was approximately 4 times quota for 2H '20. As of Oct '20 funnel for 2021 pipeline was in line with target of $22M per person @ $26M. |
| | AR: Worked with collections and sales ops to resolved AR issues on Pfizer account (tax exempt) & Sanofi (double billing) |
| | Although overall pipeline activity is approximately 26M the pipeline velocity needs to improve as does the win rate - especially for renewals. |

### › Sell Strategically

| Objective description : | Use consulative sales technicques to sell services that meet our client's business needs, and also achieve Orange's goal to add uniques value in the marketplace. |
|---|---|
| Measurement : | Meet strategic sales targets, build active and adequate funnel with qualified Create a comprehensive area (account) plan to sell managed services, Security, SDWAN, Cloud services, Voice services and collaboration opportunities that meet client business needs. |
| Due date : | 31-dec-2020 |
| Evaluation : | 3-Achieved |
| Comments : | Employee, PATTY HARAN : Developed plans for all assigned accounts. Worked to engage with newly identified and existing decision makers. As a result Orange was invited to bid on new projects including: KPMG global FinOps and Canadian member firm security initiative. Capgemini contact center sell to and sell with, Pfizer contact center, Moody's Riverbed refresh, Pfizer Riverbed hw. license & prof. services support, Ampacet MS teams DR, Moody's Zoom Phone BYOC and expanded BTALK, Capgemini bid on software subscription for WCC, IR Prognosis, video device deployment, and various software and hardware maintenance renewals. |

› Maintain Activity level to attain Acquisition Objectives

| | |
|---|---|
| **Objective description :** | Create and develop a healthy pipeline of new business opportunities in line with the achievement of Annual Order goals.<br>Focus should be on New business. |
| **Measurement :** | At least three client meetings per week to discuss and qualify new business opportunities.<br>Partner alignment and opportunity sharing.  Two direct partner meetings per month<br>At least one "C" level meeting per month to discuss and develop a new business opportunity. |
| **Due date :** | 31-dec-2020 |
| **Evaluation :** | 2-Partially Achieved |
| **Comments :** | Employee, PATTY HARAN : Moodys: Developing several oppty tracks with leadership and Flint Barber as well as new contact (George Kurion): Palo and/ or ZSCaler  interest in micro-segmentation- Orange value add to be developed. Met with Zscaler, Cisco, Fortinet, Zoom teams for Pfizer.  On Pfizer worked extensively with Genesys team on contact center oppty. For Sanofi engaged with Cisco & Palo Alto to discuss SDWAN partnering. KPMG engagement with Cisco on development with KPMG US and Canada member firms- met with KPMG Canada on security initiatives, ongoing.  ALso proposed to KPMG FinOps with new partner CloudCheckr- provided demo, budgetary pricing. Presented Orange capabilities  update to several clients including: Cleary, Ampacet, Pfizer, Capgemini acquisition Altran & IBM as new B end for 2021.<br>As I mentioned above, although Patty is good administratively I'm noting partial attainment here related to pipeline velocity. |

› Maintain Activity level to attain Acquisition Objectives

| | |
|---|---|
| **Objective description :** | Create and develop a healthy pipeline of new business opportunities in line with the achievement of Annual Order goals.<br>Focus should be on New business as well as strategic products. |
| **Measurement :** | At least three client meetings per week to discuss and qualify new business opportunities.<br>Partner alignment and opportunity sharing.  Two direct partner meetings per month<br>At least one "C" level meeting per month to discuss and develop a new business opportunity. |
| **Due date :** | 31-dec-2020 |
| **Evaluation :** | N-Not applicable |
| **Comments :** | Employee, PATTY HARAN : duplicate of above metric<br><br>This is a duplicate of the prior objective and should not be considered. |

 **T**raining

**Development needs**

No written content for this section.

PH_Performance_Review_01-jul-2020_31-dec-2020.pdf
Editing step « Completion ».

  # Overall rating

### ⇨ Overall rating

Rating : 2-Improvement Needed

## Manager's comments

I noted the 1H 2020 was a huge challenge for Patty in her newly assigned territory, this remained the case in 2H2020. She has met her objectives related to her B-end accounts, but the largest A-end accounts (Moody's, COTY and Pfizer) have made decisions to move away from Orange products and services. These decisions were being fomented before Patty took on responsibility for managing the accounts. And in the case of Pfizer, Orange was unable to accept some onerous contract terms. Nevertheless, this difficult situation has created a gap in the business Patty manages. She has made progress during 2H2020 in building an agreed consensus on her strategy with her team. However, this strategy has not resulted in an increased in proposed services. In fact, her pipeline velocity is potentially not sufficient to meet her 2021 financial growth objectives, and this will be a critical discussion as we set targets for 2021. The new opportunities created in 2020 (largely with B-end accounts), are exploring partnership and "sell with" opportunities to expand our portfolio. These have not matured, and no new deals in this space have been moved through the funnel to negotiation. I recognize that some of the challenges (and consequences) in building and growing a healthy business were exceptional, especially during the CVD19 crisis. That said, fragile prospects for stability and growth in Patty's business remain. Urgent focus needs to be on identifying new opportunities and moving these aggressively through the funnel.

## Employee's comments

We will need to look at account assignment mix for 2021 and discuss to consider adding select targeted A or B end acquisition accounts to augment current deck. Considering in particular Coty, Pfizer accounts currently in inactive status. Overall Moody's was expected to be a loss due to problems with Orange inventory scope on previous renewal.
In 2H delivered increase in SIP voice for Moody's and usage by $ 360K monthly. New BVPN service wins in $120k TCV in H2. $2M BVPN renewal was won and support from new coach sets stage for add l growth. New bids for GigE internet services. New opptys identified with SDWAN with Cloudgenix, new hosted voice solution identified $1M forecasted.
On Pfizer uncovered new contact center oppty with Pfizer valued at $600K and potential to expand voice footprint as well as expanding contact center scope with other BU's with stated support from Pfizer Medical division. Also uncovered, but lost, new scope of professional services and software with Riverbed on Pfizer. Uncovered private cloud oppty to support e-health in regional data centers in Europe.  Pfizer: MS Team DR oppty uncovered. Capgemini I Closed $ 600K in ERS/IS in 2020

Acknowledgement by the employee the : 29-jan-2021.

 # Career plan

Career development plan taking into account competencies, motivation and real career-enhancing opportunities.

## Development wishes

| | |
|---|---|
| **Expected due date :** | 12 months |
| **Development wishes :** | ■ Stay in my business area |
| **Specify :** | Manager, ADAM KIMMICK : Manager, ADAM KIMMICK : Employee, PATTY HARAN : Develop new A end accounts globally, continue support on short list of key B end accounts, focus on largest opportunity development in Moody's Pfizer, Capgemini, & Sanofi with additional solutions areas and business units. Look to consider a hybrid sales model with development in select new acquisition accounts Employee, PATTY HARAN : Manager, ADAM KIMMICK : Employee, PATTY HARAN : Develop new A end accounts globally, continue support on short list of key B end accounts, focus on largest opportunity development in Moody's Pfizer, Capgemini, & Sanofi with additional solutions areas and business units. Look to consider a hybrid sales model with development in select new acquisition accounts |

## Action plan

| Action | Due date |
|---|---|
| Develop A end accounts existing and new | 31-dec-2020 |

### ➡ Manager view

| **View :** 1-Favourable |
|---|
| **Specify :**<br><br>Although I agree that additional opportunities need to be generated, and that it might happen through the addition of new accounts, this will require a change in structure to the sales team and sales compensation structure.  I will support the recommendation, but the implementation of this plan is outside my purview.   In the meantime, Patty needs to work within her assigned territory. |

# Exhibit F

**Liane Fisher**

| | |
|---|---|
| **From:** | patty.haran@orange.com |
| **Sent:** | Wednesday, February 24, 2021 11:27 AM |
| **To:** | pattyharan@gmail.com |
| **Subject:** | FW: Moodys & Orange wave request & catch up |

 **Business Services**

**Patty Haran**
Sr. Acct Manager
Orange Business Services
Phone: +1 5167020769
patty.haran@orange.com
10 E 40th Street
New York, NY 10016
www.orange-business.com



**From:** Bothe, Jason [mailto:Jason.Bothe@moodys.com]
**Sent:** February 17, 2021 12:56 PM
**To:** HARAN Patty OBS/S AME; AGUILAR Frank WIN/IC; KLINGNER Michael WIN/IC; HINKLE Jonathan WIN/IC
**Cc:** Looney, Scott (non-empl)
**Subject:** Re: Moodys & Orange wave request & catch up

Hi team

Following up on this request. Any update?

Cheers

J~

**From:** Patty Haran <patty.haran@orange.com>
**Date:** Wednesday, February 3, 2021 at 9:50 AM
**To:** AGUILAR Frank WIN/IC <frank.aguilar@orange.com>, KLINGNER Michael WIN/IC
<michael.klingner@orange.com>, "Bothe, Jason" <Jason.Bothe@moodys.com>, HINKLE Jonathan WIN/IC
<jonathan.hinkle@orange.com>
**Subject:** RE: Moodys & Orange wave request & catch up

1

P000150

CAUTION: This email originated from outside of Moody's. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Frank & Michael,

Per Jason's request please also quote below 2 options with 1 Gbps unprotected wave:

1. 21 1-ya Tverskaya-Yamskaya ulitsa Four Winds Plaza-7th floor Moscow, Russian Federation 125047 to Equinix FR5, Kleyerstraße 90, 60326 Frankfurt am Main, Germany
2. 21 1-ya Tverskaya-Yamskaya ulitsa Four Winds Plaza-7th floor Moscow, Russian Federation 125047 to Equinix AM3, Science Park 610, 1098 XH Amsterdam, Netherlands

This is in addition to below quotes. Two and three year term options.

Thank you,

 **Business
Services**

**Patty Haran**
Sr. Acct Manager
Orange Business Services
Phone: +1 5167020769
patty.haran@orange.com
10 E 40th Street
New York, NY 10016
www.orange-business.com



-----Original Appointment-----
**From:** HARAN Patty OBS/S AME
**Sent:** February 2, 2021 3:30 PM
**To:** HARAN Patty OBS/S AME; AGUILAR Frank WIN/IC; KLINGNER Michael WIN/IC; jason.bothe@moodys.com; HINKLE Jonathan WIN/IC
**Subject:** Moodys & Orange wave request & catch up
**When:** February 2, 2021 4:30 PM-5:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** https://orangeamerica.webex.com/join/patty.haran

https://orangeamerica.webex.com/join/patty.haran

Review of 1 G unprotected wave quote, diverse with 2 & 3 year terms.

Site 1

2

# Exhibit G

---

Message

| | |
|---|---|
| **From:** | HARAN Patty OBS/S AME [patty.haran@orange.com] |
| **Sent:** | 2/1/2021 5:33:09 PM |
| **To:** | SINGH Peter OBS/S EUR [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LJWM0335]; HARAN Patty OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LNSJ0690] |
| **Subject:** | Conversation with SINGH Peter OBS/S EUR |

**HARAN Patty OBS/S AME 4:16 PM:**

Hi There

**SINGH Peter OBS/S EUR 4:20 PM:**
Hi Patty - Are you covered in snow ?

**HARAN Patty OBS/S AME 4:22 PM:**
not personally, but yes. Still coming down. No way to escape, right?

**SINGH Peter OBS/S EUR 4:23 PM:**
No.. still coming down in the city as well.  Kids are in the courtyard burying themselves currently.

at least 12 inches

Maybe 14

How are you?  I miss our chats.

**HARAN Patty OBS/S AME 4:26 PM:**
wow! Let them make some snowpeople. Julia is out sledding in the woods w/ friend. A winter baby, she loves the snow. 1st morning all year, she is up, made her bed and all smiles. How are you?

**SINGH Peter OBS/S EUR 4:27 PM:**
Nice.  I'm good, counting the days to when I can get a vaccine.  Sort of focused on work, sort of not.

I'm rolling off 3M.

Transition to the Justin, who I hired in Minneapolis.

3M now a NAM account.  And new CBU Director Ann Lim taking over.

so, until I get assigned, you can have me fully for KPMG ;-)

**HARAN Patty OBS/S AME 4:33 PM:**
wow, interesting on the changes. What do you think you will get assigned next?

I will be in your area I think- my mom is seeing a DR at 167th Street area and I am driving her in a few weeks. where are you?

**SINGH Peter OBS/S EUR 4:35 PM:**
Excellent... can we meet?  Sounds like you're visiting NY Presbyterian.

I'm at 116 close to 5th ave.

But can meet you near 167 also.

**HARAN Patty OBS/S AME 4:37 PM:**
I think so, I don't know if they will let me go in with my mom. most appt's now unless with a minor are just for the patient. so I may have a little time

would be nice. I need to get the name of DR and exact address. I just know its a eye specialist. Friday, 2/12 at 2PM

**SINGH Peter OBS/S EUR 4:39 PM:**
That sounds good.  Hopefully she'll have a good visit, and we can have a good catch up as well.

166-168 and Broadway is the NY P complex.

I know it well, both kids born there :)

**HARAN Patty OBS/S AME 4:42 PM:**
makes sense. I dont think my mom realizes its at NYP. She keeps saying the Dr.'s office.

**SINGH Peter OBS/S EUR 4:45 PM:**
As far as next challenge, dunno... maybe Goodyear or GSK

How is your year starting off?

**HARAN Patty OBS/S AME 4:50 PM:**
Nice to have a little break while it's figured out, right?

I finally closed Moody's renewal, so that helps a bit. But honestly things are intense as far as pressure for more business quickly. Not sure how safe I am

**SINGH Peter OBS/S EUR 4:55 PM:**
Yeah, I know about the heat.  Congrats on Moody's!

**HARAN Patty OBS/S AME 4:58 PM:**
you feeling the heat too?

or just heard from me already about my heat?

**SINGH Peter OBS/S EUR 4:59 PM:**
Whenever I think about you, I start of heat up.... that's what you meant right?

:-)

**HARAN Patty OBS/S AME 5:00 PM:**
that was good

nice pivot

made me smile, which I can use right about now.

thanks

**SINGH Peter OBS/S EUR 5:02 PM:**
I think I'm OK, but if we don't sign GSK things can get a bit dicey for me.

I'm not too worried about it.  If it happens change is good.  And you shouldn't worry either.

**HARAN Patty OBS/S AME 5:05 PM:**
yes, it is good. We can go always go somewhere else- just might take a little longer right now.

**SINGH Peter OBS/S EUR 5:06 PM:**
I think once the economy opens up again, I think lots of people will look to start fresh in new jobs, maybe new geography, etc.  There will be opportunities.

**HARAN Patty OBS/S AME 5:07 PM:**
yes for sure. 2022 will be a big year of job change. i was hoping to hang in here for a bit longer until things open up a bit more

**SINGH Peter OBS/S EUR 5:08 PM:**
Btw, I'm actively looking for a country cabin or cottage.

**HARAN Patty OBS/S AME 5:09 PM:**

really?

**SINGH Peter OBS/S EUR 5:09 PM:**
I went house viewing upstate recently to look at houses in the Rock Hill area.  Do you know it?

**HARAN Patty OBS/S AME 5:09 PM:**
i haven't heard of it. NY or CT?

**SINGH Peter OBS/S EUR 5:10 PM:**
NY, lower Catskills north of Middletown which is the big town in teh area.

Nice lake community

I found a place I really liked, but HOA and taxes were too high, so I passed.

I'm also looking in Poconos.

**HARAN Patty OBS/S AME 5:14 PM:**
we have stayed near candlewood Lake area in CT (New Fairfield, New Milford). There are a few lake communities there. Not too far from NY. Also Squantz Pond which is nicer than it sounds

if you want to be near a lake.... otherwise lots of other options

**SINGH Peter OBS/S EUR 5:16 PM:**
I'll take another look.  I haven't come across anything in CT though.  I'd like to stay in NY.  But the market is hot right now.  People leaving the city.

I'm trying to balance lake and mountains, which I like.  Lake community with some amenities is good for the kids.

In Rock Hill, there is a pool, tennis courts, basketball courts, playground, etc.

**HARAN Patty OBS/S AME 5:20 PM:**
yes same. Candlewood Shores, they all have tennis, bb. not sure on pool. that would be nice through. Lots of options to explore. Now is the time while your kids are young to enjoy

**SINGH Peter OBS/S EUR 5:20 PM:**
Yeah, before they don't want to be seen with me...lol

I'll check out CS.

**HARAN Patty OBS/S AME 5:21 PM:**
yep. we waited to o long. too worried about spending the $$. llake houses aren't investments for the most part. but nice to enjoy, you can use it in winter too.

**SINGH Peter OBS/S EUR 5:23 PM:**
Yeah, I don't think I'll make money as an investment, but this is what working hard is about, right?

**HARAN Patty OBS/S AME 5:23 PM:**
yes. and if its not too costly, it can stay in the family

**SINGH Peter OBS/S EUR 5:23 PM:**
To be able to add these things to enjoy life.

yep

Thinking long term as well.

**HARAN Patty OBS/S AME 5:24 PM:**
I hope you find the right spot. maybe rent for a summer 1st to make sure you like it

the area

**SINGH Peter OBS/S EUR 5:25 PM:**

Plus I had a banner year in my market investments, and think I should convert to a hard asset.  So, good investment from this perspective.

**HARAN Patty OBS/S AME 5:26 PM:**
yes true. I did well too all things considered.

**SINGH Peter OBS/S EUR 5:26 PM:**
Yep, lets see. I started literally on Jan 2 thinking about this.

And thought, why not.  Now's the time.

Something different in 2021.

**HARAN Patty OBS/S AME 5:28 PM:**
Good for you. I hope it works out. candlewood Isles is another spot. the real estate lady I spoke with last summer has me on her mailing list :-)

**SINGH Peter OBS/S EUR 5:29 PM:**
Let's both buy in the same spot... lol

I want dangerous liaisons...

**HARAN Patty OBS/S AME 5:30 PM:**
sounds like fun

**SINGH Peter OBS/S EUR 5:30 PM:**
A little distraction., excitment

I can day dream....

And reality will coming storming back soon when they return, so I'll go figure out the dinner menu now.

Wishing you a good evening!  ciao ciao bela.

**HARAN Patty OBS/S AME 5:32 PM:**
yes you too. same here. TTYL

OBS_00925

# Exhibit H

---

Message

| | |
|---|---|
| **From:** | HARAN Patty OBS/S AME [patty.haran@orange.com] |
| **Sent:** | 2/24/2021 12:19:55 PM |
| **To:** | PICHON Xavier DGC/IND IT [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KDSQ7320]; HARAN Patty OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LNSJ0690] |
| **Subject:** | Conversation with PICHON Xavier DGC/IND IT |

**HARAN Patty OBS/S AME 11:59 AM:**

Hi Xavier

**PICHON Xavier DGC/IND IT 11:59 AM:**

Hi Patty

Was thinking about you

can we talk?

**HARAN Patty OBS/S AME 12:00 PM:**

i have some bad news

sure

**PICHON Xavier DGC/IND IT 12:00 PM:**

What about?

**HARAN Patty OBS/S AME 12:00 PM:**

i have been let go, effective today

**PICHON Xavier DGC/IND IT 12:01 PM:**

Are you kidding?

**HARAN Patty OBS/S AME 12:01 PM:**

no severance. they say they don't think my module has enough business to support my salary

i wish i was.

you will be hearing from my manager soon I suppose. my email will be cut off soon so you can whatsapp me

**PICHON Xavier DGC/IND IT 12:02 PM:**

I am so sad to read this Patty

I don't know what to say...

**HARAN Patty OBS/S AME 12:02 PM:**

me too. i just wanted you to know. this is the down side of life in america. they can let people go at any time with no warning

i can give you a debrief on what i was working on

**PICHON Xavier DGC/IND IT 12:04 PM:**

Yeah

**HARAN Patty OBS/S AME 12:04 PM:**

i will forward you a meeting i had lined up for Friday after my effort with Tom Gallagher

**PICHON Xavier DGC/IND IT 12:05 PM:**

unfortunately I have seen this many times at Dimension DAta

and my wife is working for a US company

she saw that many times with former colleagues which were US based.

They learnt by email after a conference call they were those selected to leave...

**HARAN Patty OBS/S AME 12:07 PM:**
i feel that due to my daughter's illness in Q4 that I should have taken family medical leave off but I didn't want to let the company down. I cannot believe they gave me no severance. And they didnt pay me my owed commission on capgemini for 2020.

i just forwarded you the invite for friday call with Tom Gallagher's direct report with agenda she would like to discuss

**PICHON Xavier DGC/IND IT 12:07 PM:**
NOted

can I call you in 10mns?

# Exhibit I

| Message | |
| --- | --- |
| **From**: | HARAN Patty OBS/S AME [patty.haran@orange.com] |
| **Sent**: | 10/8/2020 3:25:42 PM |
| **To**: | KIMMICK Adam OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ZRPK4373]; HARAN Patty OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LNSJ0690] |
| **Subject**: | Conversation with KIMMICK Adam OBS/S AME |

**HARAN Patty OBS/S AME 2:58 PM:**

Hi Adam

**KIMMICK Adam OBS/S AME 2:59 PM:**

Hi Patty

**HARAN Patty OBS/S AME 3:02 PM:**

Eddy had reached out asking me to participate in training 3 days next week.... i said I could but now looks like i iwll need to take a few days off for my daughter's situation

should i let him know directly I won't be able to participate in full session so he can open the spot for someone else

i think it was tuesday-thursday training

tues, wed, thurs

**KIMMICK Adam OBS/S AME 3:04 PM:**

OK. I haven't told anyone (eddy) yet about your doughter

so if you can't join, I can tell Eddy. He'll certainly understand

I can call him if you want

**HARAN Patty OBS/S AME 3:06 PM:**

me either. he just needed to fill some training spots so he asked and at time i thought I could participate but today we found out she will need surgery and it will likely be on wed.

**KIMMICK Adam OBS/S AME 3:06 PM:**

just take the time Patty

I'll let Eddy know

just called Eddy

**HARAN Patty OBS/S AME 3:08 PM:**

yes. do you want to just select someone else to join? he has Paul renassia and Ken McDonald from your team for differentiated selling 10/13-1/15 9 AM-1 PM

**KIMMICK Adam OBS/S AME 3:08 PM:**

no problem

**HARAN Patty OBS/S AME 3:08 PM:**

ok thanks.

**KIMMICK Adam OBS/S AME 3:08 PM:**

Eddy will find someone else

take care of your daughter Patty. Will think of you!

**HARAN Patty OBS/S AME 3:12 PM:**

OBS_00575

thanks. i will firm up when i will be out once I know. insurance has to approve etc. details but she will be in hospital for 3 days Wed-Fri is the plan

KIMMICK Adam OBS/S AME 3:12 PM:

understand.  Let me know i you need anything.  Eddy offered as well

HARAN Patty OBS/S AME 3:13 PM:

okay thanks. will do.

OBS_00576

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICIA HARAN,

Plaintiff,

-against-

ORANGE BUSINESS SERVICES INC.,

Defendants.

Case No.: 21-cv-10585-VSB

**DECLARATION OF PATRICIA HARAN**

PATRICIA HARAN hereby declares the following pursuant to 28 U.S.C. §1746:

1. I am the Plaintiff in the above-captioned action.

2. My daughter, Julia, was 15 years old in October 2020. Julia was diagnosed with a suspected bone tumor for which she would require surgery on October 1, 2020. The need for surgery was exigent and scheduled for October 14, 2020.

3. In October 2020, I informed my manager, Adam Kimmick, that my daughter Julia possibly had a tumor in her femur bone and that she would need surgery, on-going medical treatment, and a long period of recovery and homeschooling. I informed him of my need to take leave to care for my daughter.

4. In late October 2020, I also informed Michelle Rocco, a human resources employee, that my daughter Julia had had surgery, needed on-going medical treatment, and would need a long period of recovery and homeschooling.

5. I also informed both Kimmick and Rocco that my daughter may need further surgery in the future.

DocuSign Envelope ID: A13FE252-F3EC-4CF8-861E-3B7B8EFEB983

6. I began to request occasional leave to care for my daughter in October 2020. Mr. Kimmick and the Defendants' Human Resources departments (a) failed to provide me with any information regarding my FMLA rights, (b) failed to provide me with the necessary FMLA leave forms; (c) failed to provide me with any other FMLA paperwork; (d) failed to refer me to any other individual within the Company who could apprise me of my FMLA rights, and (e) failed to inform me whether my leave could or would be designated as FMLA leave.

7. Before I took leave to care for my daughter, Mr. Kimmick had never criticized me for "lack of focus."

8. My daughter, Julia, was home recovering from surgery from October 15, 2020 to November 18, 2020. I returned to work on October 20, 2020, before my daughter was fully recovered.

9. Julia was on crutches with limited mobility during the period of her recovery. She had a wound that required cleaning and dressing on a daily basis. She needed help showering, going to the bathroom and other day-to-day activities. Julia had to care for herself during this time period, while I worked each day.

10. After informing Mr. Kimmick about Julia's condition and taking intermittent leave to care for Julia, Mr. Kimmick suddenly began subjecting me to heightened scrutiny and pressure.

11. I was intimidated by negative performance feedback I received from Mr. Kimmick, and I avoided taking more time off work while my daughter continued to recuperate, receive treatment, and attend homeschooling.

12. Mr. Kimmick constantly asked me whether I was going to be able to maintain the schedule and pace of conversations with Pfizer given my caregiving obligations.

13. He threatened to take me off the Pfizer account.

14. Mr. Kimmick directed one of my peers, Paul Reticker, to call me to apply pressure as well. After coming home from sleeping at the hospital with my daughter for five nights, I received a call from Mr. Reticker late one evening. Mr. Reticker told me that if I was unable to participate in the upcoming conversations with Pfizer, the account would be transferred to him, per Mr. Kimmick.

15. During this time period, Mr. Kimmick was constantly checking up on me to ascertain the status of my deals, even when he was fully aware of the status.

16. For example, with respect to the Moody's renewal, Mr. Kimmick repeatedly asked me on a day-to-day basis when I was going to get the contract executed by the customer. He was aware that it took time for the deal to finalize, yet he persistently asked me for updates.

17. Mr. Kimmick was responsible as a member of management to facilitate negotiations with clients by encouraging the Company internally to agree to contractual terms with clients.

18. With respect to me, Mr. Kimmick was unwilling to advocate internally to help me finalize the terms of a Master Agreement with Pfizer. Instead, he put pressure on me to get Pfizer to change its position.

19. Conversely, Mr. Kimmick helped my peers, Messrs. Reticker and Renassia, to secure deals by advocating internally on their behalf to get certain unusual contractual terms approved by Orange.

20. If Mr. Kimmick had not subjected me to increased pressure and scrutiny, I would have taken off the time necessary to care for my daughter for the full duration of her recovery.

21. On January 25, 2021, Mr. Kimmick gave me positive feedback during a meeting to discuss my performance in the second half of 2020. He acknowledged that I had secured several

deals, including renewal of a $2.5 million contract, and that I had identified many other promising opportunities that could contribute to my sales going forward.

22. I understood that my performance in 2020 was satisfactory and anticipated that I would be successful in 2021.

23. I was never provided with a sales quota for 2021.

24. I had a plan to increase my 2021 sales pipeline, which I presented to Mr. Kimmick on or about 02/08/2021. During this presentation, Mr. Kimmick did not raise any concerns or doubts about me being able to generate sufficient revenue for the 2021 fiscal year.

25. On or about December 10, 2020, my mother was diagnosed with Macular degeneration which limits her vision.

26. She is under the ongoing care of an eye doctor, requiring regular treatment and visits.

27. Due to her Macular degeneration, my mother is unable to drive at night or navigate unfamiliar settings, such as hospitals and doctor's offices.

28. Since her diagnosis, my mother has been following a regimen of treatment involving several follow-up appointments, including eye injections every 3 months to slow the progression of the disease.

29. On February 8, 2021, I informed Mr. Kimmick that I would need to take a half day off work to take my mother to the eye doctor because my mother suffered from macular degeneration.

30. I took a half day off as scheduled on February 12th.

31. I was terminated on February 24, 2021. To my knowledge, I was the only employee terminated at the time.

32. During my termination meeting, Mr. Kimmick never mentioned anything about my alleged

interpersonal issues with clients or coworkers.

Executed on March 26, 2024

PATRICIA HARAN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICIA HARAN,

Plaintiff,                                    Case No.: 21-cv-10585-VSB

-against-                                     **DECLARATION OF LIANE FISHER**

ORANGE BUSINESS SERVICES INC.,

Defendants.

LIANE FISHER hereby declares the following pursuant to 28 U.S.C. §1746:

1.  I am the attorney for the Plaintiff in the above-captioned action, and as such I am familiar with the facts and circumstances of the within action to the extent set forth herein. I submit this declaration in support of Plaintiff's opposition to Defendants' motion for summary judgment.

2.  Sales Director Adam Kimmick, an employee of Defendant, was deposed in this matter on October 5, 2023. The transcript of that deposition is attached to Plaintiff's Rule 56.1 Statement as Exhibit A.

3.  Plaintiff was deposed in this matter on April 26, 2023. The transcript of that deposition is attached to Plaintiff's Rule 56.1 Statement as Exhibit B.

4.  Plaintiff's responses to Defendant's Interrogatories are attached to Plaintiff's Rule 56.1 Statement as Exhibit C.

5.  Plaintiff's responses to Defendant's Interrogatories are attached to Plaintiff's Rule 56.1 Statement as Exhibit C.

6.  Human Resources Representative Michelle Rocco, an employee of Defendant, was deposed in this matter on May 17, 2023. The transcript of that deposition is attached to Plaintiff's Rule 56.1 Statement as Exhibit D.

7.  Plaintiff's 2020 year-end performance review is attached to Plaintiff's Rule 56.1 Statement as Exhibit E.

8.  An email regarding Plaintiff's accounts is attached to Plaintiff's Rule 56.1 Statement as Exhibit F.

9.  An instant message exchange between Plaintiff and her coworker Peter Singh is attached to Plaintiff's Rule 56.1 Statement as Exhibit G.

10. An instant message exchange between Plaintiff and her coworker Xavier Pichon is attached to Plaintiff's Rule 56.1 Statement as Exhibit H.

Executed on March 26, 2024

_____/s/_____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICIA HARAN,

*Plaintiff,*

-against-

ORANGE BUSINESS SERVICES INC.,

*Defendant.*

CASE NO.: 1:21-CV-10585-DEH-JW

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT**
**OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**BAKER & HOSTETLER LLP**

Amy J. Traub
Justin A. Guilfoyle
45 Rockefeller Plaza, 14th Floor
New York, New York 10111
Tel: 212 589-4200
Fax: 212 589-4201
Email: atraub@bakerlaw.com
Email: jguilfoyle@bakerlaw.com

*Attorneys for Defendant*
*Orange Business Services U.S. Inc.*

## TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ........................................................................................ 1

**LEGAL ARGUMENT** .................................................................................................... 2

    I.   The Vast Majority of Defendant's Rule 56.1 Statement of Undisputed Material Facts Has Been Admitted. ........................................................... 2

    II.   Plaintiff Concedes that She Cannot Establish a Prima Facie Case of FMLA Interference. ................................................................................... 3

          A.   Plaintiff Admits that She Failed to Comply with Defendant's FMLA Policy ........................................................................ 3

          B.   Plaintiff Admits She Was Given All the Time Off She Requested. .......... 4

    III.  Plaintiff's Retaliation Claim Is Meritless. ............................................. 6

          A.   Plaintiff Has Not Satisfied Her Prima Facie Burden. .......................... 6

          B.   Plaintiff Has Not Proven Pretext. .................................................. 8

    IV.  Plaintiff Offers No Evidence of Caregiver Discrimination. .......................... 9

**CONCLUSION** .......................................................................................................... 10

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alexidor v. Donahoe*,
    2016 WL 5720789 (S.D.N.Y. Sept. 30, 2016)..................................................................8

*Amley v. Sumitomo Mitsui Banking Corp.*,
    2021 WL 4429784 (S.D.N.Y. Sept. 27, 2021)..............................................................4

*Baity v. Kralik*,
    51 F. Supp. 3d 414 (S.D.N.Y. 2014)..............................................................................3

*Bodget v. 22 S. St. Opers.*,
    2019 WL 2913844 (D. Conn. July 8, 2019), *aff'd*, 828 Fed. App'x 1 (2d Cir. 2020)..........5

*Brierly v. Deer Park Union Free Sch. Dist.*,
    359 F. Supp. 2d 275 (E.D.N.Y. 2005)..........................................................................8

*El Sayed v. Hilton Hotels Corp.*,
    627 F.3d 931 (2d Cir. 2010)..........................................................................................9

*Garrett v. Garden City Hotel*,
    2007 WL 1174891 (E.D.N.Y. Apr. 19, 2007)..............................................................7

*Giannulo v. City of New York*,
    322 F.3d 139 (2d Cir. 2003).........................................................................................2

*Gonzalez v. City of N.Y.*,
    845 Fed. App'x 11 (2d Cir. 2021)................................................................................9

*Gorham v. Town of Trumball*,
    7 F. Supp. 3d 218 (D. Conn. 2014)..............................................................................8

*Greenberg v. State Univ. Hosp. – Downtown Med. Ctr.*,
    838 Fed. App'x 603 (2d Cir. 2020)..............................................................................4

*Guerrero v. City of Yonkers*,
    2023 WL 6141604 (E.D.N.Y. Sept. 20, 2023)............................................................3

*Hahn v. Office & Prof'l Emps. Int'l Union, Local 153*,
    2016 WL 4120517 (S.D.N.Y. July 22, 2016)..............................................................5

*Kelly v. Hartford Fin. Servs. Group, Inc.*,
    818 Fed. App'x 83 (2d Cir. 2020)................................................................................4

ii

*Ludwig v. Rochester Psychiatric Ctr.,*
    550 F. Supp. 2d 394 (W.D.N.Y. 2008) ..................................................................... 9

*Richards v. N.Y.C. Dep't of Educ.,*
    2015 WL 4164746 (S.D.N.Y. July 10, 2015) ........................................................ 4

*Robles v. Medisys Health Network, Inc.,*
    2020 WL 3403191 (E.D.N.Y. June 19, 2020) ....................................................... 7

*Saad v. ASML US, LLC,*
    2020 WL 12904711 (D. Conn. Sept. 4, 2020) ..................................................... 4

*Sarno v. Douglas Elliman-Gibbons & Ives, Inc.,*
    183 F.3d 155 (2d Cir. 1999) ................................................................................ 5

*Thompson v. Global Contract Servs., LLC,*
    2021 WL 3486944 (E.D.N.Y. July 21, 2021) ......................................................... 2

## **Rules**

Fed. R. Civ. P. 56(c) ................................................................................................ 2

Fed. R. Civ. P. 56.1 ............................................................................................. 2, 3

Fed. R. Civ. P. 56.1(a) ............................................................................................. 2

Fed. R. Civ. P. 56.1(b) ............................................................................................ 2

Fed. R. Civ. P. 56.1(d) ............................................................................................ 2

Defendant Orange Business Services U.S. Inc. ("Defendant") respectfully submits this Reply Memorandum of Law in Further Support of its Motion for Summary Judgment, seeking the dismissal of Plaintiff Patricia Haran's ("Plaintiff's") claims against it, in their entirety.[1]

## PRELIMINARY STATEMENT

Plaintiff's opposition confirms that she is unable to satisfy her burden of proving a *prima facie* case or otherwise defeating Defendant's motion for summary judgment. Indeed, the following material facts are not in dispute and are ultimately fatal to Plaintiff's claims:

- Defendant's FMLA policy <u>required</u> Plaintiff to submit a request for leave in writing to both her direct supervisor and to Human Resources. (Dkt. No. 72 at ¶ 8).

- Plaintiff <u>never</u> requested FMLA leave. (*Id.* at ¶ 64).

- Plaintiff <u>never</u> took FMLA leave. (*Id.* at ¶ 65).

- No one at Defendant made disparaging or negative comments about Plaintiff's daughter's or mother's illnesses or Plaintiff taking days off in connection therewith. (*Id.* at ¶¶ 53-56).

- Defendant <u>never</u> prohibited Plaintiff from taking any time off due to her daughter's or mother's illnesses, and she was paid for all such days. (*Id.* at ¶¶ 57-60).

- Prior to taking any time off in connection with her daughter or mother, Kimmick noted that Plaintiff was struggling in her new territory, that her qualified pipeline was not sufficient to meet her financial objectives, and that she had interpersonal shortcomings with both Defendant's clients and her co-workers. (*Id.* at ¶¶ 20-25).

- Plaintiff admitted that she had a "lack of focus" on her job throughout the second half of 2020. (*Id.* at ¶ 32).

- Kimmick told Plaintiff to take off whatever time she needed to take care of her daughter, he would be thinking of her, and to let him know if she needed anything. (*Id.* at ¶ 50).

---

[1] Plaintiff incorrectly sued "Orange Business Services Inc." At all relevant times, Orange Business Services U.S., Inc. was Plaintiff's employer.

Because these material facts are not in dispute, and because Plaintiff has presented no evidence other than her own subjective feelings, beliefs, and conjecture in support of her claims, summary judgment should be granted to Defendant on all of Plaintiff's claims.

<u>**LEGAL ARGUMENT**</u>

I.    <u>**The Vast Majority of Defendant's Rule 56.1 Statement of Undisputed Material Facts Has Been Admitted.**</u>

"Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." Fed. R. Civ. P. 56.1(d). "If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannulo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Plaintiff's response (Dkt. No. 72) to Defendant's Rule 56.1 Statement of Undisputed Material Facts ("56.1 Statement") (Dkt. No. 68) confirms that there are no genuine issues of material fact precluding summary judgment in Defendant's favor.

First, Plaintiff failed to properly controvert the following facts in Defendant's 56.1 Statement: 3, 4, 5, 21, 22, 23, 24, 25, 28, 30, 31, 35, 36, 37, 40, 63, 64, and 66. Consequently, these facts are deemed admitted. Second, Plaintiff responded to several paragraphs in Defendant's 56.1 Statement by merely stating that she "does not have sufficient personal knowledge to admit or deny this statement." (*See* Dkt. No. 72 at ¶¶ 3, 4, 5, 36, 37, & 40). Where "a party responds to a numbered paragraph by stating that she lacks sufficient information to admit or controvert a particular fact, the fact is deemed admitted." *Thompson v. Global Contract Servs., LLC*, 2021 WL 3486944, at *2 (E.D.N.Y. July 21, 2021) (citations omitted). Accordingly, Paragraphs 3, 4, 5, 36, 37, and 40 of Defendant's 56.1 Statement are also admitted.

Third, Plaintiff attempts to temper her admissions with respect to numerous other paragraphs in Defendant's 56.1 Statement by using qualifying language such as "Admit to the extent that …" while providing no citations to the record or actually controverting the statement. (*See* Dkt. No. 72 at ¶¶ 21, 22, 23, 24, 25, 28, 30, 31, 35, 63, & 64). Because Plaintiff failed to "specifically controvert" these paragraphs, they are admitted. *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("If the opposing party … fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule."). Accordingly, Paragraphs 21, 22, 23, 24, 25, 28, 30, 31, 35, 63, and 64 of Defendant's 56.1 Statement are also admitted.

Finally, Plaintiff failed to cite any record evidence in connection with her responses to Paragraphs 5, 25, and 66 of Defendant's 56.1 Statement. (*See* Dkt. No. 72 at ¶¶ 5, 25, & 66). Notably, a denial without a citation to the record renders the statement of fact admitted. *See Guerrero v. City of Yonkers*, 2023 WL 6141604, at *1 n.3 (E.D.N.Y. Sept. 20, 2023) ("[W]here Defendants' 56.1 statement makes an assertion that is properly supported by the record and Guerrero's 56.1 statement responds with only a denial without citation to the record, the court considers the Defendants' assertion admitted."). Accordingly, Paragraphs 5, 25, and 66 of Defendant's 56.1 Statement are also admitted.

II.    **Plaintiff Concedes that She Cannot Establish a *Prima Facie* Case of FMLA Interference.**

A.    **Plaintiff Admits that She Failed to Comply with Defendant's FMLA Policy.**

Plaintiff acknowledges that she cannot satisfy the fourth prong of her FMLA interference claim. Indeed, Plaintiff admits that Defendant's FMLA policy required her to (i) submit a request <u>in writing</u> (ii) to both her direct supervisor and to Human Resources (iii) on Defendant's FMLA

form. (Dkt. No. 72 at ¶ 8). Despite this clear requirement, Plaintiff further admits that she <u>never</u> requested FMLA leave, let alone in a way that complied with Defendant's policy.[2] (*Id.* at ¶ 64). Consequently, Plaintiff's FMLA interference claim must be dismissed. *See Kelly v. Hartford Fin. Servs. Group, Inc.*, 818 Fed. App'x 83, 85 (2d Cir. 2020) (dismissing FMLA claim where plaintiff "never once applied for leave through the established procedures"); *Amley v. Sumitomo Mitsui Banking Corp.*, 2021 WL 4429784, at *11 (S.D.N.Y. Sept. 27, 2021) (dismissing FMLA interference claim where plaintiff did not comply with employer's procedures); *Richards v. N.Y.C. Dep't of Educ.*, 2015 WL 4164746, at *14 n.20 (S.D.N.Y. July 10, 2015) (FMLA claim futile where plaintiff failed to comply with employer's requirements for requesting leave); *Saad v. ASML US, LLC*, 2020 WL 12904711, at *5 (D. Conn. Sept. 4, 2020) ("Failure to comply with an employer's policy governing notice, absent unusual circumstances, is grounds for denial of FMLA leave.").[3]

**B.    Plaintiff Admits She Was Given All the Time Off She Requested.**

Plaintiff is similarly unable to satisfy her burden with respect to the fifth element of a *prima facie* claim of FMLA interference. Notably, Defendant did not deny Plaintiff any benefits to which she was entitled under the FMLA, as confirmed by her admission that Defendant <u>never prohibited</u> her from taking <u>any time off</u> due to her daughter's or mother's illnesses (Dkt. No. 72 at ¶¶ 57-58) and that Defendant <u>paid her</u> for those days. (*Id.* at ¶¶ 59-60). Consequently, her claim fails as a matter of law. *See Greenberg v. State Univ. Hosp. – Downtown Med. Ctr.*, 838

---

[2] The case law cited on pages 8 and 9 of Plaintiff's opposition is inapposite because all of those cases dealt with instances in which the plaintiff's absences were used as reasons for the employers' termination decisions, which is not at issue here.

[3] Plaintiff fails to substantively address this clear line of cases and the FMLA's regulations that expressly permit employers to require FMLA leave requests to be in writing and pursuant to an employer's policy. Instead, Plaintiff merely attempts to muddy the waters by discussing the requirements around FMLA medical certifications, which are not at issue in this case.

Fed. App'x 603, 606 (2d Cir. 2020) (FMLA interference claim dismissed where plaintiff was given time off as sick leave); *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999) (no interference where plaintiff received time off); *Hahn v. Office & Prof'l Emps. Int'l Union, Local 153*, 2016 WL 4120517, at *4 (S.D.N.Y. July 22, 2016) (use of sick days for time off rendered FMLA interference meritless); *Bodget v. 22 S. St. Opers.*, 2019 WL 2913844, at *5 (D. Conn. July 8, 2019), *aff'd*, 828 Fed. App'x 1, 5 (2d Cir. 2020) (same).

Faced with the futility of this claim, for the first time and only in opposition to Defendant's motion, Plaintiff now claims that Defendant somehow "discouraged" her from taking further "leave" to care for her daughter. (Dkt. No. 71 at 12). This argument must be rejected for at least two reasons. First, Plaintiff failed to controvert (*i.e.*, admitted) Defendant's statement of fact citing her deposition testimony that the <u>sole basis</u> for her FMLA interference claim is her belief that despite being given the time off she wanted, it should have been categorized as FMLA leave. (Dkt. No. 72 at ¶ 61). The deposition testimony Plaintiff cites purportedly controverting Defendant's statement of fact actually re-affirms that this is the sole basis for Plaintiff's FMLA interference claim. (*Id.*).

Second, Plaintiff points to no record evidence in support of her unfounded claim that Defendant "discouraged her" from taking additional time off. She merely claims that she "interpreted" Kimmick's alleged "lack of focus" comment during her performance review as referring to her days off and that this somehow constitutes unlawful "discouragement" in connection with her FMLA rights. (Dkt. No. 78 at ¶ 35; Dkt. No. 71 at 13-14). However, this objectively innocuous comment disassociated from Plaintiff's handful of days off from work months earlier, fails to support her claim. Notably, Plaintiff admits that she had a lack of focus

during 2020 (Dkt. No. 72 at ¶ 32), which further undercuts anything nefarious about Kimmick's alleged comment. Additionally, Plaintiff completely distorts reality in claiming that Kimmick threatened to take her off of the Pfizer account when, in reality, Kimmick had a co-worker offer to handle the account in Plaintiff's absence should she have needed more time off. (Dkt. No. 78 at ¶ 21). It is black letter law that Plaintiff's conclusory and subjective beliefs are insufficient to defeat Defendant's entitlement to summary judgment.

Indeed, the undisputed material facts make clear that Plaintiff was in no way "discouraged" from taking time off: (i) Kimmick told Plaintiff to take off whatever time she needed, that he would be thinking of her, and to let him know if she needed anything; (ii) no one made disparaging or negative comments about Plaintiff taking time off of work in connection with her daughter's or mother's illnesses or their illnesses in general; and (iii) despite feeling increased pressure to get sales closed and move sales along quickly, Plaintiff's performance expectations never changed. (Dkt. No. 72 at ¶¶ 50-56). Because the record confirms that Defendant did nothing to prevent or "discourage" Plaintiff from taking time off, Plaintiff's FMLA interference claim must be dismissed for this reason as well.

**III.    Plaintiff's Retaliation Claim Is Meritless.**

    **A.    Plaintiff Has Not Satisfied Her *Prima Facie* Burden.**

Faced with the reality that she did not request or take FMLA leave (and therefore unable to satisfy the first element of her retaliation claim), Plaintiff disingenuously claims in her opposition that "she requested and took leave that was protected by the FMLA to care for her daughter and mother." (Dkt. No. 71 at 15). However, both the record and Plaintiff's admissions with respect to Defendant's 56.1 Statement prove that she <u>never requested, nor did she ever</u>

<u>take, FMLA leave</u>.  (Dkt. No. 72 at ¶¶ 63-64).  As such, her retaliation claim fails as a matter of law.  *See Robles v. Medisys Health Network, Inc.*, 2020 WL 3403191, at *18 (E.D.N.Y. June 19, 2020) (dismissing retaliation claim for failure to establish that he requested or took FMLA leave).

Further, Plaintiff's opposition establishes that she is unable to present a shred of evidence demonstrating a "causal connection" between some purported FMLA protected activity and her termination.  Plaintiff relies exclusively on temporal proximity and Kimmick's alleged "lack of focus" comment as somehow proving a causal nexus.  (Dkt. No. 71 at 18-19).

First, Plaintiff's temporal proximity argument fails because she erroneously claims that she took a half day of "leave" on February 12, 2021, and a one-day "leave" on December 30, 2020.  The record (including Plaintiff's sworn testimony and her response to Defendant's 56.1 Statement) unequivocally confirms that Plaintiff <u>never requested</u> and <u>never took</u> FMLA leave.  (Dkt. No. 72 at ¶¶ 63-64).  Nonetheless, the only stretch of time that Plaintiff took off to care for her daughter, *i.e.*, from October 14, through October 19, 2020, is too far removed from Plaintiff's termination to establish a causal connection. *See Garrett v. Garden City Hotel*, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) ("passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation.").

Additionally, Kimmick's alleged comment that Plaintiff had a "lack of focus" fails to establish a causal connection because there is absolutely no evidence tying this innocuous comment to Plaintiff's purported FMLA protected activity.  Without citation to any record evidence, Plaintiff claims, in conclusory fashion, that Kimmick's assessment of her performance (one which Plaintiff admits was true) was somehow connected to her having taken a few days off of work months earlier.  Such an objectively neutral comment completely devoid of any

connection to Plaintiff's purported protected activity fails to support her retaliation claim.[4]  *See Alexidor v. Donahoe*, 2016 WL 5720789, at *10 n.15 (S.D.N.Y. Sept. 30, 2016) (one ambiguous comment insufficient to make *prima facie* showing of causal connection) (citing *Gorham v. Town of Trumball*, 7 F. Supp. 3d 218, 234 (D. Conn. 2014) ("A single, racially-neutral comment cannot give rise to an inference of discrimination....")).

### B.    Plaintiff Has Not Proven Pretext.[5]

Plaintiff offers three equally unavailing reasons why she believes Defendant's legitimate, non-retaliatory, non-discriminatory reasons for terminating her employment are pretextual. (Dkt. No. 71 at 20-21).  First, without citation to any case law, Plaintiff cursorily claims that pretext is established because Defendant did not allow her to continue to underperform for even longer and that she believed that if given additional time her performance would have improved. These subjective beliefs do not satisfy Plaintiff's burden at the pretext stage.  *See Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 297 (E.D.N.Y. 2005) ("A plaintiff's subjective perceptions of his own abilities are not sufficient to show pretext....").

Plaintiff next attempts to demonstrate pretext by falsely claiming that Defendant had "shifting" reasons for her termination.  (Dkt. No. 71 at 21-22).  However, Kimmick—Plaintiff's direct supervisor, the individual who made the termination decision, and the best source of information regarding why Plaintiff was terminated (Dkt. No. 72 at ¶¶ 11, 39-40)—has never

---

[4] The only case cited by Plaintiff, *Danzer v. Norden Systems, Inc.*, is inapposite, as the at-issue comments there specifically referenced the plaintiff's protected class and were directly tied to the adverse action—facts not even remotely present here.

[5] Plaintiff does not challenge Defendant's legitimate, non-discriminatory, non-retaliatory reasons for terminating her employment, and as such, she has waived any arguments in connection with same.

wavered in the reasons for his decision to terminate Plaintiff.[6] (*Id.* at ¶ 41). Plaintiff is grasping at straws when she points to an HR representative's alleged comment that Plaintiff was terminated for not meeting her 2020 revenue goals because this HR employee played no role in the decision to terminate Plaintiff's employment. (*Id.* at ¶ 39). Nothing here even approaches Plaintiff's burden of proving by a preponderance of the evidence that Defendant's reasons were false <u>and</u> that retaliation was the real reason.

Finally, temporal proximity fails to establish pretext as a matter of law. *See Gonzalez v. City of N.Y.*, 845 Fed. App'x 11, 15 (2d Cir. 2021) ("temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext"); *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010); *Ludwig v. Rochester Psychiatric Ctr.*, 550 F. Supp. 2d 394, 399 (W.D.N.Y. 2008) ("temporal proximity alone is insufficient to establish pretext").

## IV.    **Plaintiff Offers No Evidence of Caregiver Discrimination.**

Finally, Plaintiff presents nothing more than her own speculative, conclusory, and self-serving beliefs as to how she was discriminated against. Initially, although Plaintiff claims that merely "criticizing" and "scrutinizing" an employee is enough to establish that she has been treated less well under the NYCHRL (Dkt. No. 71 at 23-24), a review of the cases she cites confirms that they have no relevance here.[7] These cases bear no similarity to Plaintiff's purported evidence of discrimination, *i.e.*, Kimmick's comment about Plaintiff's "lack of focus"—

---

[6] Indeed, Plaintiff either admitted or failed to controvert numerous statements confirming the reasons why she was terminated. (*See, e.g.*, Dkt. No. 72 at ¶¶ 36-42).

[7] In *Forgione*, plaintiff's supervisor called him a "fuck up," said he "should fucking retire," and stated, "How do I ... know you're not going to go home and kill your wife and kids?" In *Clarke*, the plaintiff's supervisor taunted her by calling her fat and mockingly rubbing her belly and waddling around.

a fact Plaintiff admits. (Dkt. No. 72 at ¶ 31). There is nothing remotely discriminatory about this comment, and as such, Plaintiff fails to satisfy her burden.

For the same reasons identified above, Plaintiff again fails to prove that Defendant's legitimate, non-retaliatory, non-discriminatory reasons for terminating her are pretextual in any way. (Dkt. No. 71 at 25). It is worth noting that Plaintiff now also claims that Kimmick "expressed discontent with Plaintiff's caregiving obligations" despite the fact that she cites no evidence in support of such a claim and that this claim is directly refuted by the record evidence. (Dkt. No. 72 at ¶ 50 – Kimmick told Plaintiff to take whatever time she needed and that he would be thinking of her; ¶¶ 53-56 – no disparaging or negative comments about Plaintiff's daughter's or mother's illnesses or her taking time off in connection with same). Therefore, Plaintiff's NYCHRL caregiver discrimination claim must be dismissed.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court grant its motion for summary judgment in its entirety, dismissing all of Plaintiff's claims with prejudice.

Dated: April 19, 2024
New York, New York

**BAKER & HOSTETLER LLP**

 / s /  _Justin A. Guilfoyle_
Amy J. Traub
Justin A. Guilfoyle
45 Rockefeller Plaza, 14th Floor
New York, New York 10111
Tel: 212 589-4200
Fax: 212 589-4201
Email: atraub@bakerlaw.com
Email: jguilfoyle@bakerlaw.com

_Attorneys for Defendant_
_Orange Business Services U.S. Inc._

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

PATRICIA HARAN,

*Plaintiff,*

-against-

ORANGE BUSINESS SERVICES INC.,

*Defendant.*

</td><td>

CASE NO.: 1:21-CV-10585-DEH-JW

<br>

**DEFENDANT'S RESPONSE TO PLAINTIFF'S RULE 56.1 COUNTERSTATEMENT OF FACTS**

</td></tr>
</table>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York, Defendant Orange Business Services U.S. Inc.[1] ("Defendant") submits the following response to Plaintiff Patricia Haran's ("Plaintiff's") "Rule 56.1 Counterstatement" (Dkt. No. 72) in connection with Defendant's Motion for Summary Judgment.

### DEFENDANT'S RESPONSE[2]

1.      Plaintiff was employed by Defendant from May 2017 until February 2021, and reported directly to Adam Kimmick throughout that time.  Exhibit A, Kimmick Dep. 26:4-14.

**RESPONSE:  Admit.**

2.      Plaintiff's title when she began working for Defendants [sic] was "senior account manager farmer."  Kimmick Dep. 30:2-6.

**RESPONSE:  Admit.**

---

[1] Plaintiff incorrectly sued "Orange Business Services Inc."  At all relevant times, Orange Business Services U.S., Inc. was Plaintiff's employer.

[2] Despite the directives set forth in Rule 4.f. of the Court's Individual Rules and Practices in Civil Cases, Plaintiff's "Rule 56.1 Counterstatement" began at Paragraph No. 1.

3.      In late September or early October 2020, Ms. Haran's 15-year-old daughter, Julia Haran, was diagnosed with a possible tumor in her femur bone.  Exhibit B, Plaintiff's Dep. at 74:14-75:2; Plaintiff's Decl. ¶¶ 2, 3, 4.

**RESPONSE:  Deny knowledge or information sufficient to form a belief as to the truth of this statement but admit Plaintiff testified that her daughter received this diagnosis in late September or early October 2020.**

4.      In October 2020, Plaintiff informed her supervisor, Sales Director Adam Kimmick, about Julia's diagnosis and her anticipated need for time off work to care for her daughter. Kimmick Dep. 63:10-14. Plaintiff's Decl. ¶ 3, 4.

**RESPONSE:  Admit.**

5.      Kimmick was sufficiently aware of the FMLA to know that "people should have the time and the ability to take time off from work if … required in order to support a family member." Kimmick Dep. 62:3-7.

**RESPONSE:   Admit that the quoted deposition testimony is accurate but deny that Kimmick was "sufficiently aware," as Plaintiff did not support that portion of the statement with a citation to any record evidence.**

6.      In the coming months, Ms. Haran took intermittent days off work to take Julia to doctor's appointments and for treatment, including a half day on October 14, between October 15th and 19th for major surgery, November 11, December 18, December 28, December 30, and February 12, 2021 (for Plaintiff's mother's appointment).  Plaintiff Dep. 109:8-25, Exhibit C, Plaintiff's Responses to Defendant's Interrogatories No. 15.

**RESPONSE:  Admit that Plaintiff took off the days identified in this statement.**

7.    At all times, Ms. Haran apprised Mr. Kimmick of her need for leave and the status of Julia's condition.  Plaintiff's Decl. ¶ 3, 6.

**RESPONSE:    Deny.    Plaintiff never requested, nor did she take, FMLA leave while employed by Defendant.  (Dkt. No. 72 at ¶¶ 63-64).**

8.    Plaintiff provided notice of her need for family leave to care for her daughter to Adam Kimmick in clear terms, as he recalled in his deposition: "Q. Did she ever take any time off work to care for a family member? A. I believe so, yes.  She asked for paid leave, paid time off.  Q. Which family member did she take time off of work to care for?  A. I believe it was her daughter."  Kimmick deposition, 62:19-25  "Q. Did Patty come to you and ask you if she could take time off work to care for her daughter?  A. As I said, yes.  I believe she did, yes."  Kimmick deposition 63:10-17.

**RESPONSE:  Deny.  Although Kimmick's cited testimony is accurately stated, it does not support the contention that "Plaintiff provided notice of her need for family leave to care for her daughter to Adam Kimmick in clear terms...."  Plaintiff never requested, nor did she ever take, FMLA leave while employed by Defendant.  (Dkt. No. 72 ¶¶ 63-64).**

9.    Kimmick was aware that Plaintiff's daughter's condition was "severe," "significant," "beyond just a normal injury," and he was aware that she needed medical procedures to be done.  Kimmick Dep. 138:18-142:4.  However, Kimmick at that time failed to provide Plaintiff with any information regarding her FMLA rights, and did not refer her to the employees of the Company who were equipped to discuss family leave.  Kimmick Dep., 64:12-3; Plaintiff's Decl. ¶ 6.

3

**RESPONSE:  Admit that Kimmick was aware of Plaintiff's daughter's condition based only on what Plaintiff told him.**

10.    On October 23rd, Plaintiff met with Human Resources employee Michelle Rocco to receive an award for her participation in a fundraising event.  Exhibit D, Rocco Dep. 16:15-21.

**RESPONSE:  Deny and correct that Plaintiff met with Rocco to receive a prize, not an award, and that the referenced meet up took place a pizzeria in Holbrook, NY and not at Defendant's offices or on company time.  (Rocco Dep. at 16:15-17:4).**

11.    At that time, Plaintiff communicated her daughter's condition to Ms. Rocco along with the potential need for her to take further leave going forward.  Plaintiff Dep. 48:17-52:4; Plaintiff's Decl. ¶ 4.

**RESPONSE:  Admit that Plaintiff mentioned her daughter's condition to Rocco but deny that Plaintiff communicated "the potential need for her to take further leave going forward."  (Pl. Dep. at 48:14-52:4; Rocco Dep. at 17:5-18:9).**

12.    Ms. Haran explained that Julia might need another surgery, which remained to be determined by her surgeon.  Plaintiff Dep. 48:17-52:4; Plaintiff's Decl. ¶ 4.

**RESPONSE:  Admit.**

13.    Plaintiff also explained that Julia was being homeschooled while she recovered from surgery for 6 weeks, and that Julia had ongoing doctor's appointments and treatment. Plaintiff Dep. 48:17-52:4; Plaintiff's Decl. ¶ 4.

**RESPONSE:  Admit.**

14.    At no time did Ms. Rocco inform Ms. Haran about her FMLA rights or provide her with FMLA paperwork.  Plaintiff Dep. 48:17-52:4; Rocco Dep. 18:10-13; Plaintiff Decl. ¶ 6.

**RESPONSE**:  Admit but clarify that it was not part of Rocco's job to inform Defendant's employees of their FMLA rights or to provide them with FMLA paperwork.  (Rocco Dep. at 19:9-19).

15.    Plaintiff informed both Michelle Rocco and Mr. Kimmick that her daughter might need additional surgery in the future.  Plaintiff Decl. ¶ 5.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.  The record confirms only that Plaintiff told Kimmick her daughter needed surgery that would take place on a Wednesday and that Kimmick told Plaintiff to "take whatever time she needed."  (Kimmick Dep. at 144:22-145:8, 142:5-10; Dkt. No. 72 at ¶ 50).**

16.    Plaintiff's daughter, Julia, was home recovering from surgery from October 15, 2020 to November 18, 2020.  Plaintiff Decl. ¶ 8.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.**

17.    Plaintiff returned to work on October 20, 2020, before her daughter was fully recovered.  Plaintiff Decl. ¶ 8.  Julia was on crutches with limited mobility during the period of her recovery.  Plaintiff Decl. ¶ 9.  She had a wound that required cleaning and dressing on a daily basis, and needed help with showering, going to the bathroom and other day-to-day activities.  Plaintiff Decl. ¶ 9.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports these statements.**

18.    After Plaintiff informed Mr. Kimmick about Julia's condition and began taking intermittent leave to care for Julia, Mr. Kimmick suddenly began subjecting Plaintiff to heightened scrutiny and pressure.  Plaintiff Decl. ¶ 10.

**RESPONSE:  Deny.  Plaintiff never requested, nor did she ever take, FMLA leave while employed at Defendant.  (Dkt. No. 72 at ¶¶ 63-64).  Further, Plaintiff testified that she merely "perceived" increased pressure from Kimmick, but her performance expectations did not change at any time.  (Dkt. No. 72 at ¶¶ 51-52).**

19.    Plaintiff was intimidated by negative performance feedback she received from Mr. Kimmick, and avoided taking more time off work while her daughter continued to recuperate, receive treatment, and attend homeschooling.  Plaintiff Decl. ¶ 11.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.  In fact, Plaintiff admits that: (i) no one at Defendant made disparaging or negative comments about Plaintiff's daughter's or mother's illnesses; (ii) no one at Defendant made disparaging or negative comments about her taking days off in connection with her daughter's or mother's illnesses; and (iii) Defendant never prohibited Plaintiff from taking any time off due to her daughter's or mother's illnesses.  (Dkt. No. 72 at ¶¶ 53-58).**

20.    Mr. Kimmick constantly asked Plaintiff whether she was going to be able to maintain the schedule and pace of conversations with one of her accounts, Pfizer, given her caregiving obligations.  Plaintiff Decl. ¶ 12.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.  Plaintiff testified that Kimmick merely said to her that had she been more focused on developing a relationship with someone at Pfizer, such a relationship could have helped her navigate past the obstacles with securing the Pfizer account.  (Pl. Dep. at 41:4-13).**

21.    After coming home from sleeping at the hospital with her daughter for five nights, Plaintiff received a call from a peer, Mr. Paul Reticker, late one evening; Mr. Reticker told

Plaintiff that if she was unable to participate in the upcoming conversations with Pfizer, the account would be transferred to him, per Mr. Kimmick.  Plaintiff Decl. ¶ 14.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.  This statement is also rank hearsay.  Further, Plaintiff's deposition testimony contradicts this statement because Plaintiff actually testified that Reticker called her at Kimmick's request to let her know that if she needed more time off after her daughter was released from the hospital, Reticker "was able to step in and [ ] handle some of [her] accounts."  (Pl. Dep. at 85:10-25).  Plaintiff even testified that this conversation was about Kimmick designating Reticker as the person to provide "coverage" for Plaintiff in case she needed more time off.  (Pl. Dep. at 103:3-7).**

22.     During this time, Mr. Kimmick was constantly checking up on Plaintiff to ascertain the status of her deals, even when he was fully aware of the status.  Plaintiff Decl. ¶ 15.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.  Plaintiff testified that while employed at Defendant, she had weekly calls/meetings with Kimmick. (Pl. Dep. 38:11-17; Kimmick Dep. 94:18-21).**

23.     For example, with respect to a renewal of Plaintiff's account with Moody's, Mr. Kimmick repeatedly asked Plaintiff on a day-to-day basis when she was going to get the contract executed by the customer.  Plaintiff Decl. ¶ 16.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.  The record confirms that Plaintiff was responsible for the Moody's account and was unable to secure Moody's business going forward.  (Kimmick Dep. at 137:2-8, 86:25-87:10).**

24.      He was aware that it took time for the deal to finalize, yet he persistently asked Plaintiff for updates.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.  The record confirms that Plaintiff was responsible for the Moody's account and was unable to secure Moody's business going forward.  (Kimmick Dep. at 137:2-8, 86:25-87:10).**

25.      Mr. Kimmick was responsible for facilitating negotiations with clients by encouraging the Company internally to agree to contractual terms with clients.  Plaintiff Decl. ¶ 17.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.**

26.      With respect to Plaintiff, Mr. Kimmick was unwilling to advocate internally to help Plaintiff finalize the terms of a Master Agreement with Pfizer; instead, he put pressure on Plaintiff to get Pfizer to change its position.  Plaintiff Decl. ¶ 18.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.  In fact, the record confirms that Kimmick managed the discussions around the Master Services Agreement with Pfizer while Plaintiff was on vacation in August 2020 and that he was personally involved in assisting Plaintiff with securing the Pfizer business.  (Exhibits A & B to the Declaration of Justin A. Guilfoyle, Esq., dated April 19, 2024).**

27.      Conversely, Mr. Kimmick helped Plaintiff's peers, Messrs. Reticker and Renassia, to secure deals by advocating internally on their behalf to get certain unusual contractual terms approved by Orange.  Plaintiff Decl. ¶ 19.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement.  When questioned during her deposition about what information Reticker has about her case,**

8

**Plaintiff did not identify anything about this. (Pl. Dep. at 85:7-25). Additionally, in her Interrogatory Responses, Plaintiff did not identify Renassia as an individual with any knowledge about the case and similarly failed to identify Renassia. (Dkt. No. 72 at pp. 395-399 – Plaintiff's Response to Interrogatory No. 1).**

28.    If Mr. Kimmick had not subjected Plaintiff to increased pressure and scrutiny, Plaintiff would have taken off the time necessary to care for her daughter for the full duration of her recovery. Plaintiff Decl. ¶ 20.

**RESPONSE: Deny. Nothing in the evidentiary record supports this statement. In fact, Plaintiff testified that she merely "perceived" increased pressure from Kimmick, but her performance expectations did not change at any time. (Dkt. No. 72 at ¶¶ 51-52). Additionally, Plaintiff admits that she was never prohibited from taking any time off due to her daughter's or mother's illnesses. (Dkt. No. 72 at ¶¶ 57-58).**

29.    Despite the personal difficulties Plaintiff was experiencing, she met her revenue quota for the year in 2020, and at the end of June 2020 she received a performance review rating her "fully successful." Kimmick Dep. 111:19-22, 88:11-23.

**RESPONSE: Deny but admit that Plaintiff met her revenue quota and received a "fully successful" rating for her first half 2020 performance evaluation.**

30.    In January 2021, Ms. Haran met with Mr. Kimmick to discuss her performance review for the second half of 2020. Kimmick Dep. 90:4-92:10.

**RESPONSE: Admit.**

31.    In 2020, Plaintiff had achieved 100.58% of her revenue goal and managed both her old territory and new territory while a new employee was being onboarded.  Kimmick Dep. 111:15-22, 115:4-7.

**RESPONSE:  Admit but clarify that Plaintiff only managed both territories <u>for a period of time</u> in 2020 while the new hire was coming in during the COVID-19 pandemic.  (Kimmick Dep. at 115:4-11).**

32.    Mr. Kimmick recognized that Plaintiff "stepped up to take ... a series of responsibilities that helped [him] and the business" over the course of [2020].  Kimmick Dep. 126:16-19.

**RESPONSE:  Deny and correct that Kimmick's deposition testimony was that "Patty had stepped up to take on[] a series of responsibilities that helped me and the business, I paid her for that."  (Kimmick Dep. at 126:16-19).**

33.    During the review, Mr. Kimmick delivered positive feedback to her but also attributed two lost business opportunities to her, which he used as the basis for giving her an overall rating of "2" (Needs Improvement).  See Exhibit E, Plaintiff's December 2020 Performance Review; Kimmick Dep. 90:12-15.

**RESPONSE:  Deny.  Nothing cited by Plaintiff supports the statement that these two lost business opportunities were used as the basis for giving her an overall rating of Needs Improvement.  Plaintiff's second half 2020 Performance Evaluation speaks for itself.  (Dkt. No. 67-9; Dkt. No. 72 at ¶¶ 26-35).**

34.    Mr. Kimmick had known and had discussed several times with Plaintiff that it would be highly unlikely that Defendant would successfully retain these two accounts.  See

Exhibit E, page 9, where Mr. Kimmick stated that "the largest A-end accounts ... have made decisions to move away from Orange products and services.  These decisions were being fomented before Patty took on responsibility for managing the accounts.  And in the case of Pfizer, Orange was unable to accept some onerous contract terms."  See Exhibit E.

**RESPONSE:  Admit in part and deny in part.  Nothing cited by Plaintiff supports the statement that "Mr. Kimmick had known and had discussed several times with Plaintiff that it would be highly unlikely that Defendant would successfully retain these two accounts."**

35.    In the same performance review meeting, Mr. Kimmick also told Ms. Haran that she had a "lack of focus" in general, which Plaintiff interpreted as referring to her absences and obligations due to her daughter's illness.  Plaintiff's Dep. 39:17-41:20.

**RESPONSE:  Admit in part and deny in part.  Nothing cited by Plaintiff supports the statement regarding Plaintiff's interpretation of Kimmick's comment.  In fact, Kimmick has no recollection of telling Plaintiff that she had a lack of focus.  (Kimmick Dep. at 65:10-12).  Nonetheless, Plaintiff admitted that she did in fact have a lack of focus during this time.  (Dkt. No. 72 at ¶ 32).**

36.    Plaintiff had never received this feedback from Mr. Kimmick before.  Plaintiff Decl. ¶ 7.  Plaintiff brought up the time she had taken off to support her daughter and the two spoke explicitly about the connection between Plaintiff taking time off and her lack of "focus" on work. Plaintiff's Dep. 38:6-43:23.

**RESPONSE:  Admit in part and deny in part.  Nothing cited by Plaintiff supports the statement that "the two spoke explicitly about the connection between Plaintiff taking**

**time off and her lack of 'focus' on work."   In fact, Plaintiff's deposition testimony is entirely devoid of anything about Kimmick connecting Plaintiff's handful of days off to her alleged "lack of focus."   (Pl. Dep. 38:1-43:23).   Additionally, Kimmick has no recollection of telling Plaintiff that she had a lack of focus.  (Kimmick Dep. at 65:10-12). Nonetheless, Plaintiff admitted that she did in fact have a lack of focus during this time. (Dkt. No. 72 at ¶ 32).**

37.    The "2" rating on Plaintiff's performance review did not reflect all the positive feedback she received, or the large renewal deal he had just congratulated her for making. See Exhibit F, Moody's Renewal Email; Plaintiff's Decl. ¶ 24.

**RESPONSE:  Deny.  Neither Exhibit F nor Paragraph 24 of Plaintiff's Summary Judgment Declaration have anything to do with this statement.  Nonetheless, Plaintiff's second half 2020 Performance Evaluation speaks for itself.  (Dkt. No. 67-9; Dkt. No. 72 at ¶¶ 26-35).**

38.    This review left Plaintiff so uncertain of her future at the Company that she mentioned to a coworker that "things are intense" and that she was "not sure how safe I am." Exhibit G, Instant Messages with Peter Singh.  In or around January or February 2021, Plaintiff presented Mr. Kimmick with a proposed plan for improving her deal pipeline for the following year.  Kimmick Dep. 92:23-93:6; Plaintiffs' Decl. ¶ 27.

**RESPONSE:  Admit in part and deny in part.  Nothing cited by Plaintiff supports the statement about the effect Plaintiff's second half 2020 Performance Evaluation had on her, and the cited instant messages with Singh do not even mention a performance review or Kimmick.  (Dkt. No. 72 at pp. 470-473).  Additionally, Kimmick explained that the plan Plaintiff presented was "ineffective."   (Kimmick Dep. at 92:23-93:15).**

**Additionally, Paragraph 27 of Plaintiff's Summary Judgment Declaration has nothing to do with this statement.**

39.    Plaintiff had a viable plan to increase her sales pipeline for 2021, which she presented to Mr. Kimmick on or about February 8, approximately two weeks prior to her termination. Plaintiff Decl. ¶ 27.

**RESPONSE: Deny. Paragraph 27 of Plaintiff's Summary Judgment Declaration has nothing to do with this statement. Nonetheless, Kimmick explained that the plan Plaintiff presented was "ineffective." (Kimmick Dep. at 92:23-93:15). Additionally, Paragraph 38 above claims that Plaintiff presented the plan "in or around January or February of 2021" and now claims that it took place on "February 8."**

40.    During that presentation, Mr. Kimmick did not raise any concerns about Plaintiff being able to general satisfactory revenue for the 2021 fiscal year. Plaintiff Decl. ¶ 27.

**RESPONSE: Deny. Paragraph 27 of Plaintiff's Summary Judgment Declaration has nothing to do with this statement. Nonetheless, Kimmick explained that the plan Plaintiff presented was "ineffective." (Kimmick Dep. at 92:23-93:15).**

41.    On February 8, 2021, Ms. Haran informed Mr. Kimmick that she would need to take a half day off work to take her mother to the eye doctor. Plaintiff's Dep. 106:21-107:5.

**RESPONSE: Deny. Nothing cited by Plaintiff supports this statement. Rather, Plaintiff's deposition testimony merely confirms that Defendant did not prohibit Plaintiff from taking any time off to take her mother to the doctor and that Plaintiff used PTO for such time. (Pl. Dep. at 106:21-107:5; Dkt. No. 72 at ¶¶ 58 & 60).**

42.      On or about December 10, 2020, Plaintiff's mother was diagnosed with Macular degeneration, which limits her vision and requires ongoing care by an eye doctor, requiring regular treatment and visits.  Plaintiff Decl. ¶ 28-32.

**RESPONSE:   Deny.   Nothing in the evidentiary record supports this statement. Additionally, Paragraphs 29 through 32 of Plaintiff's Summary Judgment Declaration have nothing to do with this statement.**

43.      Due to her Macular degeneration, Plaintiff's mother is unable to drive at night or navigate unfamiliar settings, such as hospitals and doctor's offices.  Plaintiff Decl. ¶ 28-32.  Since her diagnosis, Plaintiff's mother has been following a regimen of treatment involving several follow-up appointments, including eye injections every 3 months to slow the progression of the disease.  Plaintiff Decl. ¶ 28-32.

**RESPONSE:   Deny.   Nothing in the evidentiary record supports these statements. Additionally, Paragraphs 29 through 32 have nothing to do with these statements. Further, Plaintiff's correspondence with Singh about getting together when Plaintiff drops her mom off at the doctor belies the statement regarding Plaintiff's mother's inability to navigate doctor's offices.  (Dkt. Nos. 67-11 and 67-12).**

44.      Ms. Haran proceeded to take time off as scheduled on February 12.  See Exhibit C, No. 15.

**RESPONSE:  Deny and correct that Plaintiff took PTO on February 12, 2021.  (Dkt. No. 67-14 at p. 4).**

45.    Less than two weeks later, on February 24, 2021, Mr. Kimmick and an HR representative, Jennifer Lawson, met with Ms. Haran virtually and summarily terminated her employment.  Plaintiff Dep. 53:13-16.

**RESPONSE:  Admit that Plaintiff's employment was terminated on February 24, 2021 during a meeting with Plaintiff, Kimmick, and Lawson but note that the deposition testimony cited by Plaintiff does not support this statement.  (Dkt. No. 72 at ¶¶ 38-39).**

46.    Ms. Lawson told Ms. Haran that the reason for her termination was that she did not meet her "number" for 2020.  Plaintiff Dep. 54:20-55:90 [sic].

**RESPONSE:  Deny.  Plaintiff's deposition testimony confirms that Plaintiff did not recall exactly what Lawson said, said not to "quote [her]" about Lawson's comment, claimed "maybe" it was her sales achievement, and that she "d[idn't] know how she said it."  (Pl. Dep. 54:13-55:15).**

47.    However, Plaintiff had met her goal number for 2020.  Kimmick Dep. 111:19-22, 88:11-23.

**RESPONSE:  Deny.  Kimmick's testimony addresses only Plaintiff's "revenue goal" for 2020 and not about a "goal number."  (Kimmick Dep. 111:19-22, 88:11-23).**

48.    Mr. Kimmick jumped in and said, instead, that she was being terminated because she was not expected to meet her 2021 number.  Plaintiff Dep. 55:9-15.

**RESPONSE:  Admit in part and deny in part.  Kimmick made the decision to terminate Plaintiff's employment due to her lack of performance, specifically, her inability to produce enough sales pipeline for the business to be healthy in the future, the insufficient**

**velocity for opportunities already in the pipeline, and the interpersonal issues Plaintiff**

**had with Defendant's clients and employees.  (Dkt. No. 72 at ¶ 41).**

49.    Ms. Haran protested that she had not yet been given her 2021 number.  Plaintiff

Dep. 55:13-15; Plaintiff Decl. ¶ 26.

**RESPONSE:  Admit in part and deny in part.  Plaintiff's deposition testimony merely**

**states: "But as I had mentioned earlier I did not get a quota, and I said this to him in that**

**conversation, I was never given a quota for 2021."  (Pl. Dep. at 55:12-15).  Additionally,**

**Paragraph 26 of Plaintiff's Summary Judgment Declaration has nothing to do with this**

**statement.**

50.    During Plaintiff's termination meeting, Mr. Kimmick never mentioned anything

about alleged interpersonal issues with clients or coworkers.  Plaintiff Decl. ¶ 35.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement, and**

**Plaintiff's Summary Judgment Declaration does not even contain a Paragraph 35.**

**Nonetheless, Plaintiff did not deny that Kimmick was aware of Plaintiff's interpersonal**

**shortcomings and informed her of same in performance evaluations.  (Dkt. No. 72 at ¶¶**

**23-25).**

51.    After this termination meeting, Plaintiff instant messaged a coworker saying: "[I]

feel that due to my daughter's illness in Q4 that I should have taken family medical leave off

but I didn't want to let the company down."  Exhibit H, Instant Messages with Xavier Pichon.

**RESPONSE:  Admit and note that in that same instant messaging exchange, Plaintiff**

**confirmed that her employment was terminated because her "module [pipeline] did not**

**have enough business to support [her] salary."  (Dkt. No. 67-13).**

52.    To Plaintiff's knowledge, she was the only employee terminated at that time. Plaintiff Decl. ¶ 34.

**RESPONSE:  Deny.  Nothing in the evidentiary record supports this statement, and Plaintiff's Summary Judgment Declaration does not even contain a Paragraph 34. Nonetheless, Plaintiff admitted that Kimmick terminated several other employees during the course of her employment at Defendant.  (Dkt. No. 72 at ¶ 47).**

Dated: April 19, 2024
      New York, New York

**BAKER & HOSTETLER LLP**

 / s /  *Justin A. Guilfoyle*
Amy J. Traub
Justin A. Guilfoyle
45 Rockefeller Plaza, 14th Floor
New York, New York 10111
Tel: 212 589-4200
Fax: 212 589-4201
Email: atraub@bakerlaw.com
Email: jguilfoyle@bakerlaw.com

*Attorneys for Defendant*
*Orange Business Services U.S. Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| PATRICIA HARAN,<br><br>                              *Plaintiff,*<br><br>        -against-<br><br>ORANGE BUSINESS SERVICES INC.,<br><br>                              *Defendant.* | CASE NO.: 1:21-CV-10585-DEH-JW<br><br>**DECLARATION OF JUSTIN A.<br>GUILFOYLE, ESQ. IN FURTHER<br>SUPPORT OF DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT** |

I, Justin A. Guilfoyle, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am an attorney admitted to practice in, among other courts, the courts of the State of New York and the United States District Court for the Southern District of New York.   I also am an Associate at the law firm of Baker & Hostetler LLP, counsel for Defendant Orange Business Services U.S. Inc.[1] in this action.   As such, I am fully familiar with the facts and circumstances set forth herein.

2.      A true and accurate copy of Plaintiff's Microsoft Teams chats with her supervisor, Adam Kimmick, on August 21, 2020 is annexed hereto as Exhibit A and bears Bates number OBS_000544.

3.      A true and accurate copy of emails between, *inter alia*, Plaintiff and her supervisor, Adam Kimmick, on November 30, 2020 is annexed hereto as Exhibit B and bears Bates numbers OBS_000671-OBS_000678.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 19, 2024
        New York, New York                          / s /   *Justin A. Guilfoyle*
                                                     Justin A. Guilfoyle, Esq.

---

[1] Plaintiff incorrectly sued "Orange Business Services Inc."  At all relevant times, Orange Business Services U.S., Inc. was Plaintiff's employer.

# EXHIBIT

# A

Message

| | |
|---|---|
| **From:** | HARAN Patty OBS/S AME [patty.haran@orange.com] |
| **Sent:** | 8/21/2020 2:22:31 PM |
| **To:** | KIMMICK Adam OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ZRPK4373]; HARAN Patty OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LNSJ0690] |
| **Subject:** | Conversation with KIMMICK Adam OBS/S AME |

HARAN Patty OBS/S AME 2:08 PM:

Hi Adam- I'll be out on PTO all next week. On pfizer legal discussions, would you mind if I let Heather & Stephanie each know to communicate with you around updates on the MSA refresh and legal review? If not, I can ask Lou.

KIMMICK Adam OBS/S AME 2:09 PM:
Yes. I will manage that while your out

HARAN Patty OBS/S AME 2:09 PM:
ok thanks

KIMMICK Adam OBS/S AME 2:10 PM:
enjoy PTO Patty

HARAN Patty OBS/S AME 2:13 PM:
Thanks, I will!

# EXHIBIT B

| Message | |
|---|---|
| **From:** | KIMMICK Adam OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ZRPK4373] |
| **Sent:** | 11/30/2020 11:36:28 AM |
| **To:** | HARAN Patty OBS/S AME [/O=EXC-CORP/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LNSJ0690] |
| **Subject:** | RE: thanks and follow up |

Thanks Patty.  I'm free on the 10th between 4 and 5pm.

Before we get on with Bill, I'd like to have a conversation with Urs and his manager about the account.  Since we don't have a contract here, and it does not seem like we are progressing toward one,  we need to decide how we approach Pfizer.  For example, if we pull all the current business, including the EMEA voice services into one AME contact point, and the result of this is that we are asked to update the contract terms or renegotiate the deal, then this is a bad outcome for Orange.

It may be inevitable.  But I'm cautious not to force a decision that will result in a lost client.

Thanks,
Adam



**Adam Kimmick**
Head of Sales - NY and Midwest US
Orange Business Services

Phone: +1(917)373-3577
adam.kimmick@orange.com

10 East 40th Street
New York, NY 10016
www.orange-business.com

---

**From:** HARAN Patty OBS/S AME
**Sent:** November 30, 2020 11:28 AM
**To:** KIMMICK Adam OBS/S AME
**Subject:** FW: thanks and follow up

Hi Adam,

For our call with Bill Barnes.
Your calendar looks open on 12/10 from 4-5PM so I can request that time slot for our call.
Also, Bill had already sent us an email requesting single team support globally for Pfizer, attached. Do you think this is sufficient to take back to EMEA team on global teaming changes for 2021?

Confidential

Thanks



**Patty Haran**
Sr. Acct Manager
Orange Business Services
Phone: +1 5167020769
patty.haran@orange.com
10 E 40th Street
New York, NY 10016
www.orange-business.com



---

**From:** Belmonte, Lisa A [mailto:Lisa.Belmonte@pfizer.com]
**Sent:** November 30, 2020 11:08 AM
**To:** HARAN Patty OBS/S AME
**Subject:** FW: thanks and follow up

Bill's availability:
12/7, 10-11 or 1-2
12/10, 11-12 or 4-5
12/11, 10-11, 1-3

Thank you.

**Lisa Belmonte**
Executive Assistant to Brian Cincera
SVP & Chief Information Security Officer
Pfizer Digital
**Office**: 484.865.0024

   

---

**From:** Barnes, William A <William.A.Barnes@pfizer.com>
**Sent:** Sunday, November 29, 2020 5:39 PM
**To:** patty.haran@orange.com; Belmonte, Lisa A <Lisa.Belmonte@pfizer.com>
**Subject:** RE: thanks and follow up

Patty,

Calendars are tough this week.  Please reach out to Lisa Belmonte to schedule 30 minutes.  I have no additional items to include in the agenda.

Bill

Confidential

**From:** patty.haran@orange.com <patty.haran@orange.com>
**Sent:** Friday, November 20, 2020 2:28 PM
**To:** Barnes, William A <William.A.Barnes@pfizer.com>
**Subject:** [EXTERNAL] RE: thanks and follow up

Hi Bill,

I hope all is well.
I wanted to follow up from our last meeting and request a follow up session the week of November 30th along with my sales director, Adam Kimmick.
Here's a draft of discussion topics I have in mind plus whatever else you'd like to cover:

1. Request for Orange to support Pfizer globally with account team support led out of USA – written request
2. Refresh of USA MSA currently expired and/or go forward plan with EMEA agreement
3. Exclusion of PII privacy amendment and impacts
4. Pfizer voice migration to cloud & roadmap 2021
5. Riverbed monitoring unwind. Proposal for 2021 maintenance renewals on Steelhead, Steel Central and ARS-remote monitoring

Please let me know if you are open to this discussion and I can work with your admin for scheduling.
Thank you!



**Patty Haran**
Sr. Acct Manager
Orange Business Services
Phone: +1 5167020769
patty.haran@orange.com
10 E 40th Street
New York, NY 10016
www.orange-business.com



---

**From:** Barnes, William A [mailto:William.A.Barnes@pfizer.com]
**Sent:** October 19, 2020 1:44 PM
**To:** HARAN Patty OBS/S AME
**Subject:** RE: thanks and follow up

Thx Patty. Bill

---

**From:** patty.haran@orange.com <patty.haran@orange.com>
**Sent:** Sunday, October 18, 2020 5:15 PM
**To:** Barnes, William A <William.A.Barnes@pfizer.com>
**Subject:** [EXTERNAL] RE: thanks and follow up

Hi Bill,

Please give me some time to work on this issue. I will be out on Monday and possibly Tuesday on PTO due to a medical issue with my daughter and Adam, my manager is also out on PTO next week. But working on it so will follow up shortly.

Thanks



**Patty Haran**
Sr. Acct Manager
Orange Business Services
Phone: +1 5167020769
patty.haran@orange.com
10 E 40th Street
New York, NY 10016
www.orange-business.com



---

**From:** Barnes, William A [mailto:William.A.Barnes@pfizer.com]
**Sent:** October 17, 2020 8:39 AM
**To:** HARAN Patty OBS/S AME; Belmonte, Lisa A
**Cc:** MONROE Matthew OBS/S AME
**Subject:** RE: thanks and follow up

Patty,

Before scheduling the discussion, I would like to confirm Orange is prepared to consolidate all Pfizer-related activity with a single account manager. If so, please reach out to Lisa to schedule 30 minutes during the second week in November.

Regards,
Bill


**From:** patty.haran@orange.com <patty.haran@orange.com>
**Sent:** Friday, October 9, 2020 4:36 PM
**To:** Barnes, William A <William.A.Barnes@pfizer.com>; Belmonte, Lisa A <Lisa.Belmonte@pfizer.com>
**Cc:** MONROE Matthew OBS/S AME <matthew.monroe@orange.com>
**Subject:** [EXTERNAL] thanks and follow up

Hi Bill,

Thanks for the time earlier this week. As discussed I looked into the Riverbed EAM monitoring service and it expires effective December 31st 2020. Pfizer has already paid Orange in advance for this service.
I'd like to schedule a follow up call with you to discuss Pfizer's needs surrounding hosted, managed voice solutions. I will add Matt Monroe, specialist in voice and UCC services to speak with you about what we can offer globally and understand your specific requirements more. Please let me know when you can be available in October and we can schedule an open dialogue session.

Confidential

Thank you,



**Patty Haran**
Sr. Acct Manager
Orange Business Services
Phone: +1 5167020769
patty.haran@orange.com
10 E 40th Street
New York, NY 10016
www.orange-business.com



---

**From:** Barnes, William A [mailto:William.A.Barnes@pfizer.com]
**Sent:** October 1, 2020 11:14 AM
**To:** HARAN Patty OBS/S AME; Belmonte, Lisa A
**Subject:** RE: Save the date for the Hello Show by Orange Silicon Valley - October 27th to 29th 2020

Lisa,

Can you please help find 30 minutes on my calendar to speak with Patty Haran from Orange?

Regards,
Bill

---

**From:** patty.haran@orange.com <patty.haran@orange.com>
**Sent:** Wednesday, September 23, 2020 3:12 PM
**To:** Barnes, William A <William.A.Barnes@pfizer.com>
**Subject:** [EXTERNAL] Save the date for the Hello Show by Orange Silicon Valley - October 27th to 29th 2020

Hi Bill,

Hope you can join and also please share with your teams. Also, I'd like to connect with you on the priorities for YE2020 and 2021. I will send an invite out if you can let me know your availability.



## Save the date

**We are excited to invite you to the very first Hello Show by Orange Silicon Valley, which will take place from October 27th to 29th, 2020.**

The **Hello Show by Orange Silicon Valley** brings together top executives, innovation partners, leaders, venture capitalists, and entrepreneurs for three days of technology and exploration. We will explore technology and business trends as well as investment and partnership opportunities with breakthrough local startups from the Silicon Valley, New York, and other US tech hubs.

Throughout this summit, inspiring leaders, startup founders, and investors will come together to discuss how disruptive technologies are shaping the future of business in a responsible digital world.

The agenda includes:

Day One – The "Big Ideas" and technology themes shaping the economy

Day Two –  An overview of Orange's innovation and "Deep Dives" on eight industry verticals

Day Three – Sessions on "Digital Transformation," the Future of Work, and Robotics

This year the summit will be held online.

Please be sure to save these dates and register here: **link**

Orange Silicon Valley

Orange Business Services

Thanks,



**Patty Haran**
Sr. Acct Manager
Orange Business Services
Phone: +1 5167020769
patty.haran@orange.com
10 E 40th Street
New York, NY 10016
www.orange-business.com



---

Ce message et ses pieces jointes peuvent contenir des informations confidentielles ou
privilegiees et ne doivent donc
pas etre diffuses, exploites ou copies sans autorisation. Si vous avez recu ce message
par erreur, veuillez le signaler
a l'expediteur et le detruire ainsi que les pieces jointes. Les messages electroniques
etant susceptibles d'alteration,
Orange decline toute responsabilite si ce message a ete altere, deforme ou falsifie.
Merci.

This message and its attachments may contain confidential or privileged information that
may be protected by law;
they should not be distributed, used or copied without authorisation.
If you have received this email in error, please notify the sender and delete this
message and its attachments.
As emails may be altered, Orange is not liable for messages that have been modified,
changed or falsified.
Thank you.

---

Ce message et ses pieces jointes peuvent contenir des informations confidentielles ou
privilegiees et ne doivent donc
pas etre diffuses, exploites ou copies sans autorisation. Si vous avez recu ce message
par erreur, veuillez le signaler
a l'expediteur et le detruire ainsi que les pieces jointes. Les messages electroniques
etant susceptibles d'alteration,
Orange decline toute responsabilite si ce message a ete altere, deforme ou falsifie.
Merci.

This message and its attachments may contain confidential or privileged information that
may be protected by law;
they should not be distributed, used or copied without authorisation.
If you have received this email in error, please notify the sender and delete this
message and its attachments.
As emails may be altered, Orange is not liable for messages that have been modified,
changed or falsified.
Thank you.

---

Ce message et ses pieces jointes peuvent contenir des informations confidentielles ou
privilegiees et ne doivent donc
pas etre diffuses, exploites ou copies sans autorisation. Si vous avez recu ce message
par erreur, veuillez le signaler
a l'expediteur et le detruire ainsi que les pieces jointes. Les messages electroniques
etant susceptibles d'alteration,
Orange decline toute responsabilite si ce message a ete altere, deforme ou falsifie.
Merci.

This message and its attachments may contain confidential or privileged information that
may be protected by law;
they should not be distributed, used or copied without authorisation.
If you have received this email in error, please notify the sender and delete this
message and its attachments.
As emails may be altered, Orange is not liable for messages that have been modified,
changed or falsified.
Thank you.

_____
_____

Ce message et ses pieces jointes peuvent contenir des informations confidentielles ou
privilegiees et ne doivent donc
pas etre diffuses, exploites ou copies sans autorisation. Si vous avez recu ce message
par erreur, veuillez le signaler
a l'expediteur et le detruire ainsi que les pieces jointes. Les messages electroniques
etant susceptibles d'alteration,
Orange decline toute responsabilite si ce message a ete altere, deforme ou falsifie.
Merci.

This message and its attachments may contain confidential or privileged information that
may be protected by law;
they should not be distributed, used or copied without authorisation.
If you have received this email in error, please notify the sender and delete this
message and its attachments.
As emails may be altered, Orange is not liable for messages that have been modified,
changed or falsified.
Thank you.

Confidential

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PATRICIA HARAN,

Plaintiff,

v.

ORANGE BUSINESS SERVICES INC.,

Defendant.

---

21 Civ. 10585 (DEH)

**OPINION
AND ORDER**

---

DALE E. HO, United States District Judge:

In this action, Plaintiff Patricia Haran sues her former employer Orange Business Services U.S., Inc. ("OBS") regarding the termination of her employment. Plaintiff alleges that she was dissuaded from taking leave and unlawfully terminated because of her caregiving responsibilities to her daughter and mother, in violation of the Family and Medical Leave Act (the "FMLA") and the New York City Human Rights Law (the "NYCHRL"). Following discovery, Defendant moves for summary judgment on all claims. *See* ECF No. 65. For the reasons given below, Defendant's motion is **GRANTED.**

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements and evidentiary submissions in connection with Defendant's motion. The facts are either undisputed or, if disputed, resolved in the light most favorable to Plaintiff as the non-moving party, with all reasonable inferences drawn in her favor. *See Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023).[1] The facts reflect that when reviewing motions for summary judgment on claims

---

[1] In all quotations from cases, the Court omits citations, footnotes, emphases, internal quotation marks, brackets, and ellipses unless otherwise indicated. All references to Rules are to the Federal Rules of Civil Procedure.

of employment discrimination, the Court is "required to accept all sworn statements by [Plaintiff] as to matters on which she [is] competent to testify, including what she did, what she observed, and what she was told by company managers." *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019).

OBS is a telecommunications company, providing communications products and services for multinational corporations. *See* Pl.'s Resp. to Def.'s Statement of Material Facts ("Def.'s SMF") ¶ 1, ECF No. 72. Plaintiff worked at OBS from May 2017 to February 2021 as a Senior Account Manager. *Id.* ¶¶ 6, 14, 18, 38; Def's Resp. to Pl.'s Rule 56.1 Counterstatement of Facts ("Pl.'s SMF") ¶¶ 1-2 (giving Plaintiff's title as "senior account manager farmer"), ECF No. 78. Throughout her employment, she reported to Adam Kimmick ("Kimmick"). Def.'s SMF ¶¶ 10-11. Plaintiff initially managed "B-end" accounts, which are located outside the United States, and in or around January 2020, began working with "A-end" accounts. *See id.* ¶¶ 14, 17.

OBS's FMLA policy requires employees to submit a request for FMLA leave in writing to their direct supervisor and Human Resources ("HR"). *See id.* ¶ 8; Traub Decl. Ex. F, ECF No. 67-6 ("Requests for leave . . . should be submitted in writing to the supervisor and HR using the [FMLA] Form. . . . In providing notice . . . , employees must provide enough information to permit the Company to determine if the leave may qualify for FMLA and the expected timing and duration of leave."). When she joined OBS, Plaintiff acknowledged receipt of an employee handbook containing this policy and a separate document describing employee rights and responsibilities under the FMLA. *See* Def.'s SMF ¶¶ 7, 9.

During her employment, Plaintiff met with Kimmick to discuss her performance. *Id.* ¶ 16. In Plaintiff's performance evaluation for the first half of 2020, dated July 27, 2020, Kimmick rated her as "3-Fully Successful." *See* First Half of 2020 Performance Evaluation, Traub Decl. Ex. 8 at 9, ECF No. 67-8. In the narrative section of the evaluation, Kimmick

flagged that Plaintiff's revenue results "were in line with expectations, but fell short of target in both keep and N&G [new and get] orders," and that "[h]er qualified pipeline is not currently sufficient to meet her 2020 financial objectives." *Id.* He also noted communication issues within her team and with a client. *Id.* (noting further that "[t]hese episodes resulted [in] some concern that [Plaintiff] may not be fully understanding feedback, or has not had the time to 'read between the lines' regarding indirect or non-verbal cues," and that these issues "ha[ve] not been typical of past experience").

During the relevant period, Plaintiff's daughter and mother suffered from serious health conditions. On October 1, 2020, Plaintiff's fifteen-year-old daughter was diagnosed with a possible tumor in her femur bone, requiring prompt surgery. Haran Decl. ¶¶ 2-3, ECF No. 73. Plaintiff informed Kimmick about her daughter's diagnosis and that she anticipated needing to take leave to care for her daughter. *See* Pl.'s SMF ¶ 4. Plaintiff also informed Michelle Rocco, an employee in Human Resources, about her daughter's diagnosis and her need for surgery, ongoing medical treatment, and care. *See* Haran Decl. ¶ 4. Plaintiff began requesting leave to care for her daughter in October 2020, and OBS granted all requests for leave. *See id.* ¶ 6; Def.'s SMF ¶¶ 57, 59. Plaintiff did not request or take leave formally characterized as FMLA leave. Def.'s SMF ¶¶ 63-64. In total, Plaintiff took eight and a half workdays off to care for her daughter. *See id.* ¶ 49.

After Plaintiff informed Kimmick of her daughter's condition and her need to take leave, Kimmick subjected her to heightened scrutiny and pressure at work. *See* Haran Decl. ¶ 10. He asked Plaintiff whether she would be able to maintain the schedule and pace of conversations with Pfizer, a key client, in light of her caregiving responsibilities and threatened to take her off the account. *Id.* ¶¶ 12-13. Plaintiff felt intimidated and avoided taking additional leave in response. *Id.* ¶¶ 11, 20.

3

On January 28, 2021, Plaintiff and Kimmick met to discuss her performance for the second half of 2020.  *See* Second Half of 2020 Performance Evaluation, Traub Decl. Ex. 9 at 1, ECF No. 67-9.  This performance evaluation rated Plaintiff's performance as "2-Improvement Needed."  *Id.* at 10.  Kimmick's narrative in the written evaluation notes the loss of several large accounts in Plaintiff's portfolio, though it flags that some of these decisions "were being fomented" before Plaintiff assumed responsibility.  *Id.*  It further notes that Plaintiff's "pipeline velocity is potentially not sufficient to meet her 2021 financial growth objectives" and that, notwithstanding challenges of COVID-19, "fragile prospects for stability and growth in [Plaintiff's] business remain."  *Id.*  It calls for "[u]rgent focus" on identifying new opportunities. However, Kimmick also gave Plaintiff positive feedback in the meeting, including regarding the renewal of a $2.5 million contract and Plaintiff's identification of further promising opportunities.  Haran Decl. ¶ 21.

On December 10, 2020, Plaintiff's mother was diagnosed with macular degeneration, a condition which limits her vision and requires ongoing care.  *Id.* ¶¶ 25-26.  On February 8, 2021, Plaintiff informed Kimmick that she needed to take half a day off to take her mother to the doctor to treat her macular degeneration.  *See id.* ¶ 29.  Plaintiff did so, taking a half day off on February 12, 2021, to help her mother.  *See id.* ¶ 30.

On February 24, 2021, Kimmick terminated Plaintiff's employment.  *See* Def.'s SMF ¶¶ 38-39.  This lawsuit followed.

## LEGAL STANDARDS

Summary judgment is appropriate when a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for a nonmoving party."  *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d

4

Cir. 2020). A party opposing summary judgment must establish a genuine issue of fact by citing to particular parts of materials in the record. *See* Fed. R. Civ. P. 56(c)(1)(A). "A party opposing summary judgment normally does not show the existence of a genuine issue of fact to be tried merely by making assertions that are based on speculation or are conclusory." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

**DISCUSSION**

The Complaint alleges three claims: interference with Plaintiff's FMLA rights, retaliation for taking FMLA leave, and discrimination on the basis of caregiver status in violation of the NYCHRL. *See* Compl. ¶¶ 38-49, ECF No. 1. Defendant moves for summary judgment on all claims. For the reasons given below, the motion is **GRANTED**.

**A.    FMLA Interference Claim**

Summary judgment is granted to Defendant on Plaintiff's FMLA interference claim because Plaintiff does not introduce sufficient evidence that she was denied benefits under the FMLA.

"To succeed on a claim of FMLA interference, a plaintiff must establish that the defendant denied or otherwise interfered with a benefit to which she was entitled under the FMLA." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). To establish a *prima facie* case of interference with FMLA rights, a plaintiff must show:

> 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA.

*Id.* Relevant here is the fifth element: whether Plaintiff has introduced sufficient evidence to allow a jury to conclude that she was denied benefits under the FMLA.

5

It is undisputed that Defendant never directly prohibited Plaintiff from taking time off due to her daughter's or mother's illnesses by, e.g., denying a request for leave.  *See* Def.'s SMF ¶¶ 57-58.  However, this is not inherently fatal to Plaintiff's claim, because "[i]nterfering with the exercise of an employee's rights . . . include[s] . . . not only refusing FMLA leave, but discouraging an employee from using such leave."  29 U.S.C. § 825.220; *accord Potenza v. City of N.Y.*, 365 F.3d 165, 167 (2d Cir. 2004) (quoting § 825.220).

Plaintiff introduces evidence that after she began taking leave to care for her daughter, "Mr. Kimmick suddenly began subjecting me to heightened scrutiny and pressure."  Haran Decl. ¶ 10.  She further testifies that Kimmick "constantly asked me whether I was going to be able to maintain the schedule and pace of conversations with Pfizer," a key client, and threatened to take her off the account.  *See id.* ¶¶ 12-14 (noting that a coworker warned her that if she was unable to participate in conversations with Pfizer, the account would be transferred to him).  She also testifies that Kimmick asked her daily about the status of certain deals, despite being aware that it took time to finalize a deal, and that he failed to support her internally by seeking approval of unusual contract terms, instead pressuring Plaintiff to cause Pfizer to change its negotiating position.  *See id.* ¶¶ 16-19.  As a result, Plaintiff states that she was discouraged from taking all of the leave necessary to care for her daughter.  *See id.* ¶¶ 11, 20.

Even accepting these allegations as true, this evidence is insufficient to establish the denial or interference with FMLA rights.  Plaintiff offers only conclusory statements that she would have taken more leave, rather than identifying specific instances in which she was dissuaded from doing so.  *See Golden v. N.Y.C. Dep't of Educ.*, No. 06 Civ. 1587, 2007 WL 4258241, at *3 (S.D.N.Y. Dec. 3, 2007) (granting summary judgment to employer on a discouragement theory, because the plaintiff failed to "identif[y] any occasions on which he arrived at work earlier than he desired because of a fear that leave would be denied him"), *aff'd*

354 F. App'x 577 (2d Cir. 2009). With respect to Plaintiff's allegations regarding Kimmick's behavior, courts in this District have found more egregious behavior insufficient to dissuade an employee from taking FMLA leave. *See, e.g.*, *id.* ("While the supervisor's ridicule of his medical conditions . . . [may have been] unprofessional and hurtful, Golden has not shown that that conduct would have deterred an employee of ordinary firmness, in a situation similar to his, from requesting or taking FMLA leave."); *Hockenjos v. Metro. Transp. Auth.*, No. 14 Civ. 1679, 2016 WL 2903269, at *9 (S.D.N.Y. May 18, 2016) ("Criticizing, even berating an employee's substantive job performance is not enough to assert a claim for interference under a discouragement theory."); *Di Giovanna v. Beth Isr. Med. Ctr.*, 651 F. Supp. 2d 193, 200 (S.D.N.Y. 2009) (holding that the fact that a supervisor "interrogated and harassed [a plaintiff] with barrages of questions about his father's condition at inappropriate times" was insufficient to "dissuade[] a similarly situated employee of ordinary resolve from exercising or attempting to exercise FMLA rights," in large part because the plaintiff "took the days off he wanted when he wanted them"). It is also noteworthy that Kimmick's behavior, even as alleged, did not refer to Plaintiff's FMLA leave. *See Hockenjos*, 2016 WL 2903269, at *9 (finding it "critical[]" that there was no allegation that the plaintiff's supervisors "made any reference to his FMLA leave whatsoever" in giving him negative feedback).

The cases Plaintiff cites are not binding and, in any event, do not change this result. In *Casseus v. Verizon N.Y., Inc.*, the existence of a *prima facie* case was not in dispute, and the issues of fact precluding summary judgment centered on whether the plaintiff's termination was pretextual, not whether he was discouraged from taking leave. 722 F. Supp. 2d 326, 338 (E.D.N.Y. 2010). In *Avila-Blum v. Casa de Cambio Delgado, Inc.*, the employer allegedly "told [the plaintiff] outright that she would be fired if she took a period of leave to undergo treatment for her medical condition." 519 F. Supp. 2d 423, 428 (S.D.N.Y. 2007). Finally, *Ziccarelli v.*

*New York University Hospitals Center* found that statements from a supervisor that "I would like you to come back to work sooner" and "your job is safe for now" would compel a person of ordinary resolve to end their FMLA leave early, in part because the plaintiff did, in fact, end his leave early.  *See* No. 15 Civ. 9307, 2021 WL 797668, at *5 (S.D.N.Y. Feb. 27, 2021).  Plaintiff here offers no evidence of something equivalent to a thinly-veiled threat of "your job is safe for now," or specific dates on which she intended to take leave but was dissuaded from doing so.

Plaintiff does not dispute that all of her requests for leave were granted and does not introduce sufficient evidence to establish interference with her FMLA rights by discouraging her from taking further leave.  Accordingly, summary judgment is granted to Defendant on the FMLA interference claim.

**B.**    **FMLA Retaliation Claim**

Summary judgment is granted to Defendant on Plaintiff's FMLA retaliation claim because Plaintiff does not establish that she exercised rights protected by the FMLA.

"Retaliation claims [under the FMLA] . . . involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer."  *Woods v. START Treatment & Recovery Ctrs.*, 864 F.3d 158, 166-67 (2d Cir. 2017) (holding that a retaliation claim emerges out of the FMLA's prohibition on "interfer[ing] with [or] restrain[ing]" the exercise of FMLA rights).  "FMLA retaliation claims are . . . subject to the *McDonnell Douglas* burden shifting framework."  *Carter v. TD Bank, N.A.*, No. 23 Civ. 950, 2024 WL 2828470, at *4 (2d Cir. June 4, 2024).

At the first step, the *prima facie* case, "a plaintiff must establish that 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  *Graziadio*, 817 F.3d at 429.

Summary judgment is granted to Defendant because the undisputed facts show that Plaintiff did not exercise rights protected under the FMLA. Plaintiff does not dispute that she did not request or take leave under the FMLA. Def.'s SMF ¶¶ 63-64. Instead, Plaintiff took non-FMLA paid leave to care for her mother and daughter, and was given all of the time off she requested. *See id.* ¶¶ 57-60. The Second Circuit has affirmed a grant of summary judgment on an FMLA retaliation claim, where the plaintiff used accrued non-FMLA sick leave instead of FMLA child care leave. *See Wahl v. Cnty. of Suffolk*, 466 F. App'x 17, 20 (2d Cir. 2012). District courts in this Circuit have applied *Wahl* to hold that a plaintiff must invoke the FMLA leave to establish the required element of the *prima facie* case, and that a plaintiff who alleges retaliation based on the use of non-FMLA leave cannot bring an FMLA retaliation claim. *See Hahn v. Off. & Pro. Emps. Int'l Union, Loc. 153*, No. 13 Civ. 946, 2016 WL 4120517, at *5 (S.D.N.Y. July 22, 2016) ("A plaintiff fails to exercise rights protected under the FMLA when the employee does not explicitly invoke the FMLA."); *accord Amley v. Sumitomo Mitsui Banking Corp.*, No. 19 Civ. 3777, 2021 WL 4429784, at *12 (S.D.N.Y. Sept. 27, 2021) (same); *see also Ottley-Cousin v. MMC Holdings, Inc.*, No. 16 Civ. 577, 2019 WL 1994488, at *17 (E.D.N.Y. May 6, 2019) ("In order to exercise rights protected under the FMLA, an employee must request FMLA leave due to a qualifying illness or condition."); *Brown v. The Pension Bds.*, 488 F. Supp. 2d 395, 410 (S.D.N.Y. 2007) (describing a plaintiff "avail[ing] himself of the rights that flow from the FMLA [as] a necessary element of [a] retaliation claim").

This is the case even when the plaintiff was eligible for leave under the FMLA. *See, e.g.*, *Robles v. Medisys Health Network, Inc.*, No. 19 Civ. 6651, 2020 WL 3403191, at *18 (E.D.N.Y. June 19, 2020) ("[I]t is plausible that Robles qualified for FMLA leave from November 3 until his release from the Hospital on November 4. However, Robles does not allege that he exercised any FMLA-protected right to leave at that time."); *Vives v. N.Y.C. Dep't of Corrs.*, No. 15 Civ.

6127, 2019 WL 1386738, at *18 (E.D.N.Y. Mar. 27, 2019) (holding that the plaintiff failed to show that she exercised FMLA rights for purposes of a retaliation claim, when she used paid medical leave offered by her employer).  Thus, even assuming that Plaintiff was eligible for FMLA leave and that Defendants retaliated against her, the undisputed fact that Plaintiff took *non-FMLA leave* to care for her daughter and mother is fatal to her retaliation claim under the Second Circuit's decision in *Wahl*.

It is true that Plaintiff offers evidence that she was not apprised of her rights under FMLA at the time her need for leave arose.  *See* Haran Decl. ¶ 6.  Crediting this testimony, as the Court must on summary judgment, it would therefore seem perverse to require Plaintiff to explicitly invoke her FMLA rights to establish her retaliation claim.  However, Defendant's alleged failure to provide sufficient information about Plaintiff's FMLA rights properly goes to a claim for interference under the FMLA.  *See Woods*, 864 F.3d at 166 ("[A]n employee brings an 'interference' claim when her employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA.").  In contrast, it is difficult to square how an employer could both interfere with an employee's right to take FMLA leave by failing to give her adequate information, while also retaliate against her for "actually exercising her rights or opposing perceived unlawful conduct under the FMLA." *Id.*  Plaintiff's allegations about the lack of information given to her about her FMLA rights suggest that her claim sounds in interference, rather than retaliation—and her interference claim fails for the reasons given above.

Because Plaintiff does not establish the required elements for a *prima facie* case, summary judgment is granted to Defendant on her FMLA retaliation claim.

**C.    NYCHRL Claim**

Plaintiff's final claim arises out of New York City law and is brought under the Court's supplemental jurisdiction. *See* Compl. ¶ 5, ECF No. 1. Summary judgment has been granted to Defendant on Plaintiff's federal claims, and the Court declines to exercise supplemental jurisdiction over the NYCHRL claim. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 404 (2d Cir. 2017) (Calabresi, J., concurring) ("[A]fter all federal claims have been dismissed, the default rule is that federal courts should not decide related state–law claims unless there is good reason for doing so."). Plaintiff's NYCHRL claim is dismissed without prejudice to refiling in state court. *See Russell v. N.Y. Univ.*, No. 37, slip. op. 2226, 2024 WL 1773218, at *3 (N.Y. 2024) (noting that employment discrimination plaintiffs "not infrequently" opt to pursue "claims brought under the City and State HRLs" in state courts, after a federal court "grant[s] summary judgment on the federal claims, and decline[s] to exercise supplemental jurisdiction").

**CONCLUSION**

For the reasons given above, Defendant's motion is **GRANTED**. Summary judgment is granted to Defendant on the FMLA claims. The Court declines to exercise supplemental jurisdiction over the NYCHRL claim, so it is dismissed without prejudice to re-filing in state court.

The Clerk of Court is respectfully directed to close the motion at ECF. No. 65.

SO ORDERED.

Dated: July 29, 2024
      New York, New York

DALE E. HO
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X
PATRICIA HARAN,

|                          |                |                                  |
|--------------------------|----------------|----------------------------------|
|                          | **Plaintiff,** | **NOTICE OF APPEAL**             |

    **-against-**

                                                      **Docket No.: 1:21-cv-10585-DEH-JW**

**ORANGE BUSINESS SERVICES INC.,**

                                             **Defendant.**
-------------------------------------------------------------------------X

       Notice is hereby given that Plaintiff Patricia Haran hereby appeals to the United States

Court of Appeals for the Second Circuit from the Opinion and Order by United States District

Judge Dale E. Ho granting the above named Defendants' motion for summary judgment on all

claims brought in Plaintiff Haran's Complaint dated December 21, 2021, attached hereto as Exhibit

1.  The Judgment was entered on the 29th Day of July 2024.

Dated: New York, New York
      August 26, 2024

                                          BY: FISHER TAUBENFELD LLP

                                          _____
                                          Liane Fisher, Esq.
                                          Attorneys for Plaintiff
                                          225 Broadway, Ste 1700
                                          New York, New York 10007
                                          (212) 571-0700

To:
Baker Hostetler LLP
Attention: Justin A. Guilfoyle, Esq.
Attorneys for Defendants
45 Rockefeller Plaza
New York, NY 10111